## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HERCULES OFFSHORE, INC., *et al.* | ) | Case No. 16- 11385 (___) |
| | ) | |
| Debtors.[1] | ) | |
| | ) | Joint Administration Requested |

### DECLARATION OF TROY L. CARSON IN SUPPORT OF FIRST DAY MOTIONS

I, Troy L. Carson, hereby declare under penalty of perjury:

1.      I am the Senior Vice President and Chief Financial Officer of Hercules Offshore, Inc. ("HERO"), a corporation organized under the laws of Delaware, and of each of the other above-captioned debtors and debtors in possession (collectively, the "Debtors").[2]  I have been employed by HERO since 2007 and have served HERO in my current capacity since November 2014.  Prior to being named Chief Financial Officer, I served as Senior Vice President and Chief Accounting Officer, Chief Accounting Officer, Principal Accounting Officer and Vice President and Corporate Controller.

2.      In such capacity, I am generally familiar with the Debtors' day to day operations, business and financial affairs, and books and records.

3.      Except as otherwise indicated herein, all facts set forth in this declaration (this "Declaration") are based on my personal knowledge of the Debtors' operations and finances, information gathered from my review of relevant documents, or information supplied to me by

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Cliffs Drilling Company (8934); Cliffs Drilling Trinidad L.L.C. (5205); FDT LLC (7581); FDT Holdings LLC (4277); Hercules Drilling Company, LLC (2771); Hercules Offshore, Inc. (2838); Hercules Offshore Services LLC (1670); Hercules Offshore Liftboat Company LLC (5303); HERO Holdings, Inc. (5475); SD Drilling LLC (8190); THE Offshore Drilling Company (4465); THE Onshore Drilling Company (1072); TODCO Americas Inc. (0289); and TODCO International Inc. (0326).  The Debtors' corporate headquarters are located at, and the mailing address for each Debtor is, 9 Greenway Plaza, Suite 2200, Houston, TX 77046

[2]   Capitalized terms used but not defined herein have the meanings ascribed to such terms in the *Debtors' Joint Prepackaged Chapter 11 Plan* (the "Plan"), filed contemporaneously herewith.

other members of the Debtors' management and the Debtors' advisors.  I am over the age of 18

and am authorized to submit this Declaration on behalf of the Debtors.  If called upon to testify, I

could and would testify competently to the facts set forth herein.

4.      The Debtors have requested a variety of forms of relief in the "first day" motions

and applications (collectively, the "<u>First Day Motions</u>") filed concurrently herewith to minimize

the adverse effects of the commencement of the chapter 11 cases on the Debtors' businesses and

to facilitate confirmation of the Plan.  I am familiar with the contents of each of the First Day

Motions, as well as the Plan.  I believe that the relief sought in those First Day Motions is

necessary to permit an effective transition into chapter 11 as the Debtors move forward with the

monetization of their assets in a controlled manner in order to maximize the value of their assets

and provide an opportunity for a recovery to as many of the Debtors' stakeholders as possible.  I

further believe that the relief requested in the First Day Motions will preserve and maximize the

value of the Debtors' estates and assist the Debtors in achieving an expeditious, successful

outcome in the chapter 11 cases.

5.      Part I of this Declaration describes the Debtors' corporate structure and business

operations.  Part II describes the Debtors' prepetition capital structure and indebtedness.  Part III

describes the circumstances leading to the commencement of these chapter 11 cases.  Part IV sets

forth the relevant facts in support of each of the First Day Motions.

## INTRODUCTION

6.      The Debtors and their Non-Debtor Subsidiaries[3] (collectively, "Hercules") are providers of shallow-water drilling and marine services to the oil and natural gas exploration and production industry globally.  Hercules operates a fleet of twenty-five self-elevating, mobile offshore drilling units, or "jackup rigs" (seventeen marketed, eight cold stacked), and nineteen self-elevating, self-propelled "liftboat" vessels (eighteen marketed, one cold stacked).  This diverse fleet is capable of providing services such as oil and gas exploration and development drilling, well service, platform inspection, maintenance and decommissioning operations.  HERO was formed in 2004 and has evolved from a small U.S. Gulf of Mexico offshore drilling operator to an expansive, worldwide enterprise operating through its direct and indirect subsidiaries in several key shallow-water provinces around the world.

7.      On August 13, 2015, certain of the Debtors commenced voluntary prepackaged chapter 11 cases in order to address their overleveraged capital structure (consisting of more than $1.2 billion of debt) and other challenges largely caused by the then ongoing decline in the price of crude oil that was affecting many companies in the offshore drilling market.  The Debtors emerged from that chapter 11 process on November 6, 2015.  While the Debtors were successful through their prior restructuring in chapter 11 in addressing their capital structure issues, the challenges facing the Debtors' business and the offshore drilling market have continued as demand for jackup rigs remains weak, while, at the same time, the market remains scheduled to deliver a significant number of newbuild rigs in the next several years, which (with the exception of the *Hercules Triumph* and the *Hercules Resilience*) are expected to be better suited to meet

---

[3]      As discussed in further detail below, the Debtors are comprised of HERO, each of HERO's domestic direct and indirect subsidiaries that are guarantors under the First Lien Credit Agreement (as defined below), except for Hercules Liftboat Company LLC ("HLC") and Hercules Offshore International LLC ("HOIL").  HERO's direct and indirect foreign subsidiaries, HLC and HOIL (collectively, the "Non-Debtor Subsidiaries") have not commenced chapter 11 cases.

industry needs than Hercules' fleet.  As the offshore drilling market continued to face substantial challenges, in early 2016, the Debtors determined to form a special committee (the "Special Committee") consisting of the independent members of their board of directors (the "Board") to investigate strategic alternatives to maximize the value of the Debtors and their assets.  To that end, the Special Committee initiated a Marketing Process (as defined below) pursuant to which Hercules sought bids for the acquisition of Hercules as an enterprise, including the *Hercules Highlander* and a related drilling contract, or of Hercules' individual assets.  After the Special Committee determined that (a) the bids received in connection with the Marketing Process would not result in a transaction that could be consummated or would provide an acceptable recovery to junior creditors and holders of HERO Common Stock and (b) continuing Hercules business operations status quo would be both challenging and detrimental to stakeholders, the Debtors and an ad hoc group (the "Ad Hoc Group") of certain First Lien Lenders (as defined below) entered into negotiations regarding a potential transaction that would allow the Debtors to monetize their assets in a controlled manner through an orderly disposition of the Debtors' remaining assets in an effort to maximize the value of the Debtors' assets and provide an opportunity for a recovery to as many of the Debtors' stakeholders as possible, including holders of HERO Common Stock.

8.     On May 26, 2016, after many weeks of intensive negotiations, the Debtors and First Lien Lenders holding more than 99.75% of the First Lien Claims (collectively, the "Consenting First lien Lenders") entered into a restructuring support agreement (as may be amended from time to time, the "Restructuring Support Agreement").[4]  The Restructuring Support Agreement sets forth, subject to certain conditions, the commitment to and obligations of, on the one hand, the Debtors, and on the other hand, the Consenting First Lien Lenders in connection with a wind down of the Debtors business and operations, which is to be

---

[4]     A copy of the Restructuring Support Agreement is attached hereto as Exhibit A.

implemented through the Plan.  The Plan contemplates that, upon consummation, all of the

Debtors' assets (including their equity interests in the Non-Debtor Subsidiaries) will be

transferred to the Wind Down Entity, which will be responsible for, among other things, the

monetization of the Debtors' assets and winding down the Debtors' and the Non-Debtor

Subsidiaries' businesses and operations in a controlled, efficient and value-maximizing manner.

9.      The Plan has very strong support from the Debtors' First Lien Lenders, as nearly

all of the holders of First Lien Claims, representing more than 99.75% of the amount outstanding

on the First Lien Claims, voted to accept the Plan.[5]  Upon information and belief, the Consenting

First Lien Lenders also own more than 27% of the HERO Common Stock.  The solicitation of

votes to accept or reject the Plan from holders of Class 7 HERO Common Stock is continuing

after the Petition Date and will conclude on June 28, 2016.  The Debtors believe that the Plan

and the transactions contemplated thereunder will enable the Debtors to monetize their assets in a

manner that will result in maximum recoveries for all of the Debtors' stakeholders and wind

down their operations in an orderly fashion.

## PART I

### I.      Corporate History and Structure

10.      HERO was formed in 2004.  HERO is the ultimate parent of forty-one direct and

indirect subsidiaries, of which fourteen domestic entities are Debtors in the chapter 11 cases.

The remaining twenty-seven direct and indirect subsidiaries are Non-Debtor Subsidiaries and are

foreign entities, with the exception of HLC and HOIL, each of which are incorporated in

Delaware.   As discussed in further detail below, pursuant to the Amended and Restated

---

[5]   *See Preliminary Declaration of Christina Pullo of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Debtors' Joint Prepackaged Chapter 11 Plan* (the "Preliminary Voting Report"), filed contemporaneously herewith.  The Debtors commenced solicitation of the Plan on May 31, 2016. The deadline for submitting ballots was June 3, 2016 for holders of Class 3 First Lien Claims.

Forbearance Agreement (as defined below), certain of the First Lien Lenders and, at the direction thereof, the First Lien Agent, have agreed to forbear from exercising certain of their respective default-related rights and remedies against HLC and HOIL, as well as the other Non-Debtor Subsidiaries during the pendency of the chapter 11 cases (subject to certain terms and conditions).

11.     The chart attached hereto as <u>Exhibit B</u> illustrates Hercules' corporate structure as of the Petition Date.

## II.     Overview of Business Operations

12.     Hercules is a provider of shallow-water drilling and marine services to the oil and natural gas exploration and production industry globally.  Hercules provides such services to national oil and gas companies, major integrated energy companies and independent oil and natural gas operators.  Through its diverse fleet of jackup rigs and liftboats, its services range from oil and gas exploration, well service, platform inspection, maintenance and decommissioning operations.

### A.     Jackup Rig and Liftboat Fleet and Other Assets

13.     Hercules' property consists primarily of jackup rigs, liftboats and ancillary equipment, substantially all of which it owns through various subsidiaries domestically and internationally.  Hercules' owns twenty-five self-elevating mobile drilling units, or "jackup rigs." The jackup rigs are used primarily for exploration and development drilling in shallow waters, including (a) seventeen rigs in the Gulf of Mexico (nine contracted, eight cold stacked), (b) three rigs contracted offshore in Saudi Arabia, (c) one rig contracted offshore in Congo, (d) two rigs in Gabon (one ready stacked and one warm stacked), (e) one rig ready stacked in the Netherlands and (f) one rig warm stacked in Malaysia.

14.     In addition, Hercules owns and operates nineteen liftboat vessels.  Liftboats have large open deck space, which provides a versatile, mobile and stable platform to support a broad range of offshore maintenance and construction services throughout the life of an oil or natural gas well.  Hercules' liftboats include (a) fifteen liftboats operating or available for contracts in West Africa, (b) one liftboat cold stacked in West Africa and (c) three liftboats operating or available for contracts in the Middle East region.

15.     Hercules maintains offices, maintenance facilities, yard facilities, warehouses and waterfront docks as well as residential premises in various countries, including the United States, United Kingdom, Nigeria, Singapore, Saudi Arabia, United Arab Emirates, Malaysia, Congo, and Bahrain.  All of these properties are leased except for an office and a warehouse in the United Kingdom.  Hercules' leased principal executive offices are located in Houston, Texas.

### B.    Industry Operating Environment and Competition

16.     The shallow-water offshore markets in which Hercules operates are highly competitive.  Contracts are typically awarded on a competitive bid basis.  Pricing is often the primary factor in determining which qualified contractor is awarded a job, although technical capability of service and equipment, unit availability, unit location, safety record and crew quality may also be considered.  Certain competitors in the shallow-water business may have greater financial and other resources than Hercules presently has.  As a result, these competitors may have a better ability to withstand periods of low utilization, compete more effectively on the basis of price, build new rigs, acquire existing rigs, and make technological improvements to existing equipment or replace equipment that becomes obsolete.

17.     Competition for offshore rigs is usually on a global basis, as drilling rigs are mobile and may be moved, at a cost that is sometimes substantial, from one region to another in response to demand.  A number of Hercules' jackup rigs, however, are mat-supported, which

render them less capable than independent leg jackup rigs of managing variable sea floor conditions found in many areas outside of the Gulf of Mexico.  As a result, Hercules' ability to move their mat-supported jackup rigs to certain regions in response to changes in market conditions is limited.  Additionally, a number of competitors have independent leg jackup rigs with generally higher specifications and capabilities than most of the independent leg rigs that Hercules currently operates.  Particularly during market downturns when there is decreased rig demand, higher specification rigs may be more likely to obtain contracts than lower specification rigs.

18.     In the face of these market conditions, Hercules as a whole has continually sought out opportunities to improve its operations and financial performance.  In this regard, it has looked to sell or scrap underperforming or unutilized assets to convert them to cash or just to reduce the substantial expense associated with owning these assets.  In 2015, Hercules sold six unutilized rigs for aggregate proceeds of $4.5 million.

### C.    Customers and Existing Contractual Arrangements

19.     Hercules individually negotiates its contracts to provide services, and the contracts vary in their terms and provisions.  Currently, all of Hercules' drilling contracts are on a dayrate basis.  Dayrate drilling contracts typically provide for higher rates while the unit is operating and lower rates or a lump sum payment for periods of mobilization or when operations are interrupted or restricted by equipment breakdowns, adverse weather conditions or other factors.  A dayrate drilling contract generally extends over a period of time covering the drilling of a single well or group of wells or covering a stated term.  Traditionally, most contracts in the U.S. Gulf of Mexico have been on a short-term basis of less than six months.  Contracts in international locations have historically been longer-term, with contract terms of up to five years.  Customers may have the right to terminate, or may seek to renegotiate, existing contracts if

Hercules experiences downtime or operational problems above a contractual limit, if the rig is a total loss, or in other specified circumstances, which could result in penalties to Hercules. A customer is more likely to seek to cancel or renegotiate its contract during periods of depressed market conditions.

20.     A liftboat contract generally is based on a flat dayrate for the vessel and crew. Liftboat dayrates are determined by prevailing market rates, vessel availability and historical rates paid by the specific customer. Under most of its liftboat contracts, Hercules receives a variable rate for reimbursement of costs such as catering, fuel, rental equipment and other items. Liftboat contracts generally are for shorter terms than are drilling contracts.

21.     Hercules calculates its contract revenue backlog, or future contracted revenue, as the contract dayrate multiplied by the number of days remaining on the contract assuming full utilization, less any penalties or reductions in dayrate for late delivery or non-compliance with contractual obligations. Backlog excludes revenue for management agreements, mobilization, demobilization, contract preparation and customer reimbursables. The amount of actual revenue earned and the actual periods during which revenue is earned will be different than the expected backlog due to various factors. Downtime due to various operational factors, including unscheduled repairs, maintenance, operational delays, health, safety and environmental incidents, weather events and other factors (some of which are beyond Hercules' control), may result in lower dayrates than the full contractual rate. In some of the contracts, the customer has the right to terminate the contract without penalty and, in certain instances, with little or no notice.

22.     Hercules' backlog at April 28, 2016, totaled approximately $824.2 million for its executed contracts. This amount included approximately $410.9 million related to the Maersk contract for the *Hercules Highlander*, which was transferred to Maersk UK prior to the Petition

Date (as discussed below), and assumes that the dayrates for two of the Non-Debtor Subsidiaries' Saudi rigs revert back to their originally contracted rates effective January 1, 2017.

23.     The following are some of the Hercules' larger customer contracts:

- *Saudi Aramco:*  Hercules has three rigs, *Hercules 261*, *Hercules 262* and *Hercules 266*, under contract with Saudi Aramco.  *Hercules 261* and *Hercules 262* are operating under five-year contracts, each of which is scheduled to terminate in the Fall of 2019.  The contract term for the *Hercules 266* was originally scheduled to expire between September 30, 2015 and April 8, 2016, at the discretion of Saudi Aramco.  The originally contracted dayrate for the *Hercules 261*, *Hercules 262* and *Hercules 266* was approximately $136,000, $118,000 and $125,000, respectively.  As discussed in further detail below, the dayrates under the contracts for the *Hercules 261* and *Hercules 262* have been reduced to $63,650 per day until December 31, 2016.  The dayrate for the *Hercules 266* was also reduced to $63,650 per day effective January 1, 2016.  On April 6, 2016, Hercules received a notice from Saudi Aramco extending the contract for the *Hercules 266* to June 30, 2016.  The dayrate for the *Hercules 266* will remain at $63,650 per day through the term of the contract extension.  If the *Hercules 261* and the *Hercules 262* rigs remain at their currently reduced dayrates beyond December 31, 2016 and through the duration of their contract period, Hercules' backlog revenue at April 28, 2016 would be reduced by approximately $129.8 million.  The Saudi Aramco agreements can be terminated by Saudi Aramco upon 30-days' notice with no penalty or early termination payment.

- *Eni Agreement:*  In March 2015, Hercules signed a five-year contract with a subsidiary of Eni S.p.A. for use of the *Hercules 260* in West Africa.  The dayrate under the contract will range from a minimum of $75,000 per day when the price of Brent crude oil is $86 or less per barrel, to a maximum of $125,000 per day when the price of Brent crude oil is $125 or more per barrel.  This contract commenced in early April 2015.  The price of Brent crude oil is currently $49.10 per barrel.

- *Perisai Agreement:*  In November 2013, Hercules entered into an agreement with Perisai Drilling Sdn Bhd ("Perisai"), whereby Hercules agreed to market, manage and operate two Pacific Class 400 design new-build jackup drilling rigs, *Perisai Pacific 101* and *Perisai Pacific 102* ("Perisai Agreement").  Pursuant to the terms of the Perisai Agreement, Hercules is reimbursed for all operating expenses and Perisai pays for all capital expenditures.  Hercules receives a daily management fee for each rig and a daily operational fee equal to 12% of the rig-based EBITDA, as defined in the Perisai Agreement.  In August 2014, Perisai Pacific 101 commenced work on a three-year drilling contract in Malaysia.  Perisai Pacific 102 was scheduled to be delivered by the shipyard by mid-2015, but delivery has not yet occurred.  It is Hercules' understanding that Perisai is in discussions with the shipyard to further delay delivery of the rig.  Specific to the Perisai Agreement, Hercules recognized revenue and operating expenses of $2.4 million and $1.6 million, respectively, for the three months ended March 31, 2016, and $4.2 million and $2.6 million, respectively, for the three months ended March 31, 2015.  These results are included in Hercules' International Offshore segment.

### III.    Employees

24.    As of the Petition Date, Hercules had in the aggregate approximately 890 employees. The Debtors employ approximately 459 employees, and Non-Debtor Subsidiaries employ approximately 431 employees.  Hercules requires skilled personnel to operate and provide technical services and support for its rigs and liftboats.  As a result, Hercules conducts extensive personnel training and safety programs.  In the course of the last year, Hercules reduced its total number of employees as a result of prevailing economic conditions.

25.    As of the Petition Date, none of the Debtors are parties to any collective bargaining agreements.  Efforts have been made from time to time to unionize portions of the Company's offshore workforce in the U.S. Gulf of Mexico.  Employees of certain Non-Debtor Subsidiaries in West Africa are working under collective bargaining agreements.

### PART II

### I.    Prepetition Capital Structure

#### A.    The First Lien Credit Agreement

26.    HERO is the borrower under that certain Credit Agreement (the "First Lien Credit Agreement"), dated as of November 6, 2015, among HERO, as borrower, the subsidiaries of HERO party thereto, as guarantors (the "First Lien Guarantors" and collectively with HERO, the "First Lien Obligors"), Jefferies Finance LLC, as administrative agent and collateral agent (the "First Lien Agent"), and the lenders from time to time party thereto (the "First Lien Lenders").  The First Lien Credit Agreement provides for a $450 million senior secured credit facility consisting entirely of term loans (the "First Lien Facility").  The First Lien Facility was issued with 3.0% original issue discount, and $200 million of the proceeds of the First Lien Facility (the "Escrowed Amount") were placed into an escrow account (the "Escrow Account").  At the time the Escrowed Amount was placed into the Escrow Account, the Escrowed Amount was intended

to be used to pay the remaining installment payment on the *Hercules Highlander* and the expenses, costs and charges related to the construction and purchase of the *Hercules Highlander* and, in the absence thereof, to repay the term loans under the First Lien Facility.  The remaining proceeds of the First Lien Facility were used to consummate the 2015 Plan (as defined below) and were available to the Debtors for working capital and general corporate purposes.  The First Lien Facility has a scheduled maturity date of May 6, 2020.

27.    The First Lien Facility bears interest, at Hercules' option, at either (i) the alternate base rate (the highest of the prime rate, the federal funds rate plus 0.5%, the one-month LIBOR rate plus 1.0%, and 2.0%), plus an applicable margin of 8.50%, or (ii) the LIBOR rate plus an applicable margin of 9.50% per annum.  The LIBOR rate includes a floor of 1.0%.  In connection with entering into the First Lien Credit Agreement, the Debtors paid to the original commitment parties a put option premium in the total aggregate amount of $9.0 million.  This amount represented 2.0% of each such commitment party's commitment (one half of such fee was paid upon execution of the commitment letter, and the remaining half of such fee was paid on the closing date under the First Lien Credit Agreement).  In addition, the Debtors paid certain administrative and other fees to the First Lien Agent of $1.2 million.

28.    HERO's obligations under the First Lien Credit Agreement (the "First Lien Obligations") are guaranteed by the First Lien Guarantors, which include all of the other Debtors and certain of the Non-Debtor Subsidiaries.  The First Lien Obligations are secured on a first priority basis by liens on substantially all of the First Lien Obligors' respective assets, including their current and future vessels (including, in the event it would have been delivered to Hercules North Sea, the *Hercules Highlander*), bank accounts, accounts receivable, and equity interests in subsidiaries.

29.     Under the terms of the First Lien Credit Agreement, HERO is required to pay an additional premium in the event that the First Lien Facility is prepaid pursuant to section 2.10(a)(i) of the First Lien Credit Agreement or the First Lien Obligations are accelerated, which premium is comprised of all interest that would accrue until November 6, 2018, plus a 3% premium, discounted to present value ("Applicable Premium").  As of May 26, 2016, HERO estimated that the Applicable Premium to be approximately $129 million.

30.     As discussed in further detail below, as a result of an alleged Event of Default and an alleged Default (each as defined in the First Lien Credit Agreement), on April 18, 2016, HERO and the First Lien Guarantors entered into the Original Forbearance Agreement (as defined below) with respect to the First Lien Credit Agreement, and on April 28, 2016, HERO and the First Lien Guarantors entered into the Amendment (as defined below) to the Original Forbearance Agreement.  On May 26, 2016, HERO and the First Lien Guarantors entered into the Amended and Restated Forbearance Agreement in connection with the transfer of the *Hercules Highlander* to Maersk Highlander UK Limited ("Maersk UK") and the Events of Default resulting therefrom.  Pursuant to the terms of the Amended and Restated Forbearance Agreement, as a result of those Events of Default, the First Lien Obligations were accelerated and, thereafter, the Escrowed Amount was released from the Escrow Account to the First Lien Agent in partial satisfaction of the First Lien Obligations.

**B.     HERO Common Stock**

31.     As of the Petition Date, 19,988,898 shares of HERO Common Stock were issued and outstanding.

## PART III

### Events Leading to the Chapter 11 Cases

I.     **Mobile Drilling Rig and Liftboat Market**

32.     Demand for the Debtors' oilfield services is driven by its exploration and production customers' capital spending, which can experience significant fluctuation depending on current commodity prices and expectations of future price levels, among other factors.  The decline in the price of crude oil that began in mid-2014 and has extended into 2016 has severely impacted dayrates and demand for the Debtors' services.  Additionally, the consolidation and financial distress of the domestic customer base has negatively impacted demand for jackup rigs in the U.S. Gulf of Mexico.  The Debtors understand that, notwithstanding the decline in demand, more than 115 number of new jackup rigs are currently under construction around the world and will become available for service in the next three years in addition to the more than 460 rigs currently marketed.  This anticipated growth in capacity could put additional pressure on the operating environment for the Debtors' and the Non-Debtor Subsidiaries' existing jackup rig fleet.  Although activity levels for liftboats are not as closely correlated to commodity prices as the Hercules' drilling segments, commodity prices are still a key driver of liftboat demand.  Demand for liftboat services in West Africa has been weak, which the Debtors believe has been driven by budgetary constraints with major customers primarily in Nigeria.

33.     On February 25, 2015, Hercules received a notice from Saudi Aramco terminating for convenience its drilling contract for the *Hercules 261*, effective on or about March 27, 2015.  The Company received subsequent notices from Saudi Aramco extending the effective date of termination to May 31, 2015.  On June 1, 2015, Hercules received a notice from Saudi Aramco reinstating the drilling contract on the *Hercules 261*, in exchange for dayrate concessions on the *Hercules 261*, *Hercules 262* and *Hercules 266* from their existing contracted rates to $67,000 per

day.   These reduced dayrates were effective retroactively from January 1, 2015 through December 31, 2016 for the *Hercules 261* and *Hercules 262*, and through the remaining contract term for the *Hercules 266*.   On March 9, 2016, the Company received a new notice from Saudi Aramco further reducing the dayrates under the contracts for the *Hercules 261* and *Hercules 262* from $67,000 per day to $63,650 per day.   The reduced dayrates apply for the period from January 1, 2016, through December 31, 2016.   The dayrate for the *Hercules 266* was also reduced from $67,000 per day to $63,650 per day effective January 1, 2016, through the remaining term of its contract, or April 7, 2016.   On April 6, 2016, the Company received notice from Saudi Aramco extending the contract for the *Hercules 266* to June 30, 2016.   The dayrate for the *Hercules 266* will remain at $63,650 through the term of the contract extension.

34.   Hercules has taken numerous actions to mitigate the effects of the decline in activity levels, including but not limited to: (i) cold stacking nine rigs and warm stacking seven rigs[6] since the fourth quarter of 2014 to significantly reduce operating expenses; (ii) significantly reducing their capital expenditures in 2015 and the amount planned for 2016; and (iii) significantly reducing their workforce, both onshore and offshore, domestically and internationally.

## II.    The 2015 Restructuring

35.   Faced with this challenging market environment, on August 13, 2015, HERO and certain of its domestic direct and indirect subsidiaries (together with HERO, the "2015 Debtors") commenced voluntary pre-packaged chapter 11 cases (the "2015 Chapter 11 Cases") in the Bankruptcy Court.   HERO's foreign subsidiaries and one U.S. domestic subsidiary ("Non-Filing

---

[6]When rigs are "warm stacked," they are idle but actively marketed.  A warm stacked rig may have a reduced crew and would only require a full crew in the event that the rig is contracted to perform drilling services.  Rigs that are "cold stacked" are not actively marketed and normally require the hiring of a full crew, a maintenance review and refurbishment before they are able to function as operating drilling rigs.

Entities") were not debtors in the 2015 Chapter 11 Cases.

36.     Through the 2015 Chapter 11 Cases, the Debtors implemented a prepackaged plan of reorganization (the "2015 Plan") in accordance with the terms of a restructuring support agreement that the Debtors entered into with certain holders of the Debtors' then outstanding senior unsecured notes (the "Senior Notes").  The 2015 Plan provided for a substantial reduction of the Debtors' funded debt obligations by, among other things, exchanging $1.2 billion in face amount of the Senior Notes for 96.9% of the HERO Common Stock.  In addition, notwithstanding the fact that the 2015 Debtors' equity holders were substantially out of the money, the 2015 Plan provided such equity holders with the opportunity to receive their pro rata share of 3.1% of the HERO Common Stock and warrants to purchase up to another 20% HERO Common Stock on a Pro Rata basis at a per share price based on a total enterprise value of $1.55 billion.  Finally, the Plan provided the Debtors with access to new liquidity in the form of the First Lien Facility.  The Bankruptcy Court entered an order confirming the 2015 Plan on September 24, 2015, and the Plan became effective in accordance with its terms on November 6, 2015.

## III.     Declining Earnings and Utilization Rates

37.     Largely driven by the continuing depression in commodity prices, Hercules, like other companies in the offshore drilling market, has faced greater challenges as demand for jackup rigs remains weak, while the market is still scheduled to deliver a significant number of newbuild rigs in the next several years, which (with the exception of the *Hercules Triumph* and the *Hercules Resilience*) are expected to be better suited to meet industry needs than Hercules' fleet.  These challenges, including day rate reductions implemented by Saudi Aramco, are born out in Hercules' recent earnings and utilization statistics for its three business segments, Domestic Offshore, International Offshore, and International Liftboats.

38.     Specifically, revenue generated from Domestic Offshore for the first quarter of 2016 decreased 76.6% to $12.4 million from $52.9 million for the first quarter of 2015, driven by a decline in operating days and lower average dayrates.  Operating days in the first quarter of 2016 declined to 210 days with utilization of 25.6% on a marketed fleet of 9 rigs, compared to 533 days on 18 marketed rigs at 60.1% utilization in the first quarter of 2015.  Average revenue per rig per day decreased by 40.6% to $58,948 in the first quarter of 2016 from $99,203 in the first quarter of 2015.  Operating expense decreased to $11.7 million in the first quarter of 2016, from $35.9 million in the first quarter of 2015.  The significant reduction in operating expense in 2016 was largely attributable to lower activity levels.  Domestic Offshore reported an operating loss of $1.9 million in the first quarter of 2016, compared to operating income of $3.8 million in the first quarter of 2016.

39.     International Offshore reported revenue of $27.5 million in the first quarter of 2016, compared to revenue of $51.6 million in the first quarter of 2015.  Utilization increased slightly to 49.9% in the first quarter of 2016 from 47.9% in the first quarter of 2015.  Average revenue per rig per day decreased by 49.4% to $75,680 in the first quarter of 2016 from $149,700 in the first quarter of 2015, driven largely by warm stacking certain rigs and lower dayrates.  Operating expense decreased to $23.4 million in the first quarter of 2016, from $50.2 million in the first quarter of 2015.  This reduction in operating expense was due to certain rigs being warm stacked, and other rigs being prepared in the shipyard for new operations.  International Offshore recorded an operating loss of $151,000 in the first quarter of 2016 compared to an operating loss of $20.9 million in the first quarter of 2015.

40.     International Liftboats revenue declined by 39.2% to $11 million in the first quarter of 2016 from $18.1 million in the first quarter of 2015, due to a decline in operating days

and lower average revenue per vessel per day.  Utilization in the first quarter of 2016 increased slightly to 39.7% from 38.1% in the first quarter of 2015.  Average revenue per liftboat per day decreased by 26.2% to $16,945 in the first quarter of 2016 from $22,964 in the first quarter of 2015, primarily due to market pressure on dayrates.  Operating expense in the first quarter of 2016 declined by 15.6% to $11.4 million, compared to $13.5 million in the first quarter of 2015, reflecting lower activity levels.  International Liftboats recorded an operating loss of $3.9 million in the first quarter of 2016 compared to an operating loss of $351,000 in the first quarter of 2015.

41.    As a result of its declining earnings and utilization rates, Hercules has experienced significant negative operating cash flow over the last several months.  Only seven of Hercules' 25 rigs are operating and four of those seven are rolling off contracts within the next 60 days.  Unfortunately, no improvement is expected in the economic performance of the Domestic Offshore, International Offshore, and International Liftboats operations over the course of the next year.  In fact, if it maintains the *status quo*, Hercules anticipates that it will continue to experience negative operating cash flow of approximately $450,000 per day.  As a result, on May 5, 2016 and as discussed in further detail below, Hercules projected that it would violate the Maximum Senior Secured First Lien Leverage Ratio (as defined in the First Lien Credit Agreement) under the First Lien Credit Agreement on March 31, 2017, which was premised on, among other things, Hercules having made the final installment payment on, and taken delivery of, the *Hercules Highlander*.  For that reason, the Debtors believe that obtaining confirmation of the Plan and exiting chapter 11 as expeditiously and efficiently as possible is critical to maximizing value for the benefit of all stakeholders.

### IV.    Formation of the Special Committee

42.    While the 2015 Plan significantly improved Hercules' balance sheet, the challenges facing the offshore drilling industry continued to adversely impact Hercules' business.  As a result, in early 2016, HERO formed the Special Committee comprised of all of the independent members of the Board to consider and explore various strategic alternatives potentially available to Hercules in order to maximize the value of Hercules's assets.  Hercules announced the formation of the Special Committee on February 11, 2016, and, at the same time, disclosed that Hercules had $514 million in cash on hand.

43.    The Special Committee was authorized to explore, review, and evaluate any potential strategic transaction involving Hercules and any alternatives thereto, including, but not limited to, the sale of Hercules, a merger or share exchange involving Hercules, the sale of some or all of Hercules' assets, and a recapitalization of Hercules (whether by issuance of equity or debt securities, incurrence of additional indebtedness, or issuance of derivatives of securities thereof).

44.    Akin Gump Strauss Hauer & Feld LLP ("Akin Gump"), as legal counsel, and PJT Partners Inc. ("PJT"), as financial advisor, were retained to assist the Special Committee and Hercules in connection with considering and exploring strategic alternatives and additional matters.

### V.    The Marketing Process

45.    As Hercules' earnings and utilization rates continued to decline and Hercules faced increased challenges in successfully operating its business (including significant negative operating cash flow), the Special Committee determined that pursuing a potential sale of Hercules and/or its assets was an appropriate path to consider.  To that end, the Special

Committee authorized PJT to initiate a marketing process (the "Marketing Process") pursuant to which Hercules would seek bids for the acquisition of Hercules. Throughout the Marketing Process, the Special Committee was prepared to consider bids for some or all of Hercules' assets.

46.   In late February 2016, PJT launched the Marketing Process. In connection therewith, PJT contacted approximately fifty-one potentially interested parties, including a number of large drilling companies and other strategic buyers with the financial ability to pursue a transaction. Of those fifty-one potentially interested parties, fifteen parties signed non-disclosure agreements with Hercules and gained access to diligence materials contained in a virtual dataroom that was prepared for the Marketing Process (the "Dataroom"). Thereafter, approximately eight of these parties conducted significant diligence and actively communicated with PJT and members of Hercules' management team, including myself.

47.   As part of the Marketing Process, first round bids were due the week of March 21, 2016 (the "First Round Bid Deadline"). Seven parties (the "First Round Bidders") submitted non-binding bids (the "First Round Bids") by the First Round Bid Deadline. Despite Hercules' significant cash position of $514 million on February 11, the indicative purchase price of the First Round Bids ranged from $110 million on the low end to $455 million on the high end. Three of the First Round Bidders, one of which bids was only for Hercules' Middle Eastern assets, expressed interest in a potential transaction without specifying a purchase price. The First Round Bids that contained a purchase price contemplated that the purchase price would be paid (i) entirely in the form of stock, (ii) entirely in the form of cash or (iii) in a combination of stock and cash.

48.   On or about March 25, 2016, following a review of the First Round Bids, the Special Committee, with the assistance of PJT, determined that three of the First Round Bids

warranted further consideration.  Accordingly, the Special Committee directed PJT to invite the First Round Bidders who submitted such bids to submit second round bids (the "Second Round Bids") on or before April 14, 2016 (the "Second Round Bid Deadline").  After being invited to submit Second Round Bids, all three of the bidders were provided with the opportunity to conduct further diligence with respect to Hercules, including by meeting with Hercules' management team, including myself, to discuss Hercules' business and operations and a potential sale transaction.  As part of that process, Hercules' management team participated in multiple in-person meetings and/or teleconferences with each of the respective bidders to respond to inquiries regarding Hercules' business and operations.  At this stage of the Marketing Process, the goal of PJT and the Special Committee was to obtain Second Round Bids with as few contingencies as possible.

49.     On or about the Second Bid Round Bid Deadline, Hercules received two non-binding Second Round Bids from bidders (the "Second Round Bidders").  The Second Round Bids contemplated enterprise level purchase prices from $423 million to $470 million for Hercules, payable in the form of a combination of cash and stock or cash and take-back debt.  Following the Second Round Bid Deadline, Hercules received an additional non-binding bid from a third bidder that was invited to submit a Second Round Bid, as well as two non-binding bids from parties that had not submitted First Round Bids (collectively, the "Additional Bids"), including one bid for the *Hercules Highlander*.  The Additional Bids contemplated purchase prices ranging from $326 million to $515 – 520 million, with the latter bid comprised of $65-70 million of stock and $450 million of rollover debt.  Except for the bids submitted by the First Lien Lenders (as discussed below), none of the bids received provided sufficient value to pay the

First Lien Claims in full or provide any recovery to the holders of HERO Common Stock. Meanwhile, Hercules continued to maintain significant cash on its balance sheet.

50.    During the Marketing Process, the Special Committee was also contacted by certain First Lien Lenders who are Ad Hoc Group Members regarding the Marketing Process. Such First Lien Lenders advised the Special Committee that the First Lien Lenders were unlikely to consent to a sale transaction unless such transaction generated sufficient cash proceeds to pay the obligations owing under the First Lien Credit Agreement.  In response, the Special Committee encouraged the First Lien Lenders to participate in the Marketing Process by submitting a bid.  Thereafter, the First Lien Lenders submitted proposals to Hercules that were premised on an orderly wind-down of Hercules' operations and a sale of its assets on an asset-by-asset basis.  In addition, notwithstanding the fact that the wind-down process would require the First Lien Claims to be paid over time with no guaranty that the First Lien Claims would be paid in full, the bids submitted by the First Lenders contemplated, subject to diligence, payment in full of all General Unsecured Claims and significant recoveries to holders of HERO Common Stock, which, the Special Committee advised the First Lien Lenders should be included in any bid submitted by the First Lien Lenders.  The Debtors have been advised that certain of the First Lien Lenders contacted certain holders of HERO Common Stock that were not also First Lien Lenders regarding the Marketing Process, and those discussions resulted in limited dialogue.

51.    Following review of the Second Round Bids and the rights of the First Lien Lenders with respect to the transactions contemplated by such bids, the Special Committee directed PJT to engage in further discussions with the two Second Round Bidders in an effort to obtain a higher purchase price.  However, the Second Round Bidders were unwilling to increase the amount of their bids by sufficient amounts to satisfy the obligations under the First Lien

Credit Agreement.  Thereafter, the Special Committee determined that the Second Round Bids would not result in a transaction that could be consummated or that would, in any event, yield a greater recovery to junior creditors and holders of HERO Common Stock than the transaction proposed by the First Lien Lenders.

52.     In addition to the foregoing, Hercules has engaged Simmons & Co. ("Simmons") to separately market for sale its fleet of liftboat vessels (the "Liftboat Fleet") and Clarksons Platou Shipping Services USA LLC to market the *Hercules Resilience* and the *Hercules Triumph*.  Hercules has retained Mitchen Anderson Group LLC to market its domestic rigs and the *Hercules 208* and the *Hercules 267*.  Hercules has received letters of intent and/or expressions of interests for the sale of the Liftboat Fleet, the *Hercules Resilience*, the *Hercules Triumph* and other assets.  The sale processes for these assets as well as Hercules' other assets are on-going.

## VI.    The 2015 10-K Disclosures

53.     On March 30, 2016, shortly after the first round bid deadline, HERO filed a Form 10-K for 2015.  Therein, HERO disclosed that Hercules projected that it would violate the Maximum Senior Secured First Lien Leverage Ratio (as defined in the First Lien Credit Agreement) under the First Lien Credit Agreement on March 31, 2017.  If this occurred and Hercules were not able to obtain a waiver from the First Lien Lenders, the First Lien Lenders could accelerate the First Lien Facility at that time, which would require Hercules to repay immediately the First Lien Claims, including the Applicable Premium.

## VII.   The Alleged Defaults and Events of Default and the Forbearance Agreement

54.     On April 18, 2016, shortly after the Second Round Bid Deadline, HERO and the First Lien Guarantors entered into a Forbearance Agreement and First Amendment to the Credit Agreement (the "Original Forbearance Agreement"), with the First Lien Agent for itself and

certain First Lien Lenders comprised of the members of the Ad Hoc Group. Pursuant to the Original Forbearance Agreement, at Hercules' request, the Required Lenders (as defined in the First Lien Credit Agreement) agreed, during the Forbearance Period (as defined below), to forbear from exercising their rights and remedies (if any) under the First Lien Credit Agreement with respect to the alleged failure by HERO to comply with certain specified affirmative covenants relating to post-closing matters in foreign jurisdictions. In particular, certain First Lien Lenders asserted (but did not give notice under the First Lien Credit Agreement) that (i) an Event of Default (as defined in the First Lien Credit Agreement) occurred based on Hercules' alleged failure to be in compliance with an affirmative covenant with respect to causing Hercules Offshore Nigeria Limited, a Non-Debtor Subsidiary, to deliver a certificate of registration of a vessel mortgage for collateral purposes by April 15, 2016 (the "Nigeria Registration Covenant"), and (ii) a Default (as defined in the First Lien Credit Agreement) occurred based on Hercules' alleged failure to be in compliance with an affirmative covenant with respect to using best efforts to cause Discovery Offshore (Gibraltar) Limited, a Non-Debtor Subsidiary, to dissolve, merge or consolidate with or into another Loan Party within the required time period (the "Gibraltar Covenant"). While there is no express cure period in the First Lien Credit Agreement with respect to the Nigeria Registration Covenant, HERO delivered the required certificate of registration on April 21, 2016. HERO notified the First Lien Agent that it (i) disagreed with the First Lien Lenders' interpretation of the alleged Default and Event of Default with respect to these covenants and (ii) believed that defenses may exist with respect to the alleged Default and Event of Default and has reserved all rights with respect thereto.

55. Under the Original Forbearance Agreement, the First Lien Lenders' forbearance commenced on the date that certain conditions in the Original Forbearance Agreement were met

and continued until the earlier to occur of: (i) the termination of the Forbearance Period as a result of any default under the Original Forbearance Agreement; and (ii) April 28, 2016, unless otherwise mutually agreed in writing by HERO and the Required Lenders (with written notice to the First Lien Agent) (the "Forbearance Period").

56.    On April 28, 2016, HERO and the First Lien Guarantors entered into that certain Amendment No. 1 to Forbearance Agreement and First Amendment to Credit Agreement (the "Forbearance Amendment") with the First Lien Agent and certain First Lien Lenders, which amended the Original Forbearance Agreement to extend the Forbearance Period.  Pursuant to the Forbearance Amendment, the Required Lenders agreed to extend the Forbearance Period until the earliest to occur of: (i) the termination of the Forbearance Period as a result of any default under the Forbearance Agreement; (ii) 11:59 p.m. (New York City time) on May 31, 2016; and (iii) 11:59 p.m. (New York City time) on the second business day following the First Lien Lenders' delivery of written notice (which notice would have been effective only if delivered after 11:59 p.m. (New York City time) on May 4, 2016) to HERO terminating the Forbearance Period, subject to the right of the First Lien Lenders to revoke such written notice.   The First Lien Lenders never exercised their rights to accelerate the termination of the Forbearance Period. As a result, during the Forbearance Period, the Special Committee, through PJT, continued discussions with third parties in an effort to obtain greater value for stakeholders than contemplated by the bids submitted by the First Lien Lenders and the transactions contemplated by the Plan, but such efforts were not successful as no party was willing to provide greater value or certainty of closing a transaction than the First Lien Lenders.

57.    Under the Forbearance Amendment, the First Lien Lenders' forbearance was subject to certain conditions as described therein and in the First Lien Credit Agreement as

amended thereby.  The Forbearance Amendment further served to amend the First Lien Credit Agreement to, among other matters, clarify the process to be followed for delivery of an officers' certificate and release of the Escrowed Amount under the escrow agreement governing the Escrow Account (the "Escrow Agreement").

58.    Specifically, by entering into the Forbearance Amendment, Hercules agreed that it would not be permitted to draw the Escrowed Amount during the Forbearance Period, and accordingly, would not be able to accept delivery of the *Hercules Highlander* during that time. As noted above and discussed below, Hercules did not take delivery of the *Hercules Highlander*, but instead, in the exercise of its business judgment, determined to transfer its rights to the *Hercules Highlander* to Maersk UK (as defined below).  Following the transfer of the *Hercules Highlander*, the Escrowed Amount was distributed to the First Lien Agent for the benefit of the First Lien Lenders in accordance with the terms of the Escrow Agreement (the "Escrow Repayment").

**VIII.    The 1Q 2016 10-Q and Related Disclosures**

59.    On May 5, 2016, HERO filed a Form 10-Q for the first quarter of 2016 (the "1Q 2016 10-Q") and reiterated that Hercules projected that it would violate the Maximum Senior Secured First Lien Leverage Ratio (as defined in the First Lien Credit Agreement) under the First Lien Credit Agreement on March 31, 2017.  If this occurred and Hercules were not able to obtain a waiver from the First Lien Lenders, the First Lien Lenders could accelerate the First Lien Facility at that time, which would require Hercules to repay immediately the First Lien Claims, including the Applicable Premium.  HERO stated that it likely would be difficult to obtain a waiver from the First Lien Lenders at that time given, among other things, the state of the drilling market and that a refinancing likely would not be a viable option.

60.     In addition, HERO disclosed that, in the event the First Lien Facility were called and accelerated as a result of the alleged Event of Default and Default relating to the Nigeria Registration Covenant and the Gibraltar Covenant, the outstanding principal amount of the First Lien Facility and the Applicable Premium would have become due immediately.  HERO further disclosed that, if the outstanding principal amount of the First Lien Facility and Applicable Premium became due immediately, it could raise substantial doubt about Hercules' ability to continue as a going concern.

## IX.     The *Hercules Highlander* Transaction

61.     In May 2014, non-Debtor Hercules British Offshore Limited ("Hercules British Offshore") signed a five-year drilling contract (the "Maersk Agreement") with Maersk Oil North Sea UK Limited ("Maersk") for the *Hercules Highlander*.  In support of the Maersk Agreement, in May 2014, Hercules North Sea Ltd. ("Hercules North Sea") signed a rig construction contract (the "Rig Construction Contract") with Jurong Shipyard Pte Ltd. ("Jurong") in Singapore with respect to the Hercules Highlander.  In April 2016, Jurong requested that Hercules North Sea accept delivery of the *Hercules Highlander* and pay the final installment payment in accordance with terms of the rig construction contract.  As discussed in further detail below, on May 26, 2016, Hercules transferred the right to acquire the *Hercules Highlander* to Maersk Highlander UK Limited ("Maersk UK"), and Hercules British Offshore novated its rights under the Maersk Agreement to Maersk UK.

62.     As discussed above, the Marketing Process did not result in bids that were sufficient to satisfy the obligations under the First Lien Credit Agreement in full or anywhere near an amount that would be satisfactory to the First Lien Lenders.  Accordingly, the Special Committee determined that pursuing a sale or alternative transaction in respect of the *Hercules*

*Highlander*, coupled with a transaction with the First Lien Lenders that provided for holders of Allowed General Unsecured Claims to be paid in full and the opportunity for material recoveries to the holders of HERO Common Stock, provided the best means of maximizing value for the benefit of all stakeholders.

63.    Following extensive negotiations, on May 26, 2016, Hercules North Sea, HERO and Hercules British Offshore (together with Hercules North Sea and HERO, the "Hercules Parties") entered into a series of agreements related to the *Hercules Highlander*, including (i) a tripartite agreement (the "Tripartite Agreement") with Jurong and Maersk Highlander UK Limited (the "Maersk UK") pursuant to which Hercules North Sea assigned its rights to purchase the *Hercules Highlander* to Maersk UK and Maersk UK assumed the obligation to pay USD $195,988,025 to Jurong as the final installment to acquire the *Hercules Highlander* (the "Final Installment"), (ii)  Hercules British Offshore and HERO assigned to Jurong all of their rights, title and interest in and to certain equipment, consumables and spares acquired in anticipation of operating the *Hercules Highlander*, including Jurong's assumption of USD $5,098,042 in outstanding accounts payable for such equipment (the "Bill of Sale"), (iii) Hercules British Offshore novated the Maersk Agreement to Maersk UK (the "Novation") as well as a transportation contract with Dockwise Shipping B.V. to mobilize the *Hercules Highlander* to the UK North Sea from Singapore (the "Heavy Lift Novation").

64.    As a result of the completion of the transactions contemplated in the suite of agreements constituted by the Tripartite Agreement, the Bill of Sale, the Novation and the Heavy Lift Novation (the "Transaction Documents"), the Hercules Parties no longer have any interest in the *Hercules Highlander* or its related equipment, nor do they have any obligation to pay the Final Installment or the outstanding balance on the equipment included with the Bill of Sale.

Further, the Hercules Parties have no obligations to provide any drilling services to Maersk.  In connection with the execution of the Transaction Documents, several other agreements related to the *Hercules Highlander* previously entered into by certain of the Hercules Parties were terminated or assigned to Maersk UK.  The Transaction Documents also provide each of the Hercules Parties with a full release of their respective obligations, duties or other rights arising out of or related to the Maersk Agreement or the *Hercules Highlander*.  With respect to the equipment transferred under the Bill of Sale, Maersk UK also agreed to indemnify the Hercules Parties against third party payment demands if the actual acquisition costs exceed USD $5,098,042.

## X.        The Amended and Restated Forbearance Agreement

65.        On May 26, 2016, in connection with the *Hercules Highlander* transaction and the execution of the Restructuring Support Agreement, HERO and the First Lien Guarantors also entered into an Amended and Restated Forbearance Agreement (the "Amended and Restated Forbearance Agreement") with the First Lien Agent and First Lien Lenders holding in the aggregate in excess of 99% of the First Lien Claims.[7]  The Amended and Restated Forbearance Agreements amends and restates the Original Forbearance Agreement, as amended.  Entry into the Amended and Restated Forbearance Agreement was a necessary component for the *Hercules Highlander* transaction because, under the terms of the First Lien Credit Agreement, the *Hercules Highlander* transactions would cause certain Events of Default to occur under the First Lien Credit Agreement and Maersk UK would not complete its acquisition of the *Hercules Highlander* absent the releases from the First Lien Lenders.

66.        Pursuant to the Amended and Restated Forbearance Agreement, each First Lien Lender signatory thereto (severally and not jointly), and, at the direction thereof, the First Lien

---

[7] A copy of the Amended and Restated Forbearance Agreement is attached hereto as Exhibit C.

Agent, agreed, among other things, to (x) forbear from exercising certain of their respective default-related rights and remedies against HERO and the First Lien Guarantors with respect to certain defaults under the First Lien Credit Agreement specified in the Amended and Restated Forbearance Agreement (other than, among other things, the acceleration of the loans under the First Lien Credit Agreement and the delivery of a written direction instructing the First Lien Agent to deliver a written instruction to the Escrow Agent to distribute all funds in the Escrow Account to the First Lien Agent to prepay the claims under the First Lien Credit Agreement), (y) consent to the release of all liens and security interests in any assets or property subject to the transactions contemplated in the Tripartite Agreement, the Novation, the Heavy Lift Novation and the Bill of Sale and grant related releases and (z) upon the request of HERO, consent to the release of the First Lien Obligors who are not Debtors from their guarantees under the First Lien Credit Agreement and the release of all liens and security interests in any assets or property of the First Lien Obligors who are not Debtors upon the Effective Date of the Plan.

67.    In addition, pursuant to the Amended and Restated Forbearance Agreement, HERO received written notice from the First Lien Agent that the commitments under the First Lien Credit Agreement were terminated and the outstanding loans under the First Lien Credit Agreement were declared due and payable, in whole, including, without limitation the principal of the loans under the First Lien Credit Agreement, together with accrued interest thereon, unpaid accrued fees, the Applicable Premium and all other obligations of HERO accrued under the First Lien Credit Agreement and any other Loan Document (as defined under the First Lien Credit Agreement).

68.    Further, pursuant to the Amended and Restated Forbearance Agreement, the First Lien Lenders party to the Amended and Restated Forbearance Agreement directed the First Lien

Agent to deliver a written instruction to the Escrow Agent to distribute all the funds in the Escrow Account in the amount of $200 million to the First Lien Agent to prepay the First Lien Facility pursuant to section III(d) of the Escrow Agreement and section 2.10(a)(i) of the First Lien Credit Agreement.  I understand that the Applicable Premium became due and owing in connection with the *Hercules Highlander* transaction, the Events of Default resulting therefrom, the acceleration of the First Lien Obligations pursuant to the Amended and Restated Forbearance Agreement and the prepayment of the First Lien Facility.

**XI.    The Restructuring Support Agreement and the Plan**

69.    Also on May 26, 2016, after many weeks of intensive negotiations, the Debtors and the Consenting First Lien Lenders, which hold in excess of 99% of the principal amount outstanding under the First Lien Credit Agreement and approximately 27% of the HERO Common Stock, entered into the Restructuring Support Agreement.  The Restructuring Support Agreement sets forth, subject to certain conditions, the commitment to and obligations of, on the one hand, the Debtors, and on the other hand, the Consenting First Lien Lenders to effectuate the Plan.

70.    Contemporaneously with the commencement of these cases, the Debtors filed the Plan.  The Plan provides for all claims against the Debtors' estates (other than the First Lien Claims) to be paid in full in cash prior to repayment in full of the First Lien Obligations.  The Plan also provides that, if Class 7 HERO Common Stock votes to accept the Plan, the holders of HERO Common Stock will receive a meaningful recovery before the First Lien Obligations are paid in full, with such distributions to holders of HERO Common Stock subject to reduction to the extent that the Confirmation Order does not become a Final Order within 72 days of the Petition Date as the result of actions taken directly or indirectly by holders of HERO Equity

Interests, their representatives, and/or any other persons (including any HERO Entity) acting in concert with the holders of HERO Equity Interests.

71.    The Restructuring Support Agreement and the Plan contemplate a value-maximizing transaction for the Debtors and their stakeholders through the orderly monetization of the Debtors' and Non-Debtor Subsidiaries' assets and the winding down of the Hercules' entities.  Specifically, the Plan provides that holders of Claims and Equity Interests will receive the following treatment:

- each holder of an Allowed First Lien Claim shall receive its Pro Rata share of: (i) if Class 7 votes to accept the Plan, (a) the Acceptance Lender Wind Down Claim; and (b) 100% of the Class A Wind Down Entity Interests; or (ii) if Class 7 votes to reject the Plan, the Rejection Lender Wind Down Claim;

- holders of Administrative Claims, Priority Tax Claims, Priority Non-Tax Claims, Other Secured Claims and General Unsecured Claims will be paid in full in cash; and

- each holder of HERO Common Stock shall receive its Pro Rata share of: (i) if Class 7 votes to accept the Plan, (a) the Shareholder Effective Date Cash Distribution; and (b) 100% of the Class B Wind Down Entity Interests; or (ii) if Class 7 votes to reject the Plan, 100% of the Rejection Wind Down Entity Interests.

72.    The waterfall of distributions generally provides that, if Class 7 HERO Common Stock votes in favor of the Plan, each holder of HERO Common Stock will receive its Pro Rata Share of the following:

- $12.5 million in cash on the Effective Date of the Plan;

- An additional $15 million in cash after $420 million, in the aggregate, has been received by the First Lien Lenders through a combination of (i) the Escrow Repayment, (ii) principal payments under the Cash Collateral Order, (iii) any pre-Effective Date principal payments from asset sale proceeds and (iv) post-Effective Date payments on the Lender Wind Down Claim;

- 15% of the net proceeds from the monetization of Hercules' assets through the Class B Wind Down Entity Interests after $510 million and until $530 million, in the aggregate, has been received by the First Lien Lenders through a combination

of (i) the Escrow Repayment, (ii) principal payments under the Cash Collateral Order, (iii) any pre-Effective Date principal repayments from asset sale proceeds; (iv) any Effective Date payments; (v) post-Effective Date payments on the Lender Wind Down Claim; and (vi) distributions on the Class A Wind Down Entity Interests

- An additional $3 million in cash after $530 million, in the aggregate, has been received by the First Lien Lenders through a combination of (i) the Escrow Repayment, (ii) principal payments under the Cash Collateral Order, (iii) any pre-Effective Date principal repayments from asset sale proceeds; (iv) any Effective Date payments; (v) post-Effective Date payments on the Lender Wind Down Claim; and (vi) distributions on the Class A Wind Down Entity Interests; and

- 15% of the net proceeds from the monetization of Hercules' assets through the Class B Wind Down Entity Interests after $533 million, in the aggregate, has been received by the First Lien Lenders through a combination of (i) the Escrow Repayment, (ii) principal payments under the Cash Collateral Order, (iii) any pre-Effective Date principal repayments from asset sale proceeds; (iv) post-Effective Date payments on the Lender Wind Down Claim; and (v) distributions on the Class A Wind Down Entity Interests.

73.    Based on the recovery analyses attached as Exhibit E to the Disclosure Statement (the "Recovery Analyses") , if Class 7 HERO Common Stock votes to accept the Plan, holders of HERO Common Stock are projected to receive recoveries between the $12.5 million Effective Date payment (rounded to $13 million in the Disclosure Statement) and $41 million.[8]  The Plan provides that if Class 7 HERO Common Stock votes to reject the Plan, holders of HERO Common Stock will only receive recoveries after the holders of First Lien Claims have been paid in full on account of such First Lien Claim totaling $579 million (plus accrued and unpaid interest, if any, as of the Effective Date of the Plan) in the aggregate.  Based on the Recovery Analyses, if Class 7 HERO Common Stock votes to reject the Plan, holders of HERO Common Stock are projected to receive recoveries between $0 and $27 million in the aggregate

---

[8] The asset values utilized for the Recovery Analyses are lower than those reflected in the 1Q 2016 10-Q. The balance sheet values contained in the 1Q 2016 10-Q were based on the book value of Hercules' assets as of March 31, 2016.  The range of values for the assets used in the Recovery Analyses was based on bids received from third parties, indications of value from third party brokers and estimates from management, and is believed to be reflective of the range of value that can be realized for those assets in a sale.

74.    Upon consummation of the Plan, all of the Debtors' assets will be transferred to the Wind Down Entity.  The Wind Down Entity will be responsible for, among other things, monetizing the Debtors' assets and winding down the Debtors' and the Non-Debtor Subsidiaries' business and operations in a controlled manner.  The Wind Down Entity will be funded with the Initial Wind Down Funding Amount (which will not exceed $85 million) and will be governed by the Wind Down Trust Board.

75.    In addition, pursuant to the terms of the Restructuring Support Agreement, the Consenting First Lien Lenders agreed, among other things, and subject to certain conditions: (a) not to support any plan or sale process that is inconsistent with the Restructuring Support Agreement, the Term Sheet or the Plan; (b) not to instruct the Agent under the First Lien Credit Agreement to take any action inconsistent with the terms and conditions of the Restructuring Support Agreement; (c) to vote to accept the Plan; and (d) contemporaneously with the execution of the Restructuring Support Agreement, enter into (and direct the Agent to enter into) the Amended and Restated Forbearance Agreement.

76.    Finally, the Restructuring Support Agreement also provides for a settlement, pursuant to Bankruptcy Rule 9019 and Bankruptcy Code section 1123, among the Debtors and the holders of First Lien Claims of any and all disputes among the parties, including any disputes in respect of (i) the asserted Defaults and Events of Default relating to the Nigeria Registration Covenant and the Gibraltar Covenant, (ii) whether the Escrow Release Payment constitutes an avoidable preference, and (iii) any potential defenses to the amount of the Applicable Premium. The consideration for such settlement consists of the receipt by the holders of First Lien Claims of the releases contemplated by Article V of the Plan in exchange for their agreement to compromise their First Lien Claims in order to enable holders of Allowed General Unsecured

Claims to be paid in full under the Plan and the holders of HERO Common Stock to receive a meaningful recovery under the Plan before holders of First Lien Claims are paid in full.

77.    The Restructuring Support Agreement may be terminated upon the occurrence of certain events, including the failure to meet specified milestones related to filing, confirmation and consummation of the Plan, among other requirements, and in the event of certain breaches by the parties under the Restructuring Support Agreement.

78.    Based on the strong support for the Plan among holders of First Lien Claims, the Debtors believe that the Chapter 11 Cases will proceed expeditiously, and the Debtors will be able to move forward with the monetization of the Debtors' and the Non-Debtor Subsidiaries' assets and a controlled wind-down of their operations to maximize recoveries for all of the Debtors' stakeholders in an efficient manner.  The Debtors believe that this outcome is in the best interests of the Debtors, their Estates and all stakeholders, and that the Plan and the transactions contemplated thereby will maximize the value of the Debtors' and the Non-Debtor Subsidiaries' assets and enable them to make distributions to greatest number of stakeholders.

## PART IV[9]

79.    The Debtors have filed or will file a number of First Day Motions seeking orders granting various forms of relief.  I believe the forms of relief requested are necessary to enable the Debtors to operate with minimal disruption during the pendency of the Chapter 11 Cases and to ensure consummation of the Plan and the transaction contemplated therein.  I have reviewed each of the First Day Motions, including the exhibits thereto.  The Debtors believe, and I agree, that the Debtors have satisfied the applicable standards for the relief requested in each of the First Day Motions, and that the Court's grant of the requested relief is in the best interests of the

---

[9]    Capitalized terms in this Part IV of this Declaration, to the extent not defined herein, have the meanings ascribed to them in the applicable First Day Motion.

Debtors' estates, their creditors, and all other parties in interest.  Accordingly, on behalf of the Debtors, I respectfully submit that the First Day Motions should be approved.  A description of the relief requested and the facts supporting each of the First Day Motions is set forth below.

I.    **All Creditors Motion**.[10]

80.    **Relief Requested**.  The Debtors seek entry of interim and final orders authorizing them, in their sole discretion, to pay Claims of Creditors in the ordinary course of business, including, as applicable, in accordance with the terms and conditions of the Debtors' prepetition contractual relationships with Creditors, and for certain related relief, as more fully described in this Motion.  On an interim basis, the Debtors only seek authorization to pay prepetition amounts owed to the Creditors on account of the Claims in an aggregate amount not to exceed $2.9 million.  Additionally, the Debtors seek that the order require that (a) a Creditor that is subject to a prepetition contract with the Debtors maintain or apply, as applicable, contractual terms ("Customary Terms") during the pendency of the chapter 11 cases that are at least as favorable as those terms existing as of the Petition Date as a condition to receiving any payment under the order and (b) if a Creditor, after receiving a payment under the order, ceases to provide its Customary Terms, then the Debtors may, in their sole discretion, deem such payment to apply instead to any postpetition amount that may be owing to such Creditor or treat such payment as an avoidable postpetition transfer of property.  Finally, the Debtors request that the Court modify the automatic stay to permit the Creditors to proceed with litigation commenced before the Petition Date against the Debtors as the Debtors deem appropriate.

81.    **The Claims**.  The Creditors provide the Debtors goods and services in the ordinary course of business including, among other things, parts, equipment and other supplies,

---

[10]    *See Motion of Hercules Offshore, Inc., et al., for Entry of An Order Authorizing the Debtors to Pay Prepetition Claims of General Unsecured Creditors In the Ordinary Course of Business*, filed concurrently herewith.

shipping, warehousing, information technology services, financial services, leases of property and equipment, maintenance and repair services, legal services, human resources services, consulting and advisory services and other basic business necessities for the operation of the Debtors' businesses. Correspondingly, the Debtors incur numerous fixed, liquidated, and undisputed payment obligations to the Creditors in the ordinary course of business (the "Claims") that aggregated to approximately $10 million per month on average for the six months prior to the Petition Date, including approximately $1 million per month in obligations to foreign creditors.

82.    The following table contains summary descriptions of the Claims, and the Debtors' estimate of the amounts of the Claims accrued as of the Petition Date, and, of those amounts, the amounts that are due in the ordinary course of business within 21 days of the Petition Date:

| Category | Description of Services Provided | Approximate Amount Accrued as of the Petition Date[11] | Approximate Amount Due Within 21 Days |
|---|---|---|---|
| Equipment and Supplies | Equipment and supplies used in the operation of the Debtors' vessels | $146,000 | $146,000 |
| Services | Services provided in the operation of the Debtor' vessels and facilities and in its administration | $838,000 | $838,000 |
| Transportation and Logistics | Shipping services and transportation of materials, supplies and personnel | $800,000 | $414,000 |

---

[11] Estimates are based on balances as of April 30, 2016, as adjusted for identified transactions and payments since that date.

| Staffing/Training | Staffing agencies and purchased training services | $195,000 | $195,000 |
|---|---|---|---|
| Repairs and Maintenance | Repairs and maintenance of the Debtors' vessels and land-based facilities | $401,000 | $401,000 |
| Other | Other vendors and suppliers | $1,261,000 | $780,000 |
| **Total** | | $3,641,000 | $2,774,000 |

83.    The Debtors estimate that, as of the Petition Date, they owe a total of approximately $3.6 million to $6 million on account of undisputed Claims (other than amounts owing for wages, taxes and insurance).  The Debtors are not seeking to pay these amounts immediately; rather the Debtors will pay such amounts as they become due and payable in the ordinary course of the Debtors' businesses.  As of the Petition Date, the Debtors have approximately $208 million in cash on hand.  Cash maintained by the Debtors and the cash generated in the ordinary course of their businesses will provide ample liquidity for payment of the Claims, as well as for the Debtors to conduct operations during the chapter 11 cases as they move forward with the monetization of their assets and administer the chapter 11 cases.

84.    The Debtors have relationships with upwards of 1,100 trade vendors and suppliers, of whom approximately 225 were Creditors as of the Petition Date, that provide the Debtors goods and services needed to run the Debtors' businesses.  In many cases, including where a Creditor may itself be facing financial hardship, the Debtors' failure to pay Claims may result in Creditors' stopping work for or deliveries to the Debtors, which may severely disrupt the Debtors' operations as they move forward with the monetization of their assets.  That disruption may occur before the Debtors would be able to successfully bring an action in the

Court to compel performance or otherwise enforce the automatic stay.  Also, the Debtors interact with the Creditors pursuant to a variety of arrangements, including many arrangements that are not executory in nature.  The counterparty of such an arrangement may not agree to continue to do business with the Debtors unless paid on account of prepetition amounts due from the Debtors and would be under no obligation to do so.

85.    Material disruption to the Debtors' operations that may result from nonpayment of the Claims could threaten the Debtors' ability to successfully monetize their assets and wind down their operations in accordance with implementation of the Plan.  If the holders of the Claims refuse to transact with the Debtors or limit credit or other trade terms, the operations of the Debtors' businesses could be significantly disrupted.

86.    The goods and services the Creditors provide to the Debtors are absolutely necessary for the Debtors to conduct their business in the ordinary course as they begin the process of monetizing their assets in order to implement the terms set forth in the Plan.  A Creditor's non-performance could materially disrupt the Debtors' ability to operate its vessels and perform other services and harm the Debtors' customer relationships.  The Debtors cannot rely on bringing a motion to the Court to compel a Creditor to address potential holdups as its sole means of ensuring uninterrupted supply of goods and services.  Having the authority to pay the Claims will greatly help the Debtors ensure a smooth transition into chapter 11 and keep a clear path to consummate the transactions contemplated by the Plan in such a way that maximizes the value of the Debtors' estates for their stakeholders.

87.    The Debtors are currently engaged in litigation with various Creditors, concerning, among other things, regulatory, employment, and workers' compensation matters. The Debtors believe that the cost and inconvenience of imposing the automatic stay on pending

litigation is not justified in light of the fact that the Debtors are seeking to confirm the Plan on an expedited time frame, after which the litigation will resume. Moreover, staying a Creditor's litigation could potentially defeat one of the goals of the relief requested herein: to provide ride-through treatment for the Creditors in an effort to avoid any impact on the relationship between them and the Debtors as a result of the chapter 11 cases.

## II.    Cash Management Motion.[12]

88.    **Relief Requested**.  The Debtors seek authority to continue to operate the Cash Management System in the day-to-day operation of their businesses, and to honor certain prepetition obligations in accordance with the operation of the Cash Management System. Specifically, the Debtors request authority to: (i) continue to use, with the same account numbers, each of the Bank Accounts; (ii) treat the Bank Accounts for all purposes as accounts of the Debtors as debtors in possession; and (iii) conduct banking transactions by all usual means and debit the Bank Accounts on account of all usual items and payment instructions.

89.    Additionally, the Debtors seek authority to: (i) use, in their present form, all business forms (including check stock, letterhead, purchase orders, and invoices) and other correspondence and documents related to the Bank Accounts, without reference to the Debtors' status as debtors in possession; and (ii) continue the Intercompany Transactions between and among the Debtors and the Non-Debtor Subsidiaries in the ordinary course of business and in accordance with historical practices. The Debtors further request authority for the Banks to: (i) continue to maintain, service, and administer the Bank Accounts; (ii) debit the Bank Accounts

---

[12]    *See Motion of Hercules Offshore, Inc., et al., for Entry of Interim and Final Orders (a) Authorizing the Debtors to (i) Continue to Operate Their Cash Management System, (ii) Honor Certain Prepetition Obligations Related Thereto, (iii) Maintain Existing Business Forms, and (iv) Continue to Perform Intercompany Transactions, (b) Authorizing and Directing the Debtors' Banks to Honor All Related Payment Requests, (c) Waiving the Debtors' Compliance with Investment Guidelines Set Forth in Section 345(b) of The Bankruptcy Code and (d) Granting Related Relief*, filed concurrently herewith.

in the ordinary course of business on account of (a) all checks drawn on the Bank Accounts that are cashed at the Banks or exchanged for cashier's checks by the payees thereof prior to the Petition Date, (b) all checks or other items deposited in one of the Bank Accounts at the Banks prior to the Petition Date that have been dishonored or returned unpaid for any reason, together with any fees and costs in connection therewith, and (c) all undisputed prepetition amounts outstanding as of the date hereof, if any, owed to any Bank as fees or service charges for the maintenance of any aspect of the applicable Cash Management System.  Finally, the Debtors seek to continue their existing Investment Practices and request that the Court waive the Debtors' compliance with investment guidelines set forth in Bankruptcy Code section 345(b).

90.    **The Cash Management System**.  The Debtors and their Non-Debtor Subsidiaries maintain a Cash Management System, which is comprised of 57 Bank Accounts, including investment accounts, which Bank Accounts are set forth on Exhibit C to the motion and located at the Banks listed on that exhibit.    The Cash Management System is comparable to the centralized cash management system used by similarly situated companies to manage the cash of operating units in a cost-effective, efficient manner.  The Debtors use the Cash Management System in the ordinary course of their business to collect, transfer, and disburse funds generated from their operations and to facilitate cash monitoring, forecasting, and reporting.  The Debtors' treasury department maintains daily oversight over the Cash Management System and implements cash management controls for entering, processing, and releasing funds, including in connection with Intercompany Transactions.  Additionally, the Debtors' corporate accounting department regularly reconciles the Debtors' books and records to ensure that all transfers are accounted for properly.  On average, approximately $3.9 million in receipts and $7.5 million in

disbursements flows through the Cash Management System on a weekly basis to service cash received and costs incurred in connection with the Debtors' business operations.

91.    The relief requested in this Motion will help minimize any disruption in Hercules' business operations as they move forward with the monetization of their assets during the period between the Petition Date and confirmation of the Plan, and preserve the value of the Debtor's estate.  Indeed, any disruptions in the Cash Management System could lead to delays in satisfying Hercules' obligations to its vendors and suppliers and meeting the demands of its various customers.  In order to avoid the potential erosion of value that could ensue from any such interruptions, the Debtor believes it is imperative that it be authorized to continue the Cash Management System consistent with Hercules' historical practice

92.    Moreover, requiring the Debtors to maintain separate accounts now would decentralize Hercules' Cash Management System because, given Hercules' complex corporate and financial structure, it would be difficult to establish an entirely new cash management system for the Debtors.  The delays that would result from opening the new accounts, revising cash management procedures, and instructing customers to redirect payments would disrupt Hercules' business operations at this critical time when they are moving forward with monetizing their assets, have little or no benefit to the Debtors' estates, and erode the value of the Debtors' enterprise to the detriment of all stakeholders.

93.    The Debtors receive funds from customers and pay funds to creditors by wire, ACH transfer, and other similar means, as well as by check.  The Debtors also utilize a credit card account through Capital One to pay for travel and other business expenses of its executive and management level employees.  The Debtors and Non-Debtor Subsidiaries also conduct

transactions between and among themselves through wires, cash transfers and automated debits and credits.

94.    **The Bank Accounts.**    Hercules generates revenue primarily by leasing and operating its mobile offshore rig and liftboat vessels and performing related services.  The funds generated from these operations are deposited into Bank Accounts associated with the Debtor or Non-Debtor Subsidiary entity that is party to the applicable customer contract.  The majority of the Bank Accounts, and the central locus of the Hercules cash management activities, reside at Amegy Bank of Texas, N.A. ("Amegy").  The Amegy Bank Accounts ultimately concentrate into one of the three master operating accounts associated with the domestic or international regional segment of Hercules' operations.  Funds from these three master operating accounts are then paid directly or transferred back to entity-level Bank Accounts to be disbursed to pay vendors, employees, and other costs associated with the business.  Additionally, there are three (3) standalone operating accounts within the Amegy account structure.  The diagram attached to the motion as Exhibit D provides an overview of the Amegy Bank Accounts.

95.    Although the Bank Accounts at Amegy handle the primary in-flows and out-flows of funds associated with the Debtors' operations, Hercules maintains twenty-five (25) other Bank Accounts of various types and for various purposes at other banking institutions in the United States and abroad.  The Bank Accounts are generally segregated by operating region, such that, to the extent a Bank Account of a Non-Debtor requires additional funds from elsewhere within Hercules, those funds are transferred from another Non-Debtor and funds of a Debtor entity are not transferred to a Non-Debtor Subsidiary, except in certain unusual circumstances.

96.    **Amegy Accounts**.    The Bank Accounts at Amegy primarily fall under three separate master operating accounts: the master operating account held by Debtor Hercules

Drilling Company LLC (the "Domestic Master Account"); the master operating account held by Non-Debtor Hercules Oilfield Services Ltd. (the "HOSL Master Account") and the master operating account held by Non-Debtor Hercules Offshore Middle East Ltd. (the "HOME Master Account", and together with the Domestic Master Account and the HOSL Master Account, the "Master Accounts").  The Master Accounts concentrate and distribute funds to certain associated accounts (the "Sub-Accounts").   The Domestic Master Account concentrates funds from numerous Sub-Accounts associated with the Debtors' domestic operations while the HOSL Master Account and the HOME Master Account each concentrate funds from Sub-Accounts associated with a separate sector of the Non-Debtor Subsidiaries' international operations.

97.     Each of the Master Accounts is, for the most part, self-sustaining, in that it receives sufficient funds from its Sub-Accounts to cover outgoing payments from the Master Accounts and its Sub-Accounts.  However, in certain unusual circumstances, a Master Account may run low on funds and require additional funds from elsewhere within the overall Hercules enterprise.  If this occurs in either the HOME Master Account or HOSL Master Account, funds from the other will be transferred, such that no Debtor funds will be transferred to a Non-Debtor Subsidiary Bank Account.  If the HOME Master Account or the HOSL Master Account does not have sufficient funds to meet the need, the Domestic Master Account will make the appropriate transfer.  However, such Debtor to Non-Debtor Subsidiary transfers are rare and not only have no such transfers occurred since approximately October 2013, no such transfers are expected or forecasted during the time in which the Debtors contemplate being in chapter 11.  Similarly, there are rarely, if ever, non-Debtor to Debtor account transfers.

### i. *Domestic Amegy Accounts*

98.    The Domestic Master Account is the central operating account associated with the Hercules domestic operations.  The Domestic Master Account collects funds from and disburses funds to ten (10) other Bank Accounts at Amegy (together with the Domestic Master Account, the "Domestic Amegy Accounts") that are held in the name of Debtor entities.  Seven (7) of these Bank Accounts are zero balance accounts that sweep all funds remaining in the account at the end of each day into the Domestic Master Account.  These zero balance accounts receive funds generated from domestic operations, including funds paid to the Debtors in connection with customer contracts, and disburse funds to satisfy domestic payables.  One such zero balance account is a payroll account in the name of Hercules Offshore Services LLC, the domestic Debtor entity that employs the Debtors' domestic employees.  The remaining Domestic Amegy Accounts consist of a controlled disbursement accounts payable account, a self-directed investment account and a sub-account, all in the name of Hercules Drilling Company, LLC.

### ii. *HOSL Amegy Accounts*

99.    The HOSL Master Account is the central operating account in the name of Hercules Oilfield Services Ltd., a Non-Debtor Subsidiary, associated with the Hercules' international operations (other than drilling operations in Saudi Arabia, domestically-owned liftboats that operate internationally and international operations of Debtor Cliffs Drilling Company).  The HOSL Master Account collects funds from and disburses funds to ten (10) Sub-Accounts at Amegy (together with the HOSL Master Account, the "HOSL Amegy Accounts") held in the name of certain Non-Debtor Subsidiaries.  Nine (9) of these Bank Accounts are zero balance accounts that sweep remaining funds at the end of each day into the HOSL Master Account.  These zero balance accounts receive funds generated from international operations,

including funds paid to the applicable Non-Debtor Subsidiary in connection with customer contracts, and disburse funds to satisfy payables of such Non-Debtor Subsidiary. One such zero balance Bank Account is a payroll account in the name of Hercules International Offshore Ltd. that is used to pay certain of the Non-Debtor Subsidiaries' international employees. The remaining HOSL Amegy Account in the master account structure consists of a self-directed investment account held in the name of Hercules Oilfield Services Ltd.

100.     Additionally, Hercules maintains three (3) stand-alone bank accounts with Amegy used to conduct operations for Non-Debtor Subsidiaries.

*iii.     HOME Amegy Accounts*

101.     The HOME Master Account is the central operating account in the name of Hercules Offshore Middle East Ltd., a Non-Debtor Subsidiary, associated with Hercules' drilling operations in Saudi Arabia. The HOME Master Account collects funds from and disburses funds to three (3) other Sub-Accounts at Amegy:  (1) a deposit account in the name of Non-Debtor Subsidiary Hercules Offshore Arabia, Ltd. that receives funds generated from Saudi operations, including funds paid to Hercules Offshore Arabia Ltd. in connection with customer contracts, and disburses funds to satisfy payables related to its operations and (2) a self-directed investment account, with a sub-account, held in the name of Hercules Offshore Middle East Ltd.

102.     **Non-Amegy Bank Accounts**.  Hercules has a number of operating accounts in foreign locations in order to enable it to conduct its business locally.

- Hercules maintains eleven (11) local operating accounts with HSBC in the United Kingdom, the United Arab Emirates, Malaysia, India and Saudi Arabia.  With the exception of an Indian account, which is in the name of Debtor Cliffs Drilling Company, these accounts are in the name of Non-Debtor Subsidiaries.

- Hercules maintains one (1) account with Citibank located in Trinidad in the name of Cliffs Drilling Company, a Debtor entity.  The account

was used to fund local operations in Trinidad, but is now dormant and in the process of being closed

- Hercules maintains (2) current checking accounts with ING Bank in Luxembourg.  These accounts are in the name of Non-Debtor Subsidiaries Discovery Offshore, S.A. and Discovery Offshore (Gibraltar) Ltd.

- Non-Debtor Subsidiary Hercules Offshore (Nigeria) Limited maintains (3) deposit accounts with United Bank of Africa in Nigeria.  These are used to conduct operations in West Africa and are in the name of a Non-Debtor Subsidiary.

103.     **Bank Fees**.  The Debtors pay approximately $8,069 per month in bank fees incurred in connection with the Bank Accounts (the "Bank Fees").  The Debtors pay the Bank Fees as they come due on a rolling basis over the course of each month, typically by direct debit. The Debtors estimate that they owe approximately $1,344 in Bank Fees as of the Petition Date.

104.     The Debtors respectfully request that the Court authorize the Banks to continue to maintain, service and administer the Bank Accounts as accounts of the Debtors as debtors in possession, without interruption and in the ordinary course of business as set forth in the Motion.

105.     **Hercules' Investment Practices**.  In the ordinary course of business, Hercules engages in certain investment practices to preserve principal and maintain sufficient liquidity to meet operational objectives, contractual obligations, and debt requirements, while seeking to maximize investment yield, consistent with a strict internal investment policy (collectively, the "Investment Practices").  As part of its Investment Practices and utilizing the Cash Management System, Hercules invests, on an overnight basis, excess funds in the Amegy Master Accounts (i.e., funds that have not otherwise been transferred to other Bank Accounts).  It does so by sweeping such excess funds into three (3) investment accounts at Amegy (the "Overnight Investment Accounts"), one associated with each Amegy Master Account.   The principal investments within the Overnight Investment Accounts are in money market mutual funds, obligations issued by the U.S. Treasury, obligations of a U.S. Federal Agency or U.S.

Government sponsored enterprise, auction rate certificates, auction preferred stock, certificates of deposit, commercial paper, municipal securities, corporate debt, repurchase transactions, variable rate demand obligations, and Eurodollar time deposits.  The funds in each Overnight Investment Account are then swept back into each respective Amegy Master Account the following morning.

106.    For the Debtors, the overnight investment account is held at Fidelity Investments in the Fidelity Institutional Money Market Prime Money Market Portfolio – CL I, ticker FIDXX.

107.    Additionally, Hercules maintains three (3) investment accounts with Capital One Bank in Houston, each of which is associated with one of the Amegy Master Accounts. Hercules also maintains two (2) investment accounts with Comerica Bank in Houston, one in the name of HERO and one in the name of Non-Debtor Subsidiary Hercules Oilfield Services Ltd. HERO also maintains two (2) investment accounts at HSBC in New York.  Hercules Oilfield Services Ltd. also maintains an investment account at DNB Bank ASA in New York.  Finally, Hercules maintains two additional investment accounts at Amegy that are not currently in use.

108.    If the Debtors are limited to direct investments in U.S. government securities, they would need to (i) completely overhaul their existing investment approach and (ii) implement new associated controls and procedures.  The risk of a compliance breakdown in connection with these activities is at least as large as any incremental risk posed by investment in the Overnight Investment Accounts, and the costs associated with these activities would likely exceed the yield on the investments.  The Debtors are part of a large, sophisticated enterprise, and their operations team has determined that investment in the Overnight Investment Accounts will benefit the Debtors and the value of the Debtors' estates.

109.    Requiring Hercules to change its Bank Accounts, Investment Practices and other components of the Cash Management System would be a significant disruption to Hercules, which relies on the Cash Management System for its business operations.    Under the circumstances, where the Debtors have the required support to confirm the Plan on an expedited timeline, the Debtors should be permitted to continue their Investment Practices and the Cash Management System.

110.    **Business Forms**.    As part of the Cash Management System, the Debtors utilize numerous preprinted business forms (the "Business Forms") in the ordinary course of their business.    The Debtors also maintain books and records to document, among other things, their profits and expenses.    To minimize expenses to their estates and avoid confusion on the part of employees, customers, vendors, and suppliers during the pendency of the chapter 11 cases, the Debtors request that the Court authorize their continued use of all correspondence and business forms (including, without limitation, letterhead, purchase orders, invoices, and preprinted checks) as such forms were in existence immediately before the Petition Date and thereafter, without reference to the Debtors' status as debtors in possession, rather than requiring the Debtors to incur the expense and delay of ordering entirely new business forms as required under the U.S. Trustee Guidelines.

111.    **Intercompany Transactions**.    The Debtors and the Non-Debtor Subsidiaries maintain business relationships and engage in transactions with each other resulting in intercompany loans, receivables, and payables in the ordinary course of business (the "Intercompany Transactions" and claims arising from such Intercompany Transactions, the "Intercompany Claims").    The Debtors and Non-Debtor Subsidiaries track all fund transfers in

their respective accounting systems and can ascertain, trace, and account for all Intercompany Transactions.

112.    Such Intercompany Transactions are frequently conducted, (a) among the Debtors, and (b) among the Non-Debtor Subsidiaries.  Normally, the Debtors do not transfer funds from their Bank Accounts to the Bank Accounts of Non-Debtor Subsidiaries (such transfers, "Non-Debtor Subsidiary Transfers").  However, Hercules monitors the cash balances of the Master Accounts daily, in light of anticipated cash receipts and payment obligations.  If the funds in one of the Master Accounts is determined to be insufficient to meet anticipated payment obligations, Hercules will, in consultation with its tax team, make a transfer from another Master Account that it deems appropriate.  Generally, if either of the HOME Master Account or the HOSL Master Account requires additional funds, a transfer will be made from the other, such that no funds of a Debtor will flow to a Non-Debtor Subsidiary.  However, on certain rare occasions, including if an event occurs that gives rise to a significant capital expenditure, the funds in the HOME Master Account and the HOSL Master Account may be insufficient to cover their combined payment obligations.  In such instances, funds from the Domestic Master Account may be transferred to the HOME Master Account or the HOSL Master Account. Although such Non-Debtor Subsidiary Transfers are rare, they are integral to the Hercules enterprise and consistent with Hercules' historical, ordinary-course business practices.  While the Debtors do not anticipate that any transfers from the Domestic Master Account to either of the HOME Master Account or HOSL Master Account, or any other Non-Debtor Subsidiary

Transfers, will be necessary during the chapter 11 cases, it requests that such Non-Debtor Subsidiary Transfers be authorized out of an abundance of caution.[13]

113.    In connection with the daily operation of the Cash Management System, as funds are disbursed throughout the Cash Management System and as business is transacted between the Debtors and between the Non-Debtor Subsidiaries, at any given time there may be Intercompany Claims owing by one Debtor to another Debtor, one Non-Debtor Subsidiary to another Non-Debtor Subsidiary or between a Debtor and a Non-Debtor Subsidiary.   Certain Intercompany Claims are settled in cash while most are reflected as journal entry receivables and payables, as applicable, in the respective Debtors' accounting systems.   If Intercompany Transactions were to be discontinued, the Cash Management System and the Debtors' and Non-Debtor Subsidiaries' operations would be disrupted unnecessarily to the detriment of the Debtors, their creditors, and other stakeholders.

114.    More significantly, the relief requested in this Motion will help minimize any disruption in Hercules' business operations as they move forward with the monetization of their assets during the period between the Petition Date and confirmation of the Plan, and preserve the value of the Debtors' estates.   Indeed, any disruptions in the Cash Management System could lead to delays in satisfying Hercules' obligations to its vendors and suppliers and meeting the demands of its various customers.   In order to avoid the potential erosion of value that could ensue from any such interruptions, the Debtors believe it is imperative that it be authorized to continue the Cash Management System consistent with Hercules' historical practice.

---

[13]    In addition, certain employees of Non-Debtor Subsidiaries are covered under the Debtors' self-funded insurance plan.  An immaterial portion of the monthly insurance disbursements made pursuant to such insurance plan may be made for the benefit of those non-Debtor employees.

### III.    **Cash Collateral Motion**.[14]

115.    **Relief Requested**.    The Debtors seek entry of interim and final orders (i) authorizing the Debtors to use the Prepetition Collateral, including the Cash Collateral, (ii) granting the Prepetition Secured Parties adequate protection, (iii) modifying the automatic stay imposed by Bankruptcy Code section 362 to the extent necessary to implement and effectuate the terms and provisions of the Interim Order, (iv) scheduling a final hearing and (v) granting the related relief.

116.    **Use of Cash Collateral**.    The Debtors have an immediate need to obtain access to the Prepetition Collateral, including Cash Collateral, to, among other things, effectuate a controlled wind-down of their operations and to implement a successful monetization of their assets in order to maximize value for the benefit of all parties in interest.

117.    The Prepetition Collateral consists of substantially all of the Debtors' personal and real property, which includes, among others things, the Debtors' fleet of jackup rigs, liftboat vessels and equity interests in the Non-Debtor Subsidiaries.    The Debtors seek to implement an orderly wind-down of their operations and to monetize their remaining assets in such a way as to maximize value for all of their stakeholders, including, but not limited to, the Prepetition Lenders, holders of unsecured claims and holders of equity interests.    The Debtors' ability to conduct an orderly wind-down of their operations and maximize value for distribution among their stakeholders is largely dependent upon their ability to access and monetize the Prepetition Collateral.

118.    The Debtors also rely on the Cash Collateral to fund working capital, capital expenditures, research and development efforts, and for other general corporate purposes.    While

---

[14]    *See Motion of Hercules Offshore, Inc. et al, for Entry of Interim and Final Orders (i) Authorizing the Use of Cash Collateral, (ii) Granting Prepetition Secured Parties Adequate Protection, (iii) Scheduling a Final Hearing, and (iv) Granting Related Relief*, filed concurrently herewith.

some of the Debtors' cash needs may change during the wind-down, during the chapter 11 cases, the Debtors will need their operating revenue cash flow and existing liquidity to satisfy payroll, pay suppliers, meet overhead, pay utility expenses, as well as make any other payments which are essential for the continued management of the Debtors' businesses as the Debtors attempt to implement a controlled wind-down of their operations.[15]   The ability of the Debtors to satisfy these expenses as and when due, in accordance with the terms of the Budget, is essential to the Debtors' ability to wind down their businesses and secure the highest possible recoveries for all of their stakeholders.

119.    Pursuant to the Cash Collateral Motion, the Debtors' seek to provide adequate protection to the Prepetition Secured Parties for any Collateral Diminution in the form of, among other things, the Adequate Protection Liens, Adequate Protection Claims and Adequate Protection Payments (including a one-time $35 million principal payment on the First Lien Claims, monthly payments equal to the amount of interest accruing on the First Lien Claims at the applicable non-default rate under the Prepetition Credit Agreement and the payment of the fees and expenses of the advisors for the First Lien Agent, the Ad Hoc Group, Luminus and Soros, two of the largest holders of First Lien Claims).   The one-time $35 million principal payment was agreed to as part of the negotiations between the Debtors and the Consenting First Lien Lenders over the terms of the Restructuring Support Agreement, which resulted in an agreement to allow holders of General Unsecured Claims and HERO Common Stock to receive recoveries before holders of First Lien Claims are paid in full.

---

[15]    Attached hereto as <u>Exhibit D</u> is a copy of the Debtors' thirteen week cash flow projections.

## IV.    Prime Clerk LLC Retention Application Pursuant to Section 156(c).[16]

120.    **Relief Requested**.  The Debtors seek entry of an order appointing Prime Clerk

LLC ("Prime Clerk") as the Claims and Noticing Agent for the Debtors and their chapter 11

cases, including assuming full responsibility for the distribution of notices and the maintenance,

processing and docketing of proofs of claim filed in the Debtors' chapter 11 cases.

121.    **Services to be Provided**.  The Prime Clerk retention application pertains only to

the work to be performed by Prime Clerk under the Clerk's delegation of duties permitted by 28

U.S.C. § 156(c) and Local Rule 2002-1(f).  Any work to be performed by Prime Clerk outside of

this scope is not covered by the application or by any order granting approval hereof.

Specifically, Prime Clerk will perform the following tasks in its role as Claims and Noticing

Agent, as well as all quality control relating thereto:

    a.    Prepare and serve required notices and documents in the chapter 11 cases in accordance with the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") in the form and manner directed by the Debtors and/or the Court, including (i) notice of the commencement of the chapter 11 cases and the initial meeting of creditors under Bankruptcy Code section 341(a), (ii) notice of any claims bar date, (iii) notices of transfers of claims, (iv) notices of objections to claims and objections to transfers of claims, (v) notices of any hearings on a disclosure statement and confirmation of the Debtors' plan or plans of reorganization, including under Bankruptcy Rule 3017(d), (vi) notice of the effective date of any plan and (vii) all other notices, orders, pleadings, publications and other documents as the Debtors or Court may deem necessary or appropriate for an orderly administration of the chapter 11 cases;

    b.    If applicable, maintain an official copy of the Debtors' schedules of assets and liabilities and statements of financial affairs (collectively, the "Schedules"), listing the Debtors' known creditors and the amounts owed thereto;

    c.    Maintain (i) a list of all potential creditors, equity holders and other parties-in-interest and (ii) a "core" mailing list consisting of all parties

---

[16]    *See Debtors' Application for Appointment of Prime Clerk LLC as Claims and Noticing Agent*, filed concurrently herewith.

described in Bankruptcy Rule 2002(i), (j) and (k) and those parties that have filed a notice of appearance pursuant to Bankruptcy Rule 9010; update and make said lists available upon request by a party-in-interest or the Clerk;

d.   If applicable, furnish a notice to all potential creditors of the last date for filing proofs of claim and a form for filing a proof of claim, after such notice and form are approved by the Court, and notify said potential creditors of the existence, amount and classification of their respective claims as set forth in the Schedules, which may be effected by inclusion of such information (or the lack thereof, in cases where the Schedules indicate no debt due to the subject party) on a customized proof of claim form provided to potential creditors;

e.   Maintain a post office box or address for the purpose of receiving claims and returned mail, and process all mail received;

f.   For *all* notices, motions, orders or other pleadings or documents served, prepare and file or cause to be filed with the Clerk an affidavit or certificate of service within seven (7) business days of service which includes (i) either a copy of the notice served or the docket number(s) and title(s) of the pleading(s) served, (ii) a list of persons to whom it was mailed (in alphabetical order) with their addresses, (iii) the manner of service and (iv) the date served;

g.   Process all proofs of claim received, including those received by the Clerk, check said processing for accuracy and maintain the original proofs of claim in a secure area;

h.   Maintain the official claims register for each Debtor (collectively, the "Claims Registers") on behalf of the Clerk; upon the Clerk's request, provide the Clerk with certified, duplicate unofficial Claims Registers; and specify in the Claims Registers the following information for each claim docketed: (i) the claim number assigned, (ii) the date received, (iii) the name and address of the claimant and agent, if applicable, who filed the claim, (iv) the amount asserted, (v) the asserted classification(s) of the claim (*e.g.*, secured, unsecured, priority, *etc.*), (vi) the applicable Debtor and (vii) any disposition of the claim;

i.   Implement necessary security measures to ensure the completeness and integrity of the Claims Registers and the safekeeping of the original claims;

j.   Record all transfers of claims and provide any notices of such transfers as required by Bankruptcy Rule 3001(e);

k.   Relocate, by messenger or overnight delivery, all of the court-filed proofs of claim to the offices of Prime Clerk, not less than weekly;

l.     Upon completion of the docketing process for all claims received to date for each case, turn over to the Clerk copies of the Claims Registers for the Clerk's review (upon the Clerk's request);

m.    Monitor the Court's docket for all notices of appearance, address changes, and claims-related pleadings and orders filed and make necessary notations on and/or changes to the claims register and any service or mailing lists, including to identify and eliminate duplicative names and addresses from such lists;

n.     Identify and correct any incomplete or incorrect addresses in any mailing or service lists;

o.     Assist in the dissemination of information to the public and respond to requests for administrative information regarding the chapter 11 cases as directed by the Debtors or the Court, including through the use of a case website and/or call center;

p.     Monitor the Court's docket in the chapter 11 cases and, when filings are made in error or containing errors, alert the filing party of such error and work with them to correct any such error;

q.     If the chapter 11 cases are converted to cases under chapter 7 of the Bankruptcy Code, contact the Clerk's office within three (3) days of notice to Prime Clerk of entry of the order converting the cases;

r.     Thirty (30) days prior to the close of the chapter 11 cases, to the extent practicable, request that the Debtors submit to the Court a proposed order dismissing Prime Clerk as Claims and Noticing Agent and terminating its services in such capacity upon completion of its duties and responsibilities and upon the closing of the chapter 11 cases;

s.     Within seven (7) days of notice to Prime Clerk of entry of an order closing the chapter 11 cases, provide to the Court the final version of the Claims Registers as of the date immediately before the close of the chapter 11 cases; and

t.     At the close of the chapter 11 cases, (i) box and transport all original documents, in proper format, as provided by the Clerk's office, to (A) the Philadelphia Federal Records Center, 14700 Townsend Road, Philadelphia, PA 19154 or (B) any other location requested by the Clerk's office; and (ii) docket a completed SF-135 Form indicating the accession and location numbers of the archived claims.

122.    The Claims Registers shall be open to the public for examination without charge during regular business hours and on a case-specific website maintained by Prime Clerk.

## V.   Joint Administration Motion.[17]

123.   **Relief Requested**.   The Debtors seek entry of an order directing the joint administration of the chapter 11 cases for procedural purposes only and directing the Clerk of the Court to maintain one file and one docket for all seventeen of the Debtors' chapter 11 cases under the case name and number assigned to Hercules Offshore, Inc.

124.   **The Debtors' Corporate Structure**.   The Debtors are "affiliates" pursuant to Bankruptcy Code section 101(2) and each Debtor's chapter 11 case is pending in the Court. Thus, the conditions set forth in Bankruptcy Rule 1015(b) for joint administration of the chapter 11 cases is are satisfied.   Various Debtors play a role in other Debtor's capital structures, e.g., as guarantors of obligations of the others.   Numerous parties have interests in the cases of multiple Debtors.   Many of the motions, hearings, and orders in the chapter 11 cases will affect each and every Debtor entity.   Joint administration of the chapter 11 cases will reduce parties' fees and costs by avoiding duplicative filings and objections and make the most efficient use of the Court's valuable resources.   Joint administration also will allow the Office of the United States Trustee for the District of Delaware and all parties in interest to monitor the chapter 11 cases with greater ease and efficiency.   No party in interest will be prejudiced by the joint administration of the chapter 11 cases.

## VI.   Disclosure Statement and Plan Scheduling Motion.[18]

125.   **Relief Requested**.      The Debtors seek entry of the Order, (a) scheduling the Confirmation Hearing, (b) establishing the Objection Deadline and approving related procedures,

---

[17]   *See Debtors' Motion for an Order Directing Joint Administration of Chapter 11 Cases*, filed concurrently herewith.

[18]   *See Motion of Hercules Offshore, Inc., et al., For Entry of an Order (a) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (b) Establishing a Plan and Disclosure Statement Objection Deadline and Related Procedures, (c) Approving the Solicitation Procedures, and (d) Approving the Confirmation Hearing Notice*, filed concurrently herewith.

(c) approving the Solicitation Procedures, and (d) approving the form and manner of distributing the Notice.

126.    In connection with the foregoing, the Debtors request that the Court approve the following schedule of proposed dates, subject to the Court's availability:

| Event | Date |
| --- | --- |
| Voting Record Date | May 23, 2016 |
| Start of Solicitation | May 31, 2016 |
| Claims Voting Deadline | June 3, 2016 at 4:00 p.m. (ET) |
| Petition Date | June 5, 2016 |
| Notice Date | June 8, 2016 |
| Equity Voting Deadline | June 28, 2016 at 4:00 p.m. (ET) |
| Confirmation Objection Deadline | July 6, 2016 |
| Confirmation Brief and Reply Deadline and Limited Bar Date | July 11, 2016 |
| Confirmation Hearing and Final Cash Collateral Hearing | July 13, 2016 at 10:00 a.m. (ET) |

127.    **The Solicitation Procedures**.  The Debtors commenced solicitation of holders of First Lien Claims and HERO Common Stock regarding the Plan prior to the Petition Date in accordance with the following Solicitation Procedures and the Bankruptcy Code.  On May 31, 2016, the Debtors caused their solicitation agent, Prime Clerk LLC (the "Solicitation Agent"),[19] to distribute packages containing the Disclosure Statement, the Plan, and ballots (the "Solicitation Packages") to holders of Claims and Equity Interests entitled to vote to accept or reject the Plan as of the Voting Record Date.  Under the Plan, the only Classes of Claims and

---

[19] The Debtors have applied for authority to retain Prime Clerk LLC as their claims and noticing agent. *See Application of Hercules Offshore, Inc., et. al, for Appointment of Prime Clerk LLC as Claims and Noticing Agent*, which has been filed contemporaneously herewith.  The Debtors also plan to apply for authority to retain Prime Clerk as its administrative advisor pursuant to Bankruptcy Code section 327(a) to assist the Debtors with, among other things, matters related to solicitation and tabulation of votes on the Plan.

Equity Interests entitled to vote are Class 3, which consists of holders of First Lien Claims, and Class 7, which consists of holders of HERO Common Stock.  *See* Plan Art. III.C.

128.    The Disclosure Statement and ballots delivered to holders of Class 3 First Lien Claims and Class 7 HERO Common Stock instructed such holders to follow the instructions contained in the ballots (and described in the Disclosure Statement).  The ballots instructed such holders to complete and submit their ballots to cast their votes to accept or reject the Plan.  The holders of Class 3 First Lien Claims were encouraged to submit a customized electronic ballot via online transmission through the E-Ballot platform on the Solicitation Agent's website. Holders of Class 3 First Lien Claims that were unable to utilize the E-Ballot platform were permitted to submit paper ballots to the Solicitation Agent via overnight courier or personal delivery.

129.    In addition to voting on the Plan, the holders of Class 3 First Lien Claims and Class 7 HERO Common Stock were provided with the opportunity to opt out of the releases contained in Article V.E of the Plan (the "Release") and related instructions.  Each holder of a First Lien Claim and each registered holder of HERO Common Stock was explicitly informed in the Disclosure Statement and the ballot that, in order to opt out of the Release, such holder needed to check the opt out box on its ballot and submit its ballot such that it is actually received by the Solicitation Agent on or before the Claims Voting Deadline or the Equity Voting Deadline, as applicable, in order for its election to opt out of the Release to be valid.   Holders of Class 7 HERO Common Stock that hold through a Nominee were informed that they must instruct their Nominee to effect their opt out election in accordance with the instructions on the equity release opt out election form (the "Equity Release Opt Out Election Form").

130.     Certain holders of Claims and Equity Interests (i.e., holders of Claims and Equity Interests in Classes 1, 2, 4, 5, 6 and 8) were not provided a Solicitation Package because such holders are either: (a) as to Classes 1, 2, 4 and 5, unimpaired under, and conclusively presumed to accept, the Plan under Bankruptcy Code section 1126(f); or (b) as to Classes 6 and 8, impaired, not entitled to receive a distribution on account of such claims or interests under the Plan, and therefore deemed to have rejected the Plan under Bankruptcy Code section 1126(g).

131.     The Debtors' procedures and standard assumptions for tabulating ballots include those set forth in the following table:

| | |
|---|---|
| **Votes Not Counted** | – any ballot or master ballot that is illegible or contains insufficient information to permit the identification of the holder of the Claim or Equity Interest |
| | – any ballot or master ballot that is not actually received by the Solicitation Agent by the Claims Voting Deadline or the Equity Voting Deadline, as applicable |
| | – any unsigned ballot or master ballot |
| | – any ballot or master ballot that partially rejects and partially accepts the Plan |
| | – any ballot or master ballot not marked to accept or reject the Plan or marked both to accept and reject the Plan |
| | – any ballot or master ballot superseded by a later, timely submitted valid ballot |
| | – any improperly submitted ballot or master ballot |
| | – votes in excess of the positions reflected on the records of the stock transfer agent or the depository, as applicable |
| **No Vote Splitting** | – holders are required to vote all of their Claims or Equity Interests within a particular class either to accept or reject the Plan and are not permitted to split any votes |

## VII.    Schedules Waiver and Consolidated List of Creditors Motion.[20]

131.    **Relief Requested**.  the Debtors seek entry of an order (i) authorizing the Debtors to file (a) a consolidated list of creditors in lieu of submitting separate mailing matrices for each Debtor and (b) a consolidated list of the Debtors' thirty-five (35) largest unsecured creditors; (ii) waiving the requirement to file a list of equity security holders; (iii) waiving the requirement, that the Debtors file their Schedules and Statements (other than a Modified Schedule E/F for each Debtor) upon confirmation of the Plan if confirmation occurs on or before the Schedules and Statements Deadline; (iv) waiving the requirement to convene the Section 341 Meeting if the Plan becomes effective on or before the Schedules and Statements Deadline; (v) limiting notice required under Bankruptcy Rule 2002 to be provided in these cases; and (vi) granting related relief.

132.    **The Debtors' List of Creditors**. The Debtors have thousands of creditors.  The Debtors presently maintain computerized lists of the names and addresses of their respective creditors that are entitled to receive notices and other documents in the chapter 11 cases.  The lists are maintained without regard for which entity a party may have a relationship with.  The Debtors believe that the information as maintained in computer files (or those of their agents) may be utilized efficiently to provide interested parties with notices and other similar documents as contemplated by Local Rule 1007-2 on a consolidated basis.  Requiring the Debtors to submit Debtor-specific creditor matrices for each of the Debtors would be an unnecessarily burdensome task and would likely result in duplicate mailings.  Accordingly, the Debtors seek authority to

[20]    *See Debtors' Motion for Entry of An Order (i) Authorizing the Debtors to File (a) Consolidated List of Creditors and (b) Consolidated List of Debtors' Top Thirty-Five Creditors; (ii) Waiving the Requirement to File A List of Equity Security Holders; (iii) Extending the Time, and, Upon Plan Confirmation, Waiving The Requirement, to File Schedules and Statements of Financial Affairs; (iv) Waiving the Requirement to Convene The Section 341 Meeting; (v) Limiting Notice Required Under Bankruptcy Rule 2002; and (vi) Granting Related Relief*, filed concurrently herewith.

file the lists on a consolidated basis, identifying their creditors in the format or formats currently maintained in the ordinary course of the Debtors' businesses.

133.    Additionally, the Debtors request authority to file a single list of their thirty-five (35) largest general unsecured creditors on a consolidated basis.  Because the Top 20 Lists of several of the Debtors could overlap, and certain other Debtors may have fewer than twenty identifiable unsecured creditors, the Debtors submit that filing separate Top 20 Lists for each Debtor would be of limited utility.  In addition, given the international operations of the Debtors and worldwide location of many of their general unsecured creditors, the exercise of compiling separate Top 20 Lists for each individual Debtor could consume an excessive amount of the company's limited time and resources, and could constitute a distraction of management's attention otherwise needed on operations at the start of the chapter 11 cases.  Further, the Debtors do not believe that any of their unsecured creditors will be prejudiced if the Debtors file a single list of their thirty-five (35) largest unsecured creditors because the Plan contemplates that the Debtors' unsecured creditors will be paid in full.  Finally, the Debtors believe a single, consolidated list of the company's thirty-five (35) largest unsecured, non-insider creditors will aid the U.S. Trustee in its efforts to communicate with these creditors.

134.    **List of Equity Security Holders**. The Debtors respectfully submit that the requirements to file a list of equity holders should be waived in these cases.  As of the Petition Date, HERO Common Stock was listed for trading on The Nasdaq Global Select Market ("NASDAQ") and approximately 19,988,898 shares of HERO Common Stock were issued and outstanding.  The Debtors submit that preparing a list of HERO's equity security holders with last known addresses and sending notice of all motions and pleadings to such parties would prove extremely expensive and time-consuming and serve little or no beneficial purpose.  This is

especially true where, as here, the holders of HERO Common Stock have been made aware of the chapter 11 cases and the Plan through the ongoing solicitation process, and the Debtors believe that the chapter 11 cases will be expeditiously concluded.  Moreover, HERO filed with its petition a list of holders of five percent or more of the HERO Common Stock based on information ascertained from filings with the Securities and Exchange Commission (the "SEC").

135.    Even without a list of equity security holders, the Debtors will be able to serve a combined notice of commencement of the cases and the confirmation hearing on each holder of HERO Common Stock.

136.    The equity markets had immediate notice of the execution of the Restructuring Support Agreement, the solicitation of the Plan and Disclosure Statement, and the filing of the chapter 11 cases by virtue of the Debtors filing Form 8-Ks with the SEC, and the Debtors' publication of a notice of commencement of the chapter 11 cases on their public website, www.herculesoffshore.com, the website of the notice and claims agent, http://cases.primeclerk.com/herculesinfo, and in the *Wall Street Journal*.  Similarly, the equity markets will have immediate notice of material events during the chapter 11 cases by virtue of HERO's filing Form 8-Ks with the SEC.

137.    The Debtors other than HERO are all wholly-owned subsidiaries of HERO or another Debtor.  The ownership of these entities will be reflected in the corporate ownership statement filed with their voluntary petitions.  Accordingly, filing a separate list of equity security holders will serve no beneficial purpose.

138.    **Extension and Waiver of Schedules and Statements**.  Although Allowed General Unsecured Claims are unimpaired under the Plan, the Restructuring Support Agreement requires that a limited claims bar date be set solely for specific contingent and unliquidated

claims including, but not limited to, any claims asserting liability for personal injury, and claims arising from a single occurrence or transaction in an amount in excess of $300,000 (the "Specified Claims").   To comply with this requirement, the Debtors have filed the Bar Date Motion contemporaneously herewith.   Likewise, contemporaneously herewith, each Debtor has filed a modified Schedule E/F (a "Modified Schedule E/F") listing those creditors that Specified Claims according to the Debtors' books and records.

139.   The Court's grant of an extension of time to file the Schedules and Statements (other than the Modified Schedule E/F filed by each Debtor) through and including the Deadline is necessary and appropriate in light of the circumstances surrounding these prepackaged chapter 11 cases.   First, the Debtors have thousands of potential creditors and the operation of the Debtors' international businesses requires the Debtors to maintain voluminous books, records, and complex accounting systems.   Accordingly, completing the Schedules and Statements would require the Debtors and their advisors to dedicate substantial time and resources, and at substantial cost, with little or no benefit to the estate and creditors because the Debtors have proposed a prepackaged Plan that provides for the payment in full of all allowed claims (other than the First Lien Claims) that has already been accepted overwhelmingly by one of the two classes entitled to vote on the Plan.

140.   Second, for the same reasons, no party in interest would be prejudiced by the Court granting the Debtors' request for an extension through and including the Deadline. Holders of General Unsecured Claims are unimpaired under the Plan.

141.   Additionally, in light of the Debtors' substantial, international operations, the Debtors would require an enlargement of the time to prepare the Schedules and Statements. Moreover, preparing the Schedules and Statements would cause the Debtors to incur substantial

expense and would burden the Debtors' employees at a time when such employees should be implementing or preparing to wind-down their operations, monetize their assets and implement the terms of the Plan.

142.    **Waiver of Section 341(a) Meeting**.  The purpose of a Section 341 Meeting is to provide parties in interest with a meaningful opportunity to examine a debtor and obtain important information about the debtor.  In these cases, however, the Plan was solicited prior to the Petition Date and has very strong support from the Debtors' First Lien Lenders, as 100% of holders of Class 3 First Lien Claims who voted have voted to accept the Plan.[21]  Further, the holders of General Unsecured Claims are unimpaired under the Plan.  Therefore, creditors are not likely to receive any benefit from a Section 341 Meeting.  The Debtors filed the chapter 11 cases to implement and effectuate the Plan and the Debtors began the solicitation of votes on the Plan prior to commencing the chapter 11 cases.  The Debtors intend to complete the solicitation process and proceed expeditiously to confirm and consummate the Plan as quickly as possible.  Accordingly, the Debtors respectfully request that the U.S. Trustee not convene a Section 341 Meeting unless the Plan is not confirmed on or prior to the Deadline.

143.    **Limit Notice to Certain Creditors**.  In the ordinary course of the Debtors' global business, the Debtors receive goods and services from both domestic and foreign vendors.  While the Debtors have made a good faith effort to compile a consolidated list of their respective creditors, the Debtors do not possess the notice information for certain foreign vendors, and dedicating company resources to research such notice information would unnecessarily expend the Debtors' resources and distract the Debtors' management during the chapter 11 cases.

---

[21]    *See* Preliminary Voting Report, filed contemporaneously herewith.

144.    The Plan leaves all holders of General Unsecured Claims unimpaired, to be paid in full under the Plan, subject to any rights or defenses the Debtors may have to all or any portion of such Claims.  Thus, general unsecured creditors are riding through the Plan unimpaired.  The Court is permitted under Bankruptcy Rule 2002(a) to limit notices required to be provided. Here, it is appropriate to limit notices required under Bankruptcy Rule 2002 to those creditors for which the Debtors are able to determine notice addresses after expending reasonable, good faith efforts.

## VIII.    Bar Date Motion.[22]

145.    **Relief Requested**.  The Debtors seek entry of an order (the "Limited Bar Date Order") establishing 5:00 p.m., prevailing Eastern Time, on July 11, 2016, as the last date and time for each entity (including, without limitation, individuals, partnerships, corporations, joint ventures, and trusts) to file proofs of claim based on Specified Claims that arose prepetition against any Debtor (the "Limited Bar Date").

146.    The Specified Claims do not include, and, thus, the Limited Bar Date does not apply to, (w) claims arising from a single occurrence or transaction in an amount of $300,000 or less (unless such claims are contingent and unliquidated), (x) claims of any taxing authorities or other governmental units, (y) rejection damages claims, or (z) any claims of the Executives or other employees who are parties to employment and severance agreements with the Debtors. Additionally, the Executives and the other employees who are parties to employment and severance agreements with the Debtors will not be required to file any proofs of claim unless their applicable employment and/or severance agreements are rejected under the Plan or by an order of the Court, which may be the Confirmation Order, and such Executive or other employee

---

[22]    *See Motion of Hercules Offshore, Inc., et al., for Entry of an Order (a) Establishing Limited Bar Date for Filing Proofs of Claim, (b) Approving the Form and Manner for Filing Proofs of Claim, (c) Approving Notice Thereof, and (d) Granting Related Relief*, filed concurrently herewith.

has not been provided alternative severance compensation pursuant to the terms of the Plan or another agreement with the Debtors or the Wind Down Entity (as defined in the Plan).

147.     **Purpose of the Limited Bar Date**.  The purpose of providing a Limited Bar Date for Specified Claims is to provide the Debtors and the Ad Hoc Group with the ability to discover and monitor any large claims that may be filed against the Debtors' estates.  This is particularly important where, as here, the Plan provides for payment in full of all General Unsecured Claims, and the Plan further provides that, upon the Effective Date, the Wind Down Entity will establish reserves for, among other things, certain disputed claims, including General Unsecured Claims that are disputed or not yet allowed as of the effective date of the Plan.  Accordingly, the Debtors, the Ad Hoc Group, and the Wind Down Entity must be able to assess and account for any large claims that may be filed by parties asserting to be unsecured creditors of the Debtors' estates.

148.     In addition, the establishment of a Limited Bar Date for the Specified Claims is an important part of the Restructuring Support Agreement and the transactions that have been agreed to by the Debtors and the Ad Hoc Group.  The Plan is also subject to a condition to effectiveness requiring that the aggregate amount of the Specified Claims estimated by each of the Debtors in their Modified Schedule E/F, plus the amount of all Specified Claims not estimated in such schedules, not exceed $33 million, unless waived by the Requisite Consenting Lenders in their sole discretion.  Thus, to implement the Plan and move forward with the monetization of the Debtors' assets and the wind-down of the Debtors' business and operations, the entry of an order establishing the Limited Bar Date for the Specified Claims is necessary.

149.     The Debtors do not anticipate that there will be many holders of Specified Claims in the chapter 11 cases.  In fact, the Modified Schedules E/F filed by the Debtors include **no**

claims in a liquidated amount in excess of $300,000 and fifty-six contingent, unliquidated and disputed claims.

150.    The Debtors believe that clearly established procedures for the filing of these limited claims against the Debtors' estates will limit confusion on the part of holders of such claims and aid the Debtors in their attempt to expedite the chapter 11 process.  More specifically, with respect to the Specified Claims identified by the Debtors, the relevant claimholder will be sent a personalized proof of claim form that provides information about how the Specified Claim is listed in the Modified Schedule E/F.  If a holder of a Specified Claim agrees with the treatment of its claim as provided for in the Modified Schedule E/F and such Specified Claim is not listed as contingent, unliquidated or disputed, such holder will not be required to file a proof of claim. The Debtors will also provide notice of the Limited Bar Date to other parties in interest so that such entities may file proofs of claim on account of any Specified Claims such entities may assert.

## IX.    Taxes Motion.[23]

151.    **Relief Requested**.    The Debtors seek authority, but not direction, to pay outstanding Taxes (as defined below).  More specifically, in order to avoid irreparable harm to their estates, the Debtors seek interim authority to pay $180,000 on account of Taxes that will come due within the first 21 days following the Petition Date.  The Debtors also seek authority pursuant to the Proposed Final Order to remit and pay any Taxes, regardless of whether those amounts accrued before the Petition Date, in the ordinary course of business.  For the avoidance of doubt, the authority requested pursuant to this Motion would be completely discretionary and

---

[23]    *See Motion of Hercules Offshore, Inc., et al., for Entry of Interim and Final Orders Authorizing, But Not Directing, the Debtors to Pay Certain Taxes*, filed concurrently herewith.

without prejudice to the Debtors' rights to contest the amounts of any Taxes on any grounds they deem appropriate.

152.    **The Taxes**.  In the ordinary course of business, the Debtors (i) incur sales and use, income, property, and other taxes (collectively, the "Taxes") in the operation of their businesses; and (ii) pay or remit such Taxes to various taxing and other governmental authorities (collectively, the "Authorities").  The Debtors pay or remit, as the case may be, the Taxes as incurred or monthly, quarterly, semiannually, or annually to the respective Authorities, as required by applicable laws and regulations.  The Debtors estimate that approximately $180,200 will become due and owing to the Authorities in the ordinary course of business during the pendency of the chapter 11 cases.

153.    **Income Taxes**.  As a result of their operations throughout the world, the Debtors incur income tax liabilities in various jurisdictions (collectively, the "Income Taxes").  The Debtors and their Non-Debtor Subsidiaries estimate that their total prepetition income tax liability is approximately $1.8 million.[24]  The majority of the $1.8 million amount is owed to revenue authorities in Gabon, India, United Kingdom, Saudi Arabia, and Singapore.  Out of an abundance of caution, to the extent that the Debtors have (i) miscalculated the amounts due, (ii) paid an amount that was less than is actually owed, or (iii) made any payments prepetition that were rejected, lost, or otherwise not received in full by any Authority, the Debtors request authority to pay any additional amounts that may come due.

154.    **Sales Taxes**.  In certain states, the Debtors also incur sales and use taxes (collectively, the "Sales Taxes") due to the purchase or sale of goods or taxable services within those jurisdictions.  Sales Taxes are due monthly.  As of the Petition Date, the Debtors estimate

---

[24]    This amount has not been paid yet, but is not delinquent—i.e., it is scheduled by the Debtors to be paid in the ordinary course.

that they have been assessed for an aggregate of approximately $9.7 million in Sales Taxes, which Sales Taxes are subject to dispute and/or ongoing audits.  The Debtors accrue and pay Sales Tax monthly as part of the ordinary course of business, and the Debtors believe that approximately $23,700 in Sales Taxes will become due during the pendency of these cases.

155.    The Debtors estimate the approximately $11,850 in Sales Taxes will come due during the first 21 days of these chapter 11 cases.  The Debtors are seeking authority to pay any Sales Tax amounts that come due within the first 21 days of these chapter 11 cases.  If the Debtors do not pay the Sales Taxes to the applicable Authorities when due, these Authorities may assess immediate, irreversible penalties for failure to make a timely payment.  Such penalties may be entitled to priority treatment under Bankruptcy Code section 507(a)(8)(G).

156.    **Ad Valorem Taxes**.  The Authorities also impose Taxes on the Debtors relating to property that the Debtors own for the operation of their businesses ("Ad Valorem Taxes").  The Debtors accrue Ad Valorem Taxes on a monthly basis.  As of the Petition Date, the Debtors do not owe any Ad Valorem Taxes.  However, the Debtors are seeking authority, upon entry of the Final Order, to pay the Ad Valorem Taxes as and when they become due during the chapter 11 cases.  In 2016, the Debtors have accrued approximately $418,800 in Ad Valorem Taxes.  The Debtors believe that no Ad valorem Taxes will become due during the pendency of these cases.  If the Debtors do not pay the Ad Valorem Taxes to the applicable Authorities when due, these Authorities will immediately assess substantial, irreversible penalties for failure to make timely payment.  In addition, nonpayment of Ad Valorem Taxes when due might allow the applicable Authorities to impose liens on the Debtors' property under Bankruptcy Code section 362(b)(18).

157.    **Franchise Taxes**.  The Authorities also impose franchise taxes on the Debtors (the "Franchise Taxes").  Franchise Taxes accrue annually, or in some cases, quarterly.  As of the Petition Date, the Debtors have accrued $161,780 of Franchise Taxes.  The Debtors believe that no Franchise Taxes will become due during the first 21 days of the chapter 11 cases.  The Debtors are seeking authority, upon entry of the Final Order, to pay the Franchise Taxes as and when they become due during the chapter 11 cases.

158.    **Miscellaneous Taxes**.  Finally, the Debtors also incur and pay in the ordinary course of operating their businesses certain stamp fees, regulatory assessments, permitting fees, licensing fees, levies, and other miscellaneous Taxes (collectively, the "Miscellaneous Taxes").  The Debtors believe that the continued payment of the Miscellaneous Taxes, including any such taxes due and owing on account of prepetition Miscellaneous Taxes, are a necessary cost of continuing to operate their businesses.  Accordingly, the Debtors request authority to pay any such amounts, including Miscellaneous Taxes that accrued pre-petition, as they come due in the ordinary course of business.  The Debtors believe that approximately $90,000 in Miscellaneous Taxes will become due during the pendency of the cases.

159.    The Debtors' failure to pay the Taxes could adversely affect the Debtors' business operations because, among other things, (a) the Authorities could initiate audits of the Debtors or prevent the Debtors from continuing their businesses which, even if unsuccessful, would unnecessarily divert the Debtors' attention away from the monetization of their assets and the implementation of the Plan; (b) the Authorities could attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay, and pursue other remedies that will harm the estates; and (c) certain directors and officers might be subject to personal liability—even if such a failure to

pay such Taxes was not a result of malfeasance on their part—which would undoubtedly distract these key employees from their duties related to the Debtors' restructuring.

## X.   Utilities Motion.[25]

160.   **Relief Requested**.  The Debtors seek entry of an interim order and final orders (i) prohibiting the Utility Companies from altering, refusing, or discontinuing services on account of prepetition amounts outstanding or on account of any perceived inadequacy of the Debtors' proposed adequate assurance; (ii) determining that the Utility Companies have been provided with adequate assurance of payment within the meaning of Bankruptcy Code section 366; (iii) approving the Debtors' proposed offer of adequate assurance and procedures governing the Utility Companies' requests for additional or different adequate assurance; and (iv) determining that the Debtors are not required to provide any additional adequate assurance beyond what is proposed by the Motion.

161.   **The Utility Companies**.  In connection with the operation of their business, the Debtors obtain electricity, natural gas, water, telephone, internet, and/or other similar services (the "Utility Services") from a number of utility companies or their brokers (the "Utility Companies").  The Debtors do not pay for any Utility Services that are provided to their Non-Debtor Subsidiaries, and the Debtors' Non-Debtor Subsidiaries do not pay for any Utility Services provided to the Debtors.

162.   Historically, the Debtors have paid all amounts owed to the Utility Companies on a timely basis.  Moreover, to the best of their knowledge, there are no defaults or arrearages of any significance with respect to the Debtors' undisputed invoices for Utility Services, other than payment interruptions that may be caused by the commencement of the chapter 11 cases.  In the

---

[25]   *See Motion of Hercules Offshore, Inc., et al., for Interim and Final Orders (i) Prohibiting Utilities From Altering, Refusing, or Discontinuing Service; (ii) Deeming Utilities Adequately Assured of Future Performance; and (iii) Establishing Procedures for Determining Adequate Assurance of Payment*, filed concurrently herewith.

six month period prior to the Petition Date, the Debtors paid an average of approximately $116,383 per month on account of Utility Services on an aggregate basis.  The Debtors estimate that their cost for Utility Services during the next thirty days (not including any deposits to be paid) will be approximately $139,700.  Currently, the Utility Companies hold no deposits on account of the Debtors' Utility Services.

163.    Uninterrupted Utility Services are essential to the ability of the Debtors to continue operations and to the ultimate success of the chapter 11 cases.  The Debtors' operations include, among other things, operating, repairing and restocking their mobile offshore rigs and vessels, which require, among other things, fuel, water, electricity and telecommunications. Additionally, the Debtors must perform corporate and administrative functions in their Houston executive offices, which require electricity, telecommunications and other standard utility services.  Should any Utility Company refuse or discontinue service, even for a brief period, the Debtors' business operations could be severely disrupted, and such disruption would jeopardize the Debtors' ability to achieve a controlled wind-down and monetization of their assets and implement the Plan, which provides for recoveries to unsecured creditors and equity holders notwithstanding the fact that the First Lien Lenders are not being paid in full.  It is essential that the Utility Services continue uninterrupted during the chapter 11 cases.

164.    **The Proposed Adequate Assurance**.  The Debtors intend to timely pay all postpetition obligations owed to the Utility Companies and expect that available funds will be more than sufficient to pay all such obligations.  To provide adequate assurance of payment to the Utility Companies, the Debtors submit that an amount equal to one-half of one month's Utility Service payment (calculated as a historical average over the past six months) (an "Adequate Assurance Deposit"), together with the Debtors' ability to pay for future Utility

Services in the ordinary course of business (collectively, the "Proposed Adequate Assurance"), provides sufficient adequate assurance of payment and that no additional deposit, security, or other assurance of payment is or should be required for the Utility Services.

165.    Pursuant to the procedures outlined in the motion, the Debtors propose to deposit $58,192 (the "Adequate Assurance Deposit") into a newly created, segregated, interest-bearing account (the "Adequate Assurance Account") within 20 days of the Petition Date for the benefit of the Utility Providers, pending further order of the Court.   The amount of the Adequate Assurance Deposit equals approximately fifty percent of the Debtors' average monthly cost of the Utility Services during six month period prior to the Petition Date.   The Debtors submit that the creation and maintenance of the Adequate Assurance Account, in conjunction with the Debtors' ability to pay for future utility services in the ordinary course of business (collectively, the "Proposed Adequate Assurance"), constitutes sufficient adequate assurance to the Utility Providers in satisfaction of Bankruptcy Code section 366.   These protections ensure that each of the Utility Providers will have adequate assurance of payment throughout the chapter 11 cases, and the Debtors submit that no other or further assurance is necessary.   If any Utility Company believes additional assurance is required, they may request such assurance pursuant to the procedures set forth in the motion.

166.    Since the amounts of the average monthly billings for Utility Services provided by the Utility Companies are relatively modest, totaling approximately $116,383 per month, and the accrued amounts for the prepetition period are likewise minimal and the Plan proposes that all general unsecured claims will be paid in full, the Debtors request authority to make payment in full on the next bill issued in the ordinary course by its Utility Companies, including for any "stub" period for services provided during the prepetition period.

167.    The relief requested in the motion will ensure that the Debtors' operations will not be disrupted by the termination of vital Utility Services or the requests by the Utility Companies of unnecessarily large deposits that could endanger the Debtors' liquidity.  If a disruption occurs, the impact on the Debtors' chapter 11 cases would be extremely harmful to the Debtors and all of their creditors.  The Debtors' ability to conduct the monetization of their assets is dependent on the services provided by the Utility Companies.  Without the requested relief, any interruption in services by the Utility Companies could bring the Debtors' businesses to an immediate halt.  Even if the Utility Companies did not interrupt their services, without the requested relief the Debtors could be forced to address numerous requests by Utility Companies during a critical period in the chapter 11 cases and during a time when their efforts should be more productively focused on pursuing the successful monetization of their assets.  At the same time, the relief requested provides the Utility Companies with a fair and orderly procedure for determining requests for additional or different adequate assurance.

## XI.    Wages and Benefits Motion.[26]

168.    **Relief Requested**.  The Debtors seek entry of interim and final orders (i) authorizing, but not directing, the Debtors to (a) pay the prepetition Payment and Program Obligations, up to the priority expense limit imposed on employee claims under Bankruptcy Code sections 507(a)(4) and 507(a)(5) (or, in the case of the Excess PTO Amount, in excess of such limits), where applicable; (b) continue paying the Payment and Program Obligations in the ordinary course of business; (c) continue to offer, honor, and facilitate the Employee Programs in the ordinary course of business during the pendency of the chapter 11 cases; and (d) reissue

---

[26]    *See Motion of Hercules Offshore, Inc., et al., for Interim and Final Orders Authorizing, But Not Directing, the Debtors to (i) Pay Prepetition Wages, Salaries and Other Compensation, (ii) Pay Prepetition Payroll Taxes and Benefits and Continue Benefit Programs In the Ordinary Course, and (iii) Direct Banks to Honor Checks for Payment of Prepetition Employee Payment and Program Obligations*, filed concurrently herewith.

checks, wire transfers, automated clearing house payments, electronic payments, or other similar methods of payment for such payments where such method of payment has been dishonored postpetition; and (ii) directing all banks to honor the Debtors' prepetition and postpetition checks, wire transfers, automated clearing house payments, electronic payments, or other similar methods of payment for payment of the Payment and Program Obligations.

169.    **The Employees**.  As of the Petition Date, the Debtors employ or are responsible for funding the payroll obligations for approximately 459 people (the "Employees").  Some of the Employees provide local support in the Debtors' U.S. offices or foreign branch offices, while other Employees are currently deployed on offshore projects.  All of the Employees are hired through Debtor Hercules Offshore Services, LLC ("Hercules Offshore Services").  The Debtors also contract with five independent contractors (the "Independent Contractors") for various services.  Some of the Independent Contractors are former Employees of the Debtors.  The Non-Debtor Subsidiaries employ approximately 436 foreign employees.

170.    Payroll for Employees is handled through the Debtors' Houston-based payroll system.  Some Employees are paid on an hourly, weekly basis (the "Hourly Offshore Employees"); some are paid on an hourly, bi-weekly basis (the "Bi-Weekly Arrears Employees); and the rest are paid on a salaried, bi-weekly basis (the "Salaried Employees").  Hourly Offshore Employees are paid on Fridays for the one-week period concluding on the previous week's rig-specific crew change day.  Bi-Weekly Arrears Employees are paid every other Friday for the two-week period concluding on the Saturday of the previous week.  Salaried Employees are paid every other Friday for the two-week period concluding on the Saturday after the pay date.

171.    In providing benefits to the Employees, the Debtors pay and incur a number of obligations such as compensation, deductions and payroll taxes, incentive programs, equity

plans, severance programs, reimbursement expenses, relocation expenses, health benefits, workers' compensation benefits, vacation time, life insurance, accidental death and disability benefits, and other benefits, including employee contributions, claims and administrative fees to benefit providers, which the Debtors have historically provided and funded in the ordinary course of business. The Debtors seek authority to pay Employee Compensation-related obligations, including wages, salaries, expense reimbursements, benefit obligations, and related fees, deductions and withholdings, including payroll taxes as provided in the Wages and Benefits Motion.

172.    I believe the vast majority of the Employees rely exclusively on their compensation to pay their daily living expenses.  Both wages and the benefit programs discussed in further detail in the Wages and Benefits Motion are critical components of the Employees' total compensation package, and if the Debtors are not permitted to honor their outstanding Employee obligations, I believe many Employees will be exposed to significant financial difficulties. Moreover, if the Debtors are unable to satisfy such obligations, Employee morale will be jeopardized at a time when Employee support is critical.  Any resulting loss in workforce could significantly hinder the Debtors' efforts to successfully monetize their assets and wind down their business and operations in a controlled, efficient and value-maximizing manner.

173.    The Debtors also have various Employee programs and obligations that are administered or paid through third-party administrators, agents, consultants, or providers. The Debtors seek authority to pay any prepetition fees of these third parties and to continue such payments post-petition in the ordinary course of their business as set forth in the Wages and Benefits Motion, in order to insure the uninterrupted delivery of payments or other benefits to the Employees.

174.     I believe that the relief requested in the Wages and Benefits Motion is in the best interests of the Debtors' estates and will enable the Debtors to avoid immediate and irreparable harm to Debtors' estates.  The Debtors cannot effectively monetize their assets and wind down their operations on the terms set forth in the Plan absent the full cooperation and engagement of their Employees, which requires continuation of the Payment and Program Obligations. Accordingly, I respectfully submit that the Wages and Benefits Motion should be approved.

**XII.    Insurance Motion.**[27]

175.     **Relief Requested**.  The Debtors seek authority (but not direction) to make the payments required to continue their Insurance Program, including payment of any prepetition premiums, deductibles or other obligations under the Policies, and to continue postpetition their practice of paying brokerage fees and premiums to the Brokers and any other broker or agent engaged by the Debtors.

176.     **The Insurance Program**.  In the ordinary course of their businesses, the Debtors maintain an insurance program (the "Insurance Program") that provides millions of dollars of coverage for, among other things, the Debtors' operations around the globe, their offshore vessels, general liability, property casualty, and directors' and officers' liability (collectively, the "Policies").  As of the Petition Date, the Debtors are current on their premiums and there are no outstanding fixed premiums due that have not been paid.

177.     The premiums the Debtors pay to procure and maintain the Insurance Program consist of certain premiums that are fixed at the beginning of the policy year and are either paid in one annual payment or in quarterly installments.  There are additional premiums that vary based on circumstances during the year.  Annually, the Debtors pay approximately $13,261,842

---

[27]    *See Motion of Hercules Offshore, Inc., et al., for Authorization to: (a) Continue Pre-Petition Insurance Program and (b) Pay Any Pre-Petition Premiums and Related Obligations*, filed concurrently herewith.

in the aggregate for the fixed component of the premiums. Prior to the Petition Date, in May 2016, the Debtors renewed certain of their Policies, including their Primary Liftboat policies, General Liability policies, Employee Benefits policies, Automobile Liability policies, Foreign Package policies, Non-Owned Aviation, and Vessel Pollution policies (collectively, the "Renewed Policies"). In connection with the renewal of the Renewed Policies, the Debtors paid an aggregate amount of $767,957 on account of annual premiums.

178.    In addition, certain other Policies expire in June, July or October 2016, as applicable, and will need to be renewed. For those policies, the Debtors will need to make annual premium payments at the time of renewal, as follows:

| Policies | Payment Due | Total Estimated Annual Premium Amount |
|---|---|---|
| Property | July 30, 2016 | $21,860 |
| Workers' Comp & Employers' Liability | October 25, 2016 | $56,303 |
| USL&H | October 25, 2016 | $12,306 |

179.    Certain of the Debtors' other policies are paid in quarterly installments over the course of the policy year rather than in one annual payment. Prior to the Petition Date, the Debtors paid an aggregate amount of $11,461 in quarterly installment payments for the Renewed Policies. Further, the Debtors anticipate that they may be required to make one or more additional premium installment payments during the chapter 11 cases, including the following:

| Policies | Payment Due | Total Installment Amount |
|---|---|---|
| Marine Package | July 15, 2016 | $1,708,472 |
| | October 15, 2016 | $1,708,472 |
| Excess Liabilities ($75m x $25m) | July 15, 2016 | $616,288.77 |
| | October 15, 2016 | $616,288.77 |
| Excess Liabilities ($150m x $100m) | July 15, 2016 | $143,750.00 |
| | October 15, 2016 | $143,750.00 |
| War Risks | July 15, 2016 | $49,800 |
| | October 15, 2016 | $49,800 |
| General Liability | July 15, 2016 | $4,881 |
| | October 15, 2016 | $4,881 |

| Employee Benefits | July 15, 2016 | $96 |
|---|---|---|
| | October 15, 2016 | $96 |
| Automobile Liability | July 15, 2016 | $6,464 |
| | October 15, 2016 | $6,464 |

180.    The Debtors believe that that they have paid all amounts owing and currently due for the insurance program, with two minor exceptions.  First, the Debtors purchased a specific policy from the Skuld Group on June 3, 2016 to provide a certificate, for the Panamanian government authorities, of insurance for removal of marine wreckage.  The cost of this policy is approximately $40,000 and will be due upon issuance of the insurer's invoice.  Second, a portion of the premium, approximately $7,087, is currently owed for the foreign package policy.  The Debtors anticipate that these payments will be made by the Debtors in the first 21 days after the petition date.

181.    The remaining component of the Insurance Program premiums varies based on the Debtors' operations, specifically the utilization of their jackup rigs and liftboats.  The amount of this operations-dependent portion is determined, assessed and paid quarterly.  For the current policy year, the Debtors expect that the aggregate amount of the variable portion of their policy premiums will total approximately $2,930,000.  Prior to the Petition Date, in May 2016, the Debtors paid $1,469,083 relating to variable premiums assessed in the second and third quarters of 2015.  The Debtors estimate that approximately $732,500 of variable premiums will come due on July 15, 2016, and that another $732,500 of variable premiums will come due on October 15, 2016.

182.    In addition, prior to the Petition Date, the Debtors acquired a new six year tail for their directors' and officers' liability policy.

183.    The Debtors' Insurance Program is managed through two insurance brokers, Lockton Companies and Newman Martin and Buchan LLP (the "Brokers").  The Brokers assist

the Debtors in determining the appropriate type and amount of insurance coverage for their business and assets and then negotiate with insurance companies to procure the optimal policies. The Premiums are generally paid to the Brokers who then remit such payments to the Carriers. The Brokers are paid annual fees.  For the current policy year, in May 2016, the Debtors paid brokerage fees in the amount of $318,750 to New Martin and Buchman LLP and brokerage fees in the amount of $450,000 to Lockton Companies.

184.    All of the Debtors' Non-Debtor Subsidiaries and their assets are covered by the Policies issued to the Debtors.  Certain of the Policies provide coverage protecting the Debtors' Non-Debtor Subsidiaries and their assets.  Specifically, the Debtors' Marine Package policies cover all of the jackup rig and liftboat vessels owned by both the Debtors and the Non-Debtor Subsidiaries.  The Debtors, in the ordinary course of their business, pay the required premiums and accounts for their Non-Debtor Subsidiaries' share of the Marine Package policies' premiums through the creation of intercompany obligations owed to a Debtor by the relevant Non-Debtor Subsidiary.  By obtaining the required insurance coverage for the company on a combined basis, the Debtors have been able to realize substantial savings and efficiencies in the cost of their Insurance Program.  In the areas that these Policies cover, including (a) hull & machinery claims, (b) vessel pollution claims, (c) personal injury claims, and (d) third-party liability claims, it would not be feasible to separate out the Debtors' operations and other insurance needs from those of their Non-Debtor Subsidiaries and to obtain new separate insurance coverage for the Debtors and the Non-Debtor Subsidiaries, respectively, at a reasonable cost or within a reasonable time frame without exposing the Debtors and their operations to significant risk of disruption and increased expense from any material disruption of the Insurance Program.

185.    In many cases, the coverage provided by the Policies is required by various regulations, laws and contracts that govern the Debtors' business conduct under applicable non-bankruptcy law.  Likewise, the terms of the First Lien Credit Agreement require the Debtors to maintain adequate insurance coverage.  Such coverage could not be provided without the continuation of the entire Insurance Program.

186.    It is essential to the continued operation of the Debtors' business as the Debtors move forward with the monetization of their assets and a controlled wind down of their operations that the Insurance Program be maintained on an ongoing and uninterrupted basis.

## XIII.   Worldwide Stay Motion.[28]

187.    **Relief Requested**.  To ensure that the Debtors' operations are not disrupted and ability to successfully monetize their assets is not impacted by enforcement actions or the exercise of self-help remedies initiated by non-U.S. creditors, customers, governmental units, or other parties in interest, the Debtors seek entry of an order that confirms, restates, enforces, and restrains any action taken in violation of the following key protections afforded to the Debtors under the Bankruptcy Code: (a) the automatic stay provisions of Bankruptcy Code section 362; (b) the prohibition of Bankruptcy Code section 365 against terminating executory contracts or unexpired leases due to ipso facto provisions; and (c) the prohibition against discriminatory treatment by governmental units contained in Bankruptcy Code section 525.

188.    **The Debtors' Foreign Business Operations**. The Debtors use their fleet of jackup rigs and liftboat vessels to drill for oil and gas, service wells, inspect platforms, and maintain and decommission operations in numerous countries, including Bahrain, Malaysia, Nigeria, Saudi Arabia, Singapore, the United Arab Emirates, the United Kingdom, and the

---

[28]    *See Motion of Hercules Offshore, Inc., et al., for Entry of an Order: (a) Enforcing and Restating the Automatic Stay, Ipso Facto, and Non-Discrimination Provisions of the Bankruptcy Code; and (b) Granting Related Relief,* filed concurrently herewith.

United States.  The Debtors not only provide services in these countries, but also have extensive property and other resources located therein that are integral to the Debtors' ongoing overseas operations, including offices, maintenance facilities, yard facilities, warehouses, waterfront docks, and residential premises.

189.    Other than in the United Kingdom, the Debtors' overseas properties are leased, not owned, pursuant to leases which, in most cases, are governed by non-U.S. law and provided by non-U.S. landlords and other foreign counterparties.  Similarly, many of the Debtors' significant customer contracts are with non-U.S. entities for services in foreign jurisdictions.

190.    **Importance of Bankruptcy Protections**.  Due to the global scope of the Debtors' businesses and operations, the Debtors and their estates may gravely suffer from any contract cancellation, lease termination, governmental discrimination, or other adverse action in contravention of the aforementioned bankruptcy law.  The risk of such actions or cancellations is a real one because the numerous non-U.S. customers, landlords, vendors, suppliers, and governmental units with whom the Debtors regularly transact may be unfamiliar with the Bankruptcy Code, including with respect to the protections afforded by Bankruptcy Code sections 362, 365, and 525.  Indeed, numerous of the leases, contracts, and other agreements governing the Debtors' relationships with these non-U.S. entities are not governed by U.S. law, and the Debtors are subject to foreign laws and regulations in some jurisdictions.  Therefore, the Debtors believe it is possible that certain non-U.S. creditors or governmental units will not readily acknowledge the automatic stay or the contract and anti-discrimination protections afforded by U.S. bankruptcy law absent an order of the Court clearly directing them to do so.

191.    The Debtors' overseas operations are subject to other countries' laws and regulations on, for example, the importation of and operation of rigs and liftboats, currency

conversions and repatriation, oil and natural gas exploration and development, environmental protection, taxation of offshore earnings and earnings of expatriate personnel, the use of local employees and suppliers by foreign contractors, and duties on the importation and exportation of rigs, liftboats and other equipment. Additionally, the Debtors' operations in less developed countries can be subject to legal systems that are not as mature or predictable as those in more developed countries, which can lead to greater uncertainty in legal matters and proceedings. Some of the governmental units in these countries and others may not be cognizant of the protections afforded to the Debtors by Bankruptcy Code section 525 and, therefore, may inadvertently contravene this provision.

192. The potential detrimental impact on the Debtors and their estates from stay-, contract-, and discrimination-related violations of U.S. bankruptcy law at this time cannot be overstated. At this juncture, the Debtors are seeking to maximize the value of their estates and monetize their assets in such a way that will result in maximum recoveries for all of the Debtors' stakeholders. In the interest of preserving and enhancing value for all parties in interest, the Debtors submit that the Court should grant the relief requested in the Worldwide Stay Motion.

## XIV.  NOL Motion.[29]

193. **Relief Requested**. The Debtors seek entry of interim and final orders (a) authorizing the Debtors to establish notification and hearing procedures regarding the trading of Equity Securities in HERO that must be complied with before trades or transfers of such securities become effective and (b) ordering that any purchase, sale, disposition or other transfer of Equity Securities in violation of the procedures set forth below shall be void *ab initio*.

---

[29]   *See Motion of Hercules Offshore, Inc., et al., for Entry of an Order Establishing the Amount of the Disputed Claims Reserve*, filed concurrently herewith.

194.    **The Debtors' Net Operating Losses**.  HERO is publicly traded on the NASDAQ Stock Market (ticker symbol HERO).  As of the Petition Date, the Debtors had approximately 20.0 million shares of HERO Common Stock outstanding.

195.    The Debtors have experienced recent losses from the operation of their business. As a result, the Debtors estimate that their federal income tax net operating losses (the "NOLs") are approximately $166.0 million as of the Petition Date, which amounts could be even higher when the Debtors emerge from chapter 11.  Pursuant to Sections 59(e) and 172(b) of the Internal Revenue Code of 1986, as amended (the "IRC") and the United States Department of Treasury Regulations promulgated thereunder (the "Treasury Regulations"), the Debtors may be able to carry back and then forward NOLs, tax credits, and other tax attributes (the "Tax Attributes") to offset future taxable income and tax liability so that they may obtain a cash refund and improved liquidity in the future.  The Debtors' NOLs consist of losses generated in individual tax years, each of which can be "carried forward" for up to 20 subsequent tax years to offset the Debtors' future taxable income, thereby reducing future aggregate tax obligations.  These NOLs could translate into future reductions of the Debtors' federal income tax liabilities.  These tax savings could substantially enhance the Debtors' cash position for the benefit of parties in interest and contribute to the Debtors' efforts to maximize value for the benefit of their stakeholders.  The Debtors may also have other valuable Tax Attributes.

196.    The Debtors may lose the ability to use their NOLs if they experience an ownership change for federal income tax purposes.  To prevent this potential loss of property of the Debtors' estates, the Debtors request Court approval of the procedures detailed in the motion to govern the transfers of HERO Common Stock, any contingent purchases, warrants, convertible debts, puts, calls, stock subject to risk of forfeiture or contracts to acquire stock (each

an "Option") and any other beneficial interest herein (the "Equity Securities") during the pendency of these chapter 11 cases.

197.     The Equity Trading Procedures are designed to protect the Debtors from losing the benefit of all or any portion of their NOLs in connection with transfers of Equity Securities that may trigger an ownership change under IRC section 382 and/or severely limit the Debtors' ability to use their NOLs to shelter any taxable income or gain resulting from any sale of assets in the course of the chapter 11 cases.  The Debtors require a mechanism to monitor and possibly object to ownership changes resulting from transfers of Equity Securities in order to permit the Debtors to use their NOLs to the fullest extent possible or to shelter any taxable income or gain resulting from any sale of assets, thereby maximizing value for all stakeholders.

198.     Granting the relief sought in the NOL Motion on an interim basis is necessary to avoid an irrevocable loss of the Tax Attributes and the irreparable harm that would be caused through the Debtors' loss of their ability to offset taxable income with Tax Attributes.  If the Court does not grant the relief sought in the motion on an interim basis and instead waits until the Final Hearing on the motion, holders of the Debtors' Equity Securities could be emboldened to transfer such securities before the restrictions contemplated herein are imposed by the Court in the Final Order.  Such trading or deductions would put the Tax Attributes in jeopardy, as described above, and would, therefore, be counterproductive to the Debtors' objectives in seeking this relief.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 5, 2016

Respectfully submitted,

Troy L. Carson
Senior Vice President and Chief Financial
Officer
Hercules Offshore, Inc., *et al*.

## Exhibit A

**Restructuring Support Agreement**

*EXECUTION VERSION*

**THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF VOTES WITH RESPECT TO A CHAPTER 11 PLAN OF REORGANIZATION.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR, AS APPLICABLE, PROVISIONS OF THE BANKRUPTCY CODE.**

---

### RESTRUCTURING SUPPORT AGREEMENT

**by and among**

**HERCULES OFFSHORE, INC. AND ITS SUBSIDIARIES PARTY HERETO**

**and**

**THE UNDERSIGNED CREDITOR PARTIES**

**dated as of May 26, 2016**

---

## RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (as the same may be amended, modified or supplemented from time to time in accordance with the terms hereof and including all exhibits annexed hereto which are incorporated by reference herein, this "Agreement"), dated as of May 26, 2016, is entered into by and among (x) Hercules Offshore, Inc., a Delaware corporation ("HERO"), and each of the undersigned direct and indirect subsidiaries of HERO (the "Subsidiaries," and together with HERO, the "HERO Entities") and (y) each of the undersigned parties, severally and not jointly (each, together with their respective successors and permitted assigns and any subsequent holder of First Lien Claims (as defined below) that becomes party hereto in accordance with the terms hereof, collectively, an "Ad Hoc Group Member" and collectively, the "Ad Hoc Group") who are holders of (i) First Lien Claims, and (ii) in certain cases, common shares issued by HERO (the "HERO Common Stock"). Each of the HERO Entities and the Ad Hoc Group Members is referred to herein individually as a "Party" and, collectively, as the "Parties".

WHEREAS, HERO and its majority-owned subsidiaries provide shallow-water drilling and marine services to the oil and natural gas exploration and production industry globally through its domestic offshore, international offshore, and international liftboats segments;

WHEREAS, on November 6, 2015, the HERO Entities entered into that certain Credit Agreement (as amended, restated, supplemented or otherwise modified from time to time, the "First Lien Credit Agreement"), among HERO, as borrower, the Subsidiaries, as guarantors, Jefferies Finance LLC, as administrative agent and collateral agent (the "First Lien Agent"), and the lenders from time to time party thereto (the "First Lien Lenders"). Claims and Obligations (as defined in the First Lien Credit Agreement) owed under the First Lien Credit Agreement are collectively referred to herein as "First Lien Claims";

WHEREAS, on April 18, 2016, HERO and certain of its subsidiaries (the "Loan Parties") entered into that certain Forbearance Agreement and First Amendment to the Credit Agreement (the "Forbearance Agreement"), with the First Lien Agent for itself and certain First Lien Lenders designated therein, pursuant to which, the First Lien Lenders agreed to forbear from exercising their rights and remedies under the First Lien Credit Agreement with respect to the alleged failure by the Loan Parties to comply with certain specified affirmative covenants under the First Lien Credit Agreement through April 28, 2016 (the "Forbearance Period");

WHEREAS, on April 28, 2016, the Loan Parties (as defined in the First Lien Credit Agreement) entered into Amendment No. 1 to Forbearance Agreement and First Amendment to Credit Agreement ("Amendment No. 1") with the First Lien Agent and certain First Lien Lenders designated therein, which extended the Forbearance Period until the earliest to occur of: (i) the termination of the Forbearance Period as a result of any default; (ii) 11:59 p.m. (New York City time) on May 31, 2016; and (iii) 11:59 p.m. (New York City time) on the second Business Day following the Required Lenders' delivery of written notice (which notice shall be effective only if delivered after 11:59 p.m. (New York City time) on May 4, 2016) to the Loan Parties (with a copy to the First Lien Agent and the Collateral Agent) in accordance with Section 10.01(a) of the Credit Agreement terminating the Forbearance Period;

**WHEREAS,** on the date hereof, the Loan Parties entered into that certain Amended and Restated Forbearance Agreement (the "Amended and Restated Forbearance Agreement") with the First Lien Agent for itself and certain First Lien Lenders designated therein, pursuant to which, among other things, subject to the terms of the Amended and Restated Forbearance Agreement and without any waiver of the Specified Defaults (as defined in the Amended and Restated Forbearance Agreement), (i) forbear during the Forbearance Period (as defined in the Amended and Restated Forbearance Agreement) from exercising certain of their default-related rights and remedies against the Loan Parties with respect to the Specified Defaults (other than (w) the giving of written notice of the Specified Gibraltar Default (as defined in the Amended and Restated Forbearance Agreement) pursuant to Sections 8.01(e) and 10.01 of the First Lien Credit Agreement, (x) the acceleration of the Loans (as defined in the First Lien Credit Agreement) pursuant to Section 8.01 of the First Lien Credit Agreement, (y) the delivery of a written direction instructing the First Lien Agent to deliver a written instruction to the Escrow Agent (as defined in the First Lien Credit Agreement) to distribute all the funds in the Escrow Account (as defined in the First Lien Credit Agreement) to the First Lien Agent to prepay the Loans pursuant to Section III(d) of the Escrow Agreement during the Forbearance Period and (z) the delivery by the First Lien Agent of a written instruction to the Escrow Agent to distribute all of the funds in the Escrow Account to the First Lien Agent to prepay the Loans pursuant to III(d) of the Escrow Agreement, (ii) consent to release of liens contemplated by the release documents listed on Exhibit C to the Amended and Restated Forbearance Agreement, and (iii) upon the request of HERO after the Forbearance Effective Date (as defined in the Amended and Restated Forbearance Agreement), consent to the release of the Non-Debtor Loan Parties (as defined in the Amended and Restated Forbearance Agreement) from their Guarantee and release the Liens (as defined in the First Lien Credit Agreement) on and security interest in any and all assets and property of the Non-Debtor Loan Parties on the Effective Date of the Plan (as defined below);

**WHEREAS**, the HERO Entities and the Ad Hoc Group have negotiated, in good faith and at arms' length, a transaction that will effectuate a financial restructuring of the HERO Entities' capital structure and financial obligations (the "Restructuring"), on the terms and conditions set forth in this Agreement and the Term Sheet attached hereto as **Exhibit A** (including any annexes and schedules attached thereto, the "Term Sheet") that is to be implemented through voluntary cases to be commenced (the date of such commencement, the "Petition Date") by HERO, each of the Subsidiaries that is a domestic United States entity (other than Hercules Liftboat Company, LLC and Hercules Offshore International, LLC) (collectively, the "Debtors") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), before the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), on a consensual basis pursuant to a joint "pre-packaged" chapter 11 plan to be confirmed under chapter 11 of the Bankruptcy Code, the terms and conditions of which will be on the terms described in this Agreement and the Term Sheet, and that is otherwise in form and substance reasonably acceptable to the Debtors and the Requisite Consenting Lenders (as defined below) (the "Plan");

**WHEREAS**, as of the date hereof and upon the acceleration of the Obligations under the First Lien Credit Agreement but prior to the distribution by the Escrow Agent of all the funds in the Escrow Account to the First Lien Agent to prepay the First Lien Claims pursuant to

Section III(d) of the Escrow Agreement and Section 2.10(a)(i) of the First Lien Credit Agreement, the HERO Entities owed $579 million (plus accrued and unpaid interest) under the First Lien Credit Agreement on account of principal indebtedness, unpaid accrued interest, and the Applicable Premium; it being understood that additional Fees (as defined in the First Lien Credit Agreement) and Obligations may also be due and owing;

WHEREAS, the Parties intend to implement the Restructuring contemplated herein through a "pre-packaged" chapter 11 plan, and in connection therewith, the Debtors have agreed, subject to the terms and conditions of this Agreement, (i) to prepare a disclosure statement containing "adequate information" (as that term is used in the Bankruptcy Code) with respect to the Plan and the Term Sheet and otherwise in form and substance reasonably acceptable to the Debtors and the Requisite Consenting Lenders (the "Disclosure Statement"), (ii) to solicit acceptances of the Plan from the First Lien Lenders and holders of HERO Common Stock publicly traded equity interests in accordance with applicable non-bankruptcy law, as permitted under sections 1125(g) and 1126(b) of the Bankruptcy Code, (iii) to prepare and file, in case(s) under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases"), the Plan and the Disclosure Statement, and (iv) to use commercially reasonably efforts to cause the Plan to be confirmed by the Bankruptcy Court and consummated thereafter, all in accordance with the terms of this Agreement and the Term Sheet;

WHEREAS, the Ad Hoc Group Members, who collectively hold more than 99% of the outstanding loans and commitments under the First Lien Credit Agreement and approximately 27% of the HERO Common Stock, as set forth on **Schedule 1** hereto, have agreed, among other things, subject to the receipt of a Disclosure Statement, to vote in favor of, and not oppose, the Restructuring and the Plan on the terms and subject to the conditions set forth in this Agreement and the Term Sheet; and

WHEREAS, the Parties desire to express to each other their mutual support and commitment in respect of the Restructuring pursuant to the Plan on the terms and conditions contained in this Agreement and the attached Term Sheet.

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

1.      **Incorporation of Term Sheet and Definitions; Interpretation**.

The Term Sheet is expressly incorporated herein by reference and is made part of this Agreement.  All references herein to this "Agreement" or "herein" shall include the Term Sheet where not expressly stated.  The general terms and conditions of the Restructuring, as supplemented by the terms and conditions of this Agreement, are set forth in the Term Sheet.  In the event the terms and conditions set forth in the Term Sheet and this Agreement are inconsistent, the terms and conditions set forth in the Term Sheet shall govern. Capitalized terms used and not defined in this Agreement shall have the meaning ascribed to them in the Term Sheet.

In this Agreement, unless the context otherwise requires:

a.   words importing the singular also include the plural, and references to one gender include all genders;

b.   the headings in this Agreement are inserted for convenience only and do not affect the construction of this Agreement and shall not be taken into consideration in its interpretation;

c.   the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement;

d.   the words "include," "includes," and "including" shall be deemed to be followed by the phrase "without limitation." The word "or" is not exclusive; and

e.   references to any governmental entity or any governmental department, commission, board, bureau, agency, regulatory authority, instrumentality, or judicial or administrative body, in any jurisdiction shall include any successor to such entity.

2.      **Effectiveness; Entire Agreement**.

a.   This Agreement shall become effective as to the HERO Entities and each individual Ad Hoc Group Member upon delivery of counterpart signature pages to (i) this Agreement by and among (x) the Ad Hoc Group Members that together own and hold with the power to vote at least 99% of the aggregate amount of outstanding principal indebtedness under the First Lien Credit Agreement, and (y) the HERO Entities (such date, the "RSA Effective Date").

b.   Without limiting the rights and remedies of any Party arising from a breach of this Agreement prior to its valid termination, if this Agreement is validly terminated in its entirety in accordance with its terms, then this Agreement shall be null and void and have no further legal effect and none of the Parties shall have any liability or obligation arising under or in connection with this

Agreement; <u>provided</u> that if this Agreement is validly terminated in its entirety in accordance with its terms as to any Party but not as to all Parties, then this Agreement shall be null and void and have no further legal effect only with respect to such Party.

c. Each of the exhibits attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include and incorporate the exhibits, including the Term Sheet. In the event of any inconsistency between this Agreement (without reference to the exhibits) and the exhibits, this Agreement (without reference to the exhibits) shall govern except in the case of the Term Sheet, in which case the terms provided in the Term Sheet shall govern.

d. With the exception of non-disclosure and confidentiality agreements among the Parties and the Amended and Restated Forbearance Agreement, this Agreement (including the Term Sheet) constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements (oral and written) and all other prior negotiations.

3. <u>**Mutual Covenants of All Parties**</u>.

For so long as this Agreement has not been validly terminated in its entirety in accordance with its terms, and subject to the terms and conditions of this Agreement, the Parties agree severally and not jointly (in the case of any Ad Hoc Group Member, so long as it remains the legal owner, beneficial owner and/or investment advisor or manager of or with power and/or authority to bind any First Lien Claims and, if applicable, HERO Common Stock (<u>provided</u> that any transfer of First Lien Claims or, if applicable, HERO Common Stock is made in accordance with Section 10 herein)) to use commercially reasonable efforts to complete the Restructuring through the Plan within the timeframe contemplated by this Agreement and on terms and conditions consistent with those set forth herein and in the Term Sheet. For so long as this Agreement has not been validly terminated in its entirety in accordance with its terms, each Party hereby agrees and covenants severally (but not jointly) to:

a. cooperate with each other in good faith and coordinate their activities in connection with (i) the pursuit and implementation of the Restructuring, (ii) confirmation and consummation of the Plan, and (iii) in the event that the Debtors and the Requisite Consenting Lenders agree on an alternative structure that provides tax efficiencies and lower costs, implementing such an alternative Wind Down Entity structure, in each case as soon as reasonably practicable;

b. use commercially reasonable efforts and work in good faith to negotiate definitive documents implementing, achieving and relating to the Restructuring, including, but not limited to, (i) the Disclosure Statement, the motion seeking approval of the Disclosure Statement, the Plan, the order of the Bankruptcy Court confirming the Plan (such order, in form and substance reasonably acceptable to the Requisite Consenting Lenders, the "<u>Confirmation</u>

Order"), the motion seeking entry of the Confirmation Order, the plan supplement and its exhibits, the Solicitation Procedures (as defined below), the motion seeking the entry of orders approving the Debtors' ability to use cash collateral on interim and final bases (collectively, the "Cash Collateral Orders"), and each of the organizational, governance and exit credit documents contemplated by the Term Sheet; (ii) such other related plan documents and ancillary agreements required to implement the Restructuring, the Plan and Disclosure Statement, each of which are more specifically described in the Term Sheet and shall contain terms and conditions substantially consistent in all respects with the Term Sheet and, if not specified in the Term Sheet, otherwise in form and substance reasonably acceptable to the Requisite Consenting Lenders and the Debtors (collectively, the "Definitive Documents"); and (iii) execute (to the extent they are a party thereto) the Definitive Documents and otherwise support and seek to effect the actions and transactions contemplated thereby, in each case as soon as reasonably practicable, provided that each of the Definitive Documents shall (A) contain terms and conditions consistent in all material respects with this Agreement and the Term Sheet and (B) otherwise be reasonably acceptable in all respects to the Debtors and the Requisite Consenting Lenders, including with respect to any modifications, amendments, or supplements to such Definitive Documents, provided further that each of the organizational, governance and exit credit documents contemplated by the Term Sheet shall be substantially consistent in all material respects with the Term Sheet and this Agreement and reasonably acceptable to the Requisite Consenting Lenders in all respects (it being understood that any objection by the Requisite Consenting Lenders to any provision of the organizational, governance or exit credit documents contemplated by this Agreement and the Term Sheet that would materially and adversely affect the recoveries of the First Lien Lenders contemplated therein, or to have a material and adverse impact on the governance structure of the Wind Down Entity shall be deemed to be reasonable);

c.  use their commercially reasonable efforts to negotiate and execute all Definitive Documents reasonably necessary or otherwise required to commence solicitation for the Plan ("Solicitation") by no later than May 31, 2016;

d.  take such action as may be reasonably necessary to carry out the purposes and intent of this Agreement;

e.  not take any action that is inconsistent in any material way with, or is intended to frustrate, delay or impede the timely approval and confirmation of the Plan and consummation of the transactions described in the Term Sheet and the Plan;

f.  to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the transactions contemplated herein,

negotiate in good faith appropriate additional or alternative provisions to address any such impediment; <u>provided</u>, that the economic outcome for the Parties and other materials terms of this Agreement are preserved in any such provisions;

g.  comply with all of its obligations under this Agreement and the exhibits annexed hereto (which exhibits are incorporated herein by reference) unless compliance is waived in writing by each of the other Parties;

h.  comply with all of its obligations under the Amended and Restated Forbearance Agreement; and

i.  support and use commercially reasonable efforts to (i) complete the Restructuring and all transactions contemplated under this Agreement, including, without limitation, those described in the Term Sheet (and the Plan) as soon as reasonably practicable, and in any event, not later than in accordance with the deadlines specified in the milestones set forth in the Term Sheet and in the section entitled "*Additional Covenants of the Debtors*" herein (collectively, as the same may be modified in accordance with the terms of this Agreement, the "<u>Milestones</u>"), (ii) take any and all reasonably necessary actions in furtherance of the Restructuring and the transactions contemplated under this Agreement, including, without limitation, as set forth in the Term Sheet (and once filed, the Plan), and (iii) obtain (solely as it relates to such Party) any and all required regulatory and/or third party approvals necessary to consummate the Restructuring.

4.  **Actions by the Ad Hoc Group.**

Unless otherwise expressly set forth herein, matters herein requiring action by, or the consent of, the Ad Hoc Group shall be subject to the consent of Ad Hoc Group Members holding at least 50.1% of the outstanding, aggregate principal amounts owing under the First Lien Credit Agreement (the "<u>Requisite Consenting Lenders</u>").

5.  **Additional Covenants of the Ad Hoc Group Members**.

For so long as this Agreement has not been validly terminated in its entirety in accordance with its terms with respect to it, each Ad Hoc Group Member (solely on its own behalf and not on behalf of any other holder of First Lien Claims or, if applicable, HERO Common Stock) hereto agrees and covenants severally (but not jointly), so long as it remains the legal owner, beneficial owner and/or investment advisor or manager of or with power and/or authority to bind any First Lien Claims and, if applicable, HERO Common Stock (<u>provided</u> that any transfer of First Lien Claims or, if applicable, HERO Common Stock is made in accordance with Section 10 herein), to:

a.  not, directly or indirectly, (i) object to, delay, impede, or take any other action to interfere with the acceptance, implementation, confirmation or consummation of the Restructuring and the Plan; (ii) seek, solicit, support, encourage, or vote any claims  or equity interests for, consent to, or participate

in any discussions regarding the negotiation or formulation of any restructuring or reorganization for any of the Debtors that is inconsistent with this Agreement, the Term Sheet or the Plan in any respect; (iii) take any other action that would delay or obstruct the timely approval and consummation of the transactions contemplated by this Agreement, the Term Sheet or the Plan in any respect; (iv) commence or support any action or proceeding to shorten or terminate the period during which only the Debtors may propose and/or seek confirmation of a plan of reorganization; or (v) otherwise support any plan or sale process that is inconsistent with this Agreement, the Term Sheet or the Plan;

b.  not instruct the First Lien Agent to take any action that is inconsistent with the terms and conditions of this Agreement or the Amended and Restated Forbearance Agreement and if the First Lien Agent takes or threatens to take any such action, direct the First Lien Agent not to take such action;

c.  use commercially reasonable efforts to execute any document and give any notice, order, instruction, or direction necessary or reasonably requested by the Debtors to support, facilitate, implement, or consummate or otherwise give effect to the Restructuring;

d.  (i) reasonably support the approval of the Disclosure Statement, the solicitation and the solicitation procedures (such procedures, in form and substance reasonably acceptable to the Requisite Consenting Lenders, the "Solicitation Procedures"), or any of the Definitive Documents by the Bankruptcy Court or any regulatory authority, (ii) reasonably support confirmation and consummation of the Plan, (iii) not oppose, object to or join in or support any objection to the Disclosure Statement, the solicitation and the Solicitation Procedures, or any of the Definitive Documents, or (iv) otherwise commence any proceeding to oppose or alter any of the terms of the Plan or any other document filed by Debtors (to the extent such document is in form and substance reasonably acceptable to the Requisite Consenting Lenders) in connection with the confirmation and consummation of the Plan;

e.  (i) subject to receipt of the Disclosure Statement, vote, and cause its controlled affiliates and funds, as appropriate, to vote each of its First Lien Claims and, as applicable, any other voting claims against, or interests in, the Debtors, to accept the Plan by delivering its duly executed and completed ballot accepting the Plan on a timely basis following the commencement of the solicitation and its actual receipt of the Disclosure Statement and related solicitation materials that meet the requirements of applicable law, including sections 1125 and 1126 of the Bankruptcy Code; and (ii) to the extent such election is available, not elect on its ballot to preserve claims, if any, that each Ad Hoc Group Member may own or control that may be affected by any releases expressly contemplated by the Plan;

f.  not change or withdraw (or cause to be changed or withdrawn) such vote; and

g.  contemporaneously with the execution of this Agreement, enter into (and direct the First Lien Agent to enter into) the Amended and Restated Forbearance Agreement.

**6.   <u>Additional Covenants of the Debtors</u>.**

For so long as this Agreement and the Amended and Restated Forbearance Agreement have not been validly terminated in their entirety in accordance with their terms, the Debtors agree and covenant to:

a.  cause the sale process for the HERO Entities' assets to continue during the Chapter 11 Cases.  Purchase and sale agreements entered into by the HERO Entities contemplating the sale of any of the HERO Entities' vessels that secure the First Lien Claims shall be subject to the approval of the Requisite Consenting Lenders, whether such agreements are entered into before, or during the Chapter 11 Cases, which consent of the Requisite Consenting Lenders shall not be unreasonably withheld;

b.  provide draft copies of all "first day" motions or applications and other documents the Debtors intend to file with the Bankruptcy Court on the Petition Date to counsel to the Ad Hoc Group at least two (2) business days prior to the date on which the Debtors intend to file such documents and to consult in good faith with the Ad Hoc Group regarding the form and substance of any such proposed filing with the Bankruptcy Court.  The Debtors will use good faith efforts to provide draft copies of all other material pleadings the Debtors intend to file with the Bankruptcy Court to counsel to the Ad Hoc Group within a reasonable time prior to filing such pleading to the extent practicable and shall consult in good faith with the Ad Hoc Group regarding the form and substance of any such proposed pleading;

c.  conclude Solicitation (i) on or before June 3, 2016 for holders of First Lien Claims and (ii) on or before June 28, 2016 for holders of HERO Common Stock;

d.  commence the Chapter 11 Cases on or before 7:00 a.m. New York City time on June 6, 2016;

e.  file on the Petition Date such first day motions and pleadings as are reasonably acceptable, in form and substance, to the Requisite Consenting Lenders;

f.  file the Plan, the motion to approve the use of cash collateral on an interim and final basis, and the Disclosure Statement and the motion to approve the Disclosure Statement with the Bankruptcy Court on the Petition Date;

g.  obtain entry by the Bankruptcy Court of the interim Cash Collateral Order in form and substance reasonably acceptable to the Debtors and the Requisite Consenting Lenders on or before the date that is three (3) business days after the Petition Date;

h.  The Bankruptcy Court shall have established a limited claims bar date for specific contingent and unliquidated claims, including, but not limited to, any claims asserting liability for personal injury, and claims in an amount in excess of $300,000 (the "Specified Claims"), in form and substance reasonably acceptable to the Debtors and the Requisite Consenting Lenders, on or before July 29, 2016; provided, however, that the Specified Claims shall specifically not include (i) claims of any taxing authorities, (ii) rejection damages claims, or (iii) any claims of the Executives (as defined below) or other employees who are parties to severance agreements with the Debtors; and the Executives and the other employees who are parties to severance agreements with the Debtors shall not be required to file any proofs of claim unless their applicable employment and/or severance agreements are rejected under the Plan by an order of the Court, which may be the Confirmation Order and such Executive or other employee has not been provided alternative severance compensation pursuant to the terms of the Plan or another agreement with the Debtors (with the consent of the Requisite Consenting Lenders) or the Wind Down Entity;

i.  obtain approval by the Bankruptcy Court of the Disclosure Statement and the Solicitation Procedures and entry of the Confirmation Order on or before August 2, 2016, which Confirmation Order shall be a Final Order (as defined in the Term Sheet) on or before August 16, 2016;

j.  use commercially reasonable efforts to consummate the Plan on or before August 16, 2016;

k.  take no action that is materially inconsistent with this Agreement, the Term Sheet, or the Plan, or that would unreasonably delay approval or ratification, as applicable, of the Disclosure Statement, the solicitation and Solicitation Procedures, or confirmation and consummation of the Plan;

l.  not directly or indirectly (A) join in or support any alternative plan or transaction other than the Plan; or (B) take any action to alter in any material respect, unreasonably delay, or impede the approval or ratification, as applicable, of the Disclosure Statement, the solicitation and Solicitation Procedures, and confirmation and consummation of the Plan;

m.  object to any motion to approve or confirm, as applicable, any other plan of reorganization, sale transaction, or any motions related thereto, to the extent that the terms of any such motions, documents, or other agreements are inconsistent with this Agreement or the Term Sheet and such inconsistencies were not approved in writing by the Requisite Consenting Lenders;

n.  continue to operate its businesses, market assets of the Debtors for sale, and conduct sale processes in accordance with its business judgment, and confer with the Ad Hoc Group, the Requisite Lenders, and their respective representatives, as reasonably requested, to report on operational matters, the asset sale process, and the general status of ongoing operations and dispositions;

o.  use commercially reasonable efforts to provide prompt written notice to the Ad Hoc Group between the date hereof and the effective date of the Plan of (i) the occurrence, or failure to occur, of any event of which John Rynd, Troy Carson, Beau Thompson, Son Vann or Charlie Lestage (or the successors of the any of the foregoing) (the "<u>Senior Executives</u>") have actual knowledge which occurrence or failure would be reasonably likely to cause (1) any representation or warranty of the Debtors contained in this Agreement to be untrue or inaccurate in any material respect, (2) any material covenant of the Debtors contained in this Agreement not to be satisfied in any material respect or (3) any condition precedent contained in the Plan or this Agreement not to occur or become impossible to satisfy, (ii) receipt of any written notice from any third party alleging that the consent of such party is or may be required as a condition precedent to consummation of the transactions contemplated by the Restructuring, (iii) receipt of any written notice from any governmental body that is material to the consummation of the transactions contemplated by the Restructuring, (iv) receipt of any written notice of any proceeding commenced, or, to the actual knowledge of the Senior Executives, threatened against the Debtors, that, if determined in a manner adverse to the Debtors, would be material to the consummation of the transactions contemplated by the Restructuring, and (v) any failure of the Debtors to comply, in any material respect, with or satisfy any covenant, condition or agreement to be complied with or satisfied by them hereunder hereunder as a condition precedent to the consummation of the transactions contemplated by the Restructuring;

p.  use commercially reasonable efforts to obtain the earliest possible date for a hearing on confirmation of the Plan as the Bankruptcy Court may provide;

q.  provide to the Ad Hoc Group and/or its professionals, upon reasonable advance notice to the Debtors, (i) reasonable access (without any material disruption to the conduct of the Debtors' business) during normal business hours to the Debtors' books, records and  facilities, and (ii) reasonable access to the respective management and advisors of the Debtors during normal business hours for the purposes of evaluating the Debtors' finances and operations and participating in the planning process with respect to the Restructuring; and

r.  pay the reasonable and documented fees and expenses of Kirkland & Ellis LLP, as counsel to the Ad Hoc Group, White & Case LLP, as counsel to Luminus Management LLC and Soros Fund Management, LLC, and one local counsel to the Ad Hoc Group, and the reasonable and documented fees and expenses of other professionals retained by the Ad Hoc Group that have executed engagement letters with the Debtors, as well as the reasonable fees and expenses incurred by the First Lien Agent, including King & Spalding LLP, as restructuring counsel, White & Case LLP, as counsel with respect to the administration of the First Lien Credit Agreement and the other Loan Documents (as defined in the First Lien Credit Agreement), special maritime counsel and one local counsel, in each case incurred in connection with the Restructuring.

**7.    Preservation of Participation Rights**.  For the avoidance of doubt, nothing in this Agreement shall limit any rights of any Party, subject to applicable law, the Plan, and the Term Sheet, to (a) appear and participate as a party in interest in any contested matter to be adjudicated in the Chapter 11 Cases; (b) initiate, prosecute, appear, or participate as a party in interest in any adversary proceeding in the Bankruptcy Cases, so long as, in the case of each of (a) or (b), such appearance, initiation, prosecution or participation and the positions advocated in connection therewith are not materially inconsistent with this Agreement, the Amended and Restated Forbearance Agreement, the Plan or the Term Sheet, as applicable; (c) object to any motion to approve or confirm, as applicable, any other plan of reorganization or liquidation, sale transaction, or any motions related thereto, to the extent that the terms of any such motions, documents, or other agreements are materially inconsistent with this Agreement, the Plan or the Term Sheet and such inconsistencies were not approved in writing by each other Party; (d) file a copy of this Agreement (including all exhibits hereto) or a description of the matters herein with the Bankruptcy Court or as required under applicable non-bankruptcy law; (e) appear as a party in interest in the Chapter 11 Cases for the purpose of contesting whether any matter or fact is or results in a breach of, or is materially inconsistent with, this Agreement or the Amended and Restated Forbearance Agreement; and (f) as applicable, file any proof of claim.

**8.    Mutual Representations and Warranties of All Parties**.  Each Party represents and warrants to each of the other Parties that, as of the date hereof:

  a.  it has all requisite power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its obligations under, this Agreement;

  b.  the execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary action on its part; and

  c.  this Agreement constitutes the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

**9.    Additional Representations and Warranties by the Ad Hoc Group Members**. Each Ad Hoc Group Member (solely on its own behalf and not on behalf of any other Ad Hoc Group Member) represents and warrants to the best of its knowledge, as of the date hereof that:

  a.  Holdings by Ad Hoc Group.  As of the date hereof, with respect to the First Lien Claims and, if applicable, HERO Common Stock held by such Ad Hoc Group Member as set forth on **Schedule 1** hereto, such Ad Hoc Group Member (A) either (i) is the sole beneficial owner of the principal amount of such First Lien Claims and, if applicable, HERO Common Stock, or (ii) has sole investment or voting discretion with respect to the principal amount of such First Lien Claims and, if applicable, HERO Common Stock as set forth herein and has the power and authority to bind the beneficial owners of such

12

First Lien Claims and, if applicable, HERO Common Stock to the terms of this Agreement, and (B) has full power and authority to act on behalf of, vote, and consent to matters concerning such First Lien Claims and, if applicable, HERO Common Stock and to dispose of, exchange, assign, and transfer such First Lien Claims and, if applicable, HERO Common Stock.

b.  No Transfers.  As of the date hereof, with respect to the First Lien Claims and, if applicable, HERO Common Stock held by such Ad Hoc Group Member as set forth on **Schedule 1** hereto, such Ad Hoc Group Member has made no assignment, sale, participation, grant, conveyance, pledge, or other transfer of, and has not entered into any other agreement to assign, sell, use, participate, grant, convey, pledge, or otherwise transfer, in whole in or part, any portion of its right, title, or interests in any such First Lien Claims and, if applicable, HERO Common Stock that are subject to this Agreement that conflict with the representations and warranties of such Ad Hoc Group Member herein or would render such Ad Hoc Group Member otherwise unable to comply with this Agreement and perform its obligations hereunder.

c.  Sufficiency of Information Received.  Such Ad Hoc Group Member has reviewed, or has had the opportunity to review, with the assistance of professional and legal advisors of its choosing, all information it deems necessary and appropriate for such Ad Hoc Group Member to evaluate the risks inherent in the Restructuring and accept the terms of the Plan as set forth in the Term Sheet.

10.    **Transfer Restrictions**.  No Ad Hoc Group Member shall (i) sell, use, pledge, assign, transfer, permit the participation in, or otherwise dispose of any ownership (including any beneficial ownership) in the First Lien Claims and, if applicable, HERO Common Stock set forth on **Schedule 1** hereto in whole or in part; or (ii) grant any proxies, deposit any of such Ad Hoc Group Member's interests in First Lien Claims and, if applicable, HERO Common Stock as set forth on **Schedule 1** hereto into a voting trust, or enter into a voting agreement with respect to any such interest (collectively, the actions described in clauses (i) and (ii), a "Transfer"), unless it satisfies the following requirement (a transferee that satisfies such requirements, a "Permitted Transferee," and such Transfer, a "Permitted Transfer"):  The intended transferee executes and delivers to counsel to HERO and counsel to the Ad Hoc Group on the terms set forth below an executed form of the transfer agreement in the form attached hereto as **Exhibit B** (a "Transfer Agreement") before such Transfer is effective (it being understood that any Transfer shall not be effective until notification of such Transfer and a copy of the executed Transfer Agreement is received by counsel to HERO and counsel to the Ad Hoc Group, in each case, on the terms set forth herein).

Notwithstanding anything to the contrary herein, (i) the foregoing provisions shall not preclude any Ad Hoc Group Member from transferring First Lien Claims and/or HERO Common Stock to affiliates of such Ad Hoc Group Member (each, a "Creditor Affiliate"), which Creditor Affiliate automatically shall be bound by this Agreement and the Amended and Restated Forbearance Agreement upon the transfer of such First Lien Claims and/or HERO Common Stock, (ii) the foregoing provisions shall not preclude any Party from transferring First

13

Lien Claims and/or HERO Common Stock to any other Party hereto, and (iii) a Qualified Marketmaker[1] that acquires any of the First Lien Claims and/or HERO Common Stock with the purpose and intent of acting as a Qualified Marketmaker for such First Lien Claims and/or HERO Common Stock, shall not be required to execute and deliver to counsel a Transfer Agreement or otherwise agree to be bound by the terms and conditions set forth in this Agreement and the Amended and Restated Forbearance Agreement if such Qualified Marketmaker transfers such First Lien Claims and/or HERO Common Stock (by purchase, sale, assignment, participation, or otherwise) to an Ad Hoc Group Member or Permitted Transferee (including, for the avoidance of doubt, the requirement that such transferee execute a Transfer Agreement) and the transfer otherwise is a Permitted Transfer.

This Agreement shall in no way be construed to preclude any Ad Hoc Group Member or any of its affiliates from acquiring additional First Lien Claims, HERO Common Stock or any other claim against the HERO Entities or equity interest in HERO; provided, however, that (i) if any Ad Hoc Group Member acquires additional or transferred First Lien Claims, any other claims against any of the HERO Entities or HERO Common Stock, as applicable, after the RSA Effective Date, such Ad Hoc Group Member shall notify the other Parties promptly of such acquisition including the amount of such acquisition and (ii) such acquired First Lien Claims, other claims or HERO Common Stock, as the case may be, shall automatically and immediately upon acquisition by an Ad Hoc Group Member, as applicable, be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to in accordance herewith).

Any Transfer made in violation of this provision shall be void *ab initio*. Any Ad Hoc Group Member that effectuates a Permitted Transfer to a Permitted Transferee shall have no liability under this Agreement arising from or related to the failure of the Permitted Transferee to comply with the terms of this Agreement.

## 11. Termination of Obligations.

(a)    This Agreement shall terminate and all of the obligations of the Parties shall be of no further force or effect in the event that and upon the occurrence of any of the following events:  (i) occurrence of the effective date of the Plan, (ii) an order denying confirmation of the Plan is entered, (iii) an order confirming the Plan is reversed or vacated, (iv) any court of competent jurisdiction has entered an order declaring this Agreement to be unenforceable, (v) the Parties mutually agree to termination of this Agreement in writing, (vi) the termination of the Amended and Restated Forbearance Agreement or (vii) this Agreement is terminated pursuant to paragraph (b), (c) or (d) of this Section 11.

(b)    The HERO Entities may, in their discretion, terminate this Agreement by written notice to counsel for the Ad Hoc Group, upon the occurrence of any of the following events:

---

[1] As used herein, the term "Qualified Marketmaker" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Claims of the Debtors (or enter with customers into long and short positions in Claims against the Debtors), in its capacity as a dealer or market maker in claims against the Debtors and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

14

(i)      a determination by HERO's board of directors (the "Board"), in good faith, based on the advice of its outside counsel, that proceeding with the Restructuring and pursuit of confirmation and consummation of the Plan would be inconsistent with the continued exercise of fiduciary duties under applicable law;

(ii)     a breach by any Ad Hoc Group Member of its material covenants or other material obligations hereunder, which breach is not cured within three (3) business days after the giving of written notice by HERO of such breach to such Ad Hoc Group Member, provided that so long as non-breaching Ad Hoc Group Members party hereto continue to hold at least 2/3rds of the outstanding First Lien Claims, such termination shall be effective only with respect to such breaching Ad Hoc Group Member;

(iii)     any Ad Hoc Group Member shall assert after the RSA Effective Date any claim or cause of action against any Debtor or any of its current directors, officers or advisors relating to the First Lien Credit Agreement, the First Lien Claims, the HERO Common Stock or the Restructuring, except the First Lien Claims themselves or to enforce the terms of this Agreement, provided that so long as non-breaching Ad Hoc Group Members party hereto continue to hold at least 2/3rds of the outstanding First Lien Claims, such termination shall be effective only with respect to such breaching Ad Hoc Group Member;

(iv)     any representation or warranty in this Agreement made by any Ad Hoc Group Member shall have been untrue in any material respect when made, and such breach remains uncured for a period of three (3) business days following the breaching Ad Hoc Group Member's receipt of notice thereof from HERO, provided that so long as non-breaching Ad Hoc Group Members party hereto continue to hold at least two-thirds of the outstanding First Lien Claims, such termination shall be effective only with respect to such breaching Ad Hoc Group Member; or

(v)     the Bankruptcy Court (or other court of competent jurisdiction) enters an order (A) invalidating, disallowing, subordinating or limiting the enforceability, priority or validity of any of the First Lien Claims, or (B) the effect of which would render the Plan incapable of consummation on the terms set forth in this Agreement and the Term Sheet;

provided, that upon a termination of this Agreement by the HERO Entities pursuant to this Section 11(b) with respect to any Ad Hoc Group Member or all Ad Hoc Group Members, (x) all obligations of each affected Ad Hoc Group Member hereunder shall immediately terminate without further action or notice by such Ad Hoc Group Member, and (y) the HERO Entities (and each of its directors, officers, employees, advisors, subsidiaries, and representatives) shall not have or incur any liability under this Agreement or otherwise on account of such termination.

(c)     This Agreement may be terminated by the Requisite Consenting Lenders upon the occurrence of any of the following events (it being understood that the following termination events are intended solely for the benefit of the Ad Hoc Group) (the "Lender Termination Events"):

(i)     filing by the Debtors of a plan (or disclosure statement related thereto) in the Chapter 11 Cases that is materially inconsistent with the terms of the Term Sheet

and this Agreement and not otherwise in form and substance reasonably acceptable to the Requisite Consenting Lenders;

(ii)    any representation or warranty in this Agreement made by the HERO Entities shall have been untrue in any material respect when made, and such breach remains uncured for a period of three (3) business days following HERO's receipt of notice thereof from the Requisite Consenting Lenders;

(iii)    any of the Debtors or their non-Debtor affiliates shall assert after the RSA Effective Date any claim or cause of action against the First Lien Agent or any First Lien Lender, except to enforce the terms of this Agreement;

(iv)    after filing of the Plan, any amendment or modification to the Plan, or the filing of any pleading by any of the HERO Entities that seeks to amend or modify the Plan, which amendment, modification or filing is materially inconsistent with the terms of the Term Sheet or this Agreement and not otherwise in form and substance reasonably acceptable to the Requisite Consenting Lenders;

(v)    a breach by any of the HERO Entities of its material covenants or other material obligations under this Agreement or the Term Sheet, which breach is not cured within three (3) business days after the giving of written notice by counsel for the Ad Hoc Group (acting at the direction of the Requisite Consenting Lenders) of such breach;

(vi)    the Debtors (A) withdraw the Plan, (B) publicly announce their intention not to support the Plan or the Restructuring, (C) file a motion with the Bankruptcy Court seeking approval of any transaction that is inconsistent with the Restructuring, or (D) agree to pursue (including as may be evidenced by any term sheet, letter of intent or similar document) or publicly announce their intent to pursue any transaction that is inconsistent with the Restructuring;

(vii)    the failure of the Debtors to comply with the Milestones within the periods specified therein, unless otherwise agreed in writing with the Requisite Consenting Lenders and the Debtors; it being understood that if a Milestone ends on a weekend or holiday on which the Bankruptcy Court is not open and holding hearings, such Milestone shall be automatically extended to the next business day on which the Bankruptcy Court is open and holding hearings;

(viii)    the Bankruptcy Court enters an order modifying or terminating the Debtors' exclusive right to file and/or solicit acceptances of a plan of reorganization (including the Plan);

(ix)    the Bankruptcy Court (or other court of competent jurisdiction) enters an order (A) directing the appointment of an examiner with expanded powers or a trustee in any of the Chapter 11 Cases, (B) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (C) dismissing any of the Chapter 11 Cases, (D) invalidating, disallowing, subordinating or limiting the enforceability, priority or validity of any of the First Lien Claims, or (E) the effect of which would render the Plan incapable of consummation on the terms set forth in this Agreement and the Term Sheet; or

16

(x)     the First Lien Agent shall not have received all the funds in the Escrow Account to prepay the First Lien Claims in accordance with the terms of the Term Sheet by the date that is three (3) business days after the delivery by the First Lien Agent of a written instruction to the Escrow Agent to distribute all of the funds in the Escrow Account to the First Lien Agent to prepay the Loans pursuant to III(d) of the Escrow Agreement and Section 2.10(a)(i) of the First Lien Credit Agreement.

(d)     The HERO Entities or the Ad Hoc Group (by written notice executed by counsel at the direction of the Requisite Consenting Lenders) may terminate this Agreement by written notice to the Parties in the event that the Bankruptcy Court or other governmental authority shall have issued any order, injunction or other decree or take any other action, which restrains, enjoins or otherwise prohibits the implementation of the Restructuring and/or the Plan substantially on the terms and conditions set forth in this Agreement.

(e)     This Agreement shall terminate solely as to any Ad Hoc Group Member on the date on which such Ad Hoc Group Member has transferred all (but not less than all) of its First Lien Claims (and HERO Common Stock, if any) in accordance with Section 9 of this Agreement.

(f)     If this Agreement is terminated pursuant to this Section 11, all further obligations of the Parties hereunder shall be terminated and without further liability; provided that each Party shall have all rights and remedies available to it under applicable law. Upon a termination of this Agreement in accordance with this Section, no Party hereto shall have any continuing liability or obligation to any other Party hereto and the provisions of this Agreement shall have no further force or effect; provided that no such termination shall relieve any party from liability for its breach or non-performance of its obligations hereunder prior to the date of such termination.

**12.   Fiduciary Duties.**  Notwithstanding anything to the contrary herein, nothing in this Agreement shall require HERO, any of the other HERO Entities, or any of their respective officers or directors (in such person's capacity as such) to take any action, or to refrain from taking any action, to the extent that taking such action or refraining from taking such action would be inconsistent with such person's or entity's fiduciary obligations under applicable law. HERO shall give the Ad Hoc Group not less than three (3) business days' prior written notice before the exercise of rights under this Section 12 or the termination of this Agreement in accordance with Section 11(b)(i) of this Agreement (it being understood that the specific performance provisions of Section 13 of this Agreement shall not be applicable to the Parties with respect to the exercise of rights under this Section 12 or termination of this Agreement in accordance with Section 11(b)(i) of this Agreement). For the avoidance of doubt, the foregoing shall not preclude the Ad Hoc Group from challenging the appropriateness of the exercise of fiduciary duties as the basis for the exercise of rights under this Section 12 or the termination of this Agreement in accordance with Section 11(b)(i) of this Agreement.

**13.   Specific Performance**.  It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a

remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder. The Parties expressly consent to entry of orders by the Bankruptcy Court to enforce this Agreement.

14. **Counterparts**. This Agreement and any amendments, waivers, consents, or supplements hereto or in connection herewith may be executed in multiple counterparts (including by means of telecopied or electronically transmitted signature pages), all of which taken together shall constitute one and the same Agreement.

15. **No Solicitation and Acknowledgements**. Each Party acknowledges that (a) no securities of any of the HERO Entities are being offered or sold hereby and this Agreement neither constitutes an offer to sell nor a solicitation of an offer to buy any securities of any of the HERO Entities and (b) this Agreement is not, and shall not be deemed to be, a solicitation of a vote for the acceptance of any chapter 11 plan (including the Plan) pursuant to section 1125 of the Bankruptcy Code. The acceptance of votes from holders of claims against, and interests in, the Debtors, as applicable, will not be solicited until such holders have received the Disclosure Statement and related solicitation materials that meet the requirements of the Bankruptcy Code, including Bankruptcy Code sections 1125 and 1126.

16. **Relationship Among Ad Hoc Group Members**. The obligations of each Ad Hoc Group Member under this Agreement are several and not joint with the obligations of any other Ad Hoc Group Member, and no Ad Hoc Group Member shall be responsible in any way for the performance of the obligations of any other Ad Hoc Group Member under this Agreement. Each of the Ad Hoc Group Members, on the one hand, and the Debtors, on the other hand, acknowledge that they are in privity with each other and that no Ad Hoc Group Member is in privity with any other Ad Hoc Group Member in connection with this Agreement or any of the transactions contemplated hereby. It is understood and agreed that no Ad Hoc Group Member has any duty of trust or confidence of any kind or form with any other Ad Hoc Group Member, and, except as expressly provided in this Agreement, there are no commitments among or between them. In this regard, it is understood and agreed that any Ad Hoc Group Member may trade in and vote the First Lien Claims, or other debt or equity securities of the HERO Entities, including without limitation the HERO Equity Interests, without the consent of the HERO Entities or any other Ad Hoc Group Member, subject to the terms of this Agreement and applicable securities laws. Nothing contained in this Agreement, and no action taken by any Ad Hoc Group Member pursuant hereto shall be deemed to constitute the Ad Hoc Group as, and the Debtors agree that the Ad Hoc Group does not so constitute, a partnership, an association, a joint venture or any other kind of entity, or create a presumption that any Ad Hoc Group Member is in any way acting in concert or as a group, and the Debtors will not assert any such claim and the Debtors agree that the Ad Hoc Group Members are not acting in concert or as a group with respect to the transactions contemplated by this Agreement. The Debtors acknowledge and each Ad Hoc Group Member confirms that it has independently participated in the negotiation of the transaction contemplated hereby with the advice of its own counsel and advisors. Each Ad Hoc Group Member shall be entitled to independently protect and enforce its rights, including, without limitation, the rights arising out of this Agreement, and it shall not be necessary for any other Ad Hoc Group Member to be joined as an additional party in any proceeding for such purpose. No prior history, pattern or practice of sharing confidences among or between the Ad

Hoc Group Members shall in any way affect or negate the understandings and agreements set forth in this Section 16.

**17.**    <u>**Confidentiality**</u>.    Other than as may be required by applicable law and regulation or by any governmental or regulatory authority or as may be required to comply with the terms of this Agreement, no Party shall make any public announcement regarding this Agreement without the consent of the other Parties, and each Party shall coordinate with the other Parties regarding communications with the press with respect to this Agreement; for the avoidance of doubt, each Party shall have the right, without any obligation to any other Party, to decline to comment to the press with respect to this Agreement.

**18.**    <u>**Time is of the Essence**</u>.    The Parties acknowledge and agree that time is of the essence, and that they must each use best efforts to effectuate and consummate the Restructuring as soon as reasonably practicable.

**19.**    <u>**Governing Law; Consent to Jurisdiction; Waiver of Jury Trial**</u>.

THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISION WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION.

(a)    By its execution and delivery of this Agreement, each of the Parties hereto irrevocably and unconditionally agrees for itself that any legal action, suit, or proceeding against it with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit, or proceeding, shall be brought, to the extent possible, in either the United States District Court for the Southern District of New York or any New York State Court sitting in New York City or following the Petition Date, the Bankruptcy Court (the "<u>Chosen Courts</u>").  By execution and delivery of this Agreement, each of the Parties irrevocably accepts and submits itself to the exclusive jurisdiction of the Chosen Courts, generally and unconditionally, with respect to any such action, suit, or proceeding, and waives any objection it may have to venue or the convenience of the forum.

(b)    Each Party hereby waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in any legal proceeding arising out of, or relating to, this Agreement or the transactions contemplated hereby (whether based on contract, tort, or any other theory).  Each Party (i) certifies that no representative, agent, or attorney of any other Party has represented, expressly or otherwise, that such other Party would not, in the event of litigation, seek to enforce the foregoing waiver and (ii) acknowledges that it and the other Parties have been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this Section 19.

**20.**    **Independent Analysis**.  Each Party hereby confirms that it has made its own decision to execute this Agreement based upon its own independent assessment of documents and information available to it, as it has deemed appropriate.

**21.**    **Third-Party Beneficiaries.**

Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties hereto and no other person or entity shall be a third party beneficiary hereof.

**22.**    **Notices**.  Any notice, request, instruction or other document to be given hereunder by any party to the others shall be in writing and delivered personally or sent by registered or certified mail, postage prepaid, by email or overnight courier.

(a)    If to the **Ad Hoc Group**, to:

Brian S. Lennon
Robert A. Britton
Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
brian.lennon@kirkland.com
robert.britton@kirkland.com

(b)    If to any of the **HERO Entities**, to:

Beau M. Thompson
Senior Vice President, General Counsel and Secretary
Hercules Offshore, Inc.
9 Greenway Plaza, Suite 2200
Houston, Texas 77046
bthompson@herculesoffshore.com

W*ith a copy to:*

Michael S. Stamer
Philip C. Dublin
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
Bank of America Tower
New York, New York 10036
mstamer@akingump.com
pdublin@akingump.com

**23.**    **Severability**.  Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the

remainder of such provision or the remaining provisions of this Agreement.  In the event that any part of this Agreement is declared by any court or other judicial or administrative body to be null, void or unenforceable, said provision survives to the extent it is not so declared, and all of the other provisions of this Agreement remain in full force and effect only if, after excluding the portion deemed to be unenforceable, the remaining terms provide for the consummation of the transactions contemplated hereby in substantially the same manner as originally set forth at the later of the date this Agreement was executed or last amended.

       24.   **Mutual Drafting**.  This Agreement is the result of the Parties' joint efforts, and each of them and their respective counsel have reviewed this Agreement and each provision hereof has been subject to the mutual consultation, negotiation, and agreement of the Parties, and the language used in this Agreement shall be deemed to be the language chosen by the Parties to express their mutual intent, and therefore there shall be no construction against either Party based on any presumption of that Party's involvement in the drafting thereof.

       25.   **Headings**.  The headings used in this Agreement are for convenience of reference only and do not constitute a part of this Agreement and shall not be deemed to limit, characterize, or in any way affect any provision of this Agreement, and all provisions of this Agreement shall be enforced and construed as if no headings had been used in this Agreement.

       26.   **Amendments.**  Notwithstanding anything to the contrary contained herein, this Agreement may not be modified, amended, or supplemented, nor shall any provision or requirement hereof be waived, without the prior written agreement signed by both (a) the HERO Entities and (b) the Requisite Consenting Lenders; provided, that notwithstanding the foregoing, any modifications, amendments, or supplements or waivers to the Agreement, including any exhibits hereto (including any provision in the Term Sheet), to (i) the sub-provision entitled "First Lien Claims" in the provision entitled "Treatment of Claims and Interests" in the Term Sheet, (ii) the sub-provisions entitled "HERO Common Stock" and "Other Equity Interests" in the provisions entitled "Treatment of Claims and Interests" in the Term Sheet, (iii) any documentation with regard to (i) through (ii) above, (iv) any change to this Section 26, and (v) any proposed modification, amendment or supplement to, or waiver of, any provision of the Agreement that would, or would reasonably be expected to, materially and adversely affect any Ad Hoc Group Member in a manner that is disproportionate to any other Ad Hoc Group Member or the Ad Hoc Group as a whole, may not be made without the prior written consent of the HERO Entities and each member of the Ad Hoc Group (or, in the case of "subsection (v)", by such Ad Hoc Group Member that would be so affected); provided further that with regard to the obligations of any Ad Hoc Group Member to vote its HERO Equity Interests pursuant to the terms of this Agreement, including, without limitation, any obligations in Section 5 of this Agreement, such provisions may be modified, amended or supplemented by any Ad Hoc Group Member, with respect to itself, and the Debtors, without the participation of, or consent of, any other Ad Hoc Group Member.

27.    **Several, Not Joint, Claims.**    The agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

[*Signature Pages Follow*]

IN WITNESS WHEREOF, this Agreement has been duly executed as of the date first above written.

**HERCULES OFFSHORE, INC.**

By: _____
Name: Troy Carson
Title: Vice President

**CLIFFS DRILLING COMPANY**
**FDT LLC**
**FDT HOLDINGS LLC**
**HERCULES DRILLING COMPANY, LLC**
**HERCULES OFFSHORE LIFTBOAT COMPANY**
  **LLC**
**HERO HOLDINGS, INC.**
**SD DRILLING LLC**
**THE OFFSHORE DRILLING COMPANY**
**THE ONSHORE DRILLING COMPANY**
**TODCO AMERICAS INC.**
**TODCO INTERNATIONAL INC.**
**HERCULES LIFTBOAT COMPANY, LLC**
**HERCULES OFFSHORE SERVICES LLC**
**HERCULES OFFSHORE INTERNATIONAL, LLC**

By: _____
Name: Troy Carson
Title: Vice President

**HERCULES OFFSHORE (NIGERIA) LIMITED**

By: _____

Name: Troy Carson

Title: Authorized Signatory

**DISCOVERY OFFSHORE (GIBRALTAR) LIMITED**

By: _____

Name: Troy Carson

Title: Authorized Signatory

By: _____

Name: Beau Thompson

Title: Authorized Signatory

**DISCOVERY NORTH SEA LTD.**
**DISCOVERY OFFSHORE SERVICES LTD.**
**HERCULES ASSET MANAGEMENT LTD.**
**HERCULES INTERNATIONAL DRILLING LTD.**
**HERCULES INTERNATIONAL HOLDINGS, LTD.**
**HERCULES INTERNATIONAL MANAGEMENT**
**COMPANY LTD.**
**HERCULES INTERNATIONAL OFFSHORE, LTD.**
**HERCULES NORTH SEA, LTD.**
**HERCULES OFFSHORE ARABIA, LTD.**
**HERCULES OFFSHORE HOLDINGS LTD.**
**HERCULES OFFSHORE MIDDLE EAST LTD.**
**HERCULES OILFIELD SERVICES LTD.**
**TODCO TRINIDAD LTD.**

By: _____
Name: Claus E. Feyling
Title: Director

**HERCULES OFFSHORE LABUAN CORPORATION**

By: _____
Name: Claus E. Feyling
Title: Director

**HERCULES BRITANNIA HOLDINGS LIMITED**
**HERCULES BRITISH OFFSHORE LIMITED**
**HERCULES NORTH SEA DRILLER LIMITED**
**HERCULES OFFSHORE UK LIMITED**

By: _____
Name: Claus E. Feyling
Title: Director

**LUMINUS ENERGY MASTER FUND, LTD.**, as Lender

By: _____

Name: Jonathan Barrett
Title:  Director

111840544 v3

**CERTAIN FUNDS AND ACCOUNTS EACH ACTING** as Lender, severally and not jointly

By: **T. ROWE PRICE ASSOCIATES, INC.,** as investment adviser

By: _____

Name:    **Rodney M. Rayburn**

Title:    **Vice President**

**NOMURA CORPORATE RESEARCH AND ASSET
MANAGEMENT INC.**, as investment manager on
behalf of certain of its clients:

By:    _____

       Name: Steven Kotsen
       Title:  Portfolio Manager

[SIGNATURE PAGE TO RESTRUCTURING SUPPORT AGREEMENT]

**SIMPLON INTERNATIONAL LIMITED**, as Lender

By:  _____

Name: Thomas A. McKay
Title: Its Attorney-In-Fact

**BOWERY OPPORTUNITY FUND, L.P.**, as Lender

By:     Bowery Opportunity Management, LLC, its
General Partner

By:     _____
        Name: Vladimir Jelisavcic
        Title: Manager


**BOWERY OPPORTUNITY FUND, LTD.**, as Lender

By:     _____
        Name: Vladimir Jelisavcic
        Title: Director


**BLACKWELL PARTNERS LLC - SERIES A**, as
Lender

By:     Bowery Opportunity Management, LLC, its
General Partner

By:     _____
        Name: Vladimir Jelisavcic
        Title: Manager


**P BOWERY, LTD**, as Lender

By:     Bowery Investment Management, LLC, its
investment manager

By:     _____
        Name: Vladimir Jelisavcic
        Title: Manager


[SIGNATURE PAGE TO RESTRUCTURING SUPPORT AGREEMENT]

**THIRD AVENUE TRUST, ON BEHALF OF THIRD
AVENUE FOCUSED CREDIT FUND**

By: Third Avenue Management, LLC, its investment
advisor

By: _____

Name: W. James Hall
Title:   General Counsel

111840544 v3

**SOUTH DAKOTA RETIREMENT SYSTEM**

By: _____

Name: Matthew L. Clerk
Title: State Investment Officer on
behalf of the South Dakota
Retirement System

**WESTERN ASSET MANAGEMENT COMPANY**, as
investment manager and agent on behalf of certain of its
clients

By: _____

Name:
Title:      Adam Wright
            Manager, U.S. Legal Affairs

**QPB HOLDINGS LTD**, as Lender

By: _____

Name: _____

Title: _____

THOMAS L. O'GRADY
Attorney-in-Fact

111840544 v3

IN WITNESS WHEREOF, this Agreement has been duly executed as of the date first above written.

**QUANTUM PARTNERS LP**, as holder of HERO Equity Interests

**By:  QP GP LLC,** its General Partner

By: _____

Name:

Title:           **THOMAS L. O'GRADY**
                Attorney-in-Fact

**BANK OF AMERICA, N.A.**, as Lender

By: _____

Name: Michael Lee

Title: Managing Director

[SIGNATURE PAGE TO RESTRUCTURING SUPPORT AGREEMENT]

## EXHIBIT A

**Term Sheet**

**THIS TERM SHEET IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OF HERCULES OFFSHORE, INC. OR ANY OF ITS AFFILIATES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION WILL ONLY BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY AND/OR OTHER APPLICABLE LAWS. NOTHING CONTAINED IN THIS TERM SHEET IS AN ADMISSION OF FACT OR LIABILITY OR SHALL BE DEEMED BINDING ON ANY OF THE HERO ENTITIES OR ANY MEMBER OF THE AD HOC GROUP, SUBJECT TO THE EXECUTION OF THE RSA.**

HERCULES OFFSHORE, INC., ET AL.
PLAN TERM SHEET

*This term sheet (the "Term Sheet") describes the material terms of a proposed "pre-packaged" chapter 11 plan for the Debtors (as defined below). This Term Sheet is subject in all respects to the negotiation, execution and delivery of Definitive Documents[1] subject to the terms of the restructuring support agreement (the "RSA") between the HERO Entities and the members of the Ad Hoc Group (as defined below). This Term Sheet does not include a description of all the relevant terms and conditions of the transactions contemplated herein.*

*This Term Sheet shall not constitute an offer to buy, sell or exchange for any of the securities or instruments described herein. It also shall not constitute a solicitation of the same. Further, nothing herein constitutes a commitment to exchange any debt or lend funds to any of the HERO Entities.*

*This Term Sheet is proffered in the nature of a settlement proposal in furtherance of settlement discussions and is intended to be entitled to the protections of Rule 408 of the Federal Rules of Evidence and all other applicable statutes or doctrines protecting the use or disclosure of confidential information and information exchanged in the context of settlement discussions.*

---

[1] Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the RSA.

EXECUTION VERSION

**SUMMARY OF PRINCIPAL TERMS AND CONDITIONS**

**Transaction Overview**

| | |
|---|---|
| *Parties:* | Hercules Offshore, Inc. ("HERO") and its subsidiaries that are party to the First Lien Credit Agreement (as defined below), each of which shall be a party to the RSA (collectively with HERO, the "HERO Entities"). |

The ad hoc group (the "Ad Hoc Group") comprised of certain First Lien Lenders (as defined below) and listed on the signature pages attached to the RSA.

*Transaction Summary:*  Subject to the terms and conditions of this Term Sheet, the RSA and Definitive Documentation, HERO, each of the other HERO Entities that is a domestic United States entity (other than Hercules Liftboat Company, LLC and Hercules Offshore International, LLC) (collectively, the "Debtors") shall restructure and implement a process to monetize their assets and wind-down their operations through a "pre-packaged" chapter 11 plan (the "Plan"), which shall be filed with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), in cases (the "Chapter 11 Cases") commenced by the Debtors by no later than June 6, 2016 (the date on which the Chapter 11 Cases are commenced, the "Petition Date") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

Agreements entered into or terminated by the HERO Entities contemplating the sale of any of the HERO Entities' vessels that secure the First Lien Claims shall be subject to the approval of the Requisite Consenting Lenders, whether entered into before, or during the Chapter 11 Cases, which consent of the Requisite Consenting Lenders shall not be unreasonably withheld.

In connection with that certain Amended and Restated Forbearance Agreement, dated May 26, 2016, by and between the HERO Entities, the Administrative Agent, and certain of the First Lien Lenders (the "Amended and Restated Forbearance Agreement"), the Escrow Agent (as defined in the First Lien Credit Agreement (as defined below)) shall distribute all the funds in the Escrow Account (as defined in the First Lien Credit Agreement) to the First Lien Agent to prepay amounts due under the First Lien Credit Agreement pursuant to Section III(d) of the Escrow Agreement (as defined in the First Lien Credit Agreement) and Section 2.10(a)(i) of the First Lien Credit Agreement (the "Escrow Release Payment"). If the First Lien Agent shall not have received the Escrow Release Payment by the date that is 3 business days after the delivery by the First Lien Agent of a written instruction to the Escrow Agent to distribute all of the funds in the Escrow Account to the First Lien Agent to prepay the Loans, the RSA shall be terminable by the Requisite Consenting Lenders.

The Plan and the other Definitive Documents shall be substantially consistent in all respects with this Term Sheet and otherwise reasonably acceptable to the HERO Entities and the Requisite Consenting Lenders.

**Current Capital Structure**

| | |
|---|---|
| *First Lien Debt:* | Indebtedness under that certain Credit Agreement, dated as of November 6, 2015 (as amended, modified or supplemented from time to time, the "First Lien Credit Agreement"), among HERO, as borrower, Jefferies Finance LLC, as administrative agent and collateral agent (the "First Lien Agent"), and the lenders from time to time party thereto (the "First Lien Lenders"), comprised of loans on the closing date of the First Lien Credit Agreement in an aggregate principal amount equal to $450 million. The indebtedness under the First Lien Credit Agreement is secured by a first priority security interest and lien upon substantially all of the HERO Entities' personal and real property. |

The claims arising under the First Lien Credit Agreement (the "First Lien Claims") shall be scheduled as of the Petition Date and shall be deemed allowed claims (i) under the interim and final Cash Collateral Order (as defined below) and (ii) as of the Effective Date (as defined below) against the Debtors in an amount equal to the outstanding principal, plus interest (including post-petition interest), fees and other expenses and the Applicable Premium (as defined in the First Lien Credit Agreement) due thereon. As of the RSA Effective Date, the aggregate amount of First Lien Claims is $579 million (plus accrued and unpaid interest), prior to taking into account any prepayments thereon contemplated by the Amended and Restated Forbearance Agreement. Neither the First Lien Agent nor any of the First Lien Lenders shall be required to file proofs of claim in the Chapter 11 Cases on account of the First Lien Claims.

| | |
|---|---|
| *General Unsecured Claims:* | Trade and other general unsecured ordinary course obligations of the Debtors, which are neither secured nor entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court, in an estimated aggregate amount of approximately $43 million as of the Petition Date (collectively, the "General Unsecured Claims"). |
| *HERO Equity Interests:* | Any "equity security" (as such term is defined in Bankruptcy Code section 101(16)) in HERO, including any issued or authorized but unissued share of common stock, preferred stock, or other instrument evidencing an ownership interest in HERO, whether or not transferable, and any option, warrant, or right, contractual or otherwise, to acquire any such interest in HERO (including any stock-based performance award, incentive stock option, restricted stock, restricted stock unit, stock appreciation right, dividend equivalent, or other stock based award) that existed immediately prior to the Effective Date, and any claim against HERO subordinated pursuant to Bankruptcy Code section 510(b) (collectively, the "HERO Equity Interests"). "HERO Common |

3

Stock" shall refer to the approximately 20 million of outstanding common shares that are publicly traded on the NASDAQ under the HERO ticker.

**Other Equity Interests:**    Any HERO Equity Interests other than the HERO Common Stock.

**Treatment of Claims and Interests**

**Administrative Claims:**

Unclassified – Non-Voting

"Administrative Claim" shall mean: a claim for costs and expenses of administration during the Chapter 11 Cases pursuant to sections 328, 330, 363, 364(c)(1), 365, 503(b) or 507(a)(2) of the Bankruptcy Code, including, (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Debtors' estates and winding down the businesses of the Debtors (such as wages, salaries or commissions for services, and payments for goods and other services and leased premises); (b) Fee Claims (as defined below); and (c) all fees and charges assessed against the Debtors' estates pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code, 28 U.S.C. §§1-1401.

On or as soon as reasonably practicable after the effective date of the Plan (the "Effective Date"), each holder of an allowed Administrative Claim shall (i) receive cash equal to the full allowed amount of its claim, (ii) be paid in the ordinary course of business, or (iii) receive such other less favorable terms as may otherwise be agreed to by the holder of such Administrative Claim and the Debtors, in consultation with the Ad Hoc Group.

"Fee Claim" shall mean: a claim for professional services rendered or costs incurred on or after the Petition Date and on or prior to the Effective Date by professional persons retained by the Debtors pursuant to sections 327, 328, and/or 363 of the Bankruptcy Code in the Chapter 11 Cases.

**Priority Tax Claims:**

Unclassified – Non-Voting

"Priority Tax Claim" shall mean: any secured or unsecured claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

On or as soon as reasonably practicable after the Effective Date, each holder of an allowed Priority Tax Claim shall be treated in accordance with section 1129(a)(9)(C) of the Bankruptcy Code.

**Priority Non-Tax Claims:**

Unimpaired – Deemed to Accept:

"Priority Non-Tax Claim" shall mean: any claim other than an Administrative Expense Claim or a Priority Tax Claim that is entitled to priority in payment as specified in section 507(a) of the Bankruptcy Code.

On or as soon as reasonably practicable after the Effective Date, each holder of an allowed Priority Non-Tax Claim shall receive cash equal to the full allowed amount of its claim or otherwise be left unimpaired, or receive such lesser treatment as may otherwise

be agreed to by such holder, the Debtors, in consultation with the Ad Hoc Group.

**Other Secured Claims:**

Unimpaired - Deemed to Accept

To the extent any other secured claims exist, on or as soon as practicable after the Effective Date, all such secured claims allowed as of the Effective Date, if not previously paid, shall, at the option of the Debtors and with the consent of the Requisite Consenting Lenders (which consent shall not be unreasonably withheld) be satisfied by either (i) payment in full in cash, (ii) reinstatement pursuant to section 1124 of the Bankruptcy Code, or (iii) such other recovery as may be necessary to satisfy section 1129 of the Bankruptcy Code.

**First Lien Claims:**

Impaired – Entitled to Vote

If the class of HERO Common Stock votes to accept the Plan, each holder of a First Lien Claim shall receive its pro rata share of:

- a non-interest bearing senior claim against the Wind Down Entity (as defined below) in the amount of $510 million plus accrued and unpaid interest on the First Lien Claims as of the Effective Date, <u>less</u> the Escrow Release Payment and any payments of principal or Applicable Premium under the First Lien Credit Agreement previously made to the First Lien Lenders during the Chapter 11 Cases (the "<u>Acceptance Lender Wind Down Claim</u>"); and

- 100% of the Class A interests (the "<u>Class A Wind Down Entity Interests</u>") in the Wind Down Entity, which shall represent 85% of the Acceptance Wind Down Entity Interests (as defined below).

If the class of HERO Common Stock votes to reject the Plan, each holder of a First Lien Claim shall receive its pro rata share of:

a non-interest bearing senior claim  against the Wind Down Entity in the amount of $579 million plus accrued and unpaid interest on the First Lien Claims as of the Effective Date, <u>less</u> the Escrow Release Payment and any payments of principal or Applicable Premium under the First Lien Credit Agreement previously made to the First Lien Lenders during the Chapter 11 Cases (the "<u>Rejection Lender Wind Down Claim</u>").  The "<u>Lender Wind Down Claim</u>" shall refer to whichever of the Acceptance Lender Wind Down Claim or the Rejection Lender Wind Down Claim arises based on the acceptance or rejection of the Plan by the class of HERO Common Stock.

**General Unsecured Claims:**

Unimpaired – Deemed to Accept

Each holder of an allowed General Unsecured Claim, to the extent such holder's claim has not been previously paid in the ordinary course of business pursuant to an order of the Bankruptcy Court, or otherwise, shall receive payment in full in cash on the later of (a) the Effective Date and (b) the date upon which such claim becomes due and owing.

| | |
|---|---|
| ***Intercompany Claims:*** <br><br> Unimpaired – Non-Voting | On or as soon as reasonably practicable after the Effective Date, all intercompany claims shall be adjusted, continued, or discharged to the extent agreed upon by the Debtors and the Requisite Consenting Lenders in their reasonable discretion. |
| ***HERO Common Stock:*** <br><br> Impaired – Entitled to Vote | On the Effective Date, all existing HERO Common Stock shall be cancelled and of no further force and effect, whether surrendered for cancellation or otherwise.  If the class of HERO Common Stock votes to accept the Plan, each holder of HERO Common Stock shall receive its pro rata share (calculated based on the total number of shares of HERO Common Stock) of: |

    (i)    $12.5 million of cash (the "<u>Shareholder Effective Date Cash Distribution</u>") (subject to reduction by $450,000 for each full calendar day following the seventy-second (72nd) day after the Petition Date if the Confirmation Order is not a Final Order to the extent such delay is the result of actions taken directly or indirectly by holders of HERO Equity Interests, their representatives, and/or any other persons (including any HERO Entity) acting in concert with the holders of HERO Equity Interests, as reasonably determined by the Debtors and Requisite Consenting Lenders); and

    (ii)    100% of the Class B interests (the "<u>Class B Wind Down Entity Interests</u>" and, together with the Class A Wind Down Entity Interests, the "<u>Acceptance Wind Down Entity Interests</u>"), which shall represent 15% of the Acceptance Wind Down Entity Interests.

If the class of HERO Common Stock votes to reject the Plan, each holder of HERO Common Stock shall receive its pro rata share (calculated based on the total number of  shares of HERO Common Stock), of 100% of the Rejection Wind Down Entity Interests. The "<u>Wind Down Entity Interests</u>" shall refer to whichever of the Acceptance Wind Down Entity Interests or the Rejection Wind Down Entity Interests arise based on the acceptance or rejection of the Plan by the class of HERO Common Stock.

| | |
|---|---|
| ***Other Equity Interests*** | On the Effective Date, all existing Other Equity Interests shall be cancelled and of no further force and effect, whether surrendered for cancellation or otherwise. |
| ***Intercompany Equity Interests:*** <br><br> Impaired – Non-Voting | "<u>Intercompany Equity Interest</u>" shall mean an equity interest in a Debtor other than HERO. <br><br> On the Effective Date, Intercompany Equity Interests shall be cancelled and all assets of the Debtors shall vest in the Wind Down Entity. |
| <u>**Disputed Claim Reserve**</u> | One or more reserves shall be established in an amount or amounts |

reasonably acceptable to the Debtors and the Requisite Consenting Lenders and approved by the Bankruptcy Court for the administration and distribution on account of (i) Administrative Claims, (ii) Priority Tax Claims, (iii) Priority Non-Tax Claims, (iv) Other Secured Claims, or (v) General Unsecured Claims that are disputed as of the Effective Date (the "Disputed Claims Reserve"). The resolution of disputed Claims and payment of other post Effective Date Claims will be included in the duties and obligations of the Wind Down Entity.  Any amounts remaining in the Disputed Claims Reserve or any other reserve upon the satisfaction of all relevant claims shall revest in the Wind Down Entity and shall be deemed as included in the Post-Effective Date Assets.

**Release, Exculpation and Related Provisions**

*Releases:*

To the fullest extent permitted by applicable law, the Plan shall include a full mutual release from liability in favor of (a) the Debtors, (b) the Wind Down Entity, (c) the non-Debtor subsidiaries, (d) the Ad Hoc Group and its members, (e) the First Lien Agent, (f) the First Lien Lenders, (g) each holder of HERO Common Stock that votes in favor of the Plan, (h) (i) if the class of HERO Common Stock votes to accept the Plan, each holder of HERO Common Stock or (ii) if the class of HERO Common Stock votes to reject the Plan, each Holder of HERO Common Stock except any Holder of HERO Common Stock that (A) votes to reject the Plan and submits a ballot indicating a decision to not participate in the releases, or (B) does not vote to accept or reject the Plan but timely submits a ballot indicating a decision to not participate in the releases; and (i) with respect to each of the foregoing entities in clauses (a) through (h), such entity's respective current and former officers, directors, professionals, advisors, accountants, attorneys, investment bankers, consultants, employees, agents and other representatives, from any claims and causes of action related to or in connection with the HERO Entities and their subsidiaries, arising on or prior to the Effective Date (collectively, the "Releases"); *provided, however,* that no party shall be released from any claim or cause of action that was a result of such party's gross negligence or willful misconduct as determined by a Final Order (as defined in the Plan).

Notwithstanding that the ballots provided to holders of HERO Common Stock will include an opt-out election with respect to the Releases by Holders of HERO Common Stock that vote against the Plan, the Debtors will use commercially reasonable efforts to obtain entry of the Confirmation Order which Confirmation Order shall provide that the Releases bind all holders of claims and interests to the Releases.

*Exculpation:*

To the fullest extent permitted by applicable law, the Plan shall include customary exculpation provisions in favor of the Debtors and their respective current and former officers and directors,

professionals, advisors, accountants, attorneys, investment bankers, consultants, employees, agents, and other representatives, with respect to any liability relating to the Debtors or the Chapter 11 Cases arising prior to the Effective Date.

*9019 Settlement*
The Plan will incorporate a settlement under Bankruptcy Rule 9019 pursuant to which the Debtors and their estates will, to the fullest extent permitted by law, expressly release any and all claims to avoid, subordinate, setoff, reclassify, recharacterize or disallow in whole or in part the First Lien Claims and the Escrow Release Payment, whether under any provision of chapter 5 of the Bankruptcy Code, any equitable theory (including, without limitation, equitable subordination, equitable disallowance or unjust enrichment), or otherwise, and any other claims that the HERO Entities may be entitled to assert against the First Lien Agent and First Lien Lenders under any applicable law.

*Director and Officer Indemnification:*
Any obligations of the Debtors pursuant to their organizational documents to indemnify current and former officers, directors, agents, and/or employees (i) shall not be discharged or impaired by confirmation of the Plan and (ii) shall be deemed and treated as executory contracts to be assumed by the Debtors and assigned to the Wind Down Entity under the Plan.

Director and officer insurance ("D&O Insurance") will continue in place for the directors and officers of all of the HERO Entities during the Chapter 11 Cases on existing terms. After the Effective Date, the Wind Down Entity shall not terminate or otherwise reduce the coverage under any director and officer insurance policies (including any "tail policy") then in effect. Directors and officers shall be indemnified by the Wind Down Entity to the extent of such insurance. Any modifications, amendments, or the procuring of D&O Insurance shall require reasonable consent by the Requisite Consenting Lenders.

**Other Terms and Conditions**

*Cash Collateral Order:*
The Debtors shall use commercially reasonable efforts to obtain entry of interim and final cash collateral orders in form and substance reasonably acceptable to the Debtors, the Requisite Consenting Lenders and the First Lien Agent (the "Cash Collateral Order"), which shall be filed concurrently with the commencement of the Chapter 11 Cases.

Pursuant to the terms of the interim Cash Collateral Order, and following entry thereof by the Bankruptcy Court, the Debtors shall be authorized to make (i) an adequate protection payment equal to $35 million to the First Lien Agent for the benefit of the First Lien Lenders in partial payment of the principal amount due under the First Lien Credit Agreement, and (ii) monthly adequate protection payments to the First Lien Agent for the benefit of the First Lien

Lenders in an amount equal to accrued and unpaid prepetition or postpetition interest on the First Lien Claim calculated at the non-default rate under the First Lien Credit Agreement on the aggregate amount of the First Lien Claims.

*Milestones:*                   The HERO Entities shall implement the transactions contemplated by this Term Sheet and the RSA on the following timeline:

- The Debtors shall have commenced the solicitation of votes to accept or reject the Plan for holders of First Lien Claims and for holders of HERO Common Stock on or before May 31, 2016;

- The Debtors shall have concluded the solicitation of votes to accept or reject the Plan and tabulated such votes on or before June 3, 2016 for holders of First Lien Claims and June 28, 2016 for holders of HERO Common Stock;

- The Debtors shall have commenced the Chapter 11 Cases on or before 7:00 a.m. New York time on June 6, 2016;

- The Bankruptcy Court shall have entered the interim Cash Collateral Order by the date that is three business days after the Petition Date;

- The Bankruptcy Court shall have entered the final Cash Collateral Order in form and substance reasonably acceptable to the Debtors and the Requisite Consenting Lenders by the date that is thirty days after the Petition Date;

The Bankruptcy Court shall have established a limited claims bar date for specific contingent and unliquidated claims, including, but not limited to, any claims asserting liability for personal injury, and claims in an amount in excess of $300,000 (collectively, the "Specified Claims"), in form and substance reasonably acceptable to the Debtors and the Requisite Consenting Lenders, of on or before July 29, 2016; provided, however, that the Specified Claims shall specifically not include (i) claims of any taxing authorities; (ii) rejection damages claims; or (iii) any claims of the Executives (as defined below) or other employees who are parties to severance agreements with the Debtors; and the Executives and the other employees who are parties to severance agreements with the Debtors shall not be required to file any proofs of claim unless their applicable employment and/or severance agreements are rejected under the Plan by an order of the Court, which may be the Confirmation Order and such Executive or other employee has not been provided alternative severance compensation pursuant to the terms of the Plan or another

9

agreement with the Debtors (with the consent of the Requisite Consenting Lenders) or the Wind Down Entity;

- The Bankruptcy Court shall have entered the Disclosure Statement Order and Confirmation Order by August 2, 2016;

- The Plan shall have been consummated by August 16, 2016.

For the avoidance of doubt, the Debtors shall use commercially reasonable efforts to obtain the earliest possible date for hearing on confirmation of the Plan as the Bankruptcy Court may provide and the failure by the Debtors to satisfy any of the conditions set forth in this section entitled "Milestones" shall constitute an "Lender Termination Event" under section 11 of the RSA.

|   |   |
|---|---|
| *Marketing Process:* | Throughout the Chapter 11 Cases, to the extent sale and purchase agreements for the HERO Entities' assets have not been consummated, the Debtors and the other HERO Entities shall continue to market their vessels and residual assets for sale. |

Pursuant to the terms of the Cash Collateral Order, all proceeds of sales of assets that secure repayment of amounts due to the First Lien Lenders and the First Lien Agent under the First Lien Credit Agreement during the pendency of the Chapter 11 Cases shall be distributed to the First Lien Agent to repay the First Lien Claims in accordance with the terms of the First Lien Credit Agreement; *provided, however*, that all proceeds of sales of assets owned by the non-Debtor subsidiaries shall first be used to satisfy the outstanding liabilities of such non-Debtor subsidiaries and the excess, if any, shall thereafter be distributed to the First Lien Agent to repay the First Lien Claims; and *provided*, *further*, that, to the extent that $420 million has been paid to the First Lien Lenders (inclusive of the Escrow Release Payment and any payments of principal or Applicable Premium under the First Lien Credit Agreement previously made to the First Lien Lenders during the Chapter 11 Cases, but exclusive of interest and periodic adequate protection payments other than adequate protection payments designated as principal payments or payments of Applicable Premium), subject to the immediately preceding proviso, the next $15 million in proceeds of asset sales shall be reserved by the Debtors for payment of the Shareholder Supplemental Cash Distribution (as defined below) in the event the class of HERO Common Stock has voted to accept the Plan (the "Shareholder Supplemental Cash Distribution Reserve").

|   |   |
|---|---|
| *Wind Down Entity:* | On the Effective Date, all of the Debtors' remaining assets (including, but not limited to, HERO's direct and indirect equity interests in its subsidiaries that do not commence Chapter 11 Cases, the "Post-Effective Date Assets") shall be transferred to a wind down entity (the "Wind Down Entity"). The Plan shall provide that the Wind Down Entity will be a liquidating trust; *provided that* |

in the event that the Debtors and the Requisite Consenting Lenders agree on an alternative structure that provides tax efficiencies and lower costs, they shall use commercially reasonably efforts to modify the Plan and related documentation and obtain Court approval of the use of such an alternative Wind Down Entity structure.   The Wind Down Entity shall be responsible for liquidating the Post-Effective Date Assets and distributing the proceeds of the liquidation of such assets in accordance with the terms provided herein (i.e., first to satisfy in full, in cash, the Lender Wind Down Claim and, thereafter, to the holders of Wind Down Entity Interests subject to the priorities otherwise set forth below if the class of HERO Common Stock votes to accept the Plan, if applicable).  The Wind Down Entity shall be responsible for overseeing and administering (i) the termination of the Debtors' qualified 401(k) retirement plans and any related trusts and the distribution of such plans' assets to participants and for fulfilling statutory and regulatory requirements related to such plans and (ii) any statutory and regulatory requirements related to any terminated Debtor employee benefit plans. The Wind Down Entity shall establish at least three separate reserve accounts to hold funds in respect of (i) a Fee Claim reserve; (ii) the Disputed Claims Reserve and (iii) amounts necessary to satisfy allowed Administrative Claims, Priority Tax Claims, Priority Non-Tax Claims, Other Secured Claims, and General Unsecured Claims not otherwise paid on the Effective Date (collectively, the "Reserves").   After the Debtors make all payments required to be made on the Effective Date to the holders of Allowed Claims, fund the Reserves and, if applicable, pay the Shareholder Effective Date Distribution,  the Debtors shall transfer to the Wind Down Entity 100% of the Debtors' remaining cash on hand as of the Effective Date (the "Initial Wind Down Funding Amount"); *provided*,  that the Initial Wind Down Funding Amount shall not exceed $85 million, and any cash on hand of the HERO Entities, in the aggregate, in excess of such amount shall be applied to reduce the First Lien Claims (and the original principal amount of the Lender Wind Down Claim) (as defined below) on the Effective Date; *provided*, *further*, that, to the extent the class of HERO Common Stock has voted to accept the Plan and payments on the First Lien Claims shall have reached $420 million (inclusive of the Escrow Release Payment and any payments of principal or Applicable Premium under the First Lien Credit Agreement previously made to the First Lien Lenders during the Chapter 11 Cases, but exclusive of interest and periodic adequate protection payments other than adequate protection payments designated as principal payments or payments of Applicable Premium) and the Shareholder Supplemental Cash Distribution Reserve has not already been established, such excess shall be used to fund the Shareholder Supplemental Cash Distribution until such distribution is satisfied in full and thereafter distributions shall be made in accordance with the Wind Down Entity Waterfall.

Following the Effective Date, the Wind Down Entity Board (as defined below), in accordance with its fiduciary duties and based on the advice of its advisors, shall establish a budget for (i) the reconciliation of any claims for which funds have been reserved in the Disputed Claims Reserve, (ii) the monetization of the Post-Effective Date Assets, (iii) the wind down of the HERO Entities' business and operations and (iv) accomplishing all other objectives of the Wind Down Entity (the "Wind Down Budget") not in excess of $85 million.  In establishing the Wind Down Budget, the Wind Down Entity Board shall account for the use of any asset sale proceeds by any non-Debtor subsidiary to satisfy any claims against any HERO Entity during the pendency of the Chapter 11 Cases.  In the event that the Initial Wind Down Funding Amount is greater than the cash requirements projected in the Wind Down Budget, the Wind Down Entity Board shall distribute such excess amount pro rata to the holders of the Lender Wind Down Claim.  Before making any distributions provided herein, the Wind Down Entity Board shall make a good faith determination that it shall be retaining, after taking into account funds to be distributed, sufficient funding for (i) the reconciliation of any claims for which funds have been reserved in the Disputed Claims Reserve, (ii) the monetization of the Post-Effective Date Assets, (iii) the wind down of the HERO Entities' business and operations and (iv) accomplishing all other objectives of the Wind Down Entity.

Key characteristics of the Wind Down Entity shall include the following:

- The Wind Down Entity shall not be a public entity.

- The Wind Down Entity shall have first-lien, first-priority security interests and liens on the assets of the entities owned directly and indirectly by the Wind Down Entity, as set forth and further described in the organizational and/or trust documents, as applicable, for the Wind Down Entity, which documents shall govern the distributions in respect of the Lender Wind Down Claim and the Wind Down Entity Interests; provided that such lien and security interests may be subject to certain permitted liens that were permitted under the First Lien Credit Agreement.

- Specifically, with respect to the Lender Wind Down Claim: (a) such claim shall be memorialized in a separate instrument apart from the organizational documents of the trust, as applicable, governing the Wind Down Entity, and the organizational documents shall include an obligation to make payments in respect of the Lender Wind Down Claim on a priority basis in accordance with the Wind Down Entity Waterfall; (b) the Wind Down Entity shall be required to make distributions with respect to such claim to the extent of a sum certain absent a maturity date or remedies (other than the ability to assert a claim against the

12

Wind Down Entity for breach of the organizational and/or trust documents, as applicable, governing the Wind Down Entity); and (c) the claims will be transferable in a manner generally consistent with those for syndicated loans, including that transferees of such claim affirmatively agree to be bound by the terms and conditions of the separate instrument governing the Lender Wind Down Claim.

- The Wind Down Entity Interests shall not be transferable, shall not be certificated and otherwise shall be structured in accordance with applicable non-bankruptcy law such that such Wind Down Entity Interests shall not be deemed to be "securities" under U.S. securities law; *provided, however*, that, following the Effective Date, the Wind Down Entity Board shall have the discretion to take such steps as necessary to render some or all of the Wind Down Entity Interests transferable.

- The day-to-day operations of the Wind Down Entity shall be run by a Wind Down Entity representative (the "<u>Wind Down Entity Representative</u>") which may be a liquidating trustee, and which shall be appointed by the Requisite Consenting Lenders in their sole discretion; provided, that if the class of HERO Common Stock votes to reject the Plan the Wind Down Entity Representative shall be reasonably acceptable to the Debtors.

- The Wind Down Entity shall be governed by its governing body, which shall consist of three members (the "<u>Wind Down Entity Board</u>").  If the class of HERO Common Stock votes to accept the Plan, each of the members of the Wind Down Entity Board will be designated by the Ad Hoc Group.  If the class of HERO Common Stock votes to reject the Plan, the Wind Down Entity Board shall be comprised of the following members: (i) one member designated by the Requisite Consenting Lenders in their sole discretion; (ii) one member designated by the Requisite Consenting Lenders, who shall be reasonably acceptable to the Debtors; and (iii) one member designated by the Debtors, who shall be reasonably acceptable to the Requisite Consenting Lenders.

- Any actions or decisions of the Wind Down Entity Board shall be approved by a majority of the members of the Wind Down Entity Board.

- The members of the Wind Down Entity Board and the Wind Down Entity Representative shall have fiduciary duties similar to those of an official committee of unsecured creditors in a chapter 11 case; <u>provided</u>, that the Wind Down Entity Board and the Wind Down Entity representative shall exercise their fiduciary duties in such a

manner as to cause the Lender Wind Down Claim to be repaid as soon as reasonably practicable under the circumstances.

- The following shall be the "Wind Down Entity Waterfall": If the class of HERO Common Stock votes to accept the Plan, the Wind Down Entity shall make distributions to holders of Wind Down Entity Interests as follows: (i) after $420 million has been paid to the First Lien Lenders in the aggregate on (x) the First Lien Claims (inclusive of the Escrow Release Payment and any payments of principal or Applicable Premium under the First Lien Credit Agreement previously made to the First Lien Lenders during the Chapter 11 Cases, but exclusive of interest and periodic adequate protection payments other than adequate protection payments designated as principal payments or payments of Applicable Premium) and (y) the Acceptance Lender Wind Down Claim, to the extent not already paid, the next $15 million shall be paid to holders of the Class B Wind Down Entity Interests (the "Shareholder Supplemental Cash Distribution"); and (ii) after payment in full of the Acceptance Lender Wind Down Claim: (a) until such time as the holders of the Class A Wind Down Entity Interests have received $20 million on account of such Class A Wind Down Entity Interests, distributions shall be made pro rata to the holders of the Acceptance Wind Down Entity Interests; (b) once the holders of the Class A Wind Down Entity Interests have received $20 million on account of such Class A Wind Down Entity Interests, the next $3 million in distributions shall be made to the holders of the Class B Wind Down Entity Interests; (c) after the Class B Wind Down Entity Interests have received such $3 million, the next $3 million in distributions shall be made to the holders of the Class A Wind Down Entity Interests; and (d) after the holders of the Class A Wind Down Entity Interests have received such $3 million, pro rata to the holders of the Acceptance Wind Down Entity Interests.

  If the class of HERO Common Stock votes to reject the Plan, the Wind Down Entity shall make distributions to holders of Wind Down Entity Interests pro rata after payment in full of the Rejection Lender Wind Down Claim.

- Except as provided herein, unless and until the Lender Wind Down Claim has been paid in full in cash, no distributions shall be made on account of the Wind Down Entity Interests.

The organizational and/or trust documents, as applicable, for the Wind Down Entity and a list of the names of the individuals who shall comprise the Wind Down Entity Board and the Wind Down Entity representative shall be filed with the Bankruptcy Court as

exhibits in the Plan Supplement (as defined below), the form and substance of which shall be reasonably acceptable to the Debtors and the Requisite Consenting Lenders.

Any amounts remaining in the applicable Reserves after the final satisfaction of the Claims subject thereto, shall be released to the Wind Down Entity and constitute Post-Effective Date Assets.

Upon the conclusion of the liquidation of the Post-Effective Date Assets and the dissolution of the Wind Down Entity, the Wind Down Entity shall distribute any remaining proceeds from the sale of the Post-Effective Date Assets and any remaining Wind Down Funding Amount (a) first, to satisfy the remaining amount of the Lender Wind Down Claim, if any, and (b) then, to the holders of the Wind Down Entity Interests in accordance with their respective interests—subject to the priorities otherwise set forth herein if the Class of HERO Common Stock votes to accept the Plan, if applicable.

*Severance and Incentive Plan:*    The Plan shall provide that upon the Effective Date, each of John Rynd, Troy Carson, Beau Thompson, Son Vann, Charlie Lestage and John Wasmuth (each an "Executive") will waive his rights and entitlement under his existing employment agreement other than for any unpaid base salary, unpaid benefits and unpaid expense reimbursements due thereunder, and in lieu thereof will be entitled to the following payments, subject to such Executive having continued his employment with the Debtors until the Effective Date, or such Executive having been terminated without Cause (as defined in such Executive's employment agreement) prior to the Effective Date:  (i) on the Effective Date, payment of an amount equal to one times his current annual base salary; (ii) upon the later of (x) the Effective Date, (y) December 31, 2016 or (z) entry into a definitive agreement for the sale of the Hercules Triumph or the Hercules Resilience (the "Second Payment Trigger Date"), payment of an amount of such Executive's annual bonus in respect of 2015 that was paid in 2016 (the "Bonus Amount"); (iii) so long as an Executive is employed by the Wind Down Entity after the Effective Date, for any period that the Executive is so employed during the period from the Effective Date through December 31, 2016, such Executive shall be compensated for his continued employment at a rate of 150% of his current base salary (with 125% of his current base salary paid current and 25% deferred until the Second Payment Trigger Date (the "Deferral Compensation")) and for any period of employment from and after December 31, 2016 on such terms as may be agreed to by the Wind Down Entity and the Executive; and (iv) on the Effective Date, payment of an amount equal to $24,000 per Executive, representing an amount equal to one times his current annual cost of benefits; provided, however, that the amounts paid pursuant to the foregoing clauses (i) and (ii) shall in no event exceed $3.6 million in the aggregate.  For the avoidance of doubt, in the event an Executive resigns without "Executive Cause" (which shall mean the failure of the Wind Down Entity to pay such

EXECUTION VERSION

Executive his compensation when due in accordance with the terms hereof or if the Executive is asked to perform any services that are immoral, illegal or unethical) prior to the Effective Date or is terminated for Cause prior to the Effective Date, the Executive shall forfeit his rights to the payments contemplated hereby and, in the event an Executive resigns without Executive Cause or is terminated for Cause prior to the Second Payment Trigger Date, the Executive shall forfeit his rights to the Bonus Amount and the Deferral Compensation, but shall retain his rights to assert claims under his existing employment agreement, subject to, among other things, the provisions of Bankruptcy Code section 502(b)(7).  Any employment contract or similar benefits contract between any executive, contractor or other employee that is not an Executive and any Debtor shall be rejected immediately prior to the Effective Date of the Plan unless otherwise agreed among such executive, contractor or other employee and the Requisite Consenting Lenders.

| | |
|---|---|
| *Executory Contracts and Unexpired Leases:* | Executory contracts and unexpired leases shall be treated in a manner reasonably acceptable to the Debtors and the Requisite Consenting Lenders. |
| *Conditions to Consummation:* | The Plan shall contain customary conditions to consummation of the Plan and such other conditions as are agreed to by the Debtors and the Requisite Consenting Lenders, including, without limitation, the following: |

- Each of the Plan, the disclosure statement with respect to the Plan (the "Disclosure Statement") and the plan supplement (the "Plan Supplement") (including any amendments, modifications, supplements, exhibits or schedules related to any of the foregoing) and any other Definitive Documents shall be substantially consistent in all respects with the terms and conditions of this Term Sheet and the RSA, as applicable, and otherwise in form and substance reasonably satisfactory in all respects to the Debtors and the Requisite Consenting Lenders, including with respect to any modifications, amendments, or supplements to such Definitive Documents, *provided* that each of the organizational, governance and exit credit documents contemplated by this Term Sheet and the RSA shall be substantially consistent in all material respects with this Term Sheet and the RSA and reasonably acceptable to the Requisite Consenting Lenders in all respects (it being understood that any objection by the Requisite Consenting Lenders to any provision of the organizational, governance or exit credit documents contemplated by the RSA and this Term Sheet that would materially and adversely affect the recoveries of the First Lien Lenders contemplated therein, or to have a material and adverse impact on the governance structure of the Wind Down Entity shall be deemed to be reasonable).

- The order confirming the Plan and approving the Disclosure Statement (the "Confirmation Order") shall be a Final Order and shall have been entered in a form that is substantially consistent in all respects with the terms and conditions of this Term Sheet and the RSA, as applicable, and otherwise reasonably acceptable to the Debtors and the Requisite Consenting Lenders;

- All actions, documents and agreements necessary to consummate the Plan shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable government units in accordance with applicable law;

- The special claims bar date shall have occurred in accordance with the terms of this Term Sheet, and the aggregate amount of all Specified Claims not otherwise previously estimated by the Debtors in their schedule of Specified Claims shall be (i) as agreed by the Debtors and the relevant claimant, with the consent of the Requisite Consenting Lenders, or (ii) allowed for estimation purposes only (but as an aggregate cap on the amount that may be distributed on account of such Specified Claims) by an order of the Bankruptcy Court (the "Unscheduled Specified Claims").

- The amount of the Specified Claims estimated by the Debtors in their schedule of Specified Claims filed with the Bankruptcy Court plus the amount of the Unscheduled Specified Claims shall not exceed $33 million; *provided* that such condition to consummation may be waived by the Requisite Consenting Lenders in their sole discretion;

- The RSA shall not have been terminated in accordance with its terms; and

- The Amended and Restated Forbearance Agreement shall not have been terminated in accordance with its terms.

For the avoidance of doubt, failure by the Debtors to satisfy any of the conditions set forth in this section entitled "Conditions to Consummation" shall constitute an "Lender Termination Event" under section 11 of the RSA.

|  |  |
|---|---|
| *Restructuring Expenses:* | The Debtors shall pay all reasonable and documented fees and expenses of Kirkland & Ellis LLP, as counsel to the Ad Hoc Group, White & Case LLP, as counsel to Luminus Management LLC and Soros Fund Management LLC, and one local counsel to the Ad Hoc Group, and reasonable and documented fees and expenses of other |

professionals retained by the Ad Hoc Group that have executed engagement letters with the Debtors, as well as reasonable fees and expenses incurred by the First Lien Agent, including King and Spalding LLP, as restructuring counsel, White & Case LLP, as counsel with respect to the administration of the First Lien Credit Agreement and the other Loan Documents (as defined in the First Lien Credit Agreement), special maritime counsel and one local counsel, in each case incurred in connection with the Restructuring.

| | |
|---|---|
| *Reservation of Rights:* | Nothing herein shall be deemed an admission of any kind.  If the Restructuring is not consummated for any reason, the HERO Entities, the Ad Hoc Group and the First Lien Agent fully reserve any and all of their respective rights. |
| *Definitive Documents and Due Diligence:* | This Term Sheet is non-binding and indicative.   Any final agreement shall be subject to Definitive Documents, pleadings, court submissions and other documents, as well as additional legal, financial, tax and business due diligence, each substantially consistent in all respects with the terms of this Term Sheet and the RSA.  The Definitive Documents shall be substantially consistent in all respects with the terms of this Term Sheet and the RSA and otherwise in form and substance reasonably acceptable in all respects to the Debtors and the Requisite Consenting Lenders, including with respect to any modifications, amendments, or supplements to such Definitive Documents, *provided* that each of the organizational, governance and exit credit documents contemplated by this Term Sheet and the RSA shall be substantially consistent in all material respects with this Term Sheet and the RSA and reasonably acceptable to the Requisite Consenting Lenders in all respects (it being understood that any objection by the Requisite Consenting Lenders to any provision of the organizational, governance or exit credit documents contemplated by the RSA and this Term Sheet that would materially and adversely affect the recoveries of the First Lien Lenders contemplated therein, or to have a material and adverse impact on the governance structure of the Wind Down Entity shall be deemed to be reasonable). |

## EXHIBIT B

**Form of Transfer Agreement**

Transfer Agreement & Joinder

The undersigned ("Transferee") hereby acknowledges that it has read and understands the (i) Restructuring Support Agreement, dated as of May [__], 2016 (the "Agreement"), by and among (x) Hercules Offshore, Inc., a Delaware corporation, and each of its direct and indirect subsidiaries party thereto, (y) [TRANSFEROR'S NAME] ("Transferor") and (z) certain other First Lien Lenders and, in certain cases, holders of HERO Common Stock, party thereto, and (ii) the Amended and Restated Forbearance Agreement and (x) agrees to be bound by the terms and conditions of the Agreement and the Amended and Restated Forbearance Agreement to the extent Transferor was thereby bound, (ii) hereby makes all representations and warranties made in the Agreement and the Amended and Restated Forbearance Agreement by all other Ad Hoc Group Members and Lenders (as defined in the Agreement and the Amended and Restated Forbearance Agreement, respectively), and (iii) shall be deemed an Ad Hoc Group Member under the terms of the Agreement.  The Transferee is acquiring First Lien Claims[2] from Transferor in the amounts set forth on Schedule 1 hereof.  All notices and other communications given or made pursuant to the Agreement and the Amended and Restated Forbearance Agreement shall be sent to the Transferee at the address set forth in the Transferee's signature below.

Date Executed: _____

[TRANSFEREE]


By: _____
Name:
Title:

Address: _____

         _____

         _____

Attn: _____
Fax:  _____
Email:_____

---

[2] Note: If Transferee also is acquiring or owns HERO Equity Interests, add a reference to that effect here.

## Exhibit B

**Corporate Structure Chart**



Hercules Offshore, Inc. - Subsidiaries as of 20 April 2016

## Exhibit C

**Amended and Restated Forbearance Agreement**

## AMENDED AND RESTATED FORBEARANCE AGREEMENT

This Amended and Restated Forbearance Agreement (this "**Agreement**") is entered into as of May 26, 2016, by and among Hercules Offshore, Inc., a Delaware corporation (the "**Borrower**"), the Subsidiary Guarantors, Jefferies Finance LLC, as administrative agent (in such capacity, the "**Administrative Agent**") and collateral agent (in such capacity, the "**Collateral Agent**") and the Lenders signatory hereto. Any capitalized terms not specifically defined herein will have the meaning ascribed to them in the Credit Agreement.

### RECITALS

A.     WHEREAS, the Borrower, the Administrative Agent, the Collateral Agent, the Subsidiary Guarantors, and the Lenders party thereto entered into that certain Credit Agreement, dated as of November 6, 2015 (as may be amended, restated, modified or supplemented prior to the date hereof, the "**Credit Agreement**");

B.     WHEREAS, the Borrower, the Subsidiary Guarantors, certain Lenders, the Administrative Agent and the Collateral Agent are parties to that certain Forbearance Agreement and First Amendment to Credit Agreement, dated as of April 18, 2016, as amended by that certain Amendment No. 1 to Forbearance Agreement and First Amendment, dated as of April 28, 2016 (the "**Existing Forbearance Agreement**");

C.     WHEREAS, certain Lenders have asserted (but have not given notice under the Credit Agreement or any other Loan Document to the Borrower) that (i) an Event of Default has occurred based on the Borrower's failure to be in compliance with the affirmative covenant set forth in Section 5.15 of the Credit Agreement with respect to causing Hercules Offshore Nigeria Limited to deliver the certificate of registration of the vessel mortgage at the NIMASA by April 15, 2016 (the "**Specified Post-Closing Collateral Default**") and (ii) a Default has occurred based on the Borrower's failure to be in compliance with the affirmative covenant set forth in Section 5.18 of the Credit Agreement with respect to using best efforts to cause the Gibraltar Guarantor to dissolve, merge or consolidate with or into another Loan Party within 120 days after the Closing Date (or such later date as the Administrative Agent shall agree in its sole discretion) (the "**Specified Gibraltar Default**");

D.     WHEREAS, (i) the Borrower, Hercules British Offshore Limited ("**HBOL**") and Hercules North Sea, Ltd. ("**HNS**") agreed with Jurong Shipyard Pte. Ltd. ("**Jurong**") and Maersk Highlander UK Limited ("**Maersk Highlander**") that Jurong will perform the obligations under the Highlander Construction Contract in favor of Maersk Highlander and Maersk Highlander is entitled to exercise any right, benefit and/or interest in, to, under or in connection with, the Highlander Construction Contract as if it were the "Purchaser" under the Highlander Construction Contract, to the exclusion of HNS, pursuant to that certain Deed, dated as the date hereof, between the Borrower, HBOL, HNS, Jurong and Maersk Highlander attached hereto as Exhibit C-1 (including, without limitation, all schedules and exhibits attached thereto, the "**Tripartite Agreement**") (ii) HBOL agreed to assign and novate the Highlander Drilling Contract to Maersk Highlander pursuant to that certain Novation and amendment agreement in respect of a Drilling Contract relating to m.v. Hercules Highlander, dated as of the date hereof, between HBOL, Maersk Oil North Sea UK Limited and Maersk Highlander attached hereto as Exhibit C-2 (the "**Highlander Drilling Contract Novation**"), (iii) HBOL agreed to assign and novate that certain Standard Heavylift Charter Party (Heavycon 2007), dated as of February 12, 2015, by and among Dockwise Shipping B.V. and HBOL, as charterer to Maersk Highlander pursuant to that certain Novation and amendment agreement in respect of a Standard Heavylift Charter Party relating to the transport of m.v. Hercules Highlander, dated as the date hereof, between HBOL, Dockwise Shipping B.V.

and Maersk Highlander attached hereto as Exhibit C-3 (the "**Heavy Lift Contract Novation**"), (iv) the Borrower and HBOL agreed to sell or transfer (x) certain equipment, spares and consumables to be included on the *Hercules Highlander* prior to the commencement of the drilling operations pursuant to the Highlander Drilling Contract, which was procured by HBOL and other Affiliates prior to the date of this Release and (y) service agreements and training contracts related to the *Hercules Highlander* to Jurong pursuant to that certain Bill of Sale and Assignment, dated as of the date hereof, between the Borrower, HBOL and Jurong attached hereto as Exhibit C-4 (the "**Bill of Sale**" and, together with the Tripartite Agreement, Highlander Drilling Contract Novation and Heavy Lift Contract Novation, the "**Transaction Documents**"), (v) HNS and the Borrower shall terminate that certain Construction Management Agreement, dated as of August 11, 2014, between HNS and the Borrower (the "**Construction Management Agreement Termination**"), (vi) HNS shall terminate that certain Direct Agreement relating to the Construction Contract, dated as of May 19, 2014, by and among Hercules North Sea, Ltd., Maersk Oil North Sea UK Limited and Jurong Shipyard Pte Ltd. in respect of a Friede & Goldman Design JU2000E Jack Up Drilling Rig with Maersk Oil North Sea UK Limited on May 22, 2015 (the "**Direct Agreement Termination**"), and (vii) Hercules International Holdings, Ltd. ("**HIHL**") shall terminate that certain parent guarantee, dated as of May 19, 2014, granted by HIHL in favor of Maersk Oil North Sea UK Limited (the "**Parent Guarantee Termination**" and, together with the Construction Management Agreement Termination and the Direct Agreement Termination, the "**Terminations**");

E.      WHEREAS, as of the date hereof, Events of Default have occurred under Sections 8.01(d), (e), (m), (n) and (o) of the Credit Agreement arising from the consummation of the transactions contemplated by the Transaction Documents and the Terminations (the "**Transaction Events of Default**");

F.      WHEREAS, as a result of the Transaction Events of Default, the Lenders party hereto, which constitute the Required Lenders, hereby direct the Administrative Agent to declare the Loans outstanding to be forthwith due and payable, in whole or in part, whereupon the principal of the Loans so declared due and payable, together with accrued interest thereon, unpaid accrued fees, the Applicable Premium, and all other Obligations of the Borrower accrued under the Credit Agreement and any other Loan Document shall forthwith become due and payable without presentment, demand, protest or any other notice of any kind pursuant to Section 8.01 of the Credit Agreement (the "**Acceleration of Loans**");

G.      WHEREAS, at the direction of the Required Lenders, the Administrative Agent hereby declares the Loans outstanding to be due and payable, in whole, including, without limitation the principal of the Loans, together with accrued interest thereon, unpaid accrued fees, the Applicable Premium, and all other Obligations of the Borrower accrued under the Credit Agreement and any other Loan Document;

H.      WHEREAS, as a result of the Transaction Events of Default, the Lenders party hereto which constitute the Required Lenders, hereby direct the Administrative Agent to deliver a written instruction to the Escrow Agent to distribute all the funds in the Escrow Account to the Administrative Agent to prepay the Loans pursuant to Section III(d) of the Escrow Agreement and Section 2.10(a)(i) of the Credit Agreement;

I.      WHEREAS, the Borrower, certain other Loan Parties party thereto and certain Lenders party thereto entered into that certain Restructuring Support Agreement, dated as of the date hereof (as amended, restated, modified or supplemented from time to time the "**Restructuring Support Agreement**");

J.      WHEREAS, pursuant to the Restructuring Support Agreement, the Borrower and certain of its Subsidiaries, other than the Non-Debtor Loan Parties (as hereinafter defined) (the "**Debtor Loan Parties**") will file voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the

"**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Chapter 11 Cases**");

K.      WHEREAS, as of the date hereof, the Events of Default listed on Exhibit A hereto may have occurred, have occurred, are expected to occur or may occur prior to the expiration of the Forbearance Period (as hereinafter defined) (collectively, the "**Specified Defaults**");

L.      WHEREAS, subject to the terms and conditions set forth herein and without any waiver of the Specified Defaults, the Lenders party hereto, which Lenders constitute the Required Lenders, have agreed to (i) forbear from exercising certain of their default-related rights and remedies against the Loan Parties with respect to the Specified Defaults (other than (w) the giving of written notice of the Specified Gibraltar Default pursuant to Sections 8.01(e) and 10.01 of the Credit Agreement, (x) the acceleration of the Loans pursuant to Section 8.01 of the Credit Agreement, (y) the delivery of a written direction instructing the Administrative Agent to deliver a written instruction to the Escrow Agent to distribute all the funds in the Escrow Account to the Administrative Agent to prepay the Loans pursuant to Section III(d) of the Escrow Agreement and Section 2.10(a)(i) of the Credit Agreement during the Forbearance Period (as defined hereinafter) and (z) the delivery by the Administrative Agent of a written instruction to the Escrow Agent to distribute all of the funds in the Escrow Account to the Administrative Agent to prepay the Loans pursuant to Section III(d) of the Escrow Agreement and Section 2.10(a)(i) of the Credit Agreement, (ii) consent to the release of all Liens on and security interests in any and all assets and property under the Loan Documents subject to the transactions contemplated by the Transaction Documents and the Terminations and (iii) upon the request of the Borrower after the Forbearance Effective Date, consent to the release of the Non-Debtor Loan Parties from their Guarantee and release the Liens on and security interest in any and all assets and property of the Non-Debtor Loan Parties upon the effective date of the Plan (as defined in the Restructuring Support Agreement) (the "**Specified Consent**");

M.      WHEREAS, the Required Lenders are willing, on the terms and subject to the conditions set forth below, and without any waiver of the Specified Defaults, to agree to the forbearance and the other agreements provided for herein and consent to the release of all Liens on and security interests in any and all assets and property under the Loan Documents subject to the transactions contemplated by the Transaction Documents and the Terminations; and

N.      WHEREAS, each Lender under the Credit Agreement that executes and delivers this Agreement will, by the fact of such execution and delivery, be deemed to have agreed to the forbearance and the other agreements provided for herein and consent to the release of all Liens on and security interests in any and all assets and property under the Loan Documents subject to the transactions contemplated by the Transaction Documents and the Terminations provided for herein, on the terms set forth herein and subject to the conditions set forth in this Agreement without any waiver of the Specified Defaults.

NOW, THEREFORE, in consideration of the parties' mutual promises in this Agreement, and for other good and valuable consideration, the sufficiency of which is hereby acknowledged, Maersk Highlander (solely with respect to and for the purposes of receiving the releases set forth in Section 16) and the other parties hereto agree that the Existing Forbearance Agreement is hereby amended and restated in its entirety as follows:

**AGREEMENT**

1.      Definitions.  As used herein, the following terms shall have the respective meanings set forth below:

"**Claims**" shall mean claims, actions, causes of action, suits, debts, accounts, interests, liens, promises, warranties, damages and consequential damages, demands, agreements, bonds, bills, specialties, covenants, controversies, variances, trespasses, judgments, executions, costs, expenses or any other claims whatsoever (including, without limitation, crossclaims, counterclaims, rights of set-off and recoupment).

"**Forbearance Default**" shall mean (i) the occurrence of any Event of Default other than the Specified Defaults; (ii) the failure of any Loan Party to comply timely with any term, condition, or covenant set forth in this Agreement; (iii) the failure of any representation or warranty made by any Loan Party under or in connection with this Agreement to be true and complete as of the date when made; (iv) the failure of the Administrative Agent to receive a voluntary prepayment of the Loans within 3 Business Days after the delivery of the written instruction by the Administrative Agent to the Escrow Agent to distribute all of the funds in the Escrow Account to the Administrative Agent to prepay the Loans pursuant to Section III(d) of the Escrow Agreement in an amount equal to $200,000,000 due on such prepaid Loans and all accrued and unpaid interest due on such prepaid Loans; (v) the termination of the Restructuring Support Agreement; or (vi) there is a change, modification, supplement or amendment to the Restructuring Support Agreement or any version of the Plan in connection with the Chapter 11 Cases (including, without limitation, any change to the expense reimbursement obligations or general releases contemplated by the Restructuring Support Agreement as in effect on the date hereof) that is (A) materially adverse to the benefits and rights of the Administrative Agent and the Collateral Agent (it being understood and agreed that any change, modification or supplement to the scope of the expense reimbursement obligations or general releases in favor of the Administrative Agent and Collateral Agent contemplated by the Restructuring Support Agreement that is adverse in any respect to the Administrative Agent or the Collateral Agent shall be deemed to be materially adverse to the benefits and rights of the Administrative Agent and Collateral Agent) and (B) treats the Administrative Agent and the Collateral Agent materially inconsistent with the treatment of the Lenders, without the written consent of the Administrative Agent and the Collateral Agent.

"**Forbearance Effective Date**" shall mean the date on which all of the conditions precedent set forth in Section 6 hereof (each of which (other than Section 7(a) and Section 7(b); provided, that the payment condition set forth in Section 7(b) may be extended by the Administrative Agent in its sole discretion) may be waived by the Required Lenders in their sole discretion) have been met to the satisfaction of the Required Lenders.

"**Forbearance Period**" shall mean (a) prior to the commencement of the Chapter 11 Cases, the period beginning on the Forbearance Effective Date and ending on the earlier to occur of, unless otherwise mutually agreed in writing by the Borrower and the Required Lenders (with written notice to the Administrative Agent and the Collateral Agent and, solely in the case of clause (vi) in the definition of Forbearance Default, with the written consent of the Administrative Agent and the Collateral Agent): (i) the termination of the Forbearance Period as a result of any Forbearance Default and (ii) 11:59 p.m. (New York City time) on June 6, 2016 and (b) on or after the commencement of the Chapter 11 Cases, (x) with respect to the Debtor Loan Parties, the period beginning on the Forbearance Effective Date and ending on the earlier to occur of, unless otherwise mutually agreed in writing by the Borrower and the Required Lenders (with written notice to the Administrative Agent and the Collateral Agent and, solely in the case of clause (vi) in the definition of Forbearance Default, with the written consent of the Administrative Agent and the Collateral Agent): (i) the termination of the Forbearance Period as a result of any Forbearance Default and (ii) the date that is one Business Day after the Petition Date with respect to each Debtor Loan Party and (y) with respect to the Non-Debtor Loan Parties, the period beginning on the Forbearance Effective Date and ending on the earlier to occur of, unless otherwise mutually agreed in writing by the Borrower and the Required Lenders (with written notice to the Administrative Agent and the Collateral Agent): (i) the Plan Effective Date, (ii) the termination of the Restructuring Support

Agreement and (iii) the termination of the Forbearance Period with respect to the Debtor Loan Parties under the foregoing clause (b)(x)(i) as a result of any Forbearance Default.

"**Lender Parties**" shall mean (a) the Lenders, (b) the Administrative Agent, (c) the Collateral Agent, and (d) the successors and assigns of each of the foregoing.

"**Lender Party Releasors**" shall mean each Lender Party, on behalf of itself and on behalf of its agents, representatives, officers, directors, advisors, employees, subsidiaries, affiliates, successors and assigns.

"**Non-Debtor Loan Parties**" shall mean the Loan Parties that will not file voluntary petitions for relief under the chapter 11 of the Bankruptcy Code pursuant to the Restructuring Support Agreement listed in Exhibit B hereto.

"**Petition Date**" shall mean the date on which the Chapter 11 Cases are commenced.

"**Plan Effective Date**" shall mean the effective date of the Plan.

"**Releasees**" shall mean each of the Lender Parties in its capacity as a Lender, Administrative Agent or Collateral Agent and their respective affiliates, subsidiaries, shareholders and "controlling persons" (within the meaning of the federal securities laws), and their respective successors and assigns and each and all of the officers, directors, employees, agents, attorneys and other representatives of each of the foregoing in their capacities as such.

"**Releasors**" shall mean each Loan Party, on behalf of itself and on behalf of its agents, representatives, officers, directors, advisors, employees, subsidiaries, affiliates, successors and assigns.

2.    Acknowledgment.  The Borrower hereby acknowledges and agrees that: (a) the certificate of registration of the vessel mortgage at the NIMASA was not delivered by April 15, 2016; (b) the Gibraltar Guarantor was not dissolved, merged or consolidated with or into another Loan Party as of the date which is 120 days after the Closing Date, (c) each Lender Party may or may not have certain default-related rights, powers and remedies under the Credit Agreement, any other Loan Document or applicable law with respect to the Specified Defaults (including, without limitation, the Specified Post-Closing Default and Specified Gibraltar Default), which shall not be impaired in any way and shall be fully preserved after the Forbearance Period by the Lender Parties as such default-related rights, powers and remedies under the Credit Agreement, any other Loan Document or applicable law, if any, (x) with respect to the Specified Post-Closing Collateral Default, existed as of April 16, 2016, notwithstanding the Borrower causing Hercules Offshore Nigeria Limited to deliver subsequent to April 15, 2016 the certificate of registration of the vessel mortgage at the NIMASA and (y) with respect to the Specified Gibraltar Default, existed as of the date which is 120 days after the Closing Date, subject to the Borrower causing the Gibraltar Guarantor to dissolve, merge or consolidate with or into another Loan Party within the cure period set forth in Section 8.01(e) of the Credit Agreement; (d) during the Forbearance Period it shall not be able to (i) deliver the Officer's Certificate pursuant to Section III(a) of the Escrow Agreement to the Administrative Agent certifying the completion of the "Escrow Conditions" (as defined in the Escrow Agreement) or (ii) receive any funds on deposit in the Escrow Account; (e) the Transaction Events of Default have occurred and are continuing; (f) Events of Default will immediately occur upon the commencement of the Chapter 11 Cases; (g) upon the Acceleration of Loans, the Lenders are entitled to the Applicable Premium on the Called Principal pursuant to Section 2.10(a)(ii) of the Credit Agreement and (h) the Lenders are entitled to the Applicable Premium on any voluntary prepayment of the Loans with funds from the Escrow Account pursuant to Section III(d) of the Escrow Agreement as required by Section 2.10(a)(ii) of the Credit Agreement.  No Lender Party has waived or presently intends to waive

the Specified Defaults, and nothing contained herein or the transactions contemplated hereby shall be deemed to constitute any such waiver.  The Loan Parties reserve all of their rights, powers and remedies under the Credit Agreement, the other Loan Documents and applicable law.

3.      Forbearance; Forbearance Default Rights and Remedies.

(a)      Effective on the Forbearance Effective Date, each Lender Party agrees, without any waiver of the Specified Defaults, that until the expiration or termination of the Forbearance Period, it will forbear from exercising the rights and remedies available to it (if any) under Article VIII of the Credit Agreement (other than (w) the giving of written notice of the Specified Gibraltar Default pursuant to Sections 8.01(e) and 10.01 of the Credit Agreement, (x) the acceleration of the Loans pursuant to Section 8.01 of the Credit Agreement, (y) the delivery of a written direction instructing the Administrative Agent to deliver a written instruction to Escrow Agent to distribute all the funds in the Escrow Account to the Administrative Agent to prepay the Loans pursuant to Section III(d) of the Escrow Agreement and Section 2.10(a)(i) of the Credit Agreement and (z) the delivery by the Administrative Agent of a written instruction to the Escrow Agent to distribute all of the funds in the Escrow Account to the Administrative Agent to prepay the Loans pursuant to III(d) of the Escrow Agreement and Section 2.10(a)(i) of the Credit Agreement), under the other Loan Documents and/or under applicable law, in each case against any Loan Party or the Collateral solely with respect to the Specified Defaults; *provided*, *however*, that (i) nothing herein shall restrict, impair or otherwise affect any Lender Party's rights and remedies under any agreements containing subordination provisions in favor of any or all of the Lender Parties (including, without limitation, any rights or remedies available to the Lender Parties as a result of the occurrence or continuation of the Specified Defaults) or amend or modify any provision thereof, (ii) nothing herein shall restrict, impair or otherwise affect the Administrative Agent's or any Lender's right to file, record, publish or deliver a notice of default or document of similar effect under any state foreclosure law upon the expiration or termination of the Forbearance Period. Any Forbearance Default shall constitute an immediate Event of Default under this Agreement, the Credit Agreement, and the other Loan Documents without the requirement of any demand, presentment, protest, or notice of any kind to any Loan Party (all of which each Loan Party waives) and (iii) nothing herein shall restrict, impair or otherwise affect the Administrative Agent's ability to comply with instructions from the Required Lenders as contemplated by herein and apply the funds in the Escrow Account to prepay the Loans pursuant to Section III(d) of the Escrow Agreement and Section 2.10(a)(i) of the Credit Agreement to the extent that the Administrative Agent is directed by the Required Lenders in accordance with the terms herein, the Escrow Agreement and the other Loan Documents. Notwithstanding anything herein to the contrary, any statement or provision contained in this Agreement (other than the statements and provisions contained clauses (a), (b), (c), (e) and (f) in the first sentence of Section 2 of this Agreement) or action taken by the Loan Parties with respect to the Specified Defaults (including, without limitation, the occurrence thereof, but excluding the fact that the certificate of registration of the vessel mortgage at the NIMASA was not delivered by April 15, 2016 and the Gibraltar Guarantor was not dissolved, merged or consolidated with or into another Loan Party as of the date which is 120 days after the Closing Date) shall not be, or shall not be deemed to be an admission or waiver of any rights of the Loan Parties with respect to the Specified Defaults (including, without limitation, the occurrence thereof, but excluding the fact the certificate of registration of the vessel mortgage at the NIMASA was not delivered by April 15, 2016 and the Gibraltar Guarantor was not dissolved, merged or consolidated with or into another Loan

Party as of the date which is 120 days after the Closing Date) under the Credit Agreement, any other Loan Document or applicable law.  The parties hereto (other than Maersk Highlander) agree that the principal of or interest on any Loan or any other amount payable under the Loan Documents shall not bear interest at the Default Rate during the Forbearance Period, except as may otherwise be provided in the Restructuring Support Agreement, the Plan or any order entered in the Chapter 11 Cases (including any order entered in the Chapter 11 Cases authorizing the use of the Lender Parties' Collateral).  The Required Lenders hereby instruct the Administrative Agent and the Collateral Agent that, during the Forbearance Period, neither the Administrative Agent nor the Collateral Agent shall exercise any rights or remedies available to either such Person under Article VIII of the Credit Agreement (other than (x) the giving of written notice of the Specified Gibraltar Default pursuant to Sections 8.01(e) and 10.01 of the Credit Agreement, (y) the acceleration of the Loans pursuant to Section 8.01 of the Credit Agreement, and (z) the delivery of a written instruction to Escrow Agent (after the receipt of written instruction from the Required Lenders) to distribute all the funds in the Escrow Account to the Administrative Agent to prepay the Loans pursuant to Section III(d) of the Escrow Agreement and Section 2.10(a)(i) of the Credit Agreement, and upon receipt of such funds, to prepay the Loans), under the other Loan Documents and/or under applicable law.

(b)     Upon the occurrence of a Forbearance Default (other than with respect to the Non-Debtor Loan Parties on or after the commencement of the Chapter 11 Cases) or the expiration or termination of the Forbearance Period, the agreement of the Lender Parties hereunder to forbear from exercising their respective default-related rights and remedies (if any) shall immediately terminate without the requirement of any demand, presentment, protest, or notice of any kind to any Loan Party (all of which each Loan Party waives). Without limiting the generality of the foregoing, upon the occurrence of a Forbearance Default (other than with respect to the Non-Debtor Loan Parties on or after the commencement of the Chapter 11 Cases) or the expiration or termination of the Forbearance Period, the Lender Parties, subject to the terms of any order entered in the Chapter 11 Cases, may, in their sole discretion and without the requirement of any demand, presentment, protest, or notice of any kind to any Loan Party (but subject to applicable law and the rights and remedies of any Loan Party): (i) suspend or terminate any commitment to provide Loans or other extensions of credit under any Loan Document or declare the Loans then outstanding to be forthwith due and payable in whole or in part; (ii) commence any legal or other action to collect any or all of the obligations under the Loan Documents from any Loan Party; (iii) foreclose or otherwise realize on any or all of the Collateral; (iv) set off or apply to the payment of any or all of the obligations under the Loan Documents any property belonging to any Loan Party that is held by any Lender Party; and (v) take any other enforcement action or otherwise exercise any or all rights and remedies provided for by any Loan Document or applicable law, all of which rights and remedies are fully reserved by the Lender Parties.

(c)     Any agreement by the Lender Parties to extend the Forbearance Period or to waive a Forbearance Default or any condition to the effectiveness hereof must be set forth in writing and signed by a duly authorized signatory of each party required to consent pursuant to Section 10.02 of the Credit Agreement. None of the Administrative Agent, the Collateral Agent nor any Lender is obligated to extend the Forbearance Period or waive a Forbearance Default, and may decide to do so (or not do so) in its sole discretion (or, with respect to the Administrative Agent and the Collateral Agent, at the written direction of the Required Lenders (except with respect to a Forbearance Default under

clause (vi) of the definition thereof). Each of the Loan Parties acknowledges that the Lender Parties have not made any assurances concerning any extension of the Forbearance Period or waiver of any Forbearance Defaults.

(d)     The parties hereto (other than Maersk Highlander) agree that the running of all statutes of limitation or doctrine of laches or estoppel applicable to all claims or causes of action that any Lender Party may be entitled to take or bring in order to enforce its rights and remedies against any Loan Party is, to the fullest extent permitted by law, tolled and suspended during the Forbearance Period.

(e)     Any misrepresentation of a Loan Party, or any failure of a Loan Party to comply with the covenants, conditions and agreements contained in any agreement, document or instrument executed or delivered by any Loan Party with, to or in favor of any Lender Party (other than this Agreement) which would cause an Event of Default (other than the Specified Defaults) to occur under the Loan Documents shall constitute a Forbearance Default hereunder. Any misrepresentation of a Loan Party, or any failure of a Loan Party to comply with the covenants, conditions and agreements contained in this Agreement shall constitute a Forbearance Default hereunder. For the avoidance of doubt, the occurrence of the Specified Defaults in and of itself shall not constitute a Forbearance Default.

4.    Consents.  Notwithstanding anything to the contrary contained in the Credit Agreement or any other Loan Document, the Lenders party hereto (which constitute the requisite consent required under the Credit Agreement or any other Loan Document) hereby consent, without any waiver of the Specified Defaults, to the release, discharge and termination of all Liens on and security interests in any and all assets and property under the Loan Documents subject to the transactions contemplated by the Transaction Documents and the Terminations; provided, that the Loan Parties and the Lenders party hereto agree and acknowledge that the consummation of the transactions contemplated by the Transaction Documents and the Terminations shall constitute an Event of Default under Section 8.01 of the Credit Agreement regardless of the foregoing consent given by the Lenders and such Event of Default entitles the Administrative Agent and the Lenders to exercise all rights and remedies against the Loan Parties, including the Acceleration of Loans, subject to Section 3 but always without prejudice to the above mentioned releases.

5.    Acknowledgment and Agreement to Negotiate in Good Faith.  During the Forbearance Period, the Loan Parties and the Lenders parties hereto hereby agree to negotiate in good faith with respect to the Definitive Documents (as defined in the Restructuring Support Agreement) and the transaction contemplated by the Restructuring Support Agreement in accordance with Section 3 of the Restructuring Support Agreement.

6.    Representations and Warranties.  The Loan Parties represent and warrant to each of the Lenders party hereto, the Administrative Agent and the Collateral Agent that, after giving effect to this Agreement:

(a)     The representations and warranties set forth in Article III of the Credit Agreement and in each other Loan Document are true and correct in all material respects ((i) except that any representation and warranty that is qualified as to "materiality" or "Material Adverse Effect" shall be true and correct in all respects and (ii) other than the representations and warranties set forth in (w) the third sentence of Section 3.08 of the Credit Agreement with respect to the Specified Defaults, (x) the second and third sentences of Section 3.09 of the Credit Agreement with respect to the Highlander Construction Contract,

8

Highlander Drilling Contract, the Terminations or any other contract or agreement related to the *Hercules Highlander*, (y) Section 3.16 of the Credit Agreement and (z) Section 3.21 of the Credit Agreement) on and as of the Forbearance Effective Date to the same extent as if made on and as of the Forbearance Effective Date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects (except that any representation and warranty that is qualified as to "materiality" or "Material Adverse Effect" shall be true and correct in all respects) on and as of such earlier date.

(b)     Other than the Specified Defaults, no Default or Event of Default has occurred or will result from the consummation of the transactions contemplated by this Agreement.

7.     <u>Condition Precedent</u>.     This Agreement shall become effective on the Forbearance Effective Date whereupon this Agreement shall become effective as to all Lenders and Loan Parties in accordance with <u>Section 10.02</u> of the Credit Agreement, provided that all of the following conditions precedent have been satisfied (or (x) in the case of Section 7(b), waived by the Administrative Agent or (y) in the case of Section 7(c), waived by the Required Lenders):

(a)     The Administrative Agent shall have received counterparts of this Agreement that, when taken together, bear the signatures of (x) each Loan Party, (y) the Administrative Agent and the Collateral Agent, and (z) the Lenders constituting the Required Lenders under the Credit Agreement.

(b)     The Borrower shall have paid the Administrative Agent for all reasonable and documented out-of-pocket fees and reimbursement of all reasonable and documented out-of-pocket costs and expenses required to be paid by the Borrower in connection with the transactions contemplated hereunder, under any other Loan Document or as separately agreed to by the Borrower to the extent invoiced at least one (1) day prior to the Forbearance Effective Date.

(c)     The representations and warranties set forth in Section 6 of this Agreement shall be true and correct on and as of the Forbearance Effective Date.

8.     <u>Ratification</u>.

(a)     All of the terms and conditions of the Credit Agreement and the other Loan Documents remain in full force and effect and none of such terms and conditions are, or shall be construed as, otherwise amended, waived, or modified, except as specifically set forth herein. Without limiting the generality of the foregoing, the Security Documents and all of the Collateral described therein shall continue to secure the payment of all Obligations of the Loan Parties, other than as amended by or as set forth in this Agreement. Without limiting the generality of the releases contained herein (including, without limitation, Section 14 hereof), the parties hereto (other than Maersk Highlander) hereby expressly acknowledge, ratify and reaffirm all of the exculpatory provisions in favor of the Administrative Agent and the Collateral Agent contained in the Credit Agreement and any other Loan Document, including, without limitation, <u>Section 9.03</u> of the Credit Agreement.

(b)     The Borrower and each of the Subsidiary Guarantors hereby ratifies and reaffirms the Obligations and the Guaranteed Obligations, as applicable, the Credit Agreement as amended hereby, each of the other Loan Documents to which it is a party and all of the covenants,

duties, indebtedness and liabilities under the Credit Agreement as amended hereby and the other Loan Documents to which it is a party.

(c)     The execution, delivery and effectiveness of this Agreement shall not, except as expressly provided herein, operate as a waiver of any right, power or remedy of any Lender or the Administrative Agent or the Collateral Agent under any of the Loan Documents, nor constitute a waiver of any provision of any of the Loan Documents.  On and after the effectiveness of this Agreement, this Agreement shall for all purposes constitute a Loan Document.

(d)     On and after the Forbearance Effective Date, each reference in the Credit Agreement to "this Agreement," "hereunder," "hereof," "herein" or words of like import, and each reference to the Credit Agreement, "thereunder", "thereof", "therein" or words of like import in any other Loan Document, shall be deemed a reference to the Credit Agreement as amended hereby.

9.     <u>Direction</u>.  The Lenders party hereto hereby (i) direct the Administrative Agent and the Collateral Agent to execute and deliver this Agreement and, in connection therewith, to grant the releases set forth in Section 16 hereof, (ii) direct the Administrative Agent and the Collateral Agent to release, discharge and terminate any Liens on and any security interest in any and all assets or property under the Loan Documents subject to the transactions contemplated by the Transaction Documents and the Terminations, (iii) direct the Administrative Agent and the Collateral Agent to execute, deliver and file (at the sole expense of the Loan Parties) or authorize the Loan Parties or their respective counsel (or a Person designated by the Loan Parties or their counsel) to file (in consultation with the Administrative Agent, the Collateral Agent and the Required Lenders) the documents set forth on <u>Exhibit D</u> (the "**Release Documents**") and any other documents that may be necessary to give effect to the release, discharge and termination of any Liens on and security interest in any and all assets or property under the Loan Documents, as and to the extent reasonably requested by the Loan Parties in connection with the transactions contemplated by the Transaction Documents and Terminations, (iv) direct the Administrative Agent to declare the Loans outstanding to be forthwith due and payable, in whole or in part, whereupon the principal of the Loans so declared due and payable, together with accrued interest thereon, unpaid accrued fees, the Applicable Premium, and all other Obligations of the Borrower accrued under the Credit Agreement and any other Loan Document shall forthwith become due and payable without presentment, demand, protest or any other notice of any kind pursuant to Section 8.01 of the Credit Agreement, (v) direct the Administrative Agent to deliver a written instruction to the Escrow Agent to distribute all the funds in the Escrow Account to the Administrative Agent to prepay the Loans pursuant to Section III(d) of the Escrow Agreement and Section 2.10(a)(i) of the Credit Agreement, and (vi) ratify and reaffirm (a) their several obligations to indemnify the Administrative Agent and the Collateral Agent, each in its capacity as such, pursuant to, and in accordance with, <u>Section 9.08</u> of the Credit Agreement and (b) the exculpatory provisions of <u>Section 9.03</u> of the Credit Agreement.

10.     <u>Notice of Acceleration</u>.  Pursuant to Section 8.01 of the Credit Agreement and at the request of the Required Lenders pursuant to Section 9 herein, the Administrative Agent hereby gives notice to the Borrower that (i) the Commitments under the Credit Agreement are terminated and (ii) the outstanding Loans are hereby declared due and payable, in whole, including, without limitation the principal of the Loans, together with accrued interest thereon, unpaid accrued fees, the Applicable Premium, and all other  Obligations of the Borrower accrued under the Credit Agreement and any other Loan Document.

11.     <u>Notice of Voluntary Prepayment</u>.  Pursuant to Section 2.10(i) of the Credit Agreement, the Borrower hereby gives notice to the Administrative Agent of its election to make a voluntary prepayment pursuant to Section 2.10(a)(i) of the Credit Agreement in a principal amount equal to $200,000,000 on the date on which the Administrative Agent receives funds in the Escrow Account (or, if

the Administrative Agent receives the funds in the Escrow Account after 3:00 p.m. (New York City time), on the next succeeding Business Day).  The Lenders party hereto and the Administrative Agent hereby waive any required notice period pursuant to Section 2.10(i) of the Credit Agreement.

12.    Signatures.  This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  Delivery of an executed counterpart of a signature page of this Agreement by telecopy or other electronic imaging (including in .pdf format) means shall be effective as delivery of a manually executed counterpart of this Agreement.

13.    Miscellaneous.    THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.  Sections 10.09 and 10.10 of the Credit Agreement are incorporated by reference herein *mutatis mutandis*.  The provisions of this Agreement shall be binding upon and inure to the benefit of the Loan Parties, Administrative Agent, the Collateral Agent, and the Lenders and their respective successors and permitted assigns.

14.    General Release.    IN CONSIDERATION OF, AMONG OTHER THINGS, ADMINISTRATIVE AGENT'S, COLLATERAL AGENT'S AND REQUIRED LENDERS' EXECUTION AND DELIVERY OF (OR CONSENT TO DELIVERY AND EXECUTION OF) THIS AGREEMENT, EACH OF THE RELEASORS HEREBY FOREVER AGREES AND COVENANTS NOT TO SUE OR PROSECUTE AGAINST ANY RELEASEE AND HEREBY FOREVER WAIVES, RELEASES AND DISCHARGES, TO THE FULLEST EXTENT PERMITTED BY LAW, EACH RELEASEE FROM ANY AND ALL CLAIMS (OTHER THAN ANY CLAIMS (IF ANY) THAT RELATE TO, ARISE OUT OF OR OTHERWISE ARE IN CONNECTION WITH THE SPECIFIED POST-CLOSING DEFAULT, SPECIFIED GIBRALTAR DEFAULT OR THE PREPAYMENT OF THE LOANS FROM THE FUNDS IN THE ESCROW ACCOUNT AS A PREFERENTIAL TRANSFER UNDER SECTION 547 OF THE BANKRUPTCY CODE) THAT SUCH RELEASOR NOW HAS OR HEREAFTER MAY HAVE, OF WHATEVER NATURE AND KIND, WHETHER KNOWN OR UNKNOWN, WHETHER NOW EXISTING OR HEREAFTER ARISING, WHETHER ARISING AT LAW OR IN EQUITY, AGAINST THE RELEASEES, BASED IN WHOLE OR IN PART ON FACTS, WHETHER OR NOT NOW KNOWN, EXISTING ON OR BEFORE THE FORBEARANCE EFFECTIVE DATE, THAT RELATE TO, ARISE OUT OF OR OTHERWISE ARE IN CONNECTION WITH: (I) ANY OR ALL OF THE LOAN DOCUMENTS OR TRANSACTIONS CONTEMPLATED THEREBY OR ANY ACTIONS OR OMISSIONS IN CONNECTION THEREWITH OR (II) ANY ASPECT OF THE DEALINGS OR RELATIONSHIPS BETWEEN OR AMONG THE LOAN PARTIES, ON THE ONE HAND, AND ANY OR ALL OF THE LENDER PARTIES, ON THE OTHER HAND, RELATING TO ANY OR ALL OF THE DOCUMENTS, TRANSACTIONS, ACTIONS OR OMISSIONS REFERENCED IN CLAUSE (I) HEREOF. WITHOUT LIMITING THE EFFECT OF THE FOREGOING, THE RECEIPT BY ANY LOAN PARTY OF ANY LOANS OR OTHER FINANCIAL ACCOMMODATIONS MADE BY ANY LENDER PARTY AFTER THE DATE HEREOF SHALL CONSTITUTE A RATIFICATION, ADOPTION, AND CONFIRMATION BY SUCH PARTY OF THE FOREGOING GENERAL RELEASE OF ALL CLAIMS AGAINST THE RELEASEES WHICH ARE BASED IN WHOLE OR IN PART ON FACTS, WHETHER OR NOT NOW KNOWN OR UNKNOWN, EXISTING ON OR PRIOR TO THE DATE OF RECEIPT OF ANY SUCH LOANS OR OTHER FINANCIAL ACCOMMODATIONS. IN ENTERING INTO THIS AGREEMENT, EACH LOAN PARTY CONSULTED WITH, AND HAS BEEN REPRESENTED BY, LEGAL COUNSEL AND EXPRESSLY DISCLAIMS ANY RELIANCE ON ANY REPRESENTATIONS, ACTS OR OMISSIONS BY ANY OF THE RELEASEES AND HEREBY AGREES AND ACKNOWLEDGES THAT THE VALIDITY AND EFFECTIVENESS OF THE RELEASES SET FORTH ABOVE DO NOT DEPEND IN ANY

11

WAY ON ANY SUCH REPRESENTATIONS, ACTS OR OMISSIONS OR THE ACCURACY, COMPLETENESS OR VALIDITY HEREOF. THE PROVISIONS OF THIS SECTION SHALL SURVIVE THE TERMINATION OF THIS AGREEMENT, ANY LOAN DOCUMENT, AND PAYMENT IN FULL OF THE OBLIGATIONS UNDER THE LOAN DOCUMENTS.

15. Release of Non-Debtor Loan Parties.

(a) Notwithstanding anything to the contrary contained in the Credit Agreement or any other Loan Document, and subject to the satisfaction of the terms and conditions set forth in Section 15(b), the Lenders party hereto hereby agree to take (and direct the Administrative Agent and Collateral Agent to take) any and all actions reasonably necessary, including the execution and delivery of a written consent upon the request by the Borrower after the Forbearance Effective Date, to (i) the release, discharge and termination of all obligations of the Non-Debtor Loan Parties, as Guarantors, under the Loan Documents upon the Plan Effective Date and (ii) the release, discharge and termination of all Liens on and security interests in any and all assets and property of the Non-Debtor Loan Parties under the Loan Documents upon the Plan Effective Date.

(b) The Non-Debtor Loan Parties hereby agree to take any and all actions reasonably necessary to provide a release of the Releasees upon the release, discharges and terminations described in Section 15(a) in form and substance substantially similar to the releases provided by the Debtor Loan Parties in the Plan.

16. Release of Maersk Releasees.

(a) THE LENDER PARTIES PARTY HERETO AGREE THAT MAERSK HIGHLANDER IS ENTERING INTO THE TRANSACTION DOCUMENTS IN GOOD FAITH AND FOR VALUE AND IT IS HEREBY EXPRESSLY AGREED AND DECLARED BY EACH OF THE LENDER PARTIES PARTY HERETO THAT MAERSK HIGHLANDER SHALL NOT ASSUME ANY LIABILITY UNDER OR IN CONNECTION WITH THIS AGREEMENT.  FURTHER IN CONSIDERATION OF, AMONG OTHER THINGS, MAERSK HIGHLANDER'S EXECUTION AND CONSUMMATION OF THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT AND EACH OF THE TRANSACTION DOCUMENTS, EACH OF THE LENDER PARTY RELEASORS HEREBY FOREVER AGREES AND COVENANTS NOT TO SUE OR PROSECUTE, VOLUNTARILY AID OR SUPPORT IN ANY WAY, OR CAUSE TO BE COMMENCED OR PROSECUTED AGAINST MAERSK HIGHLANDER OR ANY OF ITS PARENT, PARENT'S SUBSIDIARIES, ASSIGNS, TRANSFEREES AND EACH OF THEIR OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, ATTORNEYS AND OTHER REPRESENTATIVES (IN EACH CASE, IN THEIR CAPACITY AS SUCH) (COLLECTIVELY, THE "**MAERSK RELEASEES**") AND HEREBY FOREVER RELEASES AND DISCHARGES, TO THE FULLEST EXTENT PERMITTED BY LAW, EACH MAERSK RELEASEE FROM ANY AND ALL CLAIMS, RIGHTS AND DEMANDS THAT SUCH RELEASOR NOW HAS OR HEREAFTER MAY HAVE, OF WHATEVER NATURE AND KIND, WHETHER KNOWN OR UNKNOWN, WHETHER NOW EXISTING OR HEREAFTER ARISING, WHETHER ARISING AT LAW OR IN EQUITY, WHETHER IN THIS JURISDICTION OR ANOTHER AGAINST THE MAERSK RELEASEES, BASED IN WHOLE OR IN PART ON FACTS, WHETHER OR NOT NOW KNOWN, EXISTING ON OR BEFORE THE FORBEARANCE EFFECTIVE DATE, THAT RELATE TO, ARISE OUT OF OR OTHERWISE ARE IN CONNECTION WITH: (I) ANY OR ALL OF THE TRANSACTION DOCUMENTS OR TRANSACTIONS CONTEMPLATED THEREBY OR ANY ACTIONS OR OMISSIONS IN CONNECTION THEREWITH, (II) ANY OR ALL OF THE TERMINATIONS OR ANY ACTIONS OR OMISSIONS IN CONNECTION THEREWITH, AND (III) ANY ASPECT OF THE DEALINGS OR RELATIONSHIPS BETWEEN OR AMONG THE LOAN PARTIES, ON THE ONE HAND, AND

MAERSK HIGHLANDER, ON THE OTHER HAND, RELATING TO ANY OR ALL OF THE DOCUMENTS, TRANSACTIONS, ACTIONS OR OMISSIONS REFERENCED IN CLAUSES (I) AND (II) HEREOF.    THE PROVISIONS OF THIS SECTION SHALL SURVIVE THE TERMINATION OF THIS AGREEMENT AND THE MAERSK RELEASEES MAY ENFORCE THESE RELEASES DIRECTLY OR MAERSK HIGHLANDER MAY ENFORCE THESE RELEASES ON THEIR BEHALF.

       (b)      Notwithstanding anything to the contrary contained in the Credit Agreement or any other Loan Document, no amendment, modification, waiver, replacement, termination, or cancellation of any provision of this Section 16 will be valid, unless the same shall be in writing and signed by the Lender Parties party hereto and Maersk Highlander.

[Signature Pages to Follow]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first above written.

**HERCULES OFFSHORE, INC.**

By: _____
Name: Troy L. Carson
Title: SVP + CFO

**CLIFFS DRILLING COMPANY**
**FDT LLC**
**FDT HOLDINGS LLC**
**HERCULES DRILLING COMPANY, LLC**
**HERCULES OFFSHORE LIFTBOAT COMPANY**
**    LLC**
**HERO HOLDINGS, INC.**
**SD DRILLING LLC**
**THE OFFSHORE DRILLING COMPANY**
**THE ONSHORE DRILLING COMPANY**
**TODCO AMERICAS INC.**
**TODCO INTERNATIONAL INC.**
**HERCULES LIFTBOAT COMPANY, LLC**
**HERCULES OFFSHORE SERVICES LLC**
**HERCULES OFFSHORE INTERNATIONAL, LLC**

By: _____
Name: Troy L. Carson
Title: Vice President

[SIGNATURE PAGE TO AMENDED AND RESTATED FORBEARANCE AGREEMENT]

**DISCOVERY OFFSHORE (GIBRALTAR) LIMITED**

By: _____
Name: Troy L. Carson
Title: Authorized Signatory

By: _____
Name: Beau M. Thompson
Title: Authorized Signatory

**HERCULES OFFSHORE (NIGERIA) LIMITED**

By: _____

Name: TROY L. CARSON

Title: AUTHORIZED SIGNATORY

[SIGNATURE PAGE TO AMENDED AND RESTATED FORBEARANCE AGREEMENT]

DISCOVERY NORTH SEA LTD.
DISCOVERY OFFSHORE SERVICES LTD.
HERCULES ASSET MANAGEMENT LTD.
HERCULES INTERNATIONAL DRILLING LTD.
HERCULES INTERNATIONAL HOLDINGS, LTD.
HERCULES INTERNATIONAL MANAGEMENT
    COMPANY LTD.
HERCULES INTERNATIONAL OFFSHORE, LTD.
HERCULES NORTH SEA, LTD.
HERCULES OFFSHORE ARABIA, LTD.
HERCULES OFFSHORE HOLDINGS LTD.
HERCULES OFFSHORE MIDDLE EAST LTD.
HERCULES OILFIELD SERVICES LTD.
TODCO TRINIDAD LTD.

By: _____
Name: Claus E. Feyling
Title: Director

HERCULES OFFSHORE LABUAN
  CORPORATION
HERCULES TANJUNG ASIA SDN. BHD.

By: _____
Name: Claus E. Feyling
Title: Director

HERCULES BRITANNIA HOLDINGS LIMITED
HERCULES BRITISH OFFSHORE LIMITED
HERCULES NORTH SEA DRILLER LIMITED
HERCULES OFFSHORE UK LIMITED

By: _____
Name: Claus B. Feyling
Title: Director

**JEFFERIES FINANCE LLC,**
as Administrative Agent and Collateral Agent

By: _____

Name: J. Paul McDonnell
Title: Managing Director

**LUMINUS ENERGY MASTER FUND, LTD.**, as Lender

By: _____

Name: Jonathan Barrett
Title:  Director

**CERTAIN FUNDS AND ACCOUNTS EACH
ACTING** as Lender, severally and not jointly

By: **T. ROWE PRICE ASSOCIATES, INC.,** as
investment adviser

By: _____

Name:    Rodney M. Rayburn

Title:    Vice President

111840544 v3

**NOMURA CORPORATE RESEARCH AND ASSET MANAGEMENT INC.**, as investment manager on behalf of certain of its clients:

By: _____

    Name: Steven Kotsen
    Title:  Portfolio Manager

**SIMPLON INTERNATIONAL LIMITED**, as Lender

By: _____
Name: Thomas A. McKay
Title: Its Attorney-In-Fact

[SIGNATURE PAGE TO AMENDED AND RESTATED FORBEARANCE AGREEMENT]

**BOWERY OPPORTUNITY FUND, L.P. ,** as
Lender
By: Bowery Opportunity Management, LLC, its
General Partner

By: _____
Name: Vladimir Jelisavcic
Title:  Manager


**BOWERY OPPORTUNITY FUND, Ltd. ,** as
Lender

By: _____
Name: Vladimir Jelisavcic
Title:  Director


**BLACKWELL PARTNERS LLC – SERIES A,** as
Lender
By: Bowery Investment Management, LLC, its
Manager

By: _____
Name: Vladimir Jelisavcic
Title:  Manager


**P BOWERY, LTD ,** as Lender
By: Bowery Investment Management, LLC, its
investment manager

By: _____
Name: Vladimir Jelisavcic
Title:  Manager


[SIGNATURE PAGE TO AMENDED AND RESTATED FORBEARANCE AGREEMENT]

**THIRD AVENUE TRUST, ON BEHALF OF THIRD AVENUE FOCUSED CREDIT FUND**

By: Third Avenue Management, LLC, its investment advisor

By: _____

Name: W. James Hall

Title: General Counsel

111840544 v3

**SOUTH DAKOTA RETIREMENT SYSTEM**

By:

Name: Matthew L Clark

Title: State Investment Officer on
behalf of the South Dakota
Retirement System

**WESTERN ASSET MANAGEMENT COMPANY**, as investment manager and agent on behalf of certain of its clients

By: _____

Name:

Title:      Adam Wright
           Manager, U.S. Legal Affairs

**QPB HOLDINGS LTD**, as Lender

By: _____

Name:
Title:                 THOMAS L. O'GRADY
                       Attorney-in-Fact

**BANK OF AMERICA, N.A.**, as Lender

By: _____

Name: Michael Lee

Title: Managing Director

[SIGNATURE PAGE TO AMENDED AND RESTATED FORBEARANCE AGREEMENT]

11184054 v5

Accepted and agreed solely as to Section 16:

**MAERSK HIGHLANDER UK LIMITED**

By: _____

Name: MORTEN NORDERUD-POULSEN

Title: HEAD OF NEW PROJECTS & Technology

**Exhibit A**

**Specified Defaults**

1.  Specified Post-Closing Covenant Default.

2.  Specified Gibraltar Default.

3.  Transaction Events of Default.

4.  Any breach, violation, Default or Event of Default under Section 8.01(e) of the Credit Agreement as a result of non-compliance with Section 5.01(i) of the Credit Agreement.

5.  Any breach, violation, Default or Event of Default under Section 8.01(o) of the Credit Agreement;

6.  Any breach, violation, Default or Event of Default arising under Section 8.01(h) as a result of the Chapter 11 Cases.

7.  Any breach, violation, Default or Event of Default under Section 8.01(m) with respect to any Material Adverse Effect as customarily occurs as a result of events leading up to and following the commencement of a proceeding under Chapter 11 of the Bankruptcy Code.

8.  Any Defaults or Events of Default that may occur after the commencement of the Chapter 11 Cases.

9.  The failure to promptly provide (i) notice of the occurrence of the foregoing Defaults and/or Events of Default,(ii) notice of any development that has resulted in, or could reasonably be expected to result in a Material Adverse Effect in connection with the foregoing, (iii) notice of the termination or amendment to any Material Agreement or the Borrower as result of the transactions contemplated by the Transaction Documents or the Terminations, (iv) notice of the occurrence of any event that could materially and adversely affect the value of the Collateral, taken as a whole, as contemplated by this Agreement and (v) notice to the Escrow Agent and Administrative Agent that the conditions set forth in the Escrow Agreement with respect to the release of proceeds of the Escrowed Loans cannot be satisfied.

**Exhibit B**

**Non-Debtor Loan Parties**

1. Hercules British Offshore Limited
2. Hercules International Holdings, Ltd.
3. Hercules North Sea, Ltd.
4. Discovery North Sea Ltd.
5. Discovery Offshore (Gibraltar) Limited
6. Discovery Offshore Services Ltd.
7. Hercules Asset Management Ltd.
8. Hercules Britannia Holdings Limited
9. Hercules International Drilling Ltd.
10. Hercules International Management Company Ltd.
11. Hercules International Offshore, Ltd.
12. Hercules North Sea Driller Limited
13. Hercules Offshore (Nigeria) Limited
14. Hercules Offshore Arabia, Ltd.
15. Hercules Offshore Holdings Ltd.
16. Hercules Offshore Labuan Corporation
17. Hercules Tanjung Asia Sdn. Bhd.
18. Hercules Offshore Middle East Ltd.
19. Hercules Offshore UK Limited
20. Hercules Oilfield Services Ltd.
21. TODCO Trinidad Ltd.
22. Hercules Offshore International, LLC
23. Hercules Liftboat Company, LLC

**Exhibit C-1**

**[See Attached]**

**Exhibit C-2**

**[See Attached]**

**Exhibit C-3**

**[See Attached]**

**Exhibit C-4**

**[See Attached]**

**Exhibit D**

**Release Documents**

1. Collateral Release, dated as of the date hereof, by and among the Borrower, Hercules British Offshore Limited, Hercules North Sea, Ltd., the Administrative Agent and the Collateral Agent.

2. The Deed of Release, dated as of the date hereof (the "**Deed of Release**"), by and among, Hercules Britannia Holdings Limited, Hercules Offshore UK Limited, Hercules British Offshore Limited, Hercules North Sea Driller Limited and the Collateral Agent.

3. UCC-3 amendment with respect to the UCC-1 financing statement #2015113878 filed on November 6, 2016 at the District of Columbia Recorder of Deeds.

4. UCC-3 amendment with respect to the UCC-1 financing statement #15-0036041434 filed on November 9, 2016 at the Secretary of State of Texas.

5. UCC-3 amendment with respect to the UCC-1 financing statement #2015113913 filed on November 6, 2016 at the District of Columbia Recorder of Deeds.

6. UCC-3 amendment with respect to the UCC-1 financing statement #15-0036040423 filed on November 9, 2016 at the Secretary of State of Texas.

7. UCC-3 amendment with respect to the UCC-1 financing statement #2015 5197511 filed on November 6, 2016 at the Secretary of State of Delaware.

8. MRO5 form with respect to the Debenture registered in respect of Hercules British Offshore Limited with Companies House of England and Wales.

9. Notices of Reassignment in relation to the Deed of Release.

**<u>Exhibit D</u>**

**13 Week Cash Flow Projections**

**Hercules Offshore, Inc.**
**13-Week Forecast Summary (Motion)**
**Debtor Entities**
($ in thousands)

| | Forecast<br>Jun<br>1<br>6/11/16 | Forecast<br>Jun<br>2<br>6/18/16 | Forecast<br>Jun<br>3<br>6/25/16 | Forecast<br>Jul<br>4<br>7/2/16 | Forecast<br>Jul<br>5<br>7/9/16 | Forecast<br>Jul<br>6<br>7/16/16 | Forecast<br>Jul<br>7<br>7/23/16 | Forecast<br>Jul<br>8<br>7/30/16 | Forecast<br>Aug<br>9<br>8/6/16 | Forecast<br>Aug<br>10<br>8/13/16 | Forecast<br>Aug<br>11<br>8/20/16 | Forecast<br>Aug<br>12<br>8/27/16 | Forecast<br>Sep<br>13<br>9/3/16 | 13-Week<br>Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Month**<br>**Week Number**<br>**Week Ended** | | | | | | | | | | | | | | |
| **Beginning Cash** | $ 208,312 | $ 166,423 | $ 160,796 | $ 159,604 | $ 156,579 | $ 153,844 | $ 149,220 | $ 148,525 | $ 147,378 | $ 143,535 | $ 139,434 | $ 138,302 | $ 135,810 | $ 208,312 |
| Receipts | | | | | | | | | | | | | | |
| Collections | $ 100 | $ 1,209 | $ 100 | $ 1,886 | $ 145 | $ 1,218 | $ 280 | $ 1,533 | $ 1,105 | $ - | $ 757 | $ - | $ 1,116 | $ 9,449 |
| Sales Proceeds | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Receipts | $ 100 | $ 1,209 | $ 100 | $ 1,886 | $ 145 | $ 1,218 | $ 280 | $ 1,533 | $ 1,105 | $ - | $ 757 | $ - | $ 1,116 | $ 9,449 |
| Disbursements | | | | | | | | | | | | | | |
| Personnel Costs | $ 494 | $ 4,483 | $ 494 | $ 2,204 | $ 494 | $ 2,096 | $ 494 | $ 1,908 | $ 964 | $ 1,908 | $ 701 | $ 1,908 | $ 494 | $ 18,641 |
| Premises Rents | 14 | - | 209 | 33 | 2 | - | 19 | 196 | 35 | - | 19 | 196 | 33 | 756 |
| Insurance | - | 833 | - | - | - | 2,530 | - | 22 | - | - | - | - | - | 3,384 |
| Taxes | - | 12 | 49 | 21 | - | - | 38 | 23 | - | - | 38 | 23 | 36 | 240 |
| Utilities | 46 | 18 | 28 | 7 | 48 | 42 | 5 | 19 | 30 | 46 | 18 | 28 | 7 | 344 |
| Ordinary Course Professionals | - | - | - | - | 334 | - | - | - | - | 334 | - | - | - | 668 |
| Vendors and Others | 1,285 | 1,492 | 451 | 140 | 1,097 | 1,174 | 419 | 511 | 812 | 958 | 1,113 | 336 | 160 | 9,947 |
| Sales Costs | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Disbursements | $ 1,838 | $ 6,837 | $ 1,231 | $ 2,405 | $ 1,974 | $ 5,842 | $ 975 | $ 2,680 | $ 1,841 | $ 3,246 | $ 1,889 | $ 2,492 | $ 730 | $ 33,980 |
| Net Operating Cash Flow | $ (1,738) | $ (5,627) | $ (1,131) | $ (519) | $ (1,830) | $ (4,624) | $ (695) | $ (1,147) | $ (736) | $ (3,246) | $ (1,132) | $ (2,492) | $ 386 | $ (24,531) |
| Restructuring | | | | | | | | | | | | | | |
| Pre-Petition Disbursements | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Estate Professionals | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Adequate Assurance | - | - | 61 | - | - | - | - | - | - | - | - | - | - | 61 |
| Adequate Protection Fee | - | - | - | - | 905 | - | - | - | - | 855 | - | - | - | 1,760 |
| Adequate Protection Debt | 40,150 | - | - | 2,506 | - | - | - | - | 3,107 | - | - | - | 3,107 | 48,871 |
| Total Restructuring | $ 40,150 | $ - | $ 61 | $ 2,506 | $ 905 | $ - | $ - | $ - | $ 3,107 | $ 855 | $ - | $ - | $ 3,107 | $ 50,692 |
| Net Cash Flow | $ (41,889) | $ (5,627) | $ (1,192) | $ (3,025) | $ (2,735) | $ (4,624) | $ (695) | $ (1,147) | $ (3,843) | $ (4,101) | $ (1,132) | $ (2,492) | $ (2,721) | $ (75,223) |
| **Ending Cash** | $ 166,423 | $ 160,796 | $ 159,604 | $ 156,579 | $ 153,844 | $ 149,220 | $ 148,525 | $ 147,378 | $ 143,535 | $ 139,434 | $ 138,302 | $ 135,810 | $ 133,089 | $ 133,089 |

*Post effective claims/recoveries will be disbursed/received during week ending 8/6/16
*Beginning cash balance for WE 6/11/16 assumed to be ending cash balance for 6/2/16 less Pre-Petition Disbursements