## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | : | CHAPTER 11 |
| | : | (Jointly Administered) |
| **HERCULES OFFSHORE, INC.,** *et. al*[1] | : | |
| | : | Case No. 16-11385 (KJC) |
| Debtors | : | |

## OPINION ON CONFIRMATION[2].

### BY:   KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE

> "Will you walk into my parlor?" said the spider to the fly;
> "'Tis the prettiest little parlor that ever you did spy.
> The way into my parlor is up a winding stair,
> And I have many pretty things to show when you are there."
> "O no, no," said the little fly, "To ask me is in vain,
> For who goes up your winding stair can ne'er come down again."[3]

To put it into terms employed by the Equity Committee, the central dispute for determination by the Court is whether the lender (spider) here "conjured up immaterial defaults," catching the (sufficiently unwary) Debtor "completely off guard" to "impose their will on" the Debtor, undermine its "recently confirmed plan and raid the Company's coffers to force an expedited repayment"[4] (and a premature liquidation).

---

[1] The following chapter 11 debtors are being jointly administered in this case: Cliffs Drilling Company; Cliffs Drilling Trinidad L.L.C.; FDT LLC; FDT Holdings LLC; Hercules Drilling Company, LLC; Hercules Offshore, Inc.; Hercules Offshore Services LLC; Hercules Offshore Liftboat Company LLC; HERO Holdings, Inc.; SD Drilling LLC; THE Offshore Drilling Company; THE Onshore Drilling Company; TODCO Americas Inc.; and TODCO International Inc. (collectively referred to herein as the "Debtors"). *See* Order Directing Joint Administration of the Debtors' Chapter 11 Cases, D.I. 64. The Debtors' corporate headquarters are located at, and the mailing address for each Debtor is, 9 Greenway Plaza, Suite 2200, Houston, TX 77046.

[2] This Opinion constitutes the findings of fact and conclusions of law, required by Fed.R.Bankr.P. 7052. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a). This is a core proceeding pursuant to 28 U.S.C. 157(b)(1) and (b)(2)(L). Any capitalized terms not defined in this Opinion shall have the definitions set forth in the Plan.

[3] From *The Spider and The Fly: A Fable*, Mary Howitt.

[4] Memorandum/Brief *In Support (Post-Trial) of the Official Committee of Equity Security Holders' Objection to the Confirmation of Debtors' Joint Prepackaged Chapter 11 Plan* (D.I. 432) at 2, 7, 8.

Before the Court is the Debtors' request for confirmation of the Debtors' Modified Joint Prepackaged Chapter 11 Plan (incorporating mediation settlement) (the "Plan").[5]   On September 6, 2016, the Debtors, Official Committee of Equity Security Holders (the "Equity Committee"), and certain Lenders holding in excess of 99% of the First Lien Claims (the "Ad Hoc Group") participated in mediation before The Honorable Christopher Sontchi (the "Mediation"). Unable to reach a settlement, the hearing to consider confirmation of the Plan began on September 22, 2016, and concluded September 27, 2016 (the "Confirmation Hearing").

The Equity Committee and various other parties filed objections to the Plan.   Prior to and for the duration of the Confirmation Hearing, the Debtors continued negotiating with the objecting parties and resolved a number of objections.   Currently, the following objections filed by the Equity Committee remain:

(1)    "The Plan Releases and Exculpations Are Impermissible" regarding the Plan releasing claims held by the Debtors and other third parties;

(2)    "The Plan Violates Section 1129(a)(3) of the Bankruptcy Code" because it is not proposed in good faith;

(3)    The Plan "Violates Section 1129(a)(7) of the Bankruptcy Code" (the "best interest test"); and

(4)    The Plan "Fails to Satisfy the Cramdown Standard Under Section 1129(b)" (collectively, the "Objections").[6]

Based on the record made at the Confirmation Hearing and for the reasons set forth herein, the Objections will be overruled and the Debtors' Plan will be confirmed.

---

[5] The Debtors' Joint Prepackaged Chapter 11 Plan was dated June 6, 2016 (D.I. 18) and amended on October 18, 2016 (D.I. 436).

[6] D.I. 251.

## STATEMENT OF STIPULATED FACTS[7]

### I.    CURRENT BANKRUPTCY

1.      On June 5, 2016 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.   The Chapter 11 Cases have been consolidated for procedural purposes only.[8]   The Debtors continue to operate their businesses as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.   On June 21, 2016, the United States Trustee for the District of Delaware appointed the Equity Committee.[9] The members of the Equity Committee and their respective equity holdings as of August 16, 2016 are:   Centerbridge Credit Partners Master Fund, LP (1,710,352 shares of Common Stock (defined below)); Archer Capital Management, LP (499,948 shares of Common Stock); and Lawrence Callahan (26,000 shares of Common Stock).[10]   As of August 22, 2016, the Ad Hoc Group collectively owned 5,177,563 shares of Common Stock.[11]

---

[7] At the conclusion of the Confirmation Hearing, the Court requested submission of a statement of agreed facts. The Debtors, together with the Ad Hoc Group and the Equity Committee have done so. The Statement of Stipulated Facts, including the associated footnotes (the "Statement") (D.I. 431) accurately reflects the record made at the Confirmation Hearing, so is adopted by the Court as its findings of fact. The completeness of the Statement and its helpfulness to the Court in contributing to a prompt decision are most appreciated.

[8] See Order Directing Joint Administration of the Debtors' Chapter 11 Cases, D.I. 64.

[9] See Notice of Appointment of Committee of Equity Security Holders, D.I. 109.

[10] See Verified Statement of the Official Committee of Equity Security Holders' Pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure, D.I. 316 at 2.

[11] See First Supplemental Verified Statement of Kirkland & Ellis LLP, White & Case LLP, Klehr Harrison Harvey Brazenburg LLP and the Ad Hoc Group Pursuant to Bankruptcy Rule 2019, D.I. 328, Exhibit A.

2.     Certain Hercules entities, including the international subsidiaries, are not in bankruptcy or insolvency proceedings.[12]   Some of Hercules's assets—including four international jackup rigs currently under a contract of sale—are international, Non-Debtor Subsidiaries.[13]

## II.    HERCULES'S BUSINESS

3.     Hercules performs offshore drilling services, both domestically in the Gulf of Mexico and internationally.[14]   Hercules's property consists primarily of 24 jackup rigs, 19 liftboats, and ancillary equipment.[15]   Jackup rigs are designed for drilling activities; they "jack up" on location and drill either exploratory or production wells.[16]   Liftboats serve as mobile repair, hotel, or other servicing vessels.[17]

4.     Jackup rigs are commonly referred to as either "working," "warm-stacked," or "cold-stacked."[18]   A "working" rig is under contract, fully operational, and fully staffed.[19]   A "warm-stacked" rig is off contract but maintains a reduced level of staff so that it can be reactivated relatively quickly in the event a contract for its services can be secured.[20]   A "cold-stacked" rig maintains the minimal level of personnel required by law, and is not repaired or maintained.[21]

---

[12] *See* Trial Tr. 289:23-290:3 (Rynd); Trial Tr. 588:17-20 (Dickerson).
[13] *See* Trial Tr. 290:16-18, 290:22-23 (Rynd).
[14] Trial Tr. 134:22-24 (Carson); Trial Tr. 361:1-11 (Rynd).
[15] *See* Trial Tr. 134:24-1, 135:4-12, 136:7-9 (Carson).
[16] Trial Tr. 135:16-21 (Carson).
[17] Trial Tr. 135:22-136:4 (Carson).
[18] *See* Trial Tr. 136:19-137:19 (Carson).
[19] Trial Tr. 136:20-22 (Carson).
[20] Trial Tr. 136:23-137:7 (Carson).
[21] Trial Tr. 137:8-15 (Carson).

4

5.      Hercules has 17 domestic jackup rigs in the U.S. Gulf of Mexico.[22]  None of the 17 rigs is currently under contract.[23]

6.      Additionally, Hercules owns seven international jackup rigs.[24]  Four of the seven international jackup rigs are working under contract.[25]

7.      Three of the international rigs, the *Hercules 261*, *Hercules 262*, and *Hercules 266* (collectively, the "Saudi Fleet"), are currently under contract with Saudi Aramco, a Saudi-based customer.[26]

8.      An additional international rig, the *Hercules 260*, is operating off the coast of the Congo.[27]

9.      Hercules has three additional international jackup rigs that are not currently under contract:  one off the coast of West Africa (the *Hercules Resilience* (the "Resilience")), one in Malaysia, and one off the coast in the United Kingdom, in the North Sea (the *Hercules Triumph* (the "Triumph")).[28]

10.      Between the Petition Date and the Confirmation Hearing (defined below), only one jackup rig has been sold (the *Hercules 267* for approximately $3 million).[29]  The Court also

---

[22] Trial Tr. 134:24-135:1 (Carson).

[23] Trial Tr. 135:2-3, 266:9-10 (Carson).

[24] Trial Tr. 135:4-5 (Carson).

[25] *See* Trial Tr. 135:4-12 (Carson).

[26] Trial Tr. 135:5 (Carson); *see also* Trial Tr. 363:6-7 (Rynd); JX 532 (Declaration of Troy L. Carson in Support of First Day Motions) ¶ 23.

[27] Trial Tr. 135:5-6, 135:12 (Carson); *see also* Trial Tr. 554:4-5 (Rynd).

[28] *See* Trial Tr. 135:5-10 (Carson); Trial Tr. 361:21-362:7 (Rynd); Trial Tr. 597:8-598:5 (Dickerson).

[29] *See* Trial Tr. 326:13, 326:17 (Rynd); *see also* JX 527 (September 15, 2016 PJT Process Update Presentation), at JX0527-0003.

has entered orders approving the sale of six additional rigs for a total purchase price of $1.55 million, which sales are expected to close shortly.[30]

11.    Hercules also has a contract in place to the sell the Saudi Fleet and has received a deposit for 10% of the purchase price for such sale.[31]

12.    In addition to the jackup fleet, Hercules also has nineteen liftboats, all of which are international.[32]  Sixteen liftboats are located off the coast of West Africa, and the remaining three liftboats are located in the Middle East.[33]

13.    Four liftboats are currently operating:   two in the Middle East and two off the coast of West Africa.[34]

### III.    *HERCULES HIGHLANDER*

14.    In May 2014, non-Debtor Hercules British Offshore Limited ("Hercules British Offshore") signed a five-year drilling contract (the "Maersk Agreement") with Maersk Oil North Sea UK Limited ("Maersk Oil") for a new jackup rig, the *Hercules Highlander* (the "*Highlander*").[35]   The *Highlander* was contracted to be a specifically-built, high-specification

---

[30] *See* Order (I) Authorizing SD Drilling LLC to Sell the Hercules 265 and Related Assets Free and Clear of All Liens, Claims and Encumbrances and (II) Granting Related Relief, D.I. 396; Order (I) Authorizing Cliffs Drilling Company to Sell the Hercules 208 and Related Assets Free and Clear of All Liens, Claims and Encumbrances and (II) Granting Related Relief, D.I. 395; Order (I) Authorizing (A) The Offshore Drilling Company to Sell the Hercules 202 and the Hercules 204, (B) SD Drilling LLC to Sell the Hercules 213, and (C) Cliffs Drilling Company to Sell the Hercules 200 and (II) Granting Related Relief, D.I. 394; *see also* Trial Tr. 326:14-15, 326:20-22 (Rynd).

[31] *See* Trial Tr. 291:9-15 (Rynd) ("We are under a letter of intent and we've entered into a contract and we received a 10 percent deposit from that acquisition."); *see also* JX 527 (September 15, 2016 Process Update), at JX0527-0002.

[32] Trial Tr. 136:7-8 (Carson).

[33] Trial Tr. 136:8-9 (Carson).

[34] Trial Tr. 136:12-14 (Carson).

[35] *See* JX 226 (Disclosure Statement for the Debtors' Joint Prepackaged Chapter 11 Plan) at JX0226-0025; *see also* Trial Tr. 147:6-9 (Carson); Trial Tr. 333:11-334:9 (Rynd).

jackup rig to work offshore in the United Kingdom in the Culzean Field.[36]   The terms of the

Maersk Agreement provided for a $225,000 dayrate over a five-year period beginning upon the

*Highlander's* arrival in the Culzean Field, estimated to occur by August 2016.[37]

15.    In support of the Maersk Agreement, also in May 2014, another non-Debtor

subsidiary, Hercules North Sea Ltd. ("Hercules North Sea") signed a rig construction contract

(the "Rig Construction Contract") with Jurong Shipyard Pte Ltd. ("Jurong") in Singapore with

respect to the *Highlander*.[38]

16.    Hercules's management team forecasted that the Maersk Agreement, at full

utilization and day rates, would provide between $40 and $50 million of EBITDA per year to

Hercules.[39]

### IV.    2015 BANKRUPTCY FILING

17.    On August 13, 2015, HERO and certain of its domestic direct and indirect

subsidiaries (collectively, the "2015 HERO Debtors") commenced voluntary pre-packaged

chapter 11 cases (the "2015 Chapter 11 Cases") in this Court.[40]

18.    On September 24, 2015, this Court entered an order confirming the *Debtors' Joint*

*Prepackaged Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* (the "2015

Plan").[41]

---

[36] *See* Trial Tr. 147:6-9 (Carson).

[37] *See* JX 159 (Maersk Oil and Hercules Contract Summary) at JX0159-0001, JX0159-0003;
Trial Tr. 147:22-24 (Carson); Trial Tr. 333:19-21 (Rynd); Cole Dep. Tr. 85:17-20.

[38] *See* JX 226 (Disclosure Statement for the Debtors' Joint Prepackaged Chapter 11 Plan) at
JX0226-0025; *see also* Trial Tr. 333:24-334:7 (Rynd).

[39] Trial Tr. 251:6-7 (Carson); Trial Tr. 481:4-8 (Rynd).

[40] *See* Case No. 15-11685.

[41] *See* Order Approving the Debtors' Solicitation and Disclosure Statement For, and Confirming,
the Debtors' Joint Prepackaged Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code,
Case No. 15-11685 (D.I. 181).

19.     The 2015 Plan provided Hercules with access to new liquidity in the form of exit financing under that certain Credit Agreement (the "First Lien Credit Agreement"), dated as of November 6, 2015, among HERO, as borrower, certain of HERO's subsidiaries, as guarantors (the "First Lien Guarantors" and, collectively with HERO, the "First Lien Obligors"), Jefferies Finance LLC ("Jefferies"), as administrative agent and collateral agent (the "First Lien Agent"), and certain lenders (the "First Lien Lenders").[42]

20.     The 2015 Plan became effective on November 6, 2015.[43]

## V.     FIRST LIEN CREDIT AGREEMENT

21.     The First Lien Credit Agreement provided Hercules with a $450 million senior secured credit facility consisting entirely of term loans (the "First Lien Facility").[44]

22.     HERO's obligations under the First Lien Credit Agreement (the "First Lien Obligations") are guaranteed by the First Lien Guarantors, which include all of the other Debtors and certain of the Non-Debtor Subsidiaries.[45]   The First Lien Obligations are secured on a first priority basis by liens on substantially all of the First Lien Obligors' respective assets, including their vessels, bank accounts, accounts receivable, and equity interests in subsidiaries.[46]   The First

---

[42] *See* JX 469 (First Lien Credit Agreement); JX 532 (Declaration of Troy L. Carson in Support of First Day Motions) ¶ 26; Debtors' Joint Prepackaged Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code, Case No. 15-11685, D.I. 15.
[43] *See* Notice of Effective Date of the Debtors' Joint Prepackaged Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code, Case No. 15-11685, D.I. 227.
[44] *See* JX 469 (First Lien Credit Agreement); JX 532 (Declaration of Troy L. Carson in Support of First Day Motions) ¶ 26; *see also* Trial Tr. 146:18-23 (Carson); Davis Dep. Tr. 44:7-18.
[45] *See* JX 469 (First Lien Credit Agreement); JX 532 (Declaration of Troy L. Carson in Support of First Day Motions) ¶ 28.
[46] *See* JX 469 (First Lien Credit Agreement); JX 532 (Declaration of Troy L. Carson in Support of First Day Motions) ¶ 28.

Lien Credit Agreement provides for the payment of an additional premium ("Applicable Premium" or "Makewhole") to the First Lien Lenders upon the occurrence of certain events.[47]

23.    The First Lien Credit Agreement contains two financial covenants:    (1) a minimum liquidity ratio covenant (the "Liquidity Covenant"); and (2) a maximum secured leverage ratio (the "Leverage Ratio") covenant, scheduled to take effect on January 1, 2017 (the "Leverage Covenant").[48]    Beginning with the last day of the fiscal quarter ending March 31, 2017, the Leverage Covenant required that Hercules's Leverage Ratio not exceed 6.00 to 1.00; 5.00 to 1.00 as of June 30, 2017; 4.00 to 1.00 as of September 30, 2017; and 3.50 to 1.00 as of December 31, 2017 and beyond.[49]

24.    Upon emergence from the 2015 Chapter 11 Cases, Hercules believed it would be able to meet both the Liquidity Covenant and the Leverage Covenant.[50]

## VI.    ESCROW AGREEMENT

25.    Per the terms of the First Lien Credit Agreement, upon the effective date of the 2015 Plan, $200 million of the proceeds of the First Lien Credit Agreement (the "Escrowed Amount") were placed into an escrow account (the "Escrow Account").[51]    The Escrowed Amount was intended to be used for the remaining installment payment on the *Highlander*,

---

[47] *See* JX 469 (First Lien Credit Agreement) § 8.01; *see also* Trial Tr. 154:23-155:7 (Carson) (defining Applicable Premium).

[48] *See* JX 469 (First Lien Credit Agreement) § 6.10 (Financial Covenant); *see also* Trial Tr. 150:22-151:7 (Carson).

[49] JX 469 (First Lien Credit Agreement) § 6.10(a); *see also* Trial Tr. 152:17-154:7 (Carson).

[50] *See* Trial Tr. 156:1-8 (Carson); *see also* JX 106 (December 11, 2015 Board Presentation) at JX0106-0025 (projecting compliance with Leverage Covenant at year end 2017).

[51] *See* Trial Tr. 146:18-23 (Carson); Trial Tr. 727:2-8 (Dickerson); JX 532 (Declaration of Troy L. Carson in Support of First Day Motions) ¶ 26.

originally scheduled for delivery on or around April 19, 2016, and the expenses, costs and charges related to the construction and purchase of the *Highlander*.[52]

26.     Per the terms of that certain Escrow Agreement (the "Escrow Agreement"), dated as of November 6, 2015, among HERO, the First Lien Agent and Wilmington Trust, National Association, as escrow agent (the "Escrow Agent"), upon the satisfaction of certain conditions (the "Escrow Conditions"), the First Lien Agent would instruct the Escrow Agent to distribute funds in the Escrow Account to Jurong for the remaining installment payment on the *Highlander* and the expenses, costs and charges related to the construction and purchase of the *Highlander*.[53]

27.     In addition, upon the occurrence of an Event of Default (as defined in the First Lien Credit Agreement), the Escrow Agreement provided that the First Lien Agent, at the direction of the requisite First Lien Lenders, could instruct the Escrow Agent to distribute funds in the Escrow Account to prepay the loans under the First Lien Facility.[54]

## VII.    BOARD OF DIRECTORS POST-EMERGENCE FROM 2015 BANKRUPTCY

28.     John Rynd, Hercules's CEO, was the only "holdover" member to remain on the current HERO board of directors (the "Board") following the 2015 HERO Debtors' emergence from chapter 11.[55]

29.     Lawrence Dickerson was appointed to the Board as chairman.[56]

---

[52] *See* JX 532 (Declaration of Troy L. Carson in Support of First Day Motions) ¶ 27; *see also* JX 469 (First Lien Credit Agreement) at JX0469-0007 (preamble).

[53] JX 296 (Escrow Agreement) § III(a).

[54] *Id.* § III(d).

[55] Trial Tr. 287:1-6 (Rynd); Trial Tr. 584:2-585:2 (Dickerson).

[56] *See* Trial Tr. 581:7-16 (Dickerson); Truong Dep. Tr. 73:12-23, 74:2-8.

30.    Between the effective date of the 2015 Plan (November 6, 2015) and the Petition

Date, the Board held 28 meetings.[57]   A number of these meetings were "combined" meetings of

the full board with a special committee of the board that, as discussed *infra*, was formed in

January 2016 to evaluate strategic alternatives for Hercules.[58]   The special committee also held

an additional 10 meetings separate and apart from the full Board.[59]

---

[57] *See* JX 112 (November 23, 2015 Board Minutes); JX 113 (December 11, 2015 Board
Minutes); JX 114 (December 11, 2015 Compensation Committee Minutes); JX 115 (December 21, 2015
Board Minutes); JX 116 (December 28, 2015 Board Minutes); JX 117 (January 4, 2016 Board Minutes);
JX 118 (January 18, 2016 Board Minutes); JX 119 (January 20, 2016 Board Minutes); JX 121 (January
29, 2016 Joint Board and Special Committee Minutes); JX 123 (February 24, 2016 Board Minutes); JX
128 (March 30, 2016 Board Minutes); JX 130 (April 2, 2016 Joint Board and Special Committee
Minutes); JX 131 (April 4, 2016 Joint Board and Special Committee Minutes); JX 134 (April 12, 2016
Joint Board and Special Committee Minutes); JX 135 (April 12, 2016 Joint Board and Special Committee
Minutes); JX 136 (April 14, 2016 Joint Board and Special Committee Minutes); JX 137 (April 15, 2016
Joint Board and Special Committee Minutes); JX 138 (April 16, 2016 Joint Board and Special Committee
Minutes); JX 139 (April 17, 2016 Joint Board and Special Committee Minutes); JX 140 (April 21, 2016
Board Minutes); JX 141 (April 26, 2016 Joint Board and Special Committee Minutes); JX 143 (April 27,
2016 Board Minutes); JX 144 (April 28, 2016 Joint Board and Special Committee Minutes); JX 145 (May
2, 2016 Joint Board and Special Committee Minutes); JX 146 (May 4, 2016 Joint Board and Special
Committee Minutes); JX 147 (May 6, 2016 Joint Board and Special Committee Minutes); JX 148 (May
19, 2016 Joint Board and Special Committee Minutes); JX 149 (May 25, 2016 Joint Board and Special
Committee Minutes).
    [58] *See* JX 121 (January 29, 2016 Joint Board and Special Committee Minutes); JX 130 (April 2,
2016 Joint Board and Special Committee Minutes); JX 131 (April 4, 2016 Joint Board and Special
Committee Minutes); JX 134 (April 12, 2016 Joint Board and Special Committee Minutes); JX 135
(April 12, 2016 Joint Board and Special Committee Minutes); JX 136 (April 14, 2016 Joint Board and
Special Committee Minutes); JX 137 (April 15, 2016 Joint Board and Special Committee Minutes); JX
138 (April 16, 2016 Joint Board and Special Committee Minutes); JX 139 (April 17, 2016 Joint Board
and Special Committee Minutes); JX 141 (April 26, 2016 Joint Board and Special Committee Minutes);
JX 144 (April 28, 2016 Joint Board and Special Committee Minutes); JX 145 (May 2, 2016 Joint Board
and Special Committee Minutes); JX 146 (May 4, 2016 Joint Board and Special Committee Minutes); JX
147 (May 6, 2016 Joint Board and Special Committee Minutes); JX 148 (May 19, 2016 Joint Board and
Special Committee Minutes); JX 149 (May 25, 2016 Joint Board and Special Committee Minutes).
    [59] *See* JX 120 (January 29, 2016 Special Committee Minutes); JX 122 (February 19, 2016 Special
Committee Minutes); JX 124 (March 4, 2016 Special Committee Minutes); JX 125 (March 11, 2016
Special Committee Minutes); JX 126 (March 18, 2016 Special Committee Minutes); JX 127 (March 25,
2016 Special Committee Minutes); JX 129 (March 31, 2016 Special Committee Minutes); JX 132 (April
8, 2016 Special Committee Minutes); JX 133 (April 12, 2016 Special Committee Minutes); JX 142 (April
26, 2016 Special Committee Minutes).

## VIII.   STATE OF OIL MARKET AND MARKET FOR HERCULES'S RIGS AND LIFTBOATS

31.   Oil prices dropped in late November 2014.[60]

32.   Following the drop in oil prices, Saudi Aramco came to Hercules and other providers of drilling services in Saudi Arabia seeking to cut dayrates,[61] and Hercules acquiesced.[62]   On February 25, 2015, Hercules received notice that Saudi Aramco was terminating the contract for the *Hercules 261* for convenience, effective March 27, 2015 and then extended to May 31, 2015.[63]   The originally-contracted day rates for the *Hercules 261*, *Hercules 262*, and *Hercules 266* were approximately $136,000, $118,000, and $125,000, respectively.[64]

33.   Hercules was able to renegotiate with Saudi Aramco to reinstate the *Hercules 261* contract, in exchange for dayrate concessions for all three of the jackup rigs to $67,000 per day for each rig, effective retroactively from January 1, 2015 through December 31, 2016 for the *Hercules 261* and *Hercules 262*, and through the remaining contract term for the *Hercules 266*.[65]

34.   Crude oil prices declined from $52 per barrel in July 2015, when the restructuring support agreement with respect to the 2015 Plan was executed, to $44-46 per barrel during the pendency of the 2015 Chapter 11 Cases,[66] and to just under $30 per barrel in early 2016.[67]

---

[60] Trial Tr. 292:15-17 (Rynd) *see also* WTI Consensus Pricing Trial Demonstrative (relying on JX 519 – JX 525).

[61] *See* Trial Tr. 292:15-294:7 (Rynd).

[62] Trial Tr. 293:9-294:7 (Rynd); Trial Tr. 688:10-689:13 (Dickerson).

[63] *See* Trial Tr. 293:2-8 (Rynd); JX 532 (Declaration of Troy L. Carson in Support of First Day Motions) ¶ 33.

[64] *See* JX 532 (Declaration of Troy L. Carson in Support of First Day Motions) ¶ 23.

65 *See* Trial Tr. 293:9-14 (Rynd); JX 532 (Declaration of Troy L. Carson in Support of First Day Motions) ¶ 33.

[66] *See* WTI Consensus Pricing Trial Demonstrative (relying on JX 519 – JX 525); *see also* Trial Tr. 336:17-24 (Rynd).

[67] WTI Consensus Pricing Trial Demonstrative (relying on JX 519 – JX 525); Trial Tr. 162:2-7 (Carson) ("If you remember, back in February of '16, people thought that oil had found a bottom, had kind of leveled out.   And then in February of '16 it dropped below $30 a barrel.   It sent shockwaves

12

35.     On March 9, 2016, Hercules received a new notice from Saudi Aramco further

reducing the dayrates under the contracts for the *Hercules 261* and *Hercules 262* from $67,000

per day to $63,500 per day, applicable retroactively to January 1, 2016 through December 31,

2016.[68]

36.     Hercules has been unable to obtain any work for the *Triumph* or the *Resilience*.[69]


IX.     **SPECIAL COMMITTEE**

37.     On January 20, 2016, Hercules formed a Special Committee of the Board (the

"Special Committee"), comprised of all independent directors (*i.e.*, all Board members except

CEO John Rynd), with Mr. Dickerson as its chair.[70]

38.     The Special Committee was formed to pursue strategic alternatives available to

Hercules.[71]

39.     These strategic alternatives included consideration of various options, including

status quo analyses, sale of some of Hercules's assets, the sale of Hercules as a whole, and

---

through the industry."); Trial Tr. 546:2-4 (Rynd); Trial Tr. 635:8-23 (Dickerson).

    [68] *See* JX 532 (Declaration of Troy L. Carson in Support of First Day Motions) ¶ 33; *see also* Trial Tr. 295:10-20, 363:6-364:3 (Rynd).

    [69] Trial Tr. 158:21-159:5, 229:6-11(Carson); Trial Tr. 317:3-8, 341:1-342:3 (Rynd); Trial Tr. 596:9-597:4 (Dickerson) ("[T]here would be some 50-odd rigs that the *Resilience/Triumph* would be competing against, and in that timeframe I doubt that there were more than four or five jobs that came up, most of which went to incumbent rigs that were in place."); JX 28 (November 24, 2015 email from K. Mahony to R. Grissinger and G. Donohue, attaching analyst reports) at JX0028-0001 ("We're still waiting for management to find a contract for the Hercules Resilience and Hercules Triumph . . .").

    [70] JX 119 (January 20, 2016 Board Minutes) at JX0119-0002; *see also* Trial Tr. 180:10-14 (Carson); Trial Tr. 629:10-630:1 (Dickerson); JX 118 (January 18, 2016 Board Minutes).

    [71] JX 118 (January 18, 2016 Board Minutes); JX 119 (January 20, 2016 Board Minutes); *see also* Trial Tr. 181:15-21 (Carson); Trial Tr. 298:7-19 (Rynd); Trial Tr. 621:14-622:2 (Dickerson).

consideration of issuing additional equity or debt securities or incurrence of additional indebtedness.[72]

40.      HERO publicly announced the formation of the Special Committee on February 11, 2016.[73]

41.      In February 2016, the Special Committee engaged PJT Partners Inc. ("PJT") as financial advisor, and Akin Gump Strauss Hauer & Feld LLP ("Akin Gump") as counsel.[74]

## X.      MARKETING PROCESS

42.      Shortly after its formation, the Special Committee authorized PJT to initiate a marketing process (the "Marketing Process") to seek bids for the potential acquisition of some or all of Hercules's assets or Hercules as a whole.[75]

43.      As part of the Marketing Process, PJT contacted over 50 potential strategic partners and potential financial sponsors to gauge interest and solicit bids to acquire some or all of Hercules's assets, including the *Highlander*,[76] or merge with Hercules as a whole.[77]

---

[72] Trial Tr. 181:22-182:5 (Carson); Trial Tr. 375:23-376:21 (Rynd); JX 84 (February 24, 2016 PJT Deck) at JX0084-0007; Trial Tr. 599:5-600:12, 626:24-627:6, 636:9-16 (Dickerson); JX 119 (January 20, 2016 Board Minutes, Resolutions of the Board of Directors) at JX0119-0004 (Delegating "to the Special Committee the exclusive power and authority of the Board to:   explore, review and evaluate potential strategic alternatives for the Corporation, including (without limitation) the sale of the Corporation, a merger or share exchange involving the Corporation, the sale of some or all of the Corporation's assets, a recapitalization of the Corporation, whether by issuance of equity or debt securities (including common or preferred stock of the Corporation) or incurrence of additional indebtedness or issuance of derivative securities thereof) and any alternatives thereto.").

[73] JX 532 (Declaration of Troy L. Carson in Support of First Day Motions) ¶ 42.

[74] Trial Tr. 182:6-10 (Carson); Trial Tr. 352:20-22, 354:9-14 (Rynd); Trial Tr. 633:24-634:13 (Dickerson); JX 120 (January 29, 2016 Special Committee Minutes) at JX0120-0001; JX 532 (Declaration of Troy L. Carson in Support of First Day Motions) ¶ 44.

[75] JX 532 (Declaration of Troy L. Carson in Support of First Day Motions) ¶ 45; *see also* Trial Tr. 183:13-22 (Carson); Davis Dep. Tr. 170:14-171:5.

[76] Trial Tr. 232:14-22 (Carson); Trial Tr. 353:23-354:7 (Rynd); *see also* Genereux Dep. Tr. 87:19-23.

[77] *See, e.g.*, JX 85 (March 4, 2016 PJT Presentation to Board) (depicting bidder interest for individual assets and Hercules as a whole).

14

44.     To facilitate the Marketing Process, Hercules established a dataroom (the "Dataroom"), which included Hercules's financial projections and forecasts.[78]   The Dataroom also included specifications for Hercules's rigs and liftboats.[79]   In order to access the Dataroom, interested parties had to sign non-disclosure agreements.[80]   Approximately fifteen parties signed such agreements.[81]

45.     First round bids were due the week of March 21, 2016 (the "First Round Bid Deadline").[82]

46.     Seven parties (the "First Round Bidders") submitted non-binding bids (the "First Round Bids") by the First Round Bid Deadline.[83]

47.     The indicative purchase prices of the First Round Bids, all but one of which sought to acquire all, or substantially all of Hercules's assets, ranged from $110 million on the low end to $455 million on the high end.[84]

48.     The highest First Round Bid from "Bidder A" for all of Hercules's assets, except one Saudi Arabian asset, was for $455 million, consisting of $200 million in cash and $255 million in equity in the post-acquisition entity.[85]

---

[78] Trial Tr. 557:10-558:1 (Rynd); 642:3-6, 655:14-24 (Dickerson); JX 85 (March 4, 2016 PJT Presentation to Board).

[79] JX 85 (March 4, 2016 PJT Presentation to Board) at JX0085-0008.

[80] *See, e.g.*, Trial Tr. 655:14-656:4 (Dickerson); JX 87 (March 18, 2016 PJT Update) at JX0087-0003.

[81] JX 532 (Declaration of Troy L. Carson in Support of First Day Motions) ¶ 46; *see also* JX0087-0003 (March 18, 2016 PJT Update).

[82] JX 162 (March 8, 2016 Letter from PJT re: Opportunity to Submit Indication of Interest in Hercules) at JX0162-0001; *see also* Trial Tr. 622:3-6 (Dickerson).

[83] *See* JX 88 (March 25, 2016 PJT Presentation to Board) at JX0088-0024 (One of the seven bids was submitted by certain of the First Lien Lenders and was considered alongside the other First Round Bids.)

[84] *Id.*; *see also* JX 532 (Declaration of Troy L. Carson in Support of First Day Motions) ¶ 47.

[85] JX 88 (March 25, 2016 PJT Presentation to Board) at JX0088-0024.

15

49.     The Special Committee directed PJT to invite three of the First Round Bidders (collectively, the "Second Round Bidders") to submit second round bids (the "Second Round Bids") by April 14, 2016 (the "Second Round Bid Deadline").[86]

50.     The Second Round Bidders were provided an opportunity to conduct additional diligence of Hercules, including meetings with management, to discuss Hercules's business and operations.[87]

51.     Management participated in multiple in-person meetings and/or teleconferences with each of the Second Round Bidders.[88]   In addition, John Rynd spoke directly to the CEO of Bidder A.[89]

52.     By the Second Round Bid Deadline in April 2016, Hercules received two nonbinding Second Round Bids from two of the three bidders (the "Second Round Bidders").[90]

53.     The highest Second Round Bid was again from Bidder A for substantially all of Hercules's assets excepting the liftboats, Hercules 208 and Hercules 267.[91]   At this time, Bidder A increased its bid to $470 million, comprised of $220 million in cash and $250 million in equity in the post-acquisition entity.[92]

54.     After the Second Round Bid Deadline, Hercules received a third non-binding bid from the third bidder originally invited to submit a Second Round Bid, as well as two non-

---

[86] JX 532 (Declaration of Troy L. Carson in Support of First Day Motions) ¶ 48; *see also* Trial Tr. 657:7-17 (Dickerson).

[87] JX 532 (Declaration of Troy L. Carson in Support of First Day Motions) ¶ 48.

[88] *Id.*

[89] *See* Trial Tr. 553:16-554:24 (Rynd).

[90] JX 532 (Declaration of Troy L. Carson in Support of First Day Motions) ¶ 48; JX 91 (April 15, 2016 PJT Presentation to Board) at JX0091-0002-4; Trial Tr. 402:3-15 (Rynd).

[91] JX 91 (April 15, 2016 PJT Presentation to Board) at JX0091-0004.

[92] *Id.* at JX0091-0002; JX 532 (Declaration of Troy L. Carson in Support of First Day Motions) ¶ 49; *see also* Trial Tr. 402:20-403:5 (Rynd).

binding bids from parties that had not submitted First Round Bids (collectively, the "Additional Bids").[93]   One of the Additional Bids, from Maersk Drilling ("Maersk Drilling"), was solely for the *Highlander*.[94]

55.     The Additional Bids contained purchase prices ranging from a bid for $326 million to a bid for $515-520 million, both for the entirety of Hercules, which was comprised of $65-70 million of stock and $450 million of rollover debt.[95]

56.     The *Highlander*-only Additional Bid offered $205 million, but that bid was later reduced.[96]

## XI.    HERCULES'S FORECASTS, DECEMBER 2015 – FEBRUARY 2016

57.     On December 11, 2015, management provided the Board with a budget projecting 2016 EBITDA of approximately negative $7.7 million and forecasting 2017 EBITDA of approximately $144.5 million.[97]

58.     On February 24, 2016, management provided the Board with a budget projecting 2016 EBITDA of approximately negative $30 million EBITDA, and forecasting 2017 EBITDA of approximately $103 million.[98]

---

[93] JX 532 (Declaration of Troy L. Carson in Support of First Day Motions) ¶ 49.
[94] *See* JX 95 (PJT Update) at JX0095-0003; JX 532 (Declaration of Troy L. Carson in Support of First Day Motions) ¶ 49.
[95] JX 95 (April 28, 2016 PJT Process Update Presentation) at JX0095-0003.
[96] *Id.*
[97] *See* JX 106 (December 11, 2015 Board Presentation) at JX0106-0025; JX 113 (December 11, 2015 Board Minutes); Trial Tr. 164:17-22 (Carson); Trial Tr. 342:4-343:7 (Rynd).
[98] JX 14 (February 24, 2016 Board Presentation) at JX0014-0020; Trial Tr. 187:13-15, 187:18-20 (Carson).

59.    Management made changes to the February 24th budget and forecast.[99]   The final

2016 budget (1) reduced the warm-stacked daily operating costs for the *Triumph* and the

*Resilience* from approximately $24,000 per day for the *Triumph* and $27,500 per day for the

*Resilience*[100] to $10,000 per day per rig beginning April 1, 2016, (2) eliminated a company-wide

incentive program for G&A, (3) reduced the operating costs for the *Hercules 263* to $1,500 per

day (from approximately $9,400 per day) as of July 1, 2016,101  and (4) assumed that the

*Triumph* would not find work before March 2017 and the *Resilience* would not find work before

December 2016.[102]   Based on these revisions, Hercules projected 2016 EBITDA of

approximately negative $12.68 million, and forecasted 2017 EBITDA of $106 million.[103]

60.    All management budgets and forecasts assumed that the *Highlander* operated as

expected and that Maersk Oil paid the full contract dayrate.[104]

## XII.    MARCH 30, 2016 10-K

61.    On March 30, 2016, HERO filed its Form 10-K for fiscal year 2015.[105]

62.    As clarified in an amendment to the Form 10-K filed on April 15, 2016, as of

March 30, 2016, Hercules and a majority of the Board did not believe that it was more likely

than not that Hercules would file for bankruptcy in 2016.[106]

---

[99] Trial Tr. 367:15-368:2 (Rynd); Trial Tr. 640:17-641:4 (Dickerson); Trial Tr. 198:13-199:6
(Carson).
[100] JX 14 (February 24, 2016 Board Presentation) at JX0014-0007.
[101] JX 58 (February 25, 2016 Final Budget Presentation) at JX0058-0004.
[102] *See* Trial Tr. 198:13-199:6 (Carson); JX 435 at JX0435-0008, 0012-0014.
[103] JX 108 (February 25, 2016 Final Budget Presentation) at JX0108-0151, JX0108-0019-0020.
[104] Trial Tr. 358:23-359:11 (Rynd); Trial Tr. 622:16-623:7 (Dickerson).
[105] *See* JX 214 (March 30, 2016 Form 10-K).
[106] JX 215 (April 15, 2016 Form 10-K/A) at JX0215-0006.

18

## XIII.    COMMUNICATIONS WITH LUMINUS

63.     Luminus Energy Partners Master Fund, Ltd. ("Luminus"), is a Bermuda-based hedge fund managed by Luminus Management, LLC in New York.[107]   At the time of Hercules's emergence from the 2015 Chapter 11 Cases, Luminus held approximately 1.2% of the debt outstanding under the First Lien Credit Agreement.[108]

64.     As of the date of the Confirmation Hearing, Luminus owned approximately 40% of the debt outstanding under the First Lien Credit Agreement.[109]

65.     In addition, as of June 15, 2016, Luminus owned 914,992 shares of Hercules's common stock (the "HERO Common Stock").[110]

66.     In December 2015, Luminus contacted management regarding Hercules.[111]

67.     In February 2016, Luminus provided Hercules with a presentation stating that it viewed Hercules's significant cash burn as unsustainable and harmful to Hercules's value.[112]   In that presentation, Luminus shared its view that Hercules would default on the Leverage Covenant in the first half of 2017.[113]

---

[107] Trial Tr. 209:10-15 (Carson); Trial Tr. 371:9-15 (Rynd); Weitzman Dep. Tr. 8:15-21.

[108] JX 49 (Email dated December 17, 2015 from J. Rynd to L. Dickerson, cc'ing T. Carson re: Board Update.pptx, attaching Board Update.pptx) at JX0049-0015.

[109] Trial Tr. 371:8-15 (Rynd); Weitzman Dep. Tr. 128:10-16; JX 303 at JX0303-0001 (email from Adam Weitzman to John Rynd).

[110] Exhibit A to the Verified Statement of Kirkland & Ellis, White & Case LLP, Klehr Harrison Harvey Branzburg LLP and the Ad Hoc Group Pursuant to Bankruptcy Rule 2019, D.I. 100.

[111] JX 18 (December 18, 2015 email from E. Keller to L. Dickerson); Weitzman Dep. Tr. 33:22-34:22; Trial Tr. 371:16-21 (Rynd).

[112] See JX 98 (Email dated February 14, 2016 from E. Davis to M. Stamer, M. Genereux, J. Goodgame, forwarding Materials for HERO Call, attaching HERO BoD Presentation 1-21-2016.pdf and HERO Management Incentive Compensation Proposal – Luminus 1-26-2015 v1.pdf) at JX0098-0006-0008.

[113] Id. at JX0098-0006, 0010.

68.    In February 2016, Luminus also provided Hercules with a presentation setting forth potential de-risking options for the *Highlander*, including project financing and a joint venture with Jurong.[114]

69.    Luminus urged Hercules to de-risk the *Highlander*, citing, among other things, risk that Maersk Oil would cancel its contract or seek to renegotiate the Maersk Agreement dayrates.[115]

70.    On April 12, 2016, Luminus presented its views of Hercules to the Special Committee, including a view that the results of the Marketing Process were disappointing.[116] Luminus also suggested an out-of-court sale of Hercules's assets,[117]   and de-risking alternatives for the *Highlander*, including project finance and a joint venture.[118]

71.    Following its meeting on April 12, 2016, the Special Committee instructed PJT to begin negotiating with Luminus regarding a potential transaction while simultaneously continuing the Marketing Process.[119]

72.    On April 15, 2016, Luminus provided a proposal for a controlled chapter 11 bankruptcy in which Hercules's various assets could be sold off individually, and holders of

---

[114] JX 60 (Email dated February 19, 2016 from A. Weitzman to J. Rynd re: Highlander thoughts, attaching Hercules Advisors Presentation 02-19-2016.pdf) at JX060-0008; *see also* JX 100 (April 12, 2016 Luminus Presentation to Board) at JX0100-0019-0020.

[115] JX 98 (Email dated February 14, 2016 from E. Davis to M. Stamer, M. Genereux, J. Goodgame, forwarding Materials for HERO Call, attaching HERO BoD Presentation 1-21-2016.pdf and HERO Management Incentive Compensation Proposal – Luminus 1-26-2015 v1.pdf) at JX0098-0013; JX 56 (Luminus Presentation dated February 19, 2016); *see also* Keller Dep. Tr. 110:9-10 ("We said taking the *Highlander* was a risky move.").

[116] *See* JX 100 (April 12, 2016 Luminus Presentation to Board); Trial Tr. 653:16-654:2 (Dickerson).

[117] JX 100 (April 12, 2016 Luminus Presentation to Board) at JX0100-0023.

[118] *Id.* at JX0100-0019-0020.

[119] JX 134 (April 12, 2016 Joint Board and Special Committee Minutes) at JX0134-0001; Trial Tr. 401:22-402:7, 407:19-24 (Rynd); Trial Tr. 657:18-658:21 (Dickerson).

HERO Common Stock would receive $27.5 million in "cash or highly certain value."[120]

However, this proposal was not viewed as final and was believed to be subject to due

diligence.[121]

### XIV.    DEFAULTS ALLEGED

73.    Section 5.15 of the First Lien Credit Agreement provides that "each Loan Party

will . . . [e]xecute and deliver the documents and complete the tasks set forth on Schedule 5.15,

in each case within the time limits specified therein (or such longer period of time acceptable to

the Administrative Agent at its sole discretion)" (the "Nigeria Registration Covenant").[122]

74.    Schedule 5.15 provides that "[w]ithin 60 Business Days following the Closing

Date (or such longer time as may be agreed by the Collateral Agent in its sole discretion), the

Borrower shall cause Hercules Offshore Nigeria Limited (its Nigerian subsidiary) to deliver the

certificate of registration of the vessel mortgage at the NIMASA," the Nigerian Maritime

Administration and Safety Agency.[123]

75.    The deadline for delivery of the certificate of registration had previously been

extended on multiple occasions with consent of the First Lien Agent.[124]

76.    On March 31, 2016, the First Lien Agent advised that the deadline would only be

further extended until April 15, 2016.[125]

---

[120] *See* JX 181 (April 15, 2016 Luminus Presentation to Board) at JX0181-0005.
[121] *See, e.g.*, Davis Dep. Tr. 173:14-177:8.
[122] JX 469 (First Lien Credit Agreement) § 5.15.
[123] *Id.* Schedule 5.15.
[124] Trial Tr. 213:8-14 (Carson); *see also* Keller Dep. Tr. 178:12-18; Trial Tr. 463:11-19, 468:2-13 (Rynd); Trial Tr. 660:22-661:11 (Dickerson).
[125] JX 419 (Email dated March 31, 2016 from J. Woolmer to W. Blazek re: Hercules-Post-closing); *see also* Trial Tr. 509:2-510:6 (Rynd).

77.    On April 14, 2016, Hercules requested a further extension, but that request was denied.[126]

78.    Hercules did not deliver the registration certificate on April 15, 2016.[127]    The registration certificate was delivered on April 21, 2016.[128]

79.    The assets subject to the Nigerian Registration Covenant Default are worth between approximately $6 and $25 million.[129]

80.    The First Lien Lenders, including Luminus, did not accelerate Hercules's debt obligations under the First Lien Credit Agreement with respect to the Nigeria Registration Covenant Default as a result of the Original and Amended Forbearance Agreements (discussed and defined below).[130]

81.    On Friday, April 15, Hercules's counsel Baker Botts notified the First Lien Agent by email that (i) Hercules disagreed with the required First Lien Lenders' interpretation of the alleged Event of Default with respect to the Nigeria Registration Covenant, (ii) defenses may exist with respect to the alleged Event of Default, and (iii) "[a]ny attempt to declare an Event of Default under the First Lien Credit Agreement as a result of the delays in Nigeria would be in bad faith."[131]

---

[126] Trial Tr. 213:8-14 (Carson); Trial Tr. 383:24-385:6 (Rynd); Trial Tr. 662:23-663:12 (Dickerson).
[127] Trial Tr. 213:4-7 (Carson); Trial Tr. 392:19-23 (Rynd).
[128] Trial Tr. 394:12-14 (Rynd); Trial Tr. 754:23-755:2 (Dickerson)
[129] Trial Tr. 470:20-24 (Rynd); Keller Dep. Tr. 173:18-23.
[130] Trial Tr. 213:1-3 (Carson); Trial Tr. 514:19-515:3 (Rynd); Trial Tr. 789:12-790:10 (Dickerson).
[131] JX 80 (Email from B. Thompson to L. Dickerson) at JX0080-0001; *see also* Trial Tr. 261:1-4 (Carson) (Hercules disagreed with the Lenders' assertions of default); Trial Tr. 468:2-469:11 (Rynd); Weitzman Dep. Tr. 209:15-22 ("I understand that that e-mail had been sent.").

82.     Counsel for the First Lien Agent responded to Baker Botts, stating:   "We do not agree with your characterization of the facts set forth in your email."[132]

83.     Shortly after informing the Debtors of the alleged Nigeria Registration Covenant Default, the Ad Hoc Group's advisors identified a potential Default (as defined in the First Lien Credit Agreement) based on Hercules's alleged failure to comply with an affirmative covenant in the First Lien Credit Agreement, Section 5.18, with respect to Discovery Offshore (Gibraltar) Limited, a Non-Debtor subsidiary.[133]

84.     Section 5.18 required Hercules to use its "best efforts" to cause its Gibraltar subsidiary to dissolve, merge, or consolidate with or into another Loan Party (as defined in the First Lien Credit Agreement) within 120 days of closing (the "Gibraltar Covenant").[134] Hercules had begun to unwind the Gibraltar entity, but then paused after determining that unwinding the Gibraltar entity would jeopardize Hercules's ability to collect an outstanding $11 million receivable.[135]   Hercules elected to continue its efforts to collect the $11 million before winding down the entity.[136]   The receivable remains disputed and unpaid today.[137]

85.     Hercules never advised the First Lien Lenders about its failure to dissolve the Gibraltar entity and never sought an extension or otherwise discussed the matter with the First Lien Lenders.[138]

---

[132] JX 430 (Email dated April 15, 2016 from Rebecca Gottlieb re: Hercules- Post-Closing); *see also* Trial Tr. 529:11-530:9 (Rynd).
[133] Trial Tr. 235:2-10 (Carson); Trial Tr. 396:3-13 (Rynd); Trial Tr. 755:7-15 (Dickerson).
[134] JX 469 (First Lien Credit Agreement) § 5.18 ("Dissolutions").
[135] Trial Tr. 235:18-236:10 (Carson); Trial Tr. 397:10-19 (Rynd).
[136] Trial Tr. 235:18-236:10 (Carson); Trial Tr. 397:10-19 (Rynd).
[137] Trial Tr. 235:8-236:16 (Carson).
[138] Trial Tr. 235:17-237:4 (Carson); Trial Tr. 517:16-518:6 (Rynd).

86.    The alleged Gibraltar Covenant Default was raised by the Ad Hoc Group's advisors during the negotiation of the Original Forbearance Agreement and was included in that Agreement to make clear that the First Lien Lenders were not waiving the potential Default relating to the Gibraltar Covenant.[139]

87.    Hercules reserved all rights with respect to future challenges to the alleged Nigeria Registration Covenant and Gibraltar Covenant defaults, should the Plan not be confirmed.[140]

## XV.    ORIGINAL AND AMENDED FORBEARANCE AGREEMENTS

88.    Between April 14, 2016, when Hercules received notice that its request for a further extension to deliver the Nigeria registration certificate would be denied, and April 18, 2016, the Board and Special Committee met four times with management and Hercules's legal and financial advisors.[141]

89.    On April 18, 2016, the Board and Special Committee determined that HERO should enter into the *Forbearance Agreement and First Amendment to the First Lien Credit Agreement* (the "Original Forbearance Agreement"), with the First Lien Guarantors, the First Lien Agent, and certain First Lien Lenders.[142]

---

[139] *See* Keller Dep. Tr. 200:5-8.
[140] Trial Tr. 670:14-17 (Dickerson); JX 532 (Declaration of Troy L. Carson in Support of First Day Motions) ¶ 54.
[141] *See* JX 136 (April 14, 2016 Joint Board and Special Committee Minutes); JX 137 (April 15, 2016 Joint Board and Special Committee Minutes); JX 138 (April 16, 2016 Joint Board and Special Committee Minutes); JX 139 (April 17, 2016 Joint Board and Special Committee Minutes); *see also* Trial Tr. 382:13-24 (Rynd); Trial Tr. 657:18-658:2, 662:20-663:6 (Dickerson).
[142] *See* JX 139 (April 17, 2016 Joint Board and Special Committee Minutes) at JX0139-0001; JX 74 (Forbearance Agreement and First Amendment to Credit Agreement).

90.    Pursuant to the Original Forbearance Agreement, the First Lien Lenders agreed to forbear on accelerating the amounts asserted to be due under the First Lien Credit Agreement related to the alleged Nigeria Covenant and the Gibraltar Covenant Defaults.[143]

91.    Also pursuant to the Original Forbearance Agreement, Hercules agreed that it would not be permitted to draw the Escrowed Amount during the Original Forbearance Period (as defined in the Original Forbearance Agreement)[144] to fund the delivery of the *Highlander*.[145]

92.    Pursuant to the Credit Agreement, as amended by the Original Forbearance Agreement, Hercules was able to draw on the Escrowed Funds outside of the forbearance period as long as the First Lien Lenders were provided with two-days' notice.[146]

93.    On April 28, 2016, Hercules and the First Lien Guarantors entered into *Amendment No. 1 to Forbearance Agreement and First Amendment to Credit Agreement* (the "Amended Forbearance Agreement"), which amended the Original Forbearance Agreement to extend the Forbearance Period (the "Amended Forbearance Period," and together with the Original Forbearance Period, the "Forbearance Period").[147]

## XVI.    HERCULES'S FORECAST, MAY 2016

---

[143] *See* JX 74 (Forbearance Agreement and First Amendment to Credit Agreement) at JX0074-0001; Trial Tr. 407:5-14 (Rynd).

[144] *See* JX 74 (Forbearance Agreement and First Amendment to Credit Agreement) at JX0074-0002 (defining "Forbearance Period" as "the period beginning on the Forbearance Effective Date and ending on the earlier to occur of:   (i) the termination of the Forbearance Period as a result of any Forbearance Default; and (ii) April 28, 2016, unless otherwise mutually agreed in writing by the Borrower and the Required Lenders (with written notice to the Administrative Agent and the Collateral Agent).")

[145] *See id.* at JX0074-0003, § 2; Trial Tr. 407:5-14 (Rynd).

[146] JX 74 (Forbearance Agreement and First Amendment to Credit Agreement) at JX0074-0005-0004, § 4(b).

[147] *See* JX 470 (Amendment No. 1 to Forbearance Agreement and First Amendment to Credit Agreement, entered into as of April 28, 2016), at JX0470-0001-0002 (defining "Forbearance Period" as, with certain exceptions, extending through 11:59 p.m. (New York City time) on May 31, 2016).

25

94.    On May 2, 2016, management presented an update on first quarter performance for 2016, including EBITDA figures for the quarter of approximately negative $6.7 million.[148] For the year as a whole, the May 2, 2016 management presentation projected 2016 EBITDA of approximately negative $15.3 million.[149]

95.    The May 2, 2016 management presentation also contained a 2017 EBITDA forecast of approximately $117 million, and forecasted Leverage Covenant breach in Q4 2017.[150]

**XVII.    MAY 5, 2016 10-Q**

96.    Also during the May 2, 2016 Board meeting, the Board unanimously approved Hercules's Form 10-Q for the period ending March 31, 2016.[151]   Management also approved the Form 10-Q.[152]

97.    In the Form 10-Q filed May 5, 2016, Hercules stated that it was "currently projecting that it will violate the Maximum Senior Secured First Lien Leverage Ratio under its Credit Agreement on March 31, 2017."[153]

98.    Hercules further disclosed that, if the Leverage Covenant were violated by March 31, 2017, and Hercules was unable to obtain a waiver, "the lenders could accelerate [the First Lien Credit Agreement] debt obligations" and "the Company would be required to pay an

---

[148] JX 110 (May 2, 2016 Board Presentation) at JX0110-0012; Trial Tr. 214:19-215:13 (Carson); Trial Tr. 490:12-20 (Rynd); JX 145 (May 2, 2016 Joint Board and Special Committee Minutes) at JX0145-0002.
[149] JX 110 (May 2, 2016 Board Presentation) at JX0110-0013.
[150] *Id.* at JX0110-0016.
[151] *See* JX 145 (May 2, 2016 Joint Board and Special Committee Minutes) at JX0145-0003; Trial Tr. 216:21-22 (Carson).
[152] Trial Tr. 216:17-20 (Carson).
[153] JX 466 (May 5, 2016 Form 10-Q) at JX0466-0010; *see also id.* at JX0466-0007 ("The Company is currently projecting that it will violate the Maximum Senior Secured First Lien Leverage Ratio under its Credit Agreement on March 31, 2017.").

additional premium of all interest that would accrue until November 6, 2018, plus a 3%

premium, discounted at present value."[154]

99.    Hercules noted that because of the Applicable Premium, "it could be challenging

for the Company to obtain a waiver, and further, given the current state of the drilling market, the

Company does not believe refinancing would be a viable option."[155]

## XVIII.    AMENDED RESTATED FORBEARANCE AGREEMENT AND *HIGHLANDER* NOVATION

100.    During the Forbearance Period, the Special Committee continued to pursue the

Marketing Process, continuing discussions with the Second Round and Additional Bidders

through PJT. [156]    The Special Committee and its advisors compared the bids received by the

Second Round and Additional Bidders to the Luminus proposals.[157]

101.    The Special Committee determined that Hercules should transfer its rights to the

*Highlander* to Maersk Highlander UK Limited ("Maersk UK").[158]

102.    The First Lien Credit Agreement required the consent of the Required Lenders (as

defined in the First Lien Credit Agreement) in order for Hercules North Sea to transfer its rights

to purchase the *Highlander* to Maersk UK.[159]

---

[154] *Id.* at JX0466-0010; *see also id.* at JX0466-0007 ("If this occurs and the Company is not able to obtain a waiver from its lenders, the lenders could accelerate these debt obligations.    In addition, the Company would be required to pay an additional premium of all interest that would accrue until November 6, 2018, plus a 3% premium, discounted to present value ('Applicable Premium.').").

[155] *Id.* at JX0466-0010; *see also id.* at JX0466-0007 ("Because of this Applicable Premium, it could be challenging for the Company to obtain a waiver, and further, given the current state of the drilling market, the Company does not believe refinancing would be a viable option.").

[156] *See* JX 93 (April 21, 2016 PJT Situation Update Presentation); Trial Tr. 413:21-415:7 (Rynd); Trial Tr. 670:18-671:15, 671:21-672:3 (Dickerson).

[157] *See* JX 93 (April 21, 2016 PJT Situation Update Presentation) at JX0093-0002; JX 140 (April 21, 2016 Board Minutes).

[158] *See* Trial Tr. 242:14-17 (Carson); Trial Tr. 604:23-605:3 (Dickerson); Trial Tr. 612:12-17 (Dickerson); Trial Tr. 665:6-666:20 (Dickerson).

[159] *See* JX 469 (First Lien Credit Agreement) at JX0469-0113.

103.    On May 26, 2016, the First Lien Lenders and the First Lien Obligors entered into an *Amended and Restated Forbearance Agreement* (the "Amended and Restated Forbearance Agreement").[160]

104.    Pursuant to the Amended and Restated Forbearance Agreement, the Required Lenders consented to the release of their liens on the *Highlander*, but did not consent to the sale of Hercules North Sea's rights to the *Highlander*.[161]

105.    The Amended and Restated Forbearance Agreement further stated that the transfer of such rights constituted an Event of Default under the First Lien Credit Agreement and the Required Lenders accelerated the debt under the First Lien Credit Agreement.[162]

106.    Per the terms of the Amended and Restated Forbearance Agreement, the Escrowed Amount (along with interest) was then released to the First Lien Agent for the benefit of the First Lien Lenders, reducing the amount of outstanding First Lien Debt by $200 million.[163]

107.    On May 26, 2016, Hercules North Sea, HERO, and Hercules British Offshore entered into a series of agreements related to the *Hercules Highlander*.   These agreements included a tripartite agreement (the "Tripartite Agreement") with Jurong and Maersk UK pursuant to which, among other things, (i) the right to acquire the *Highlander* was transferred to Maersk UK; (ii) Maersk UK assumed the obligation to pay the final installment payment of $195,988,025 to Jurong; (iii) Hercules British Offshore and HERO assigned to Jurong all of their respective rights, title and interest in and to certain equipment, consumables, and spare parts

---

[160] *See* JX 253 (Amended and Restated Forbearance Agreement).
[161] *See id.* at JX0253-0008.
[162] *See id.* at JX0253-0010.
[163] *See* JX 253 (Amended and Restated Forbearance Agreement) at JX0253-0010; Genereux Dep. Tr. 136:17-137:9.

acquired in anticipation of operating the *Hercules Highlander*, including Jurong's assumption of

$5,098,042 in outstanding accounts payable for such equipment, and (iii) Hercules British

Offshore novated its rights under the Maersk Drilling Agreement to Maersk UK.[164]

## XIX.    RESTRUCTURING SUPPORT AGREEMENT

108.    On May 26, 2016, the First Lien Obligors and First Lien Lenders holding more

than 99% of the First Lien Claims (collectively, the "Consenting First Lien Lenders") entered

into a restructuring support agreement (the "Restructuring Support Agreement"), unanimously

approved by the Board during a meeting the day before.[165]

109.    During the meeting on May 26, 2016, PJT and management presented the Board

with an estimated range of sales proceeds for Hercules's assets of $94 million to $273 million.[166]

Combined with working capital assets and Hercules's cash balance as of April 30, 2016, total

proceeds available under the Original Plan (defined below) were estimated to be between $625

million and $805 million.[167]

110.    The Restructuring Support Agreement set forth the commitments and obligations

of the Debtors and the Consenting First Lien Lenders, respectively, in connection with the wind-

down of Hercules's business and operations, to be implemented under a chapter 11 plan.[168]

---

[164] *See* JX 532 (Declaration of Troy L. Carson in Support of First Day Motions) ¶ 63.

[165] *See* JX 180 (Restructuring Support Agreement); Trial Tr. 312:6-9 (Rynd); JX 149 (May 25, 2016 Joint Board and Special Committee Minutes) at JX0149-0003 ("Upon a motion duly made and seconded to approve both sets of resolutions [re: *Highlander* transaction and RSA/Term Sheet for Chapter 11 Filing], subject to there being no material changes in any of the relevant documents or the arrangements contemplated by them, the Board unanimously approved the motion, with no Board members voting 'nay.'").

[166] *See* JX 8 at JX0008-0009.

[167] JX 149 (May 25, 2016 Joint Board and Special Committee Meeting Minutes, PJT Presentation Attachment) at JX0149-0014; Trial Tr. 313:8-23 (Rynd).

[168] *See* JX 180 (Restructuring Support Agreement); *see also* JX 457 (Debtors' Joint Prepackaged Chapter 11 Plan (D.I. 18).

111.    The Restructuring Support Agreement and original Joint Prepackaged Chapter 11

Plan filed on the Petition Date (the "Original Plan") (as well as the Plan)[169] contemplated that,

upon Consummation, all of the Debtors' assets (including their equity interests in the Non-

Debtor Subsidiaries) will be transferred to the Wind Down Entity, which would be responsible

for, among other things, the monetization of the Debtors' assets and winding down the Debtors'

and the Non-Debtor Subsidiaries' businesses and operations.    The Wind Down Entity would be

funded,[170] so as to maintain currently warm-stacked rigs in the warm-stacked state,[171] and there

is no forced time period to sell off the remaining assets through the Wind Down Entity.[172]

112.    The Original Plan allowed the First Lien Claims in the amount of $579 million

and provided the following treatment for holders of Equity Interests, if the class voted in favor of

the Original Plan:

- $12.5 million in cash on the Effective Date of the Plan;

- An additional $15 million in cash after $420 million, in the aggregate, has been received by the First Lien Lenders through a combination of (i) the Escrow Repayment, (ii) principal payments under the Cash Collateral Order, (iii) any pre-Effective Date principal payments from asset sale proceeds and (iv) post-Effective Date payments on the Lender Wind Down Claim;

- 15% of the net proceeds from the monetization of Hercules's assets through the Class B Wind Down Entity Interests after $510 million and until $530 million, in the aggregate, has been received by the First Lien Lenders through a combination of (i) the Escrow Repayment, (ii) principal payments under the Cash Collateral Order, (iii) any pre-Effective Date principal repayments from asset sale proceeds; (iv) any Effective Date payments; (v) post-Effective Date payments on the Lender Wind Down Claim; and (vi) distributions on the Class A Wind Down Entity Interests

---

[169] JX 457 (Debtors' Joint Prepackaged Chapter 11 Plan, D.I. 18).
[170] *See* Trial Tr. 288:11-289:13 (Rynd).
[171] *See* Trial Tr. 289:18-22 (Rynd).
[172] *See* Trial Tr. 289:14-17 (Rynd).

- An additional $3 million in cash after $530 million, in the aggregate, has been received by the First Lien Lenders through a combination of (i) the Escrow Repayment, (ii) principal payments under the Cash Collateral Order, (iii) any pre-Effective Date principal repayments from asset sale proceeds; (iv) any Effective Date payments; (v) post-Effective Date payments on the Lender Wind Down Claim; and (vi) distributions on the Class A Wind Down Entity Interests; and

  - 15% of the net proceeds from the monetization of Hercules's assets through the Class B Wind Down Entity Interests after $533 million, in the aggregate, has been received by the First Lien Lenders through a combination of (i) the Escrow Repayment, (ii) principal payments under the Cash Collateral Order, (iii) any pre-Effective Date principal repayments from asset sale proceeds; (iv) post-Effective Date payments on the Lender Wind Down Claim; and (v) distributions on the Class A Wind Down Entity Interests.[173]

## XX.    SOLICITATION PROCESS

113.    On May 31, 2016, the Debtors caused Prime Clerk LLC to distribute solicitation packages containing the Disclosure Statement, the Plan, and ballots to holders of Claims and Equity Interests entitled to vote to accept or reject the Original Plan as of May 23, 2016.[174]   As classes holding impaired claims, Class 3 First Lien Claims and Class 7 HERO Common Stock were solicited to vote on the Original Plan.[175]

114.    The First Lien Claims voted unanimously to accept the Original Plan.[176]

115.    Class 7 HERO Common Stock voted to reject the Original Plan, with holders of 54.58% of the outstanding shares voting to reject and holders of 45.42% of the outstanding shares voting to accept.[177]

---

[173] JX 532 (Declaration of Troy L. Carson in Support of First Day Motions) ¶ 72; *see also* Debtors' Joint Prepackaged Chapter 11 Plan, Art. III.D, D.I. 18.

[174] Preliminary Declaration of Christina Pullo of Prime Clerk LLC Regarding Solicitation of Votes and Tabulation of Ballots Cast on Debtors' Joint Prepackaged Chapter 11 Plan, D.I. 20.

[175] Debtors' Joint Prepackaged Chapter 11 Plan, Art. III.C, D.I. 18.

[176] Preliminary Declaration of Christina Pullo of Prime Clerk LLC Regarding Solicitation of Votes and Tabulation of Ballots Cast on Debtors' Joint Prepackaged Chapter 11 Plan, D.I. 20, Exhibit A.

[177] Supplemental Declaration of Christina Pullo of Prime Clerk LLC Regarding Solicitation of Votes and Tabulation of Ballots cast on Debtors' Joint Prepackaged Chapter 11 Plan, D.I. 225, Exhibit A.

116.    Specifically, the final voting results on the Original Plan are set forth in the chart below[178]:

| Class | Class Description | Number Accepting | Number Rejecting | Amount Accepting | Amount Rejecting | Class Voting Result |
|-------|-------------------|------------------|------------------|------------------|------------------|---------------------|
|       |                   | % | % | % | % | |
| 3 | First Lien Claims | 79 | 0 | $249,407,881.03 | $0.00 | ACCEPT |
|   |                   | 100% | 0% | 100% | 0% | |
| 7 | HERO Common Stock | 988 | 411 | 6,706,496 | 8,060,316 | REJECT |
|   |                   | 70.62% | 29.38% | 45.42% | 54.58% | |

## XXI.    DISCOVERY AND CONFIRMATION BRIEFING

117.    Prior to the Confirmation Hearing, the Parties engaged in document discovery. Additionally, the Parties conducted 13 depositions, including of Special Committee members Lawrence Dickerson, Eugene Davis, and Jon Cole; Board member and CEO John Rynd; CFO Troy Carson; Treasurer and VP of Investor Relations Son Vann; PJT Principal Michael Genereux; the Equity Committee's 30(b)(6) witness Bao Truong of Centerbridge Partners, L.P.; Rob Sales of Archer Capital; Equity Committee proposed expert Joshua Scherer of Ducera; and two representatives from Luminus, Adam Weitzman and Ethan Keller.   Fact discovery concluded on July 26, 2016,[179] though the Parties consented to a limited number of depositions after the close of fact discovery due to witness availability conflicts.

118.    On July 27, 2016, the Equity Committee filed an objection to the Original Plan.[180]

---

[178] *Id.*
[179] *See* Discovery and Scheduling Order for Plan Confirmation, D.I. 208, ¶ 1.
[180] *See* Objection of Official Committee of Equity Security Holders to (I) Approval of Disclosure Statement for Debtors' Joint Prepackaged Chapter 11 Plan and (II) Confirmation of Debtors' Joint

119.    On August 5, 2016, the Debtors and the Ad Hoc Group filed briefs in support of confirmation of the Original Plan.[181]

120.    A confirmation hearing was initially scheduled to begin August 10, 2016, but following the Debtors' request for mediation at the telephonic status conference held on August 4, 2016, the hearing was postponed to September 22, 2016.[182]

## XXII.    MEDIATION AND AMENDED PLAN

121.    On September 6, 2016, the Debtors, the Equity Committee, and the Ad Hoc Group participated in mediation before The Honorable Christopher Sontchi (the "Mediation").[183]

122.    During the Mediation, the Equity Committee, the Ad Hoc Group and the Debtors were not successful in reaching a global compromise with respect to the Original Plan and related objections.[184]   The Mediation did, however, result in a revised agreement between the Debtors and the Consenting First Lien Lenders that continued to permit 100% recovery to the general unsecured claimants in the cases.   With respect to holders of HERO Common Stock, the Consenting First Lien Lenders agreed to (i) subordinate their Claims in order to provide a $15 million guaranteed payment to HERO Common Stock holders and (ii) reduce the amount of the Rejection Lender Wind Down Claim by $32.5 million. The terms of the additional settlement with the Consenting First Lien Lenders were embodied in the Plan.

---

Prepackaged Chapter 11 Plan, D.I. 251.

[181] *See* Debtors' Memorandum of Law in Support of an Order Approving the Debtors' Disclosure Statement for, and Confirming, the Debtors' Joint Prepackaged Chapter 11 Plan, D.I. 308; Ad Hoc Group of First Lien Lenders' (A) Reply to the Objection of Official Committee of Equity Security Holders to (I) Approval of Disclosure Statement for Debtors' Joint Prepackaged Chapter 11 Plan and (II) Confirmation of Debtors' Joint Prepackaged Chapter 11 Plan and (B) Preliminary Objections to the (I) Standing Motion and (II) Objection to First Lien Claims, D.I. 306.

[182] *See* Notice of Rescheduled Confirmation Hearing Date and Time, D.I. 299.

[183] Trial Tr. 221:9-21 (Carson); Trial Tr. 323:2-8 (Rynd).

[184] Trial Tr. 773:9-17 (Dickerson).

## XXIII.    CONFIRMATION HEARING

123.    Beginning on September 22, 2016, and concluding September 27, 2016, the Court

held a hearing on confirmation of the Plan (the "Confirmation Hearing").

124.    The Court heard testimony from four witnesses for the Debtors:  (1) CFO Troy

Carson; (2) CEO John Rynd; (3) Chairman of the Board and Special Committee member

Lawrence Dickerson; (4) and Steven Simms of FTI Consulting, Inc.

125.    Testimony was submitted via deposition designations and counter-designations

for Special Committee members Eugene Davis and Jon Cole, PJT representative Michael

Genereux, Hercules's Treasurer Son Vann; Adam Weitzman and Ethan Keller of Luminus; and

Bao Truong of Centerbridge.

## DISCUSSION

### 1.    The Plan Releases and Exculpations Are Permissible

The Equity Committee asserts that the Plan provides the lenders, directors, officers, and

various third parties with releases from claims held by the Debtors, which are impermissible by

law and warrant denial of Plan confirmation. The Plan provides for releases by the Debtors (the

"Debtor Releases") of certain claims, rights and causes of actions that the Debtors may have

against each of the Released Parties. [185]

---

[185] "Released Parties" means each of: (a) the Debtors, (b) the Wind Down Entity; (c) the Non-Debtor Subsidiaries; (d) the Ad Hoc Group; (e) the Ad Hoc Group Members; (f) the Consenting First Lien Lenders; (g) each Consenting First Lien Lender; (h) the First Lien Agent; (i) the First Lien Lenders; (j) each holder of HERO Common Stock that is also a Consenting First Lien Lender; (k) with respect to each of the foregoing Entities in clauses (a) through (j), such Entity's predecessors, successors and assigns, current and former affiliates, subsidiaries, funds, portfolio companies, and management companies; and (l) with respect to each of the foregoing Persons in clauses (a) through (k), each of their respective current and former officers, directors, professionals, advisors, accountants, attorneys, investment bankers, consultants, employees, agents and other representatives (each solely in their capacity as such). *See* Plan, Art. I.A. ¶ 106.

34

Bankruptcy Code section 1123(b)(3)(A) permits a debtor to include settlement of a debtor's claims as discretionary provisions in a plan of reorganization. Courts have identified five factors that are relevant in determining whether to approve a debtor's releases:

i.     an identity of interest between the debtor and non-debtor such that a suit against the non-debtor will deplete the estate's resources;

ii.    a substantial contribution to the plan by the non-debtor;

iii.   the necessity of the release to the reorganization;

iv.    the overwhelming acceptance of the plan and release by creditors and interest holders;

v.     the payment of all or substantially all of the claims of the creditors and interest holders under the plan.[187]

The foregoing factors "are neither exclusive nor conjunctive requirements, but simply provide guidance in the Court's determination of fairness."[188] However, these factors "form the foundation for such an analysis, with due consideration of other factors that may be relevant to [the] case."[189]

Under Article V.D. of the Plan, entitled "Releases by the Debtors," the Debtors purport to grant releases to, among other entities, the Ad Hoc Group (including its members), the First Lien Lenders and the First Lien Agent (collectively, the "Released Lender Parties"), and the Debtors' Directors and Officers from all claims related in any way to the Debtors, their businesses and the Chapter 11 Cases, in connection with any act taking place on or before the Effective Date of the Plan. Article V.D. further grants these releases to the Released Parties' "predecessors, successors

---

[187] *In re Wash. Mut., Inc.,* 442 B.R. 314, 346 (Bankr. D. Del. 2011); *In re Zenith Elecs. Corp.,* 241 B.R. 92, 110 (Bankr. D. Del. 1999); *In re Exide Techs.,* 303 B.R. 48, 71-72 (Bankr. D. Del. 2003).
[188] *Wash. Mut.,* 442 B.R. at 346.
[189] *Id.* at 347.

and assigns, current and former affiliates, subsidiaries, funds, portfolio companies, and management companies," and "each of their respective current and former officers, directors, professionals, advisors, accountants, attorneys, investment bankers, consultants, employees, agents and other representatives . . . ."[190]

The Special Committee and the Board unanimously approved the Mediation Settlement and the Plan, concluding they are in the best interest of all stakeholders and provide more than sufficient consideration to support the releases.[191] In support thereof, the Debtors' Post Trial Memorandum summarized their reasoning: The Original Plan required payment in full of all unsecured claims and priority payments to shareholders, including a guaranteed up-front payment.[192] At the low-end estimate for distributable value under the Original Plan, the First Lien Lenders stood to receive only $388 million out of their $579 million Allowed Claims while guaranteeing 100% unsecured creditor recoveries and $12.5 million to equity. The Mediation resulted in additional concessions from the First Lien Lenders, including a $15 million guaranteed payment to shareholders and a $32.5 million reduction in the Rejection Lender Wind Down Claim.[193]

**Directors and Officer Releases**

The releases granted to each of the Debtors' and Released Lender Parties' current and

---

[190] Plan at ¶¶ I.A.106, V.D. (D.I. 436).
[191] Trial Tr. 611:10-612:5 (Dickerson); Trial Tr. 325:6-11, 330:11-331:1 (Rynd); *see also* JX 529 (PJT).
[192] D.I. 434 at ¶ 30; JX 471 (Restructuring and Support Agreement Dated May 26, 2016), at JX 0471-0048; First Day Declaration ¶ 72; Trial Tr. 587:5-18 (Dickerson).
[193] D.I. 434 at ¶ 34. *See supra* Statement of Stipulated Facts ¶ 122.

former "officers, directors, professionals, advisors, accountants, attorneys, investment bankers, consultants, employees, agents and other representatives"[194] are appropriate.

After voluminous Plan discovery, the Equity Committee states it "may have" colorable claims against the Debtors' directors and officers for the purported "engineered liquidation and refusal to exercise the Restructuring Support Agreement's 'fiduciary out' to protect the equity security holders."[195] However, the Equity Committee offers little support for this contention. Since these hypothetical claims would be released under the Plan, the Court will evaluate the viability of such claims.

The Special Committee's decisions must be analyzed under the business judgment rule. The rule presumes that directors acted "independently with due care, in good faith, and in the honest belief that their actions were in the stockholders' best interests."[196] The Court need only determine that the Debtors exercised sound business judgment in deciding to accept the settlement integral to the proposed plan.[197] The Special Committee's judgment must be upheld "unless it cannot be attributed to any rational purpose."[198] The Delaware Chancery Court has upheld board decisions under the business judgment rule when the board made its decision on an "informed basis" such that it was counseled by its attorneys and financial advisors and relied, in part, on that advice in making its own "independent business judgment to the advice they

---

[194] Plan at ¶¶ I.A.106, V.D.

[195] Equity Comm. Obj. ¶ 67.

[196] *Williams v. Geier*, 671 A.2d 1368, 1376 (Del. 1996).

[197] *See U.S. Bank Nat'l Assoc. v. Wilmington Tr. Co.* (*In re Spansion, Inc.*), 426 B.R. 114, 140-42 (Bankr. D. Del. 2010) (providing deference to the debtors' exercise of sound business judgment in pursuing plan contemplating a particular settlement); *see also In re Coram Healthcare Corp.*, 315 B.R. 321, 329 (Bankr. D. Del. 2004) ("[T]he court should defer to a [debtor in possession's] judgment so long as there is a legitimate justification for his action." (*citing Myers v. Martin* (*In re Martin*), 91 F.3d 389, 395 (3d Cir. 1996)).

[198] *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 74 (Del. 2006).

37

received."[199] Similarly, the Debtors' directors and officers, regardless of their independence, are exculpated from liability to Hercules and/or its shareholders "provided . . . that such person acted in good faith and in a manner . . . reasonably believed to be in, or not opposed to, the best interests of the Corporation. . . ."[200]

The record is clear that the Debtors' business was on a sharp downward spiral. Hercules was burning cash at a rate of $450,000 per day. Oil prices were low and the supply of unused rigs were high. Because of the challenging market conditions, the Debtors struggled unsuccessfully to find work even for the *Triumph* and *Resilience*, its two most marketable rigs. There was a substantial risk that the Leverage Covenant[201] would be breached or Hercules would otherwise default on the Credit Agreement in the first quarter of 2017, allowing the First Lien Lenders to accelerate their debt. Of course, this was not Hercules' expectation in June and July of 2015 when the 2015 Plan was negotiated and agreed to; however, it became Hercules' reality shortly after it emerged from Chapter 11 reorganization in 2015.

Faced with these financial challenges, HERO formed the Special Committee. The Special Committee then hired Akin Gump, as legal counsel, and PJT, as financial advisor, for their

---

[199] *Citron v. E.I. du Pont de Nemours & Co.*, 584 A.2d 490, 510-12 (Del. Ch. Ct. 1990) (upholding board's decision approving a merger under business judgment rule where board relied on advice of legal counsel and its financial advisors); *see also Minn. Invco of RSA # 7, Inc. v. Midwest Wireless Holdings, LLC*, 903 A.2d 786, 797 (Del. Ch. Ct. 2006) (upholding board of directors' decision where evidence at trial showed board acted "upon the advice of counsel and Bear Stearns").

[200] Ex. 68, Second Amended and Restated Bylaws of Hercules Offshore, Inc., Art. V, § 2; Ex. 69, Second Amended and Restated Certificate of Incorporation, as amended and restated effective as of Nov. 6, 2015, of Hercules Offshore, Inc., Div. C., § 7.

[201] Under the Leverage Covenant, a leverage ratio is calculated by dividing the outstanding indebtedness under the First Lien Credit Agreement by Hercules's consolidated cash flow (essentially, EBITDA). Trial Tr. 153:1-153:9 (Carson); JX 469 (First Lien Credit Agreement), at JX0469-0016, JX0469-0115 (§ 6.10). As of March 31, 2017, the leverage ratio could not exceed 6.00 to 1.00. SF ¶ 23. The leverage ratio decreased (becoming more difficult to satisfy) with each passing quarter in 2017. A Leverage Covenant breach would permit acceleration of the First Lien Debt, triggering payment of the Applicable Premium to the First Lien Lenders.

expertise. The record clearly indicates that the Special Committee/ Board and management met frequently—often multiple times a week or even multiple times a day between the Special Committee's formation and the Petition Date—to consider the Debtors' options and evaluate an outcome that would maximize value to all stakeholders.[202] This record reflects an intensive and thoughtful effort by management and the Special Committee to respond to the market challenges. This record also demonstrates a lengthy, comprehensive Marketing Process, which involved many sophisticated, well-represented constituents.[203]

With the advice and assistance of its hired professionals, the Special Committee and management carefully evaluated competing proposals by Luminus. Luminus' proposals were compared to the best bids received during the Marketing Process to determine which option presented the best opportunity to maximize recovery for all stakeholders. At issue here is whether the Special Committee and management simply and improvidently caved into Luminus' pressure on the strategic review.

Evidence indicates that between January and March 2016, the Special Committee engaged in negotiations with Luminus while allowing the Marketing Process to proceed.[204]  The Debtors provided extensive evidence indicating that it became apparent that the Marketing Process would not yield a meaningful bid for Hercules that exceeded the value of the First Lien Claims or the Debtors' cash on hand. This also meant that the bids would not provide recoveries

---

[202] The Board and/or Special Committee met a total of 38 times between November 23, 2015 and the execution of the Restructuring Support Agreement on May 26, 2016.

[203] During the Marketing Process, PJT contacted fifty-one potential strategic partners and sponsors regarding potential transactions. PJT evaluated each bid the company received.

[204] The Equity Committee's Objection states that "Luminus was frustrated by the Special Committee's refusal to respond favorably to its multiple proposals to liquidate or file for bankruptcy." Equity Comm. Obj. ¶ 24, D.I. 251.

to the Debtors' unsecured creditors and equity holders. Acknowledging this, the Special

Committee determined that negotiations with the First Lien Lenders were worth pursuing. The

First Lien Lenders suggested a plan that the Debtors argue was in the best interests of Hercules'

stakeholders.

The Equity Committee also asserts that the Board failed to comply with its fiduciary

duties and failed to exercise sound business judgment in reacting to the Alleged Defaults. In

response, the Debtors insist that the Board was "laser-focused" on the potential Leverage

Covenant default[205] and engaged in "robust discussion" with management regarding the potential

default early on.[206]

Upon review of the Debtors' evidence surrounding the Board's implementation of a plan

of action, I conclude that the Board acted properly, consistent with their fiduciary duties.

More specifically, in presentations relating to Hercules's 2016 budget, management

included an "EBITDA Waterfall" depicting whether Hercules would satisfy the Leverage

Covenant under then-current projections and assumptions.[207] To keep themselves up-to-date,

Board members and management met regularly on the topic.[208] During these meetings, the

Board also discussed the details and implications of the Alleged Defaults.[209]

---

[205] Trial Tr. 201:12-15 (Carson); Trial Tr. 349:17-18 (Rynd).

[206] Trial Tr. 165:19-22, 170:2-10 (Carson); JX 106 (Budget Review dated December 11, 2015), at JX0106-0025.

[207] JX 106 (2016 Budget Review dated December 11, 2015), at JX0106-0025; JX 14 (Financial Results Update and 2016 Budget dated February 24, 2016), at JX0014-0020; JX 108, at JX0108-0020.

[208] Trial Tr. 627:9-22 (Dickerson); Trial Tr. 367:9-368:2 (Rynd).

[209] The Board held four meetings on April 14, 15, 16, and 17 after the First Lien Agent did not extend the deadline for satisfying the Nigeria Registration Covenant. Trial Tr. 382:13-17, 383:11-384:6 (Rynd). Legal counsel was present to advise on the Nigeria Registration Covenant and Hercules's options and assisted Hercules in expressly disputing the alleged default. SF ¶¶ 81, 88; Trial Tr. 383:20-384:6 (Rynd); JX 342; *see also* Davis Dep. Tr. 209:21-210:3.

That brings us to the *Hercules Highlander*. The Debtors argue that the Board and Special Committee considered various methods of obtaining liquidity for acquiring the *Hercules Highlander*.[210] However, the Debtors maintain that the methods were ultimately determined to be infeasible. Although, even if these options had been feasible, the Special Committee and Board had determined, and all evidence suggests, by this time that acquiring the *Hercules Highlander* was unlikely to lead to a value maximizing transaction. The bids received for Hercules (which included the *Hercules Highlander* and the Maersk Drilling Agreement) were too low to ensure that unsecured creditors would be paid in full, much less provide a return to equity. Even if Hercules purchased the *Hercules Highlander*, the benefits still would not have prevented the Debtors from defaulting under the Leverage Covenant in 2017. The bottom line is that a future default of the Leverage Covenant was inevitable.

Testimony at the Confirmation Hearing reflected that the Board was appointed because of the members' experience in the offshore drilling industry and oversight of distressed companies. The unfortunate market conditions and series of events that took place were largely out of the Board's control. I conclude that the Special Committee and Board complied with their fiduciary duties, and ultimately chose the option that they believed would conserve the value of the Estates and maximize recovery for all stakeholders, including equity holders.

---

[210] The Board determined that litigation with respect to the defaults was too risky. If the Debtors had litigated the Alleged Defaults and lost, then the First Lien Lenders could have accelerated their debt and forced an immediate bankruptcy in which unsecured creditors and equity likely would have recovered nothing. Even if the Debtors ultimately could have succeeded in such litigation, it would have likely taken a significant period of time to achieve such an outcome. Other considerations included: attempting to obtain a mandatory injunction compelling the release of escrowed funds; using the Debtors' existing cash on hand (rejected due to negative liquidity impact); obtaining outside financing (rejected because it required the consent of the First Lien Lenders, which plainly would not be forthcoming).

As the Debtors point out, the Board members and management are further insulated from claims by the provisions of HERO's certificate of incorporation, which exculpates its officers and directors from claims for breaches of fiduciary duty except in cases of bad faith, disloyalty, personal benefit, and unlawful dividends and stock purchases. There are no credible allegations to support claims under the certificate of incorporation exculpation exception.

## Lender Releases[211]

The Equity Committee avers that the Debtors have numerous colorable claims and causes of action against the Released Lender Parties, which include (i) equitable subordination, (ii) equitable disallowance, and (iii) breach of the covenant of good faith and fair dealing. Under the Plan, such derivative claims would be released. Therefore, as a threshold matter, I will examine the viability of such claims.

Equitable subordination of the lenders' claims to equity fails as a matter of law. The Third Circuit has held that Bankruptcy Code section 510(c) does not permit creditors' claims to be equitably subordinated to equity interests.[212] Therefore, this claim is without merit.

The "equitable disallowance" claim is not typically recognized by bankruptcy courts. The exceptions to the allowance of a claim are specifically enumerated in Bankruptcy Code section

---

[211] As set forth in the Plan, the Debtors are granting releases of the Released Lender Parties "in exchange for their agreement to compromise their First Lien Claims as set forth herein, and their enabling holders of Allowed General Unsecured Claims to be paid in full under the Plan and the holders of HERO Common Stock to receive their Pro Rata share of the Shareholder Effective Date Cash Distribution and 100% of the Class B Wind Down Entity Interests, if Class 7 HERO Common Stock votes to accept the Plan, notwithstanding the fact that the value of the Debtors' Estates would not otherwise permit such distributions under applicable provisions of the Bankruptcy Code." Plan, at Art. V.A.

[212] *See In re Winstar Commc'ns, Inc.*, 554 F.3d 382, 414 (3d Cir. 2009) ("[C]reditors' claims may not be equitably subordinated to equity interests.").

502(b), and a creditors' conduct—whether or not it was in good faith—is not within this list of

exceptions.[213] As a result, bankruptcy courts routinely reject equitable disallowance as a remedy

under the Code.[214] In any event, the record here does not support such a claim.

Finally, the Equity Committee claims the Released Lender Parties breached the implied

covenant of good faith and fair dealing by (i) asserting "baseless" events of default, (ii) declining

to extend the deadline for the Nigeria Registration Covenant, and (iii) forcing entry into the

Original Forbearance Agreement. These lie at the heart of the Equity Committee's discontent.

According to New York state law,[215] the implied covenant of good faith and fair dealing

is breached when a party acts in a manner that would deprive the other party of the right to

receive the benefits of their agreement.[216] The implied covenant includes any promises which a

reasonable promisee would be justified in understanding were included.[217] However, no

obligation may be implied that would be inconsistent with other terms of the contractual

relationship.[218] Here, a finding that the Released Lender Parties breached the covenant of good

---

[213] 11 U.S.C. § 502(b).

[214] *See In re LightSquared Inc.*, 504 B.R. 321, 339 (Bankr. S.D.N.Y. 2013) ("[I]n accordance with the general rules of statutory interpretation, a plain reading of section 502 of the Bankruptcy Code does not permit equitable disallowance, as it is not among the enumerated exceptions to allowance of a claim."); *Sher v. JP Morgan Chase Funding Inc. (In re TMST, Inc.)*, 518 B.R. 329, 357 (Bankr. D. Md. 2014), *vacated in part on other grounds*, 2014 WL 6390312, No. 09-17787-DK (Bankr. D. Md. Nov. 13, 2014) ("[I]n Section 502(b), the Code provides specific grounds for disallowance of claims that do not include equitable disallowance.").

[215] The First Lien Credit Agreement is governed by the law of the State of New York. JX 469 § 10.09.

[216] *1357 Tarrytown Rd. Auto, LLC v. Granite Properties, LLC*, 142 A.D.3d 976, 37 N.Y.S.3d 341, 343 (N.Y. App. Div. 2016); *see also Frankini v. Landmark Constr. of Yonkers, Inc.*, 91 A.D.3d 593, 595, 937 N.Y.S.2d 80; *P.T. & L. Contr. Corp. v. Trataros Constr., Inc.*, 29 A.D.3d 763, 764, 816 N.Y.S.2d 508.

[217] *See Dalton v. Educational Testing Serv.*, 87 N.Y.2d 384, 389, 639 N.Y.S.2d 977, 663 N.E.2d 289).

[218] *See Dalton, 87 N.Y.2d at* 389; *Murphy v. American Home Prods. Corp.*, 58 N.Y.2d 293, 304

faith and fair dealing would contradict explicit and unambiguous terms of the First Lien Credit Agreement and create additional obligations not contained therein.

The First Lien Credit Agreement required the company to register a "vessel mortgage" covering certain collateral at the Nigerian Maritime Administration and Safety Agency (the "Nigerian Registration Covenant"). By early April 2016, the registration deadline had been extended without objection several times due to various delays. When the Debtors requested a further extension, the First Lien Agent denied the request at the direction of the First Lien Lenders. When the Debtors failed to meet the deadline, the First Lien Lenders had the contractual right to allege an event of default under the First Lien Credit Agreement.

With respect to the alleged Gibraltar covenant breach, the Debtors admit that they were required under the Credit Agreement to use best efforts to dissolve the Gibraltar entity within 120 days of closing, and that "best efforts" meant they "are going to try [their] hardest to dissolve this entity."[219] Notwithstanding its contractual obligation, Hercules decided against dissolving the Gibraltar entity because it thought dissolution might compromise its ability to pursue the collection of an outstanding receivable and failed to so inform their lenders.[220] Thus, while the Company may have used best efforts to collect a disputed receivable, it did not take action necessary to dissolve the Gibraltar entity.[221]

---

(1983).

[219] Tr. 235:2-10 (Carson), 515:14- 516:11 (Rynd); *see also* JX 469 (Credit Agr. § 5.18).

[220] Tr. 235:8-236:16 (Carson).

[221] *See Bloor v. Falstaff Brewing Corp.*, 601 F.2d 609, 614-15 (2d Cir. 1979) (finding under New York law that a party breaches its "best efforts" covenant when it places its own economic interest above its contractual obligations).

The Debtors acknowledge they defaulted on both the Nigerian and Gibraltar covenants.[222] The Equity Committee characterizes these defaults as immaterial but, as the Debtors point out, there is no "materiality" requirement in the Credit Agreement. Rather, the Credit Agreement states that *any* failure to satisfy the Post-Closing Collateral Requirements is grounds for acceleration of the loan and payment of the makewhole.[223] The alleged Nigerian and Gibraltar covenant defaults were not fabricated.

The Equity Committee further argues that it was bad faith for the First Lien Agent not to grant the Debtors another extension of time to comply with the Nigerian Registration Covenant. Upon review of the evidence, there is nothing to suggest the existence of such a mandate on the First Lien Agent.[224] As such, withholding consent was arguably unfortunate, but not inappropriate.

Finally, the Equity Committee insists that the Lenders' default contentions were a pretext to force the Debtors to enter into the Forbearance Agreement, thereby preventing the company from accessing the Escrowed Funds to purchase the *Hercules Highlander*. The problem with this argument is that there is no evidence in the record to indicate that the Lenders called (or even threatened to call) the default prior to entering into the Forbearance Agreement. Admittedly, their leverage at that point was apparent, and the Debtors undoubtedly felt the pressure.

---

[222] Tr. 235:2-10 (Carson); 396:7-13, 512:8-513:12 (Rynd); 705:23-706:8 (Dickerson); Genereux Dep. 214:11-14.

[223] JX 469 (Credit Agr. §§ 5.15, 8.01).

[224] *See State St. Bank & Trust Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 170 (2d Cir. 2004) (dismissing claim for breach of implied covenant of good faith and fair dealing, reasoning that "[w]here a contract allows a bank to withhold consent for a particular conduct and sets no express restrictions on the bank's right to do so, the bank is not prohibited from unreasonably or arbitrarily withholding such consent").

However, I cannot infer bad faith from the Lenders' inaction based on the facts before me.

The Ad Hoc Group argues that lenders are allowed to assert their views about a borrower's strategic options, including that liquidation would maximize value for them and for all stakeholders.[225] It is true that lenders, like any other corporate entity, have a right to protect their own interests and those of their stakeholders.[226] In response, the Equity Committee argues that the First Lien Lenders overstepped their boundaries into forbidden territory. While the Court acknowledges that the First Lien Lenders were strategic in their actions, lenders are free to enforce contract rights and negotiate hard against borrowers at arms-length, particularly those that are in distress, as here.[227] And bargain hard they did.

The Equity Committee's arguments that the Released Lender Parties breached the covenant of good faith and fair dealing are not supported by evidence in the record. There is no doubt that the First Lien Lenders were persistent in pursuing their rights under the First Lien Credit Agreement. Hercules characterized the First Lien Lenders, sardonically, as "aggressive," "vocal," "persistent," and at times "annoying;"[228] however, there is no evidence that they acted unlawfully and no evidence that the Debtors were damaged by any alleged lender misconduct. Messrs. Dickerson, Carson, and Rynd were all credible witnesses, who acknowledged Luminus's insistent behavior, but testified convincingly that such behavior did not unduly influence their

---

[225] See Tr. 653:13-654:6 (Dickerson); Davis Dep. 317:23-318:7.

[226] See F.D.I.C. v. Wheat, 970 F.2d 124 (5th Cir. 1992); Lane v. Chowning, 610 F.2d 1385, 1388-89 (8th Cir. 1979).

[227] See Tr. 593:6-19 (Dickerson).

[228] Trial Tr. 372:7-19, 373:12-374:14, 454:1-13 (Rynd), 528:4-15, 653:9-654:6 (Dickerson) (testifying that Luminus was "very aggressive" but did nothing "improper"), 719:3-20 (Dickerson).

46

responsibilities to the Company or its shareholders.[229] There has also been no evidence presented that the First Lien Lenders interfered with Hercules's business or were somehow impliedly bound to grant another extension of time to satisfy the Nigerian Covenant.[230] Nor was any evidence introduced to establish that the First Lien Lenders or their agents caused or contributed to Hercules's inability to timely satisfy the Nigerian Covenant.[231] Rather, the record shows the First Lien Lenders acted within the boundaries of their contractual rights.

Paramount to this decision, is the evidence that the First Lien Lenders have provided substantial consideration to Hercules in exchange for the releases, most significantly: (i) guaranteeing payment in full of all unsecured claims against the Debtors, currently projected to total approximately $35 million; (ii) allowing all unsecured claims against the Non-Debtor Subsidiaries to be paid in full; (iii) guaranteeing a $15 million up-front payment to shareholders; and (iv) reducing the amount of the First Lien Lenders' claim by $32.5 million. The Restructuring Support Agreement (the "RSA") and Amended Plan provide further value to stakeholders by allowing Hercules to use the First Lien Lenders' cash collateral and continue operating for so long as is necessary to engage in a controlled and unrushed monetization of its assets, ensuring maximum asset recoveries. Given the significant monetary and process-oriented value provided to the Estates by the First Lien Lenders under the RSA and the Plan, the lender

---

[229] The Equity Committee offered no live witnesses during the Confirmation Hearing.
[230] Trial Tr. 211:1-16 (Carson) (Luminus did not "interfere . . . with management's daily operations of the company"), 373:12-374:13 (Rynd) (Luminus never interfered with his "ability to discharge [his] duties as [CEO]").
[231] Trial Tr. 861:2-5, 862:7-863:9 (admitting JX 80 and similar exhibits solely for non-hearsay purposes); Trial Tr. 386:19-387:1 (Rynd) (noting difficulties of doing business in Nigeria); Trial Tr. 555:24-556:7 (Rynd) (noting failure of Equity Committee to seek discovery from Baker Botts as to cause(s) of delays).

47

releases are reasonable and appropriate.

The Debtor Releases meet the appropriate standard: these proposed released parties possess a sufficient identity to the Debtors and have made a substantial contribution, particularly the First Lien Lenders. While I have determined that the Equity Committee has failed to support any claim(s) against the Released Parties, the releases bring needed certainty to the Debtors' exit from chapter 11. The Plan has overwhelming support and has garnered consensus from all stakeholders but equity, who, although arguably "out of the money," will still receive a distribution.

**Third Party Releases**

Article V.E. of the Plan provides for a consensual release (the "Consensual Third-Party Releases") of certain claims, rights and causes of action against the Released Parties by the Releasing Parties.[232] The Equity Committee objected to the Consensual Third-Party Releases on the grounds that, with respect to equity holders, such releases are not consensual and do not

---

232 "Releasing Parties" means each of: (a) the Debtors, (b) the Wind Down Entity; (c) the Non-Debtor Subsidiaries; (d) the Ad Hoc Group; (e) the Ad Hoc Group Members; (f) the Consenting First Lien Lenders; (g) each Consenting First Lien Lender; (h) the First Lien Agent; (i) the First Lien Lenders; (j) each holder of HERO Common Stock that votes to accept the Plan; (k) (X) if Class 7 HERO Common Stock votes to accept the Plan, each holder of HERO Common Stock or (Y) if Class 7 HERO Common Stock votes to reject the Plan, each holder of HERO Common Stock except any holder of HERO Common Stock that (I) votes to reject the Plan and submits a ballot or an Equity Release Opt Out Election Form indicating a decision to not grant the releases contained in Article V.E of the Plan or (II) does not vote to accept or reject the Plan but timely submits a ballot or an Equity Release Opt Out Election Form indicating a decision to not grant the releases contained in Article V.E of the Plan; (l) with respect to each of the foregoing Entities in clauses (a) through (k), such Entity's predecessors, successors and assigns, current and former affiliates, subsidiaries, funds, portfolio companies, and management companies; and (m) with respect to each of the foregoing Persons in clauses (a) through (l), each of their respective current and former officers, directors, professionals, advisors, accountants, attorneys, investment bankers, consultants, employees, agents and other representatives (each solely in their capacity as such). See Plan, Art. I.A.106.

48

satisfy the requirements for approval of a non-consensual third-party release. To resolve this objection, the Court was advised that the Debtors and the Consenting First Lien Lenders have agreed to modify the Plan to exclude all holders of HERO Common Stock from providing the Consensual Third-Party Releases, except with respect to any First Lien Lenders that are parties to the RSA and who also hold HERO Common Stock. With this modification, the objection to the Consensual Third-Party Releases is resolved.

2. **The Plan Does Not Violate Section 1129(a)(3) of the Bankruptcy Code Because it is being Proposed in Good Faith**

Section 1129(a)(3) of the Bankruptcy Code provides that, in order to be confirmed, the plan must have been "proposed in good faith and not by any means forbidden by law."[233] "The good faith standard requires that the plan be 'proposed with honesty, good intentions and a basis for expecting that a reorganization can be effected with results consistent with the objectives and purposes of the Bankruptcy Code.'"[234] "In evaluating the totality of circumstances surrounding a plan a court has 'considerable judicial discretion' in finding good faith, with the most important feature being an inquiry into the 'fundamental fairness' of the plan.'"[235] Furthermore, the determination of good faith under Section 1129(a)(3) is made based on the information available to the court at the confirmation hearing, and is not limited to the information available when the plan was first proposed. "[I]nformation affecting the good faith determination might be added to the record throughout the process leading up to confirmation."[236]

---

[233] 11 U.S.C. § 1129(a)(3).
[234] *In re Tribune*, 464 B.R. 126, 154 (Bankr. D. Del. 2011) (internal citation omitted).
[235] *In re Coram Healthcare Corp.*, 271 B.R. 228, 234 (Bankr. D. Del. 2001).
[236] *In re Am. Capital Equip., LLC*, 688 F.3d 145, 157 (3d Cir. 2012).

49

The Equity Committee makes two arguments in support of its proposition that the Plan was not proposed in good faith. First, the settlement provides no value to the Debtors' estates in return for the releases granted under the Plan to First Lien Claim holders. The Court has already addressed this issue at length and, as stated, finds the releases appropriate. Second, the Equity Committee claims that the Debtors have submitted an inaccurate and deficient Disclosure Statement. Specifically, the Equity Committee argues a lack of details surrounding the calculation of First Lien Claims, the arms-length negotiations prior to entering into the Forbearance Agreement, the value of the *Hercules Highlander*, the exact source of HERO's restriction from accessing the escrowed funds, and request an updated liquidation analysis and waterfall analysis.

At bottom, the Equity Committee is unhappy with their economic treatment under the Plan. The Equity Committee has been adverse to the Debtors from the very beginning of the 2016 Bankruptcy Case. It voted against the Plan, and no amount of additional information would have changed that vote. Upon review, I find that the Disclosure Statement provides those creditors entitled to vote with adequate information.

3.   **The Plan Does Not Violate the "best interests" test of Section 1129(a)(7) of the Bankruptcy Code[237]**

Section 1129(a)(7) of the Bankruptcy Code provides that "[t]he court shall confirm a plan only if . . . [w]ith respect to each impaired class of claims or interests . . . each holder of a claim or interest of such class – (i) has accepted the plan; or (ii) will receive or retain under the plan on

---

[237] The Court has been advised that the Equity Committee's third objection regarding governance of the Wind Down Entity has been resolved by the parties.

50

account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date . . ."[238] "In a case where claims are being released under the chapter 11 plan but would be available for recovery in a chapter 7 case, the released claims must be considered as part of the analysis in deciding whether creditors fare at least as well under the chapter 11 plan as they would in a chapter 7 liquidation."[239]

The Equity Committee argues that the Plan releases claims held by the Debtors' equity security holders that would be available to them in a Chapter 7 liquidation, citing the same unsupported claims against the Released Lender Parties.[240] The Court already addressed these claims herein. More importantly, even assuming that the claims have merit, the Equity Committee has offered no credible evidence that holders of HERO Common Stock would recover greater value in a chapter 7 case than they are to receive under the Plan. The Debtors' Liquidation Analysis[241] shows that, even in the high range of estimated liquidation values, there would be no excess value to distribute to holders of HERO Common Stock.[242] Therefore, based on the record before me, I conclude that the Plan satisfies the best interests test of Bankruptcy Code section 1129(a)(7).

4.    **The Plan Satisfies the Cramdown Standard Under Section 1129(b)**

Bankruptcy Code section 1129(b)(1) provides that if a plan meets all applicable requirements of Bankruptcy Code section 1129(a) other than Bankruptcy Code section

---

[238] 11 U.S.C. § 1129(a)(7).
[239] *Wash. Mut.*, 442 B.R. at 359-360.
[240] *See* Objection 1 *supra.*
[241] Prepared by FTI Consulting, Inc. with input from the Debtors' management.
[242] Disclosure Statement, Ex. D.

1129(a)(8), the court may confirm the plan so long as it does not discriminate unfairly and is fair and equitable with respect to each class of claims and interests that is impaired and has not accepted the plan.[243] Section 1129(a)(8) of the Bankruptcy Code provides that "[t]he court shall confirm a plan only if . . . [w]ith respect to each class of claims or interests – (A) such claim has accepted the plan; or (B) such class is not impaired under the plan."[244] HERO Common Stock, which is impaired under the Plan, has voted to reject the Plan.

The Plan can be confirmed only if it complies with the requirements of Bankruptcy Code § 1129. As I noted in *Exide Technologies* and *Tribune:*

> The plan proponent bears the burden of establishing the plan's compliance with each of the requirements set forth in § 1129(a), while the objecting parties bear the burden of producing evidence to support their objections.[245] In a case such as this one, in which an impaired class does not vote to accept the plan, the plan proponent must also show that the plan meets the additional requirements of § 1129(b), including the requirements that the plan does not unfairly discriminate against dissenting classes and the treatment of the dissenting classes is fair and equitable.[246]

Bankruptcy Code section 1129(b)(2) provides that a plan is fair and equitable with respect to a class of impaired unsecured claims or interests, as applicable, if the plan provides that the holder of any claim or interest that is junior to the claims or interests of such class will not receive or retain any property under the plan on account of such junior claim or interest.[247]

---

[243] *See* 11 U.S.C. § 1129(b)(1); *see also John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 157 n.5 (3d Cir. 1993); *In re Zenith Elecs. Corp.*, 241 B.R. 92, 105 (Bankr. D. Del. 1999).

[244] 11 U.S.C § 1129(a)(8).

[245] *Matter of Genesis Health Ventures, Inc.*, 266 B.R. 591, 598–99 (Bankr. D. Del.2001); *Matter of Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 221 (Bankr. D. N.J. 2000) (citations omitted).

[246] *In re Exide Tech.*, 303 B.R. 48, 58 (Bankr. D. Del. 2003); *In re Tribune Co.*, 464 B.R. 126, 151–52 (Bankr. D. Del.), *on reconsideration,* 464 B.R. 208 (Bankr. D. Del. 2011).

[247] *See* 11 U.S.C. § 1129(b)(2)(B)(ii), (C)(ii).

The Debtors offered extensive evidence that indicates that the Plan does not provide any recovery for any Claims or Equity Interests junior to the Equity Interests in the subject classes. Additionally, the Debtors present ample evidence that no holder of a Claim in a Class senior to the subject classes is receiving more than 100% on account of its Claim. Accordingly, the Plan is fair and equitable with respect to holders of Equity Interests in the subject classes.

A plan unfairly discriminates in violation of Bankruptcy Code section 1129(b) if it provides materially different treatment for creditors and interest holders with similar legal rights without compelling justifications for doing so.[248] Here, the Debtors have shown that all similarly situated holders of HERO Common Stock, Other Equity Interests and Intercompany Interests will receive substantially similar treatment and the Plan's classification scheme rests on a legally acceptable rationale. The Debtors have also demonstrated that the Plan does not permit the First Lien Claims to be paid more than in full. In addition, as discussed herein, the Equity Committee's objections to the First Lien Claims lack merit.

Accordingly, I conclude that the Plan meets all other applicable requirements of section 1129(a), is fair and equitable, and does not discriminate unfairly with respect to holders of Claims or Equity Interests. The Equity Committee makes the blanket statement that the Plan fails to satisfy Sections 1129(a)(1), 1129(a)(2), 1129(a)(3), 1129(a)(7) and 1129(a)(5)(A)(2) of the Bankruptcy Code, however, offers no explanation beyond citing to arguments previously presented. The Equity Committee failed to create any doubt that the Debtor has met its burden to

---

[248] *See, e.g.*, *In re Coram Healthcare Corp.*, 315 B.R. 321, 349 (Bankr. D. Del. 2004) (citing cases and noting that separate classification and treatment of claims is acceptable if the separate classification is justified because such claims are essential to the debtor's reorganized business); *In re Lernout & Hauspie Speech Prods., N.V.*, 301 B.R. 651, 661 (Bankr. D. Del. 2003) (permitting different treatment of two classes of similarly situated creditors upon a determination that the debtors showed a legitimate basis for such discrimination).

demonstrate that the confirmation requirements are satisfied.   The parties are directed to confer

and submit a proposed order under certification memorializing the Court's decision.




BY THE COURT:


_____
KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

Dated: November 1, 2016